1  LATHAM & WATKINS LLP
   Alfred C. Pfeiffer, Jr. (Bar No. 120965)
2     Charles Crompton (Bar No. 138825)
   Hanno Kaiser (Bar No. 262249)
3  505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
4  Telephone: +1.415.391.0600
Facsimile: +1.415.395.8095
5  Email: al.pfeiffer@lw.com
Email: charles.crompton@lw.com
6  Email: hanno.kaiser@lw.com

7  Attorneys for Defendant
RPX CORPORATION

8

9  UNITED STATES DISTRICT COURT

10  NORTHERN DISTRICT OF CALIFORNIA

11  OAKLAND DIVISION

12  CASCADES COMPUTER INNOVATION
LLC,
13
              Plaintiff,
14
        v.
15
RPX CORPORATION, HTC
16  CORPORATION, LG ELECTRONICS,
INC., MOTOROLA MOBILITY, INC.,
17  SAMSUNG ELECTRONICS CO. LTD.,
DELL INC.,
18
           Defendants.
19

CASE NO. 12-CV-01143-YGR

**DEFENDANT RPX CORPORATION'S
NOTICE OF MOTION AND MOTION TO
DISMISS PLAINTIFF'S COMPLAINT
PURSUANT TO FEDERAL RULE OF CIVIL
PROCEDURE 12(B)(6); SUPPORTING
MEMORANDUM OF POINTS AND
AUTHORITIES**

Date:     June 19, 2012
Time:    2:00 PM
Place:    TBD

The Honorable Yvonne Gonzalez Rogers

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

SF\907432

1

RPX'S NOTICE OF MOTION AND
MOTION TO DISMISS PLAINTIFF'S COMPLAINT
CASE NO. 12-CV-01143-YGR

# TABLE OF CONTENTS

**PAGE**

STATEMENT OF THE ISSUES TO BE DECIDED ................................................................. 1

INTRODUCTION ............................................................................................................ 2

STATEMENT OF FACTS ................................................................................................ 3

    A.    Background ....................................................................................................... 3

    B.    The Parties ....................................................................................................... 4

    C.    The Present Lawsuit ......................................................................................... 4

    A.    THE ELEMENTS OF CASCADES' CLAIMS .......................................................... 6

    B.    CASCADES' ALLEGATIONS MAKE NO ECONOMIC SENSE. ..................... 8

        1.    None of the Manufacturing Defendants Would Rationally Have Urged RPX Not To Enter Into An Advantageous Cascades Transaction For Which Each Had Already Paid. ..................... 8

        2.    Cascades' Allegation That The Manufacturing Defendants Acted Contrary To Their Economic Self-Interest In Not Accepting A $5-Million License Is Implausible ........................................ 9

        3.    Purposefully Refusing To Negotiate A License For Patents That A Company Knew To Be Valid And Infringed Would Be Nonsensical ........................................................................................ 11

        4.    Cascades' Remaining Allegations Fail To Support An Antitrust Claim ....................................................................................... 12

        5.    The SEC Filing Incorporated Into The Complaint Further Contradicts Cascades' Claims ........................................................ 13

    C.    THE COMPLAINT SHOULD BE DISMISSED BECAUSE CASCADES FAILS TO ALLEGE ANTITRUST INJURY. ............................. 15

    D.    CASCADES FAILS TO ALLEGE A RELEVANT ANTITRUST MARKET .......................................................................................................... 17

        1.    Market Definition In Antitrust Cases ........................................................ 17

        2.    Cascades' Patented "Technology" As The Relevant Market ................. 18

        3.    Android Devices As The Relevant Market ............................................. 20

LATHAM&WATKINS LLP   SF\907432
ATTORNEYS AT LAW
SAN FRANCISCO

i

RPX'S NOTICE OF MOTION AND
MOTION TO DISMISS PLAINTIFF'S COMPLAINT
CASE NO. 12-CV-01143-YGR

# TABLE OF AUTHORITIES

## CASES

*Allied Orthopedic Appliances, Inc. v. Tyco Health Care Grp. LP*,
   592 F.3d 991 (9th Cir. 2010) ............................................................................... 17

*Am. Ad Mgmt, Inc. v. Gen. Telephone Co. of Cal.*,
   190 F.3d 1051 (9th Cir. 1999) ............................................................................. 16

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................................... 5

*Atl. Richfield Co. v. USA Petroleum Co.*,
   495 U.S. 328 (1990) ............................................................................................... 6

*Ball Mem'l Hosp. v. Mut. Hosp. Ins.*,
   784 F.2d 1325 (7th Cir. 1986) ............................................................................. 15

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................... 5

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
   182 F.3d 1096 (9th Cir. 1999) ............................................................................. 18

*Blue Cross & Blue Shield United v. Marshfield Clinic*,
   65 F.3d 1406 (7th Cir. 1995) ............................................................................... 19

*Broadcast Music v. Columbia Broadcasting Sys.*,
   441 U.S. 1 (1979) ................................................................................................... 6

*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962) ............................................................................................. 19

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977) ............................................................................................... 6

*Calnetics Corp. v. Volkswagen of Am.*,
   532 F.2d 674 (9th Cir. 1976) ............................................................................... 19

*Cargill, Inc. v. Monfort of Colo., Inc.*,
   479 U.S. 104 (1986) ............................................................................................... 7

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Telephone Co.*,
   20 Cal. 4th 163 (1999) ........................................................................................... 7

*Church & Dwight Co. v. Mayer Labs, Inc.*,
   No. 10-CV-4429, 2012 U.S. Dist. LEXIS 51770 (N.D. Cal. Mar. 1, 2012) ........................ 15

*Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.*,
   611 F.3d 495 (9th Cir. 2008) ................................................................................. 6

*Cont'l T.V., Inc. v. GTE Sylvania, Inc.*,
   433 U.S. 36 (1977) ............................................................................................... 17

LATHAM&WATKINS LLP   SF\907432
ATTORNEYS AT LAW
SAN FRANCISCO
                              ii
                                                    RPX'S NOTICE OF MOTION AND
                                       MOTION TO DISMISS PLAINTIFF'S COMPLAINT
                                                     CASE NO. 12-CV-01143-YGR

*Dial A Car v. Transportation, Inc.*,
  82 F.3d 484 (D.C. Cir. 1996) ........................................................................ 15

*Epicenter Recognition, Inc., v. Jostens, Inc.*,
  81 Fed. App'x. 910 (9th Cir. 2003) ............................................................... 20

*Golden Gate Pharm. Servs., Inc. v. Pfizer, Inc.*,
  433 Fed. App'x 598 (9th Cir. May 19, 2011) ................................................ 19

*Handgards, Inc. v. Ethicon, Inc.*,
  743 F.2d 1282 (9th Cir. 1984) ...................................................................... 15

*Illinois Tool Works, Inc. v. Independent Ink, Inc.*,
  547 U.S. 28 (2006) ........................................................................................ 18

*In re Elevator Antitrust Litig.*,
  502 F.3d 47 (2d Cir. 2007) ............................................................................ 18

*In re Seagate Tech., LLC*,
  497 F.3d 1360 (Fed. Cir. 2007) ..................................................................... 12

*Indeck Energy Servs. v. Consumers Energy Co.*,
  250 F.3d 972 (6th Cir. 2001) ......................................................................... 16

*J&L Elecs. v. Elecs. For Imaging*,
  No. 01-CV-4853, 2005 WL 1661958 (N.D. Cal. July 14, 2005)................... 18

*James Cape & Sons Co. v. PCC Constr. Co.*,
  453 F.3d 396 (7th Cir. 2006) ......................................................................... 16

*Kendall v. Visa U.S.A., Inc.*,
  518 F.3d 1042 (9th Cir. 2008) ...................................................................... 13

*Kwikset Corp. v. Superior Court*,
  51 Cal. 4th 310 (2011) .................................................................................... 7

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ........................................................................................ 6

*McGlinchy v. Shell Chem. Co.*,
  845 F.2d 802 (9th Cir. 1988 .......................................................................... 20

*Midwest Gas Servs. v. Indiana Gas Co.*,
  317 F.3d 703 (7th Cir. 2003) ........................................................................ 15

*Minks v. Polaris Indus.*,
  546 F.3d 1364 (Fed. Cir. 2008)...................................................................... 12

*Nat'l Soc. of Prof'l Engineers v. United States*,
  435 U.S. 679 (1978)......................................................................................... 7

*Newcal Indus. v. Ikon Office Solution*,
  513 F.3d 1038 (9th Cir. 2008) ...................................................................... 19

*Oltz v. St. Peter's Cmty. Hosp.*,
  861 F.2d 1440 (9th Cir. 1988) ...................................................................... 18

*Person v. Google, Inc.*,
    No. 06-CV-7297, 2007 U.S. Dist. LEXIS 47920 (N.D. Cal. June 25, 2007) ...................... 18

*Pfizer v. Teva*,
    518 F.3d 1353 (Fed. Cir. 2008) .................................................................. 19

*PNY Techs., Inc., v. SanDisk Corp.*,
    No. 11-CV-4689, 2102 U.S. Dist. LEXIS 55965 (N.D. Cal. Apr. 20, 2012) ........................ 6

*Rebel Oil Co. v. Atlantic Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1993) ...................................................................... 20

*Reiter v. Sonotone Corp.*,
    442 U.S. 330 (1979) ............................................................................... 15

*Rutman Wine Co. v. E & J Gallo Winery*,
    829 F.2d 729 (9th Cir. 1987) ...................................................................... 15

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993) ................................................................................ 7

*Sprewell v. Golden State Warriors*,
    266 F.3d 979 (9th Cir. 2001) ...................................................................... 13

*Sun Microsystems, Inc. v. Hynix Semiconductor, Inc.*,
    608 F. Supp. 2d 1166 (N.D. Cal. 2009) ........................................................... 12

*Tanaka v. Univ. of S. Cal.*,
    252 F.3d 1059 (9th Cir. 2001) .................................................................... 18

*Theme Promotions, Inc. v. News AM. Mktg. FSI*,
    546 F.3d 991 (9th Cir. 2008) ..................................................................... 18

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ...................................................................... 18

*TYR Sport, Inc. v. Warnaco Swimwear, Inc.*,
    709 F. Supp. 2d 802 (C.D. Cal. 2010) ............................................................ 12

*United States v. E.I. duPont de Nemours & Co.*,
    351 U.S. 377 (1956) ............................................................................... 17

*United States v. Grinnell Corp*,
    384 U.S. 563 (1966) ................................................................................ 7

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ..................................................................... 15

*William O. Giley Enters. v. Atl. Richfield Co.*,
    588 F.3d 659 (9th Cir. 2009) ...................................................................... 6

LATHAM&WATKINS LLP   SF\907432
ATTORNEYS AT LAW
SAN FRANCISCO

iv

RPX'S NOTICE OF MOTION AND
MOTION TO DISMISS PLAINTIFF'S COMPLAINT
CASE NO. 12-CV-01143-YGR

1

**STATUTES**

2    15 U.S.C. § 1 ........................................................................................................ 6

3    15 U.S.C. § 2 ........................................................................................................ 7

4    California Business & Professions Code § 17200 ................................................ 7

     California Business & Professions Code. §16720 ............................................... 7

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

SF\907432

v

RPX'S NOTICE OF MOTION AND
MOTION TO DISMISS PLAINTIFF'S COMPLAINT
CASE NO. 12-CV-01143-YGR

1

## <u>NOTICE OF MOTION AND MOTION TO DISMISS</u>

2  PLEASE TAKE NOTICE that on June 19, 2012, at 2:00 p.m., or as soon thereafter as the

3  matter may be heard, in the United States District Court, Northern District of California, at 1301

4  Clay Street, Oakland City Center, Oakland, CA 94612, before the Honorable Yvonne G. Rogers,

5  Defendant RPX Corporation will, and hereby does, move the Court for an order dismissing

6  Plaintiffs' Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil

7  Procedure. This motion is based on the Notice of Motion and Motion, the accompanying

8  Memorandum of Points and Authorities, the Request for Judicial Notice and the accompanying

9  Exhibits, the Proposed Order, the pleadings on file in this action, and upon such other matters

10  presented to the Court at the time of the hearing.

11

## <u>RELIEF SOUGHT</u>

12  Defendant RPX Corporation seeks dismissal of each claim asserted in plaintiff's

13  Complaint, pursuant to Federal Rule of Civil Procedure12(b)(6).

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
SF\907432
1
RPX'S NOTICE OF MOTION AND
MOTION TO DISMISS PLAINTIFF'S COMPLAINT
CASE NO. 12-CV-01143-YGR

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

### STATEMENT OF THE ISSUES TO BE DECIDED

3    1.    Whether Cascades' group-boycott theory makes economic sense, when the

4  Complaint's allegations (and the incorporated SEC filing) demonstrate that the RPX members

5  that allegedly refused to fund a licensing transaction between RPX and Cascades for the Elbrus

6  patents had already paid for, and would have directly benefitted from, RPX's acquiring a license

7  to the Elbrus patents.

8    2.    Whether Cascades has failed to allege antitrust injury, and thus lacks standing,

9  when it neither averred any harm to consumers nor alleged that RPX's supposed actions, even if

10  true, caused any injury to Cascades recognized under antitrust law.

11    3.    Whether Cascades has failed to allege a relevant antitrust market—and thus

12  cannot maintain its rule-of-reason claims—in referring, in conclusory fashion, to three

13  inconsistent markets and focusing on an implausible "market or submarket for the licensing by

14  Cascades of its patented technology," without pleading facts pertaining to several requirements

15  for market definition: reasonable interchangeability between substitutes, supply-side substitution,

16  cross-price elasticity of demand, or barriers to entry.

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

SF\907432

1

RPX'S NOTICE OF MOTION AND
MOTION TO DISMISS PLAINTIFF'S COMPLAINT
CASE NO. 12-CV-01143-YGR

**INTRODUCTION**

The plaintiff in this case, Cascades, tried to sell licenses to what it calls "the Elbrus patents." First, Cascades negotiated with RPX "for a high seven-figure payment," but no deal was struck. Then, Cascades approached a number of smartphone manufacturers. Two of them offered "less than $100,000." Cascades turned them down. Cascades then offered a license for $5-million apiece to another group of manufacturers. Cascades received no response.

Cascades now alleges that the reason it could not get what it thinks the Elbrus patents are worth in the marketplace is the result of a vast conspiracy among potential licensees. That is, of course, entirely implausible, because there is a much-simpler explanation: $5 million is too much for the individual licenses Cascades is offering. If a person wants to sell her house for $5 million and cannot find a buyer, it is extremely unlikely that the reason is a vast conspiracy among potential buyers. It's far more likely that people—*independently*—are not buying because the price is too high. With this lawsuit (and a slew of patent-infringement lawsuits against RPX's co-Defendants), Cascades seeks to get via litigation what it cannot get in the marketplace. The Court should dismiss the defective Complaint.

Cascades' claims fail for three independent reasons:

*First*, because RPX's members had already paid their full subscription fees, the allegation that those members conspired to get RPX to terminate negotiations with Cascades makes absolutely no sense. Had RPX entered into a transaction with Cascades, its members would have obtained licenses—at no extra cost—to patents that many of them had been accused of (and in some instances sued by Cascades for allegedly) infringing. Cascades' allegation that these companies would forego a pre-paid benefit in favor of a costly alternative is implausible. It is akin to saying that an insured would urge his insurer not to pay for a covered, costly event.

*Second*, Cascades lacks standing to sue because the Complaint does not allege antitrust injury. There is no allegation that, as a result of the alleged conduct, consumers paid higher prices or were denied access to a product incorporating a relevant technology.

*Third*, Cascades' antitrust claims fail under the rule of reason because the Complaint does not allege a relevant antitrust market. Cascades provides only a conclusory and implausible

LATHAM&WATKINS⊔₽   SF\907432
ATTORNEYS AT LAW
SAN FRANCISCO                                                2

RPX'S NOTICE OF MOTION AND
MOTION TO DISMISS PLAINTIFF'S COMPLAINT
CASE NO. 12-CV-01143-YGR

1   allegation that the '750 patent and other patents and patented technology allegedly controlled by

2   Cascades somehow constitute a single relevant market, to the implicit (but never-explained)

3   exclusion of all competing products. (Compl., ¶ 35.) Such conclusory market-definition

4   allegations are insufficient as a matter of law in rule-of-reason cases like this one. The Complaint

5   alleges no facts concerning reasonable interchangeability among substitute technologies, supply-

6   side substitution, cross-price elasticity of demand, or barriers to entry. The absence of a relevant

7   market dooms Cascades' rule-of-reason claims and further reveals a lack of antitrust injury and

8   hence no standing for all of Cascades' antitrust claims.

9   **STATEMENT OF FACTS**

10  **A.    Background**

11       This case arises out Cascades' failed attempt to obtain its desired fees for licenses to

12  patents that are allegedly relevant to the operation of Android smart phones and their

13  manufacturers. (Compl., ¶ 13.)

14       Cascades is a "patent-assertion entity" ("PAE"). (*Id.* at ¶¶ 15-16). PAEs, which are

15  sometimes referred to as "patent trolls," are patent-holding entities that neither build products nor

16  license technology to manufacturers *ex ante*, but instead acquire patents or patent rights and then

17  enforce their portfolios against manufacturers that invent and produce goods. (FED. TRADE

18  COMM'N, THE EVOLVING IP MARKETPLACE: ALIGNING PATENT NOTICE AND REMEDIES WITH

19  COMPETITION 60 (2011), RJN Ex. A ("FTC REPORT").) As the Federal Trade Commission

20  ("FTC") has observed, "nearly one-third of IT licensing executives [have] reported that 'trolls'

21  [have] had a significant impact on their organization." (*Id.* at 61.) [1]

22       The FTC report explained that defensive buying funds, which acquire patents on behalf

23  of information-technology ("IT") companies that have been targeted by patent trolls, have

24  emerged in response to the harm that PAEs are exacting on manufacturers in the IT industry.

25  (FTC Report, RJN Ex. A, at 66-67.) The FTC observed that these defensive "purchases take

26

27  [1] As RPX's accompanying Request for Judicial Notice explains, the Court can take judicial notice of the FTC Report for the purpose of ruling on this motion to dismiss.

28

patents 'off the street' by preventing a PAE from acquiring and asserting the patents against members." (*Id.* at 66.) The FTC correctly identified RPX as a defensive buying fund. (*Id.* at 67.) Cascades aptly describes RPX as an "anti-troll." (Compl., pp. 6-7.)

### B.     The Parties

Plaintiff Cascades is an Illinois limited-liability company that has allegedly acquired valid rights to a portfolio of 38 patents (the "Elbrus patents" or "Cascades patents"). (Compl., ¶ 1.) Cascades acknowledges that it has been labeled a patent troll and that it is a non-manufacturing entity. (*Id.* at ¶ 16.)

Defendant RPX is a defensive patent aggregator that seeks to protect its member-clients from the patent-infringement suits that PAEs regularly launch against them. (Compl., ¶¶ 17, 20.) RPX operates by acquiring patents or patent rights that PAEs might otherwise assert against its clients and then licensing those patents to its members. (*Id.*; FTC REPORT, RJN Ex. A, at 67.) Unlike Cascades, RPX has publicly committed never to sue anyone for patent infringement. (RPX Jan. 21, 2011 SEC S-1 form, RJN Ex. B, at 58 ("We have not asserted and will not assert our patents."[2]).)

Defendants HTC Corporation ("HTC"), LG Electronics, Inc. ("LG"), Motorola Mobility, Inc. ("Motorola"), Samsung Electronics Co. ("Samsung"), and Dell, Inc. ("Dell")—"the Manufacturing Defendants"—are IT companies that do, or did, manufacture a wide variety of products, including Android devices. (Compl., ¶ 13.) All of the Manufacturing Defendants are RPX members. According to the Complaint, HTC, Motorola, Samsung, LG, and Dell respectively possess 41%, 35%, 17%, 4%, and less than 4% of the "Android market in the United States." (*Id.*) Cascades has sued all of the Manufacturing Defendants for alleged patent infringement in the Northern District of Illinois. (Ill. Compls., RJN Ex. C.)

### C.     The Present Lawsuit

Cascades initiated the present lawsuit on March 7, 2012, alleging that RPX conspired with its co-Defendant members in violation of U.S. antitrust and California state laws. (R. 1.[3])

---

[2] As explained below, Cascades has incorporated RPX's S-1 SEC filing into the Complaint.

[3] "R. #" refers to the #th entry in this Court's docket in the present case.

1   According to Cascades, the purpose of Defendants' alleged conspiracy was to force Cascades

2   either to reduce the royalty that it demanded for licensing its intellectual property or to abandon

3   its licensing efforts.[4] (Compl., ¶ 31.) Cascades concludes that the supposed conspiracy must

4   explain why RPX and the Manufacturing Defendants did not acquire a license to the Elbrus

5   patents. (*Id.*)

6        Cascades asserts that RPX contacted Cascades in 2010, making "a substantial offer on

7   behalf of its members" for Cascades' patent portfolio. (Compl., ¶ 19.) According to Cascades, its

8   negotiations with RPX "would have resulted in a high seven-figure payment to Cascades for a

9   fully paid-up license." (*Id.* at ¶ 27.) Cascades alleges that "the Manufacturing Defendants were

10  required to contribute to the settlement" that RPX was negotiating with Cascades, but that "RPX

11  terminated negotiations with Cascades and withdraw [*sic*] its offer because one or more of its

12  members allegedly would not fund the license deal." (*Id.* at ¶¶ 27, 28.)

13              **LEGAL STANDARD GOVERNING THIS MOTION TO DISMISS**

14       To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient

15  factual allegations to demonstrate a right to relief going beyond the speculative level. *Bell Atl.*

16  *Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Formulaic, conclusory, or implausible allegations

17  fail to satisfy this standard because they fail to *show* that the law entitles the plaintiff to relief.

18  *Ashcroft v. Iqbal*, 556 U.S. 662, 679, *passim* (2009).

19       Antitrust-conspiracy allegations must "raise a reasonable expectation that discovery will

20  reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556. The Supreme Court has

21  observed that "it is one thing to be cautious before dismissing an antitrust complaint in advance

22  of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive."

23  *Id.* at 558. In determining whether a claim is plausible, the Supreme Court has called on "the

24  reviewing court to draw on its experience and common sense." *Iqbal*, 556 U.S. at 679.

25

26

27  [4] RPX disputes the Complaint's allegations, most of which are baseless and unsupported. For the
    purpose of its accompanying Motion to Dismiss, however, RPX accepts the well-pleaded

28  allegations as true insofar as material that the Complaint incorporates by reference does not
    contradict them.

1     In determining the plausibility of alleged antitrust violations, courts should consider

2  whether the alleged facts are consistent with economic theory. *See, e.g.*, *Matsushita Elec. Indus.*

3  *Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (allegations that do not make economic

4  sense are implausible); *William O. Giley Enters. v. Atl. Richfield Co.*, 588 F.3d 659, 662 (9th Cir.

5  2009) ("On a motion to dismiss in an antitrust case, a court must determine whether an antitrust

6  claim is 'plausible' in light of basic economic principles"); *Coalition for ICANN Transparency,*

7  *Inc. v. VeriSign, Inc.*, 611 F.3d 495, 501 (9th Cir. 2008) (same); *PNY Techs., Inc., v. SanDisk*

8  *Corp.*, No. 11-CV-4689, 2102 U.S. Dist. LEXIS 55965, at *11 (N.D. Cal. Apr. 20, 2012) ("If the

9  allegations in the complaint fail to give rise to a plausible claim for relief, this basic deficiency

10  should . . . be exposed at the point of minimum expenditure of time and money by the parties and

11  the court.").

12                    **CASCADES FAILS TO STATE A CLAIM**

13         **A.      THE ELEMENTS OF CASCADES' CLAIMS**

14     Cascades alleges that RPX and the Manufacturing Defendants conspired not to obtain a

15  license to Cascades' patents in violation of Sections 1 and 2 of the Sherman Act. (Compl., ¶¶ 33-

16  59.) Cascades also brings state-law claims based on the same allegations under the Cartwright

17  Act and the California Unfair Competition Law. (*Id.* at ¶¶ 60-66.)

18     Cascades asserts both *per se* and rule-of-reason claims under Section 1 of the Sherman

19  Act, which prohibits agreements that unreasonably restrain competition. 15 U.S.C. § 1. To

20  succeed on a *per se* claim, a plaintiff must establish that the defendant entered into an agreement

21  amounting to a hardcore offense, such as naked horizontal price-fixing or market-sharing, and

22  that the plaintiff has suffered "antitrust injury" as a result. *Broadcast Music v. Columbia*

23  *Broadcasting Sys.*, 441 U.S. 1, 8 (1979). Antitrust injury is harm to plaintiff of a kind against

24  which the antitrust laws were meant to protect. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,

25  429 U.S. 477, 489 (1977); *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 341-42

26  (1990). Under the rule of reason, a plaintiff must prove that the challenged agreement, by virtue

27  of defendants' market power, was unreasonably restrictive of competition in a relevant market

28

LATHAM&WATKINS LLP  SF\907432
ATTORNEYS AT LAW
SAN FRANCISCO

6

RPX'S NOTICE OF MOTION AND
MOTION TO DISMISS PLAINTIFF'S COMPLAINT
CASE NO. 12-CV-01143-YGR

1  and that the plaintiff suffered antitrust injury. *Nat'l Soc. of Prof'l Engineers v. United States*, 435

2  U.S. 679, 690 (1978).

3  Section 2 of the Sherman Act prohibits unilateral behavior amounting to actual or

4  attempted monopolization. 15 U.S.C. § 2. To demonstrate actual monopolization, a plaintiff must

5  prove that the defendant possesses monopoly power in a relevant market, willfully acquired or

6  maintained that power, and did not achieve that power by selling superior products, through

7  business acumen, or by historic accident. *United States v. Grinnell Corp*, 384 U.S. 563, 570-71

8  (1966). To prove attempted monopolization, a plaintiff must establish that a defendant (1)

9  possessing market power (2) engaged in predatory conduct with (3) specific intent to monopolize

10  and (4) that the exclusionary conduct carried a dangerous probability of success. *See Spectrum

11  Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993). Antitrust injury is a requisite of standing to bring

12  an action for a violation of Section 2. *See Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104

13  (1986); *Brunswick*, 429 U.S. at 489.

14  California's Cartwright Act does not reach unilateral conduct. Much like Section 1 of the

15  Sherman Act, it prohibits concerted agreements among competitors to create or to carry out

16  restrictions in trade or commerce, to fix prices, or to allocate customers or markets. Cal. Bus. &

17  Prof. Code. §16720.

18  The California Unfair Competition Law ("the UCL") prohibits "any unlawful, unfair or

19  fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Standing under the UCL is

20  limited to a person who "has suffered injury in fact and has lost money or property as a result of

21  unfair competition." *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 320-21 (2011). The UCL

22  "does not proscribe specific practices." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular

23  Telephone Co.*, 20 Cal. 4th 163, 180 (1999). Instead, the UCL prohibits "anything that can

24  properly be called a business practice and that at the same time is forbidden by law." *Id*. By

25  proscribing any unlawful business practice, "section 17200 borrows violations of other laws and

26  treats them as unlawful practices that the unfair competition law makes independently

27  actionable." *Id*. (internal quotations omitted).

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

SF\907432

7

RPX'S NOTICE OF MOTION AND
MOTION TO DISMISS PLAINTIFF'S COMPLAINT
CASE NO. 12-CV-01143-YGR

**B.     CASCADES' ALLEGATIONS MAKE NO ECONOMIC SENSE.**

>     1.     **None of the Manufacturing Defendants Would Rationally Have Urged RPX Not To Enter Into An Advantageous Cascades Transaction For Which Each Had Already Paid.**

Cascades describes RPX as "a patent aggregator that acquires patents for its members (now in excess of 110), each of whom is granted a license in exchange for a payment ranging from $60,000 to $6,000,000." (Compl., ¶ 2.) "Funding is provided by members and each can renew its membership periodically by paying additional monies to RPX." (*Id.* at ¶ 20.) In other words, RPX collects subscription fees from its members and then, using the accumulated fees, seeks to acquire patents or patent license rights from PAEs and others for the benefit of its members. Cascades' description of RPX's business model is important, because it entirely undercuts the alleged "group boycott and concerted refusal to deal" theory, on which Cascades bases its antitrust claims. (*Id.* at ¶ 12.)

"Initially," Cascades alleges, "RPX negotiated with Cascades to acquire license rights under all of the Cascades patents for its 100-plus members (including each of the other defendants)." (Compl., ¶ 27.) Then, "RPX terminated negotiations with Cascades and withdraw [*sic*] its offer because one or more of its members allegedly would not fund the license deal." (*Id.* at ¶ 28.) RPX's withdrawal, Cascades alleges, was not the result of RPX's unilateral business decision. Rather, Cascades alleges that RPX "withdrew its offer when its members agreed to boycott Cascades." (*Id.* at ¶ 37.) The goal of the boycott, Cascades informs us, was to "forc[e] license prices below a competitive level." (*Id.* at ¶ 38.)

*But why?*

Why would any member keep RPX from completing a transaction with Cascades that would have given the member (and all other RPX members) a license to Cascades' patents and ended the ongoing patent litigations *at no extra cost?* Specifically, why would HTC, LG, Motorola, Samsung, or Dell stop RPX from acquiring a license to the Elbrus patents, given that each of them had already paid its annual membership-subscription fees to RPX "ranging from $60,000 to $6,000,000?" Any license deal between RPX and Cascades *at any price* would have directly benefitted each Manufacturing Defendant. It would have ended the patent-infringement

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

SF\907432

8

RPX'S NOTICE OF MOTION AND
MOTION TO DISMISS PLAINTIFF'S COMPLAINT
CASE NO. 12-CV-01143-YGR

1   lawsuits that Cascades has brought against them. It would have given them a license to the

2   Elbrus patents, which Cascades claims they have been infringing, all at no incremental costs to

3   the Manufacturing Defendants. It simply makes no economic sense to claim that "some

4   defendants acting through RPX initially supported the idea of accepting a license, that support

5   eroded and the defendants then joined forces and effectively agreed not to accept a license at any

6   price." (Compl., ¶ 47.) Cascades' theory is akin to suggesting that a health-insurance subscriber

7   would encourage her insurer *not* to pay a medical provider's bill. Having already paid her

8   insurance, she would have no rational incentive to do so.

9          A complaint must plead sufficient facts to demonstrate a plausible right to relief in order

10  to survive a motion to dismiss. *Twombly*, 550 U.S. at 570. Allegations of business actions that

11  make no economic sense, however, are not plausible. *Matsushita*, 475 U.S. at 587. The

12  Complaint demonstrates that RPX members had already paid in full for a potential Cascades deal

13  through their subscription fees. They had every incentive to urge RPX to obtain a license from

14  Cascades, at any cost. It is therefore wholly incredible that Defendants would conspire to

15  suppress the royalty rate for a license to Cascades' patent portfolio. Because Cascades'

16  allegations as to the fact and nature of the conspiracy make absolutely no sense, the Complaint

17  fails to state a claim under *Twombly* and its progeny. The Court should therefore dismiss the

18  Complaint pursuant to Rule 12(b)(6).

19                    2.   **Cascades' Allegation That The Manufacturing Defendants Acted**
                          **Contrary To Their Economic Self-Interest In Not Accepting A $5-**
20                        **Million License Is Implausible.**

21         After negotiations for a collective license failed, and after initiating their patent-

22  infringement lawsuits, Cascades offered each of HTC, Motorola, Samsung, and LG an individual

23  license for an identical lump-sum royalty payment of $5 million, conceivably offset in part by

24  participation in potential royalties collected from other possible licensees, if any. (Compl., ¶ 30.)

25  Cascades alleges that each of these companies acted contrary to its economic interest in not

26  accepting this license offer. (*Id.*) Beyond the facial implausibility of the claim that the *only*

27  rational choice was to pay Cascades' license demand, other factual allegations in the Complaint

28  also render implausible Cascades' assertion that the $5-million license offer for *each*

1   Manufacturing Defendant was so attractive that refusing it was contrary to economic interest.

2   First, the Complaint alleges that the negotiations between Cascades and RPX had

3   contemplated a high seven-figure license payment (e.g., $9 million) to Cascades to cover all of

4   RPX's 110 members. (Compl., ¶¶ 27, 19.) Yet, if $9 million would have covered a good-faith

5   acquisition for *all* 110 members, it makes no sense to say that charging $5 million to *each* of at

6   least three of the four Manufacturing Defendants was such an astounding value that none of them

7   could rationally decline.

8   Second, Cascades' allegation necessarily implies that accepting the $5-million offer

9   would have been unequivocally superior to any other course of action for each of the

10  Manufacturing Defendants. In other words, rejecting the offer made HTC, Motorola, Samsung,

11  and LG worse off. But Cascades fails to make any factual assertions backing up this conclusory

12  allegation. The most immediate alternative explanation for why the Manufacturing Defendants

13  declined Cascades' offer is that the price was too high. In fact, the Complaint alleges a

14  benchmark that strongly suggests that the $5-million price tag was excessive, as Dell and

15  Pantech Wireless previously and independently offered less than $100,000 for the same

16  portfolio. (Compl., ¶ 36.) Of course, Cascades says that it "believes" that these offers were in

17  "bad faith," (*id*.) but saying so is not enough. Cascades has alleged no facts to support a claim of

18  bad faith. The only thing properly averred here is that there were two offers for less than

19  $100,000.

20  Third, Cascades cannot argue that "the right to recover up to all of the payment based on

21  25% of the licensing revenues that Cascades received from any other infringer" (Compl., ¶ 30)

22  changes the calculus, because it does not. Pursuant to Cascades' scheme, only the first mover

23  gets to enjoy a "rebate." (*Id*.) The rebate to the first mover is contingent upon subsequent

24  Manufacturing Defendants' (or others') accepting a $5-million offer. Those subsequent offers are

25  not eligible for any rebate. (*Id*.) Therefore, if the first mover considers $5 million (minus a

26  potential rebate) excessive, it cannot rationally expect others to accept a $5 million rebate-

27  ineligible offer. Thus, the first mover would not see any value in the rebate scheme, and would

28  calculate its costs based on the full $5 million. So, of course, would any subsequent licensee.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

SF\907432

10

RPX'S NOTICE OF MOTION AND
MOTION TO DISMISS PLAINTIFF'S COMPLAINT
CASE NO. 12-CV-01143-YGR

Finally, the Complaint alleges that HTC, Motorola, Samsung, and LG have very different market shares of Android devices. (Compl., ¶ 13.) Logically, then, each could rationally conclude that it would derive different total (as opposed to per-sold-device) values than the others from a license to the Elbrus patents. The only benchmark alleged in the Complaint is Dell's offer of "less than $100,000." (*Id*. at ¶ 36.) Given that Dell has "a market share below 4%," (*id.* at ¶ 13.) a less-than-$100,000 offer implies a price for the Elbrus patents of $25,000 per market-share percentage point. It makes eminent sense therefore that no Manufacturing Defendant would accept a $5-million demand. In other words, based on the allegations in the Complaint, *none* of the Manufacturing Defendants had an independent incentive to pay what Cascades demanded. Cascades' allegation that it was contrary to the economic interest of every one of them to refuse the same offer (*id.* at ¶ 30) therefore makes no sense.

Construed collectively, these allegations render implausible Cascades' claim that $5 million was so enticing an offer that it was contrary to the Manufacturing Defendants' economic interests to turn it down. Indeed, the only plausible factual inference is that this price was too high to warrant an individual license. In other words, there was no coordinated boycott or refusal to deal—just a series of individual refusals to pay as much as Cascades demanded.

### 3. Purposefully Refusing To Negotiate A License For Patents That A Company Knew To Be Valid And Infringed Would Be Nonsensical.

Cascades avers that RPX recognizes "the validity and value of the Cascades patents" and that "each of the Manufacturing Defendants . . . have [*sic*] openly and notoriously infringed the '750 patent (and other Cascades patents)[.]" (Compl., ¶¶ 27, 37.) These allegations are implausible.

If the Manufacturing Defendants knew the patents to be valid and infringed, it would make no economic sense for them purposefully to decline to negotiate a license when the prospective licensor has the demonstrated ability to enforce its patent portfolio in court. (Compl., ¶¶ 17, 47.) Each Manufacturing Defendant's allegedly deliberate decision to perpetuate its infringing activities while refusing to countenance a license would result in its having to pay attorneys' fees under 35 U.S.C. Section 285 and treble damages under 25 U.S.C. Section 284 for

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

SF\907432

11

RPX'S NOTICE OF MOTION AND
MOTION TO DISMISS PLAINTIFF'S COMPLAINT
CASE NO. 12-CV-01143-YGR

willful infringement. *See In re Seagate Tech., LLC*, 497 F.3d 1360, 1370-71 (Fed. Cir. 2007); *Minks v. Polaris Indus.*, 546 F.3d 1364, 1375 (Fed. Cir. 2008). Such actions would not merely be contrary to the Manufacturing Defendants' private economic interest—as Cascades alleges (Compl., ¶ 30)—they would be equally antithetical to their collective economic interest.

As the alleged conspiracy not to negotiate a license imputes conduct to Defendants that is economically irrational, the Complaint's central allegation is implausible. *Matsushita*, 475 U.S. at 587 (holding that alleged business conduct making no economic sense is not plausible).

4.  **Cascades' Remaining Allegations Fail To Support An Antitrust Claim.**

Cascades' second essential allegation—that RPX agreed with the Manufacturing Defendants that none of the Manufacturing Defendants would separately negotiate a license (Compl., ¶ 28)—is merely a conclusory assertion, contradicted by the admission in Paragraph 20 of the Complaint that RPX's membership agreements permit members to enter into their own deals, and the admission in Paragraph 36 that Dell *et al*. attempted to do so.

All that remains is a series of conclusory and self-contradictory assertions that RPX "encourages others not to accept licenses under patents owned by NPEs" and, with its members, "conspire[s] to accept, reject or negotiate licenses with NPEs." (Compl., ¶¶ 32, 30.) These allegations cannot sustain Cascades' antitrust claim. First, even if it were true that RPX encouraged its members not to deal with Cascades, mere encouragement would fall far short of the actual agreement that is a prerequisite of a violation of the Sherman Act, Section 1. *See Sun Microsystems, Inc. v. Hynix Semiconductor, Inc*., 608 F. Supp. 2d 1166, 1191 (N.D. Cal. 2009) ("In order to establish a section 1 violation, a plaintiff must prove . . . the existence of an agreement or conspiracy among two or more separate entities"); *TYR Sport, Inc. v. Warnaco Swimwear, Inc*., 709 F. Supp. 2d 802, 815-16 (C.D. Cal. 2010) ("[I]n an antitrust conspiracy case, one cannot reasonably infer a combination or conspiracy solely from conduct that is consistent with independent action, without additional evidence of an actual agreement."). The allegation that RPX conspired with members to "accept" or to "negotiate" licenses is directly at odds with Cascades' antitrust claims here; it appears to amount to nothing more than a

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

SF\907432

12

RPX'S NOTICE OF MOTION AND
MOTION TO DISMISS PLAINTIFF'S COMPLAINT
CASE NO. 12-CV-01143-YGR

1  conclusory complaint about RPX's general business model that does not meet the pleading

2  requirements of *Twombly*.

3         There is, therefore, no basis for a well-pleaded antitrust or asserted state-law claim

4  against RPX, and so the Complaint fails to meet the pleading requirements of Federal Rule of

5  Civil Procedure 8(a) and should be dismissed in its entirety. *See Kendall v. Visa U.S.A., Inc.*, 518

6  F.3d 1042, 1049 (9th Cir. 2008) ("Allegations of facts that could just as easily suggest rational,

7  legal business behavior by the defendants as they could suggest an illegal conspiracy are

8  insufficient to plead a violation of the antitrust laws.").

9       5.      **The SEC Filing Incorporated Into The Complaint Further**
10              **Contradicts Cascades' Claims.**

11        In addition to the internal inconsistences of the Complaint discussed above, Cascades has

12  pleaded itself out of court by incorporating RPX's January 21, 2011 Form S-1 filing with the

13  SEC ("the SEC filing" or "S-1 form"). As RPX's accompanying Request for Judicial Notice

14  explains, Ninth Circuit law makes clear that the Court may take judicial notice of the SEC filing.

15  This because Cascades relies upon, and quotes from, that filing in the Complaint. (Compl., ¶ 24.)

16  Furthermore, the Court need not accept as true any allegations in the Complaint that the

17  incorporated SEC filing contradicts. *See, e.g., Sprewell v. Golden State Warriors*, 266 F.3d 979,

18  988 (9th Cir. 2001).

19        The SEC filing, like the relevant provisions of the Complaint outlined above, directly

20  contradicts Cascades' allegations that "the [M]anufacturing [D]efendants were required to

21  contribute to the settlement" and that "one or more of [RPX's] members" refused to fund the

22  relevant deal. (Compl., ¶¶ 27-28.) The SEC filing establishes that RPX "generate[s] revenue

23  from subscription fees that are based on [its] published fee schedule rather than the value of the

24  patent assets [it] acquire[s]." (S-1 form, RJN Ex. B, at 59.) Furthermore, RPX "generate[s]

25  substantially all of [its] revenue from subscription fees from [its] clients." (*Id.* at 4.) RPX has

26  "derived substantially all of [its] revenue from the sale of memberships . . . and . . . expect[s] this

27  will continue for the foreseeable future." (*Id.* at 10.) Once companies become RPX members,

28  they "are able to renew their memberships perpetually under the fee schedule in effect at the time

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO   SF\907432

13

RPX'S NOTICE OF MOTION AND
MOTION TO DISMISS PLAINTIFF'S COMPLAINT
CASE NO. 12-CV-01143-YGR

that they joined [RPX's] network with periodic adjustments by [RPX] only based on changes in the Consumer Price Index." (*Id.* at 11.) "The substantial majority of [RPX's] . . . acquisitions through December 31, 2010 involved patent assets that . . . were funded with [its] own capital resources, which consist of equity financing, subscription fee collections and seller financing." (*Id.* at 36.) These facts further contradict any economic rationale for Cascades' alleged group boycott.

RPX's SEC filing also states that "assets that cost more than we are prepared to spend with our own capital resources or that may be relevant only to a very small number of clients do not generally fit within our self-financed acquisition model." (S-1 form, RJN Ex. B, at 36). Such assets may be acquired "with financial assistance from … particular clients," in what RPX refers to as "structured acquisitions." (*Id.*) The Complaint does not allege, however, that the present transaction was such a "structured acquisition." To the contrary, Cascades alleges that "RPX negotiated with Cascades to acquire license rights under all of the Cascades patents *for its 100-plus members (including each of the other defendants).*" (Compl., ¶ 27 (emphasis added); *see also id.* at 37). Cascades, in other words, is alleging a garden-variety, subscription-funded license acquisition in which members first pay RPX a membership fee based on a published schedule; RPX then identifies potential patent transactions such as the Cascades patents; and RPX decides unilaterally whether to buy the patents or patent rights, in which case all of RPX's members obtain licenses.

As the Manufacturing Defendants would not have been asked to provide any further capital in support of a Cascades license acquisition beyond the basic subscriptions that they had already paid, they could not have threatened to "withhold" funding. Nor, indeed, could they have threatened to claw back subscription fees for which they had already paid—the SEC filing provides that RPX's "subscription agreements are non-cancelable and state that fees paid are non-refundable." (S-1 form, RJN Ex. B, at 35.) Because the incorporated SEC filing further contradicts an essential Cascades allegation—that RPX members could withhold funding—the only stated motivation for RPX's involvement in the alleged conspiracy evaporates.

## C.   THE COMPLAINT SHOULD BE DISMISSED BECAUSE CASCADES FAILS TO ALLEGE ANTITRUST INJURY.

The Complaint also fails because Cascades has not identified any injury cognizable under the antitrust laws. This failure deprives Cascades of standing and requires dismissal.

Every antitrust plaintiff must show more than harm to itself. *See, e.g.*, *Rutman Wine Co. v. E & J Gallo Winery,* 829 F.2d 729, 734 (9th Cir. 1987) ("Indispensable to any section 1 claim is an allegation that *competition* has been injured rather than merely competitors.") (emphasis in original); *Midwest Gas Servs. v. Indiana Gas Co.*, 317 F.3d 703, 710-13 (7th Cir. 2003) ("A private antitrust plaintiff . . . does not acquire standing merely by showing that he was injured by the defendant's conduct"); *Dial A Car v. Transportation, Inc.*, 82 F.3d 484, 486-87 (D.C. Cir. 1996) ("While Dial A Car alleges injury to itself, that injury involves only one specific competitor and is insufficient to support a finding that the market as a whole is or will be injured"). It is injury to consumers that counts. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 343 (1979) (observing that the Sherman Act represents a "consumer welfare prescription"); *see also Ball Mem'l Hosp. v. Mut. Hosp. Ins.*, 784 F.2d 1325, 1334 (7th Cir. 1986) ("When the plaintiff is a poor champion of consumers, a court must be especially careful not to grant relief that may undercut the proper functions of antitrust."); *Church & Dwight Co. v. Mayer Labs, Inc.*, No. 10-CV-4429, 2012 U.S. Dist. LEXIS 51770, at *109 (N.D. Cal. Mar. 1, 2012) ("[T]he correct measure of harm is harm to the competitive process and thereby harm to consumers") (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001)).

The only injury-based allegation that Cascades levels at Defendants is that the alleged conspiracy caused Cascades to have to undertake the expense of enforcing its intellectual-property rights in court. (Compl., ¶ 47.) That expense, however, is not the type of injury that the antitrust laws are designed to prevent. While there is case law that the costs of *defending* against baseless patent claims may constitute antitrust injury (*see, e.g.*, *Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282, 1296 (9th Cir. 1984)), there is no case law of which RPX is aware that the costs of *enforcing* a patent right may constitute antitrust injury. There is a good reason for this asymmetry, because patents do not confer upon the holder an affirmative right to obtain royalties

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

SF\907432

15

RPX'S NOTICE OF MOTION AND
MOTION TO DISMISS PLAINTIFF'S COMPLAINT
CASE NO. 12-CV-01143-YGR

1   from third parties, much less royalties of a particular "high-seven-figure" amount. The only legal

2   right that a patent imparts is the ability to bring suit to enjoin infringement and to obtain

3   damages. *See, e.g.*, Mark A. Lemley & Carl Shapiro, *Probabilistic Patents*, 19 J. ECON. PERSPS.

4   75, 75 (2005) ("[A] patent does not confer upon its owner the right to exclude but rather a right

5   to try to exclude by asserting the patent in court."). That right of Cascades remains unabridged,

6   as no allegation exists that Defendants' supposed agreement rendered Cascades unable to enforce

7   its patent portfolio. To the contrary, the Complaint concedes that Cascades has the ability to

8   enforce its patent portfolio. Indeed, Cascades has sued the Manufacturing Defendants for

9   infringement of the '750 patent and other Elbrus patents.[5]

10      Cascades has not alleged any antitrust injury. The Complaint does not aver that

11   Defendants' actions have caused consumers to pay higher prices. Quite to the contrary, it alleges

12   that Cascades has lost money on account of an alleged "group boycott . . . [which] lessens the

13   royalty burden on . . . [the] Android operating system." (Compl., ¶ 32); *Am. Ad Mgmt, Inc. v.

14   Gen. Telephone Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999) ("It is well established that the

15   antitrust laws are only intended to preserve competition for the benefit of consumers."); *cf.*

16   *James Cape & Sons Co. v. PCC Constr. Co.*, 453 F.3d 396, 399 (7th Cir. 2006) (holding that the

17   plaintiff failed to establish antitrust injury because "[defendants'] activities actually *increased*,

18   rather than restricted, competition, albeit in an illegal manner") (emphasis in original). Nor does

19   the Complaint allege that the supposed conduct caused products not to incorporate value-adding

20   technologies that they would otherwise bear. *See, e.g.*, *Indeck Energy Servs. v. Consumers

21   Energy Co.*, 250 F.3d 972, 977 (6th Cir. 2001) (holding that injury to a single competitor is

22   insufficient to constitute harm to competition and stating that the alleged exclusion must "result[]

23   in the elimination of a superior product or a lower-cost alternative").

24      This failure is fatal to Plaintiff's claims. It is well settled that antitrust plaintiffs lack

25   standing if they fail to allege, or later to establish, antitrust injury. *See Brunswick*, 429 U.S. at

26   ___

[5] As explained in RPX's accompanying Request for Judicial Notice, the Court can take notice of
the fact that Cascades is in the midst of infringement proceedings against each Manufacturing
Defendant, along with several other companies, in the U.S. District Court for the Northern
District of Illinois. (Ill. Compls. RJN Ex.C.) These actions have not yet progressed to claim
construction, validity, or infringement determinations regarding the asserted patents.

LATHAM&WATKINS™   SF\907432
ATTORNEYS AT LAW
SAN FRANCISCO

16

RPX'S NOTICE OF MOTION AND
MOTION TO DISMISS PLAINTIFF'S COMPLAINT
CASE NO. 12-CV-01143-YGR

1    489; *Am. Ad Mgmt*, 190 F.3d at 1054-57. As Cascades has failed to plead facts showing antitrust

2    injury, it lacks standing to bring claims under the Clayton Act for alleged violations of the

3    Sherman Act. The Complaint should therefore be dismissed.

4          **D.     CASCADES FAILS TO ALLEGE A RELEVANT ANTITRUST MARKET.**

5          Cascades' rule-of-reason claims also fail because the Complaint has not pled a

6    cognizable, relevant market in which the allegedly anticompetitive conduct occurred. *See Allied*

7    *Orthopedic Appliances, Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996, 998 (9th Cir.

8    2010). Cascades jumps back and forth among a series of vague and inconsistent market

9    definitions, none of which is sufficient to survive a motion to dismiss. Cascades' primary

10   position appears to be that the relevant market is "a separate submarket for licenses under the

11   '750 patent, the other Cascades/Elbrus patents and the patented technology itself within the

12   meaning of the antitrust laws." (Compl., ¶¶ 35, 46, 48.) But Cascades also alleges that

13   "[D]efendants have market power in the Android market." (*Id.* at ¶¶ 38, 46.) And Cascades also

14   refers in passing to the Android operating system's "achieving a 40% market share" of the

15   "mobile operating system." (*Id.* at. ¶ 13.)

16         All of these alleged markets are conclusory and insufficient under Rule 8(a). Cascades

17   provides no factual allegations sufficient to show the plausible existence of any such market.

18   After briefly discussing the law applicable to market definition in antitrust cases, RPX will

19   address each alleged antitrust market separately, explaining why each fails to satisfy Rule 8(a).

20              **1.     Market Definition In Antitrust Cases**

21         For rule-of-reason claims, alleged anticompetitive conduct can only be judged in the

22   context of a relevant antitrust market. *See Cont'l T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 45

23   (1977). Thus, a fundamental first step is to identify the relevant product and geographic markets

24   in which to assess the plaintiff's claims. According to the Supreme Court, "commodities

25   reasonably interchangeable by consumers for the same purposes" comprise a relevant antitrust

26   market. *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 395 (1956). As the Ninth

27   Circuit has explained, "the relevant market includes all sellers or producers who have actual or

28   potential ability to deprive each other of significant levels of business." *Theme Promotions, Inc.*

1   *v. News AM. Mktg. FSI*, 546 F.3d 991, 1002 (9th Cir. 2008). A correctly defined antitrust market

2   "includes the pool of goods or services that enjoy reasonable interchangeability of use and cross-

3   elasticity of demand." *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1446 (9th Cir. 1988).

4        Failure to allege a plausible relevant market is a ground for dismissing a complaint. *See*

5   *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1065 (9th Cir. 2001) (affirming dismissal of

6   complaint on the ground that the plaintiff "failed to identify a relevant market for antitrust

7   purposes"); *see also Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1105 (9th

8   Cir. 1999); *J&L Elecs. v. Elecs. For Imaging*, No. 01-CV-4853, 2005 WL 1661958, at *3 (N.D.

9   Cal. July 14, 2005).

10                    2.    **Cascades' Patented "Technology" As The Relevant Market**

11        The principal alleged market upon which Cascades relies is one limited to the licensing of

12   its own patented technology. (Compl., ¶ 35, 46, 48.) Cascades' desire to gerrymander the

13   relevant market so severely may be explained by its inability even to claim any anticompetitive

14   effect or antitrust injury from the alleged conspiracy in any appropriately defined market. But

15   that does not excuse Cascades from adequately pleading the plausible existence of an antitrust

16   market, which it does not and cannot do.

17        Merely saying something is a relevant market is not enough.[6] *See Kendall*, 518 F.3d at

18   1048; *Person v. Google, Inc.*, No. 06-CV-7297, 2007 U.S. Dist. LEXIS 47920, at *11-12 (N.D.

19   Cal. June 25, 2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007).

20   Among other failures, Cascades never claims that there are no reasonably interchangeable

21   substitutes for the technology that the '750 patent and other Elbrus patents supposedly claim. *See*

22   *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001) ("To survive a Rule 12(b)(6) motion to

23   dismiss, an alleged product market must bear a rational relation to the methodology courts

24   prescribe to define a market for antitrust purposes—analysis of the interchangeability of use or

25   the cross-elasticity of demand, and it must be plausible."). Indeed, Cascades never talks about

26   interchangeability of technology or products at all, which is a fatal flaw in its claim. *See Golden*

27   ─────────────────────
    [6] Cascades cannot argue that a patent necessarily or even generally constitutes its own antitrust
28       market. *See Illinois Tool Works, Inc. v. Independent Ink, Inc.*, 547 U.S. 28, *passim* (2006)
        (holding that the fact of a patent does not justify a presumption of market power).

1  *Gate Pharm. Servs., Inc. v. Pfizer, Inc.*, 433 Fed. App'x 598, 599 (9th Cir. May 19, 2011)

2  ("While the market definition need not be pled with specificity, the SAC fails to state *any* facts

3  indicating that all pharmaceutical products are interchangeable for the same purpose. The failure

4  to allege a product market consisting of reasonably interchangeable goods renders the SAC

5  'facially unsustainable' and appropriate for dismissal.") (emphasis in original) (quoting *Newcal*

6  *Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008)).

7       There is no support for the notion that the Elbrus patents are their own market, other than

8  Cascades' allegation that it has rights to them all. This is another fatal deficiency. Cascades

9  bizarrely contends that "more than 35 Elbrus patents, including the '750 patent," occupy the

10  same market. (Compl., ¶¶ 12, 35, 46, 48.) This could only be the case if each of these patents

11  covers a technology that performs substantially the same function as all of the others, such that

12  prospective purchasers of that technology (consumers) would see the "more than 35" patents as

13  being reasonably interchangeable with one another—*but not with any non-Cascades technology*.

14  *See E.I. duPont*, 351 U.S. at 395. The Complaint alleges no facts that would support this

15  improbable result. Indeed, it seems unlikely that Cascades would argue that the Elbrus patents all

16  perform largely the same function, as that would render them all invalid for obviousness-type

17  double-patenting. *See Pfizer v. Teva*, 518 F.3d 1353, 1363 (Fed. Cir. 2008). By the same token,

18  Cascades provides no facts to explain why the market is somehow sufficiently narrow to exclude

19  all technology to which Cascades lacks rights and yet is sufficiently broad to capture all

20  technology that the Elbrus patents cover.

21       Moreover, Cascades presents no allegations pertaining to the feasibility of supply-side

22  substitution such that, were the price of the 38 patents in the supposed market to increase, other

23  companies could enter the market and provide substitutable technologies at lower prices. *Brown*

24  *Shoe Co. v. United States*, 370 U.S. 294, 325 n.42 (1962); *Blue Cross & Blue Shield United v.*

25  *Marshfield Clinic*, 65 F.3d 1406, 1410-11 (7th Cir. 1995); *Calnetics Corp. v. Volkswagen of Am.*,

26  532 F.2d 674, 691 (9th Cir. 1976). Finally, and related to the preceding point, the Complaint

27  provides no facts surrounding, nor does it even reference, barriers to entry. *See Matsushita*, 475

28  U.S. at 591 n.15 ("[W]ithout barriers to entry it would presumably be impossible to maintain

LATHAM&WATKINS LLP   SF\907432
ATTORNEYS AT LAW
SAN FRANCISCO

19

RPX'S NOTICE OF MOTION AND
MOTION TO DISMISS PLAINTIFF'S COMPLAINT
CASE NO. 12-CV-01143-YGR

1  supracompetitive prices for an extended time."); *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d

2  1421, 1439 (9th Cir. 1993); *see also Epicenter Recognition, Inc., v. Jostens, Inc.*, 81 Fed. App'x.

3  910, 911 (9th Cir. 2003).

4          No one could infer the existence of a plausible antitrust market limited to Cascades'

5  patent portfolio from the Complaint. Absent such a market, Cascades cannot show any price

6  increase, output reduction, diminution in quality, or other negative competitive effect from the

7  alleged conspiracy. Without a relevant market and a showing of anticompetitive effect,

8  Cascades' rule-of-reason claims necessarily fail. *See McGlinchy v. Shell Chem. Co.*, 845 F.2d

9  802, 812-13 (9th Cir. 1988) ("It is the impact upon competitive conditions in a definable market

10  which distinguishes the antitrust violation from the ordinary business tort. [The] failure to allege

11  injury to competition is a proper ground for dismissal by judgment on the pleadings."). Of

12  course, and related to the last Section, the absence of a relevant market also demonstrates that

13  Cascades has not suffered antitrust injury. *Am. Ad Mgmt*, 190 F.3d at 1057 ("Antitrust injury

14  requires the plaintiff to have suffered its injury in the market where competition is being

15  restrained.").

16          3.   **Android Devices As The Relevant Market**

17          Although Cascades appears to characterize the Elbrus patents as the relevant market, it

18  confusingly makes repeated reference to an Android market and to a larger mobile-operating-

19  system market, of which Android is a part. (Compl., ¶¶ 13, 38, 46.) Cascades' allegations

20  concerning markets for Android devices and for mobile operating systems fail for the same

21  reasons discussed above—the Complaint makes virtually no reference to reasonable

22  interchangeability, supply- and demand-side substitution, cross-price elasticity of demand,

23  barriers to entry, and so on.[7] Furthermore, even if Android devices or mobile operating systems

24  constituted a relevant market, none of the allegations in the Complaint would support an antitrust

25  violation under the rule of reason. Nothing in the Complaint states or implies that the quantity of

26  sold Android devices diminished, that the price of Android devices increased, or that the quality

27

28  [7]   The Complaint does acknowledge that Android devices compete in a broader smartphone
       market, as to which Cascades again provides no interchangeability analysis at all.

1  of those items dipped as a result of Defendants' supposed actions. Indeed, the only pertinent

2  allegation in the Complaint suggests that, if the allegations were true, the price of Android

3  devices would have dropped as a result of the supposed conspiracy. (*Id.* at ¶ 32) (alleging that the

4  "group boycott . . . lessens the royalty burden on . . . [the] Android operating system").[8]

5                                            **CONCLUSION**

6           For the preceding reasons, the Complaint should be dismissed under Federal Rule of

7  Civil Procedure 12(b)(6).

8

9  Dated: May 14, 2012                              Respectfully submitted,

10                                                  LATHAM & WATKINS LLP
                                                    Alfred C. Pfeiffer, Jr.
11                                                  Charles Crompton
                                                    Hanno Kaiser
12

13                                                  By _____/s/ Alfred C. Pfeiffer, Jr._____
                                                    Alfred C. Pfeiffer, Jr.
14                                                  Attorneys for Defendant
                                                    RPX CORPORATION
15

16

17

18

19

20

21

22

23

24

25

26

27

28  [8]   Of course, RPX is not a participant in any market for the manufacturing and selling of
          Android devices.

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

SF\907432

21

RPX'S NOTICE OF MOTION AND
MOTION TO DISMISS PLAINTIFF'S COMPLAINT
CASE NO. 12-CV-01143-YGR