DAVIS WRIGHT TREMAINE LLP
MARTIN L. FINEMAN, Bar No. 104413
505 Montgomery Street, Suite 800
San Francisco, CA 94111
(415) 276-6575
Fax: (415) 276-6599
E-mail: martinfineman@dwt.com

NIRO, HALLER & NIRO
Raymond P. Niro (Member of the N.D. Cal. Bar)
Daniel R. Ferri (Admitted *Pro Hac Vice*)
Gabriel I. Opatken (Admitted *Pro Hac Vice*)
Ashley LaValley (Admitted *Pro Hac Vice*)
181 West Madison, Suite 4600
Chicago, IL 60602-4515
 (312) 236-0733
Fax: (312) 236-3137
E-mail: rniro@nshn.com
E-mail: dferri@nshn.com
E-mail: gopatken@nshn.com
E-mail: alavalley@nshn.com

Attorneys for Plaintiff
Cascades Computer Innovation LLC

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| CASCADES COMPUTER INNOVATION LLC, <br><br> Plaintiff, <br><br> v. <br><br> RPX CORPORATION; HTC CORPORATION; LG ELECTRONICS, INC.; MOTOROLA MOBILITY HOLDINGS, INC.; SAMSUNG ELECTRONICS CO. LTD.; and DELL INC., <br><br> Defendants. | Case No. 12-CV-01143-YGR <br><br> **PLAINTIFF CASCADES COMPUTER INNOVATION'S COMBINED OPPOSITION TO MOTIONS OF DEFENDANTS DELL AND RPX TO DISMISS** <br><br> Date: June 19, 2012 <br> Time: 2:00 PM <br> Place: TBD <br><br> Before the Honorable Yvonne Gonzalez Rogers |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     SUMMARY OF THE ALLEGATIONS IN THE COMPLAINT ...................................... 2

III.    LEGAL STANDARD FOR A MOTION TO DISMISS ................................................ 4

IV.     DELL'S ARGUMENTS FOR DISMISSAL LACK MERIT ........................................... 5

      A.      The Claims Against Dell Are Not Compulsory Counterclaims ............................ 5

      B.      Cascades Has Not "Pled Itself Out Of Court" ...................................................... 11

      C.      Cascades Pled Relinquishment Of Independent Decision-Making Authority ...... 15

V.      RPX'S ARGUMENTS FOR DISMISSAL LACK MERIT ............................................ 18

      A.      Defendants Were Economically Motivated To Conspire Against Cascades ........ 18

      B.      Cascades Has Properly Pled Antitrust Injury ........................................................ 21

            1.      Unlawful Conduct .................................................................................... 22

            2.      Injury To Plaintiff .................................................................................... 22

            3.      The Injury To Cascades Flows From Defendants' Unlawful Conduct ..... 23

            4.      The Injuries Suffered By Cascades Are Of The Type The Antitrust Laws Were Designed To Prevent ...................................................................... 23

      C.      Cascades Has Also Properly Pled A Relevant Antitrust Market ......................... 25

VI.     DISCOVERY WILL PROVIDE MORE SUPPORT FOR CASCADES' CLAIMS ....... 27

VII.    CONCLUSION ................................................................................................. 29

## <u>TABLE OF AUTHORTIES</u>

**Page**

**FEDERAL CASES**

*Alltrade, Inc. v. Uniweld Prods., Inc.,*
    946 F.2d 622 (9th Cir. 1991) .................................................................9

*Alvear-Velez v. Mukasey,*
    540 F.3d 672 (7th Cir. 2008) ................................................................9

*Am. Ad Mgmt. Inc. v. General Tel. Co.,*
    190 F.3d 1051, 1055 (9th Cir. 1999) ...................................................22

*Apple, Inc. v. Samsung Elecs. Co.,*
    2012 U.S. Dist. LEXIS 67102 (N.D. Cal., May 14, 2012) ...............25, 26

*Asset Allocation & Mgmt., Co. v. W. Employers Ins. Co.,*
    892 F.2d 566 (7th Cir. 1989) ................................................................9

*Atl. Richfield Co. v. USA Petroleum Co.,*
    495 U.S. 328 (1990).........................................................................21, 24

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007).........................................................................4, 28

*Big Bear Lodging Ass'n v. Snow Summit, Inc.,*
    182 F.3d 1096 (9th Cir. 1999) ..............................................................25

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
    429 U.S. 477, 489 (1977)......................................................................21

*Burlington N. R.R. Co. v. Strong,*
    907 F.2d 707 (7th Cir. 1990) .................................................................6

*Campfield v. State Farm Mut. Auto Ins. Co.,*
    532 F.3d 1111 (10th Cir. 2008) ............................................................25

*Critical-Vac Filtration Corp. v. Minutemean Int'l, Inc.,*
    233 F.3d 697 (2d Cir. 2000)...................................................................8

*Destiny Tool v. SGS Tools Co.,*
    344 F. App'x 320, 2009 WL 2700318 (9th Cir. Aug. 27, 2009) ........7, 8

*Free Freehand Corp. v. Adobe Sys., Inc.,*
    2012 U.S. Dist. LEXIS 17254 (N.D. Cal. Feb. 12, 2012) ....................25

*Galileo Int'l P'ship v. Global Vill. Commc'n, Inc.,*
    1996 WL 452273 (N.D. Ill. Aug. 8, 1996) ........................................6, 10

PLAINTIFF CASCADES COMPUTER INNOVATION'S COMBINED OPPOSITION TO MOTIONS OF DEFENDANTS DELL
AND RPX TO DISMISS – CASCADES V. RPX, *ET AL.*, CASE NO. 12-CV-01143-YGR

ii

*Gilldorn Sav. Ass'n v. Commerce Sav. Ass'n*,
    804 F.2d 390 (7th Cir. 1986) ......................................................................6, 7

*Hostway Corp. v. JPMorgan Chase Bank, NA*,
    2009 U.S. Dist. LEXIS 75049 (N.D. Ill. Aug. 24, 2009) ........................9

*Hydranautics v. FilmTec Corp.*,
    70 F.3d 533 (9th Cir. 1995) ....................................................................8, 9

*In re Marshall*,
    600 F.3d 1031 (9th Cir. 2010) ......................................................................6

*In re Tableware Antitrust Litig.*,
    484 F. Supp. 2d 1059 (N.D. Cal. 2007) ................................................20, 22

*In Re: TFT-LCD (Flat Panel) Antitrust Litig.*,
    2009 U.S. Dist. LEXIS 17792 (N.D. Cal. March 3, 2009) ........................5

*Jane Doe v. Ariz. Hosp. & Healthcare Ass'n*,
    2009 U.S. Dist. LEXIS 42871 (D. Ariz. Mar. 19, 2009) ........................24

*Johnson v. Lucent Techs., Inc.*,
    653 F.3d 1000 (9th Cir. 2011) ..............................................................4, 18

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
    232 F.3d 979 (9th Cir. 2000) ................................................................22, 24

*Martino v. McDonald's Sys., Inc.*,
    432 F. Supp. 499 (7th Cir. 1977) ..............................................................8

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986).............................................................................18, 20

*Mercoid Corp. v. Mid-Continent Investment Co.*,
    320 U.S. 661 (1944).....................................................................................8

*Momento, Inc. v. Seccion Amarilla USA*,
    2009 U.S. Dist. LEXIS 85295 (N.D. Cal. Sept. 17, 2009) ....................4, 5

*Oplink Commc'ns, Inc. v. Finisar Corp.*,
    2011 U.S. Dist. LEXIS 91054 (N.D. Cal. Aug. 16, 2011).........................9

*Poller v. Columbia Broad. Sys., Inc.*,
    368 U.S. 464, 473 (1962),............................................................................5

*S. Construction Co., Inc. v. Pickard*,
    371 U.S. 57, 60 (1962).................................................................................10

PLAINTIFF CASCADES COMPUTER INNOVATION'S COMBINED OPPOSITION TO MOTIONS OF DEFENDANTS DELL
AND RPX TO DISMISS – CASCADES V. RPX, *ET AL.*, CASE NO. 12-CV-01143-YGR

iii

*Sony Elecs. v. Soundview Techs.*,
  157 F. Supp. 2d 180 (D. Conn. 2001)..................................................23

*Sun Microsystems, Inc. v. Hynix Semiconductor, Inc.*,
  608 F. Supp. 2d 1166 (N.D. Cal. 2009) ..............................................18

*Tank Insulation Int'l, Inc. v. Insultherm, Inc.*,
  104 F.3d 83 (5th Cir. 1997) .................................................................8

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001)...........................................................26, 27

*TYR Sport, Inc. v. Warnaco Swimwear, Inc.*,
  709 F. Supp. 2d 802 (C.D. Cal. 2010) ................................................18

*U.S. Philips Corp. v. Sears Roebuck & Co.*,
  55 F.3d 592 (Fed. Cir. 1995)................................................................8

*U.S. Philips Corp. v. Sears Roebuck & Co.*,
  1987 WL 26123 (N.D. Ill. Dec 2, 1987) ...........................................7, 8

*USM Corp. v. SPS Techs., Inc.*,
  102 F.R.D. 167 (N.D. Ill. 1984).........................................................7

*Warshawsky & Co. v. Arcata Nat'l Corp.*,
  552 F.2d 1257 (7th Cir. 1977) ...........................................................10

*West Penn Allegheny Health Sys., Inc. v. UPMC*,
  627 F.3d 85 (3d Cir. 2010)..................................................................24

**OTHER CASES**

*Cel-Tech Commc'ns Inc. v. L.A. Cellular Tel. Co.*,
  20 Cal.4th 163 (1999) ........................................................................25

*Essex Ins. Co. v. Heck*,
  186 Cal.App.4th 1513 (2010) .............................................................14

**RULES**

Federal Rule of Civil Procedure 11 ..............................................1, 2, 16

Federal Rule of Civil Procedure 12(b)(6) ..................................4, 18, 26

Federal Rule of Civil Procedure 13(a) .........................................5, 8, 9, 10

## I.      INTRODUCTION

Plaintiff Cascades Computer Innovation LLC ("Cascades") has alleged a buyer-side conspiracy to corrupt the free market for licenses to patented technology on devices running the Android operating system. Defendants RPX and Dell separately moved to dismiss Cascades' complaint.  The other defendants (LG, Samsung, HTC and Motorola) have not moved to dismiss and presumably will answer the complaint.

RPX and its members should not be surprised at the filing of this lawsuit. In fact, RPX raises this very concern in its SEC filing (which it requested be judicially noticed):

> ***It is possible that courts or other governmental authorities will interpret existing laws regulating*** risk management and insurance, ***competition and antitrust practices***, taxation, the practice of law and patent usage and transfers ***in a manner that is inconsistent with our business practices.*** Our business, prospects, financial condition and results of operations may be harmed if our operations are found to be in violation of any existing laws or any other governmental regulations that may apply to us.

(RPX Br., Ex. B, S-1 Form at p. 17; emphasis added).

Cascades filed this antitrust lawsuit based on facts indicating that RPX has, indeed, violated the antitrust laws and will ask the Court to find that RPX's business practices (at least in this circumstance) are in violation of existing antitrust laws.

RPX filed its motion to dismiss Cascades' complaint on May 14, 2012 arguing that Cascades' allegations (1) lack economic sense, (2) fail to allege antitrust injury, and (3) fail to allege a relevant antitrust market. That same day, Dell filed its motion (with no overlapping arguments) and, instead, contended that Cascades' claims should be dismissed (1) as compulsory counterclaims, (2) because Cascades "pled itself out of court," and (3) because Cascades failed to plead relinquishment of independent decision-making authority by Dell.

Notably, both Dell and RPX previously attempted to force a voluntary dismissal of Cascades' complaint.  On March 30, 2012 (raising the prospect of a Rule 11 motion), counsel for

Dell sent a letter to Cascades demanding that Cascades dismiss its complaint. After response from Cascades, Dell did nothing. On April 18, 2012, counsel for RPX then sent a letter to Cascades demanding withdrawal of two allegations in the complaint based on Rule 11 threats. RPX followed with a more detailed motion for sanctions on April 24, 2012. After Cascades responded (providing evidence of the conspiracy and combination based on RPX's own admissions), RPX did nothing.

The obviously concerted action by Dell and RPX sends two clear messages. First, neither defendant is anxious to provide the discovery that Cascades will seek early in this case. And second, both are willing to fight (putting up a united front) to prevent Cascades from obtaining that discovery. Cascades has sufficiently pled violations of the antitrust laws by RPX and each of the manufacturing defendants; with minimal discovery, Cascades will have further factual support for its allegations.

## II.    SUMMARY OF THE ALLEGATIONS IN THE COMPLAINT

HTC, LG, Motorola, Samsung and Dell (collectively, the "manufacturing defendants") all sell devices (including cell phones and computer tablets) that employ the Android operating system. (Compl. at ¶ 8). Together, they sell more than 90% of the phones sold in the United States that use the Android operating system. (*Id*. at ¶ 13). Each manufacturing defendant is a member of RPX. (*Id*.).

The stated goal of RPX is to protect its members from patent infringement claims from non-manufacturing entities ("NPEs"). (*Id*. at ¶ 17). The purpose of RPX and the reason for joining RPX is the formation of an industry group that can force individual inventors, patent owners and NPEs to deal collectively with RPX as an agent for its members acting in concert with each other, rather than having each member deal separately and independently with the patent holder. (*Id*. at ¶ 20). RPX facilitates joint defense agreements amongst its members and

even offers NPE patent insurance. (*Id.* at ¶¶ 24-26). Both joint defense agreements and NPE patent insurance encourage group, not individual, efforts at negotiating or accepting patent licenses. (*Id.* at ¶¶ 25-26). As stated on RPX's website, "RPX is often able to achieve 'Wholesale' pricing terms, where we can acquire rights for our members at significantly reduced cost relative to what the NPE might charge an individual company on its own." (*Id.* at ¶ 21).

Cascades is an NPE that holds the exclusive right to license and enforce a portfolio of patents claiming technology that facilitates the installation and use of applications on Android devices (the "Cascades Patents"). (*Id.* at ¶¶ 1, 12, 13, 34). Each manufacturing defendant infringes at least one Cascades Patent. (*Id.* at ¶ 37). RPX initially negotiated with Cascades to acquire license rights to the Cascades Patents, and made a high seven-figure offer. (*Id.* at ¶¶ 27-28). RPX then summarily withdrew its offer on the grounds that one or more of its members would not fund the license deal. (*Id.* at ¶ 28). Cascades believes the manufacturing defendants all agreed among themselves and with RPX not to negotiate independently with Cascades and to present a unified, concerted effort to oppose Cascades' efforts to license its patents. (*Id.*).

Cascades offered each of LG, Motorola, Samsung, and HTC a proposal that in exchange for a lump-sum royalty payment of $5 million, the manufacturer would receive a fully paid-up license and the right to offset 25% of all licensing revenues received from other infringers, up to $5 million. (*Id.* at ¶ 30). Effectively, Cascades' offer would allow any of the four major Android suppliers to recover all of their money paid back and pay nothing for a license. (*Id.* at ¶ 30). Yet, not one of LG, Motorola, Samsung or HTC even responded to the offer. (*Id.* at ¶ 30, 36). To make it seem as if it was negotiating independently, Dell made a ridiculous offer of less than $100,000 for a fully paid-up license to all of the Cascades Patents. (*Id.* at ¶ 36). No manufacturing defendant has engaged in good-faith discussions or negotiations with Cascades regarding licenses. (*Id.*). Thus, despite RPX's initial interest in receiving a license on behalf of

PLAINTIFF CASCADES COMPUTER INNOVATION'S COMBINED OPPOSITION TO MOTIONS OF DEFENDANTS DELL AND RPX TO DISMISS – CASCADES V. RPX, *ET AL.*, CASE NO. 12-CV-01143-YGR

3

1   its members, the refusal by certain members of RPX to fund that license deal has precluded

2   Cascades from being able to license its patents to any member of RPX and, thus, over 90% of the

3   Android market. (*Id*. at ¶¶ 28-30, 36-38).

4          Under the auspices of agreements with RPX, joint defense agreements, NPE insurance

5   and common counsel, defendants have conspired amongst themselves to not accept licenses to

6   the Cascades Patents under the terms and conditions offered by Cascades. (*Id*. at ¶¶ 13, 21, 24-

7   26, 39). As a result of defendants' concerted activities, the value of licenses for patented

8   technology pertaining to the Android operating system has been diminished. (*Id*. at ¶ 52).

9   Because of this artificial devaluation, the incentive to innovate by Cascades and NPEs in general

10  has been reduced. (*Id.*). The output of new technologies is restricted, and the price of existing

11  technologies is inflated. (*Id.*). Cascades itself has lost substantial royalty income from license

12  agreements it would otherwise have accomplished in a free market, has been precluded from

13  growing its business, and has been forced to incur otherwise unnecessary legal expenses in

14  separately enforcing its patents against the individual manufacturing defendants who themselves

15  are engaged in the conspiracy. (*Id*. at ¶¶ 39, 55).

16  **III.   LEGAL STANDARD FOR A MOTION TO DISMISS**

17         In deciding a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6),

18  all facts pled in a complaint must be taken as true and construed in a light most favorable to the

19  nonmoving party. *Johnson v. Lucent Techs., Inc.*, 653 F.3d 1000, 1010 (9th Cir. 2011).

20  Allegations of antitrust violations must only "raise a reasonable expectation that discovery will

21  reveal evidence of illegal agreement." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555

22  (2007). "There is no special pleading rule requiring greater factual specificity in antitrust cases."

23  *Momento, Inc. v. Seccion Amarilla USA*, 2009 U.S. Dist. LEXIS 85295, at *2 (N.D. Cal. Sept.

24  17, 2009). "[E]laborate fact pleading" is not required because "'in complex antitrust litigation,'

25

'motive and intent play leading roles,' and 'the proof is largely in the hands of the alleged conspirators.'" *In Re: TFT-LCD (Flat Panel) Antitrust Litig.*, 2009 U.S. Dist. LEXIS 17792, at *12 (N.D. Cal. March 3, 2009) (quoting *Poller v. Columbia Broad. Sys., Inc.,* 368 U.S. 464, 473 (1962)). Moreover, motions to dismiss are disfavored where, as here, the antitrust allegations are fact-intensive. *Momento*, 2009 U.S. Dist. LEXIS 85295, at *2.

## IV.    DELL'S ARGUMENTS FOR DISMISSAL LACK MERIT

### A.    The Claims Against Dell Are Not Compulsory Counterclaims

Dell argues that Cascades' separate patent infringement claim against it on one patent and the antitrust and unfair competition claims involving all of the Cascades' Patents that are made in this action are logically related and, thus, are compulsory counterclaims. (Dell Br. at 9).  To the contrary, Cascades' antitrust and unfair competition claims are simply not compulsory counterclaims to its own patent infringement claims at all.  *See* Fed. R. Civ. P. 13(a) (requiring a party [Cascades] to bring any counterclaim it has against an opposing party [Dell] if it arises from same the transaction or occurrence as the "***opposing party's claim***").   Therefore, Rule 13(a), and Dell's basis for dismissal, simply does not apply.  Dell has its analysis backwards.

No matter: the claims asserted by Cascades in this action would not have been compulsory counterclaims in the Illinois action in any case because they do not arise out of the same transaction or occurrence as Cascades' patent *infringement* claims as defined in Rule 13(a). The Illinois suit against Dell is for infringement of a single patent -- United States Patent No. 7,065,750.  Claims for violation of federal antitrust laws (Counts I and II) and violation of the Cartwright Act and unfair competition under California law (Counts III and IV) are not compulsory counterclaims because they are not "logically related" to the patent infringement

PLAINTIFF CASCADES COMPUTER INNOVATION'S COMBINED OPPOSITION TO MOTIONS OF DEFENDANTS DELL
AND RPX TO DISMISS – CASCADES V. RPX, *ET AL.*, CASE NO. 12-CV-01143-YGR

5

claim on the '750 patent, as required by Seventh Circuit law.[1] *See, e.g., Burlington N. R.R. Co. v. Strong*, 907 F.2d 707, 711 (7th Cir. 1990).

While Dell contends that it attempted to settle the Illinois patent infringement action without success, that does not relieve Dell of liability for engaging in a combination and conspiracy to restrain trade -- even if it had actually settled the Illinois case (which it has not). These are distinct claims, comprising separate factual underpinnings and different legal issues.

While "the words 'transaction or occurrence' should be interpreted liberally in order to further the general policies of the federal rules," courts have also stressed that the "inquiry cannot be a 'wooden application of the common transaction label'" despite its liberal construction. *Id*. (quoting *Gilldorn Sav. Ass'n v. Commerce Sav. Ass'n*, 804 F.2d 390, 396-97 (7th Cir. 1986)). A trial court must "examine carefully the factual allegations underlying each claim to determine if the logical relationship test is met" and must "consider the totality of the respective claims, including the nature of the claims, the legal basis for recovery, the law involved, and the respective factual backgrounds." *Id*.

Here, the nature of the claims in the Illinois lawsuit and this action are only peripherally related, as are the corresponding legal bases for recovery, the laws involved and the respective factual issues. The claims made in this action arise out of antitrust violations by Dell and five other defendants concerning their concerted refusal to deal with Cascades in licensing its entire portfolio of more than 30 patents. (*See* Compl. at ¶ 34.) On the other hand, the Illinois lawsuit only involves a claim against Dell for its direct and contributory infringement of one of the 30

---

[1] Cascades does not dispute Dell's contention that Seventh Circuit law would apply to a proper "compulsory counterclaim" argument because Cascades filed its patent case against Dell in the Northern District of Illinois. Even so, the Ninth Circuit uses the same "logical relationship" test and, thus, this Circuit's case law may guide this analysis. *See, e.g., In re Marshall*, 600 F.3d 1031, 1057-58 (9th Cir. 2010).

1   patents. The claims made in this action do not bear a "logical relationship" to Dell's infringement

2   of the '750 patent.

3       Further, the '750 patent in the Illinois lawsuit requires analysis and discovery of complex

4   technical and factual issues related to whether the accused Dell tablet and smartphone products

5   practice the methods claimed in the '750 patent; whereas, Cascades' antitrust and unfair

6   competition claims involve analysis of the agreements and common actions of six defendants

7   and the resulting injury.  "Judicial economy would not be well served" when two claims are

8   based on separate transactions. *Gilldorn Sav. Ass'n*, 804 F.2d at 397.  This is particularly true

9   when one action is significantly more complex than the other or when, as here, compelling a

10  single trial will "unduly and unnecessarily complicate[] the litigation." *Id.*

11      Dell's cited case law does not support its argument.  In *USM*, the court found that a

12  fraudulent procurement antitrust claim was a compulsory counterclaim to a patent infringement

13  claim because the allegations of fraud would have successfully challenged both the validity of

14  the patent and the infringement claim. *USM Corp. v. SPS Techs., Inc.*, 102 F.R.D. 167, 170 (N.D.

15  Ill. 1984).  *Destiny Tool* is similarly distinguishable.  There, it was the antitrust *defendants* who

16  filed the patent infringement suit, and the court held that an antitrust claim is compulsory when it

17  alleges anticompetitive activity in the assertion of patents -- not the case here.  *Destiny Tool v.*

18  *SGS Tools Co.*, 344 F. App'x 320, 2009 WL 2700318 (9th Cir. Aug. 27, 2009).  Dell further

19  mischaracterizes *U.S. Philips*, which also involved anticompetitive activity in the assertion of

20  patents. *U.S. Philips Corp. v. Sears Roebuck & Co.*, 1987 WL 26123 (N.D. Ill. Dec 2, 1987).

21  Special circumstances, not present here, guided the court in that case.  Because the defendant had

22  argued that the antitrust claims should be tried with the patent claim in a prior action (because

23  severance would be "a waste of judicial time" and "undue burden on the defendants," and

24  because the antitrust claims had actually already been fully litigated in the previous action), the

25

Federal Circuit held that judicial estoppel, not Fed.R.Civ.P. 13(a), was the basis for affirming the district court's decision to dismiss. *U.S. Philips Corp. v. Sears Roebuck & Co.*, 55 F.3d 592, 597 (Fed. Cir. 1995). Dell not only fails to reference the Federal Circuit's decision (which specifically held that the issue was <u>not</u> whether the antitrust claims were compulsory), but it also fails to mention that, in *U.S. Philips*, the antitrust claims had already been tried in the original patent infringement action. Nothing even close to that has occurred in this case.

On the other hand, case law supports a finding that Cascades' antitrust claims are not compulsory counterclaims to the Illinois patent infringement claim. In *Mercoid Corp. v. Mid-Continent Investment Co.*, 320 U.S. 661, 671 (1944), the Supreme Court held that an antitrust counterclaim is a permissive (not compulsory) counterclaim in a patent infringement suit. *See also Destiny Tool*, 2009 WL 2700318, at *3. Moreover, the patent infringement suit and antitrust violations in *Mercoid* were more "logically related" than in this case because the antitrust claims in *Mercoid* arose out of the patentee's improper use of its patent, namely, that it was seeking to extend the grant of the patent to unpatented devices. *Id*. at 662. Those antitrust counterclaims necessarily required analysis of the scope of the patent-in-suit and the devices covered by the patent whereas, here, the scope of the '750 patent is not even at issue.[2] Further, other circuits (including the Ninth) have held that a party is not barred in a subsequent suit for failure to raise the antitrust claim in the infringement suit. *See, e.g., Hydranautics v. FilmTec Corp.*, 70 F.3d 533, 536 (9th Cir. 1995). The court reasoned, "The distinctiveness between the facts giving rise to the patent and those giving rise to the antitrust claims is suggested by the different appellate

---

[2] While some courts (including the Ninth Circuit) have strictly followed *Mercoid* in refusing to hold any antitrust claim compulsory in the underlying patent infringement lawsuit, *see, e.g., Hydranautics*, 70 F.3d at 536-37; *Tank Insulation Int'l, Inc. v. Insultherm, Inc.*, 104 F.3d 83, 88 (5th Cir. 1997), other courts have restricted its holding to cases involving patent misuse claims. *Critical-Vac Filtration Corp. v. Minutemean Int'l, Inc.*, 233 F.3d 697, 702-04 (2d Cir. 2000). The Seventh Circuit has expressly declined to rule on this issue, so Cascades will limit the *Mercoid* holding to its facts. *Martino v. McDonald's Sys., Inc.*, 432 F. Supp. 499, 505 (7th Cir. 1977).

1  paths Congress has provided for those two kinds of claims." *Id.*  In other words, an appeal of an

2  antitrust claim will go to the Ninth Circuit while an appeal of a patent infringement claim would

3  go to the Federal Circuit.

4       The Court should see Dell's motion for what it is: forum-shopping and strategic

5  maneuvering. Dell apparently has decided it would rather be in Illinois than before this Court.

6  And Dell would rather defend against antitrust conspiracy claims in a case in which it is the only

7  defendant, rather than one that includes the other conspirators. But tactics and strategies do not

8  substitute for a legal reason to treat this unrelated claim as a compulsory counterclaim.

9       Further, Rule 13(a) does not require a claim that is a compulsory counterclaim in an

10  earlier filed *and still pending* action to be "dismissed with prejudice," as Dell requests. The

11  principles of *res judicata* do not apply here because the Illinois Action is still pending.  *See, e.g.,*

12  *Alvear-Velez v. Mukasey*, 540 F.3d 672, 677 (7th Cir. 2008) (providing that *res judicata* requires

13  "a final judgment on the merits"); *Oplink Commc'ns, Inc. v. Finisar Corp.*, 2011 U.S. Dist.

14  LEXIS 91054, at *8 (N.D. Cal. Aug. 16, 2011) ("Cases have not held dismissal with prejudice is

15  proper in these circumstances when the first action has not reached final judgment.").  Instead, a

16  Court has the power to stay or dismiss the claim with leave to replead it in the previously filed

17  suit.  *Hostway Corp. v. JPMorgan Chase Bank, NA,* 2009 U.S. Dist. LEXIS 75049, at *6 (N.D.

18  Ill. Aug. 24, 2009) (citing *Asset Allocation & Mgmt., Co. v. W. Employers Ins. Co.*, 892 F.2d

19  566, 572 (7th Cir. 1989)).  While some courts have allowed a compulsory counterclaim to be

20  dismissed *without prejudice*, many courts have expressly disapproved of this practice.  *See, e.g.,*

21  *Asset Allocation*, 892 F.2d at 571; *Alltrade, Inc. v. Uniweld Prods., Inc.*, 946 F.2d 622, 628-29

22  (9th Cir. 1991).  Indeed, the ability to do so is "a power, not a duty" and should "be exercised

23  with due regard for the balance of convenience in litigating the parties' dispute in one forum

24  rather than another." *Id.* at 572-73.  A court should not dismiss or stay claims that are

compulsory counterclaims in another action "where there is a clear showing that the balance of convenience or other special circumstances favor this forum." *Galileo Int'l P'ship v. Global Vill. Commc'n, Inc.*, 1996 WL 452273, at *2 (N.D. Ill. Aug. 8, 1996).

Here, it is clear that both convenience and judicial economy favor the antitrust and unfair competition claims going forward in this forum.  The purpose of Rule 13(a), "to prevent multiplicity of actions and to achieve resolution in a single lawsuit of all disputes arising out of common matters," would not be served by staying or dismissing these claims. *Warshawsky & Co. v. Arcata Nat'l Corp.*, 552 F.2d 1257, 1261 (7th Cir. 1977) (citing *S. Construction Co., Inc. v. Pickard*, 371 U.S. 57, 60 (1962)).  Cascades sued five of the six defendants for patent infringement in three separate actions that are currently pending in the Northern District of Illinois. Under Dell's theory, Cascades would be required to assert its antitrust and unfair competition claims in ***four different lawsuits*** – three separate actions against the five manufacturing defendants in Illinois and a separate action against RPX in this district. The logical absurdity of Dell's request is clear. It would be inefficient, a waste of judicial resources, and would result in repetitive litigation and potentially inconsistent decisions.

Dell has cited no authority to support what it requests of the Court – to dismiss Cascades' claims with prejudice because they are somehow compulsory counterclaims to Cascades' own patent infringement claim.  The argument makes no sense because these claims simply could not have been asserted as counterclaims at all and, moreover, they are not compulsory.  The Illinois action is still pending and no principles of *res judicata* apply.  And finally, Dell's request that Cascades litigate its claims separately against each co-conspirator is a model of inefficiency.

## B.     Cascades Has Not "Pled Itself Out Of Court"

Dell's argument that Cascades "pled itself out of court" is based on a strained misconstruction of Cascades' allegations.  Paragraph 36 of the complaint (which is the sole basis for Dell's contention) states in its entirety:

> 36.     As part of its business, Cascades has offered to license its '750 patent (and its other patents) under nearly identical terms to those entities (like HTC, LG, Motorola, Samsung and Dell) that sell devices that use Android operating systems and want to lawfully practice the inventions of the Cascades' patents.  Cascades has continuously sought to grant licenses to users of its patented technology.  Many separate companies have been repeatedly contacted over the last year alone, including the defendants and other manufacturers (such as ASUS, Pantech Wireless, Philips Electronics and Sharp Electronics).  ***Dell and Pantech each made token offers of less than $100,000 for a fully paid-up license under all the Cascades patents, offers which Cascades believes were spurious and made in bad faith.   Other than these token offers, no manufacturing entity has engaged in independent, good-faith discussions or negotiations with Cascades or even acknowledged letters offering licenses, thus, acting contrary to their own private interests and, ultimately, the public good***.  As noted above, Motorola, LG, Samsung and HTC, who dominate the Android market, refused to even discuss a license, despite being offered terms that could effectively result in a zero royalty.  Motorola and others chose to negotiate only through RPX.

(emphasis added).

Focusing on just a selective portion of paragraph 36, Dell ignores the following well-pled facts, which demonstrate the plausibility of antitrust violations as required by applicable law:

- •     "RPX's stated goal is to protect its members from patent infringement claims from NPEs." (*Id*. at ¶ 17).

- •     "RPX frequently acts as the agent or intermediary of its members for purposes of acquiring patents and negotiating licensing and purchase terms on behalf of its members collectively." (*Id*. at ¶ 20).

- •     "Although the contracts RPX has with its members ***purportedly*** give members the ability to deal independently in their own self-interest, the whole purpose of RPX and the reason

for joining RPX is to form an industry group that can force individual inventors, patent owners and NPEs to deal collectively with RPX as an agent for its members acting in concert with each other, rather than having each member deal separately and independently with the patent holder." (*Id.*; emphasis added).

• "RPX also gathers intelligence and data on patent acquisition opportunities, patent litigation and licensing activities and trends, all for the purpose of forcing lower royalty payments for licensing by combining the efforts of its members at the expense of their independent interests." (*Id.* at ¶ 22).

• "By facilitating and funding joint defense arrangements, RPX enables its members to act in concert in dealing with NPEs seeking to license their patents and eliminates the ability of its individual members to act independently." (*Id.* at ¶ 25).

• "RPX terminated negotiations with Cascades and [withdrew] its offer because one or more of its members allegedly would not fund the license deal. This demonstrated that all members either had to agree to a license or none would agree." (*Id.* at ¶ 28).

• "On information and belief, after negotiations with Cascades ended, RPX and the other defendants conspired and agreed that none of them would separately negotiate with Cascades for a license and that all would act together to oppose Cascades' efforts to license and enforce the '750 and other Cascades patents." (*Id.*).

• "On information and belief, the individual manufacturing defendants all agreed among themselves and with RPX not to negotiate independently with Cascades and to present a unified, concerted effort to oppose licensing and enforcement of the Cascades patents." (*Id.*).

• "RPX members sign an agreement with RPX that effectively limits their freedom to negotiate licenses independently. RPX represents that, by negotiating licenses through it, royalty amounts can be reduced. By penalizing those who do not renew and continue their

membership with RPX, members are effectively encouraged not to deal independently with patent owners like Cascades." (*Id.* at ¶ 29).

- "As evidence of the conspiracy, the manufacturing defendants (HTC, LG, Motorola, Samsung and Dell) have clearly acted against their individual economic interests." (*Id.* at ¶ 30).

- "Defendants have contracted, combined and conspired to restrain trade by jointly refusing to negotiate or accept licenses under the Cascades patents. Defendants' goal is to force either a drastically reduced royalty for rights under the Cascades patents or no royalty payment at all." (*Id.* at ¶ 31).

- "This uniformity of action (indeed, of inaction) strongly demonstrates a group effort to refuse to license, thereby forcing license prices below a competitive level at monopsony prices." (*Id.* at ¶ 38).

- "Under the auspices of agreements with RPX, joint defense agreements, NPE insurance, common counsel, meetings, phone calls, emails and discussions with RPX and otherwise, defendants have met, conferred, conspired, combined and agreed among themselves … that they would not accept licenses from Cascades under terms and conditions offered by Cascades … and, thus, would collectively continue to jointly refuse to license the Cascades patents." (*Id.* at ¶ 39).

- "The common [legal] representation has been solicited and then used to be certain that the defendants do not operate independently in evaluating the terms and conditions of a license under the Cascades patents." (*Id.* at ¶ 40).

- "In furtherance of the conspiracy and combination, defendants have now jointly engaged in a common defense against the '750 patent and the other Cascades patents. In that

way, they effectively have agreed to limit their individual freedom of action in dealing with Cascades, even against their private economic interests." (*Id*. at ¶ 43).

- "Defendants have not acted independently, but instead have conspired and agreed to restrict their independent action in negotiating a license with Cascades." (*Id*. at ¶ 44).

The foregoing well-pled factual allegations do more than place Dell and RPX on notice of Cascades' claims against them. They provide substantial factual detail about the conspiracy and combination based on RPX's own admissions, limited publicly available information and Cascades' own experiences. To the extent Dell argues that more facts must be pled, only discovery can provide that information (which is obviously solely in the hands of the defendants).

In support of its argument that Cascades "pled itself out of court," Dell focuses exclusively on one fact that Cascades does not intend to recant: "Dell and Pantech each made token offers of less than $100,000 for a fully paid-up license under all the Cascades patents." (*Id*. at ¶ 36). Dell argues that this allegation proves that "Dell independently and directly negotiated with [Cascades] regarding a license for use of Cascades' patented technology." (Dell Br. at 11). Dell further contends that Cascades has pled itself out of court by alleging that "Dell directly made an independent settlement offer for a license to use the technology." (*Id*.).

Again, Dell reads snippets of what it wants to read from Cascades' complaint and ignores the totality of Cascades' allegations. Cascades specifically alleged that Dell's offer was a "token offer" that "Cascades believes [was] spurious and made in bad faith." Is a potential antitrust defendant able to avoid liability by making a token or nominal bad-faith offer? California case law suggests not. *See Essex Ins. Co. v. Heck*, 186 Cal.App. 4th 1513, 1528 (2010) (considering whether a nominal/token offer of settlement under CCP § 998 is sufficient: "A token or nominal offer made with no reasonable prospect of acceptance will not pass the good faith test.").

PLAINTIFF CASCADES COMPUTER INNOVATION'S COMBINED OPPOSITION TO MOTIONS OF DEFENDANTS DELL
AND RPX TO DISMISS – CASCADES V. RPX, *ET AL*., CASE NO. 12-CV-01143-YGR

14

Dell's offer of $75,000 for a license under more than 30 patents was clearly an unreasonable offer that Dell knew Cascades would never accept, for at least two reasons. First, while Dell currently maintains less than a 4% share of the Android market, an offer of $75,000 amounts to $18,750 per market share point. When extrapolated to the entire market, Dell's offer would represent a total payment to Cascades of $1,875,000 – an unreasonable price for a patent portfolio of over 30 patents that RPX itself was originally willing to license for a price in the high seven figures. Second, the Cascades portfolio contains over 30 patents, and a settlement with Dell would inevitably result in a license under all of those patents. Even at the conservative number of 30 patents, Dell's offer amounts to a license price of $2,500 per patent – hardly enough to cover patent maintenance fees.

Proper analysis of the well-pled facts demonstrates that Cascades has alleged all that it was required to plead (and more). Further, the allegations regarding Dell's "negotiations" with Cascades (when accurately characterized in context) demonstrate that the token offer was in bad faith and not reasonably calculated to facilitate meaningful discussions of settlement. Dell's bad-faith attempt to settle does not indicate that it was acting independently. If anything, the offered amount suggests that Dell may have been attempting to drive down the license price for the remaining defendants (who would presumably seek to obtain a favorable license based on their own greater market share).

## C.     Cascades Pled Relinquishment Of Independent Decision-Making Authority

In arguing that Cascades has failed to plead relinquishment of independent decision-making authority, Dell relies on the same strained factual arguments raised with respect to its "pled itself out of court" argument. For the same reasons discussed above, Dell's argument must fail.

The manufacturing defendants sacrificed their independence (as Motorola admitted, for example, in saying that it preferred to negotiate through RPX, not independently) and Cascades pled exactly that. (*See* Compl. at ¶ 36). As noted above, RPX threatened Cascades with Rule 11 sanctions if it did not withdraw its contentions made in paragraphs 28 and 43 of the complaint:

> We are writing to you, pursuant to Federal Rule of Civil Procedure 11, in the hope that we can resolve informally an issue relating to two specific factual assertions in the Complaint and Demand for Jury Trial (the "Complaint"), which you recently filed in this action. We draw your attention in particular to paragraphs 28 and 43 of the Complaint, in which you allege respectively that "RPX terminated negotiations with Cascades and withdraw [sic] its offer because one or more of its members allegedly would not fund the license deal" and that [defendants] have agreed not to negotiate with or accept licenses from Cascades without consulting and agreeing with other members of the conspiracy concerning the acceptability of the terms offered by Cascades…." Complaint ¶¶ 28, 43.

(Ex. A, Letter from Alfred Pfeiffer, Jr. dated April 18, 2012, p. 1).

Cascades timely responded to these charges by demonstrating that RPX itself had apparently not shared relevant facts with its own attorneys:

> In this case, Cascades and RPX engaged in significant negotiations. Before those negotiations ended as described in the Complaint, the parties were close to an agreement that would license the Cascades patents to the RPX members for a payment of $9 million. ***Later, RPX told Cascades that it had lost support from its members for the deal at the $9 million level***. RPX has previously explained its practice of pre-selling deals with its members. If a purchase or license is set at a low point of $1 to $2 million, for example, RPX apparently looks to presell at a level 3-4 times that amount or $3 to $8 million. At higher purchase prices, like the $9 million proposed for a license under the Cascades patents, the pre-sale amount would be around 2 times or $18 million. ***These representations were made by RPX and constitute admissions***.

> To be clear, the representations were that RPX had lost support for the deal from relevant members -- again, admitting that the relevant group was negotiating collectively, not individually. Independent confirmation of this approach was provided through contacts with RPX members such as Motorola, who we understand had numerous calls with RPX over the Cascades negotiations. ***(Motorola admitted, for example, that "it would like to resolve this [a license] through RPX and see it as a win win if you guys can come to terms.")*** We also understand that RPX was contacted by Philips, Pantech and other members. And in direct communications with Cascades, ***RPX admitted that it was negotiating***

> *on behalf of its members: "our clients don't want to hear about Cascades again"* and *"it may take some time for the perceived value to increase with both clients and non-clients as well."*  Later, we were told this:

>> my point was that ***our clients*** don't want to solve this one Cascades case (on the '750 patent) – only to basically fund additional litigation from Cascades.  They want a global solution to Cascades – not just a solution on this one particular case – knowing that there will be others to follow.

>> It wasn't that I (or ***our clients***) didn't want to hear about Cascades again.   We/they just don't want to have to solve this problem multiple times.

(Ex. B, Letter from Gabriel I. Opatken, dated May 11, 2012, pp. 2-3; emphasis added).

These admissions (made by RPX in emails to Cascades' counsel) show that RPX's members (its so-called clients) have, indeed, worked closely together with RPX, combined and conspired in their dealings with Cascades, and that RPX has facilitated the combination and conspiracy. Rather than reply to Cascades' response letter, RPX chose an alternative method to avoid discovery into the underlying facts of this case – it filed a motion to dismiss.

Moreover, RPX's SEC filings demonstrate RPX's role as the agent or intermediary in charge of the conspiracy: "Our mission is to transform the patent market by establishing RPX as the ***essential intermediary*** between patent owners and operating companies" (RPX Br., Ex. B, S-1 Form at p. 4, 59; emphasis added); "In circumstances where ***we substantively act as an agent to acquire patent assets*** from a seller on behalf of clients who are paying for such assets separately from their subscription agreements, we may treat the client payments on a net basis;" (*Id*. at p. 40, F-9; emphasis added); and "***Our business model aligns our interests with those of our clients***" (*Id*. at p. 54, 59; emphasis added).

Specifically with respect to Dell, the numerous factual allegations of the complaint – discussed extensively above in Section IV(B) – sufficiently establish that Dell did, in fact, cede

independent decision-making authority. An unreasonable token offer that would never be accepted by Cascades (or any rational licensor) does not change the analysis.

## V.    RPX'S ARGUMENTS FOR DISMISSAL LACK MERIT

### A.    Defendants Were Economically Motivated To Conspire Against Cascades

Debates about economics are not the basis for a motion to dismiss.  That is for a trial on the merits.  A complaint cannot be dismissed by challenging some allegations of a complaint while ignoring others – every well-pled allegation in a complaint must be assumed true for the purposes of a motion to dismiss.  *Johnson*, 653 F.3d at 1010.  And in that regard, RPX confuses the standard for a judgment on the merits and the legal standard governing a motion to dismiss by heavily citing to cases that were decided on summary judgment, not Rule 12(b)(6) motions based on the allegations of a complaint alone.  *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 576 (1986); *Sun Microsystems, Inc. v. Hynix Semiconductor, Inc.*, 608 F. Supp. 2d 1166, 1191 (N.D. Cal. 2009); *TYR Sport, Inc. v. Warnaco Swimwear, Inc.*, 709 F. Supp. 2d 802, 805 (C.D. Cal. 2010).   At the pleading stage, Cascades has no burden to "prove" or present "evidence" of its claims.

RPX relies on the Supreme Court's *Matsushita* decision, where the Court considered the parties' economic self-interests in granting the antitrust defendant's motion for summary judgment.  There, the plaintiff failed to present persuasive evidence that it made economic sense for the defendants to join an illegal boycott.  Here, however, even without the benefit of discovery, Cascades has alleged facts that show defendants did, indeed, have an economic interest in refusing to deal independently with Cascades.

For example, the complaint alleges that defendants conspired in order to "force either a drastically reduced royalty for rights under the Cascades patents or no royalty rates at all." (Compl. at ¶ 31). The complaint further alleges: "This uniformity of action (indeed, of inaction)

strongly demonstrates a group effort to refuse to license, thereby forcing license prices below a competitive level at monopsony prices." (*Id*. at ¶ 38).

RPX ignores these allegations and, instead, claims its members just pay a subscription fee. They do more. Members help finance RPX's purchases of licenses and, in certain circumstances (on the basis of RPX's own admissions), participate further in the decision to consummate transactions. (*Id*. at ¶ 28: "RPX terminated negotiations with Cascades and [withdrew] its *offer because one or more of its members allegedly would not fund the license deal*." (emphasis added)). For example, RPX's SEC filing states:

> Patent assets that cost more than we are prepared to spend with our own capital resources or that may be relevant only to a very small number of clients do not generally fit within our self-financed acquisition model. When such patent assets are available for sale, we may work to acquire them with financial assistance from the particular clients against whom the assets are being or may be asserted. Such **clients either pay amounts separate from their subscription fee** or, less frequently, lend us funds to be used in the transaction.

(RPX Br., Ex. B, S-1 Form at p. 36; emphasis added; see also *id*. at pp. 15, 38, 40 and F-17).

Likewise, RPX accounts for "Gross Acquisition Spend," which it defines as "the amount [RPX has] deployed in the period to acquire patent assets, including amounts contributed by [RPX] and amounts contributed by [RPX's] clients **in excess of their subscription fees**." (*Id*. at pp. 7, 38). In at least these circumstances, each defendant would benefit by acquiring a license to the Cascades patent portfolio at prices more akin to Dell and Pantech's token offers below $100,000.

Finally, an antitrust plaintiff "need not demonstrate the existence of an explicit conspiracy, only that the inference of conspiracy is reasonable in light of the competing inferences of independent action." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1059, 1075 (N.D. Cal. 2007) (quoting *Matsushita*, 475 U.S. at 588). Courts are required to determine whether the defendants had "any rational motive" to conspire. *Id*. at 1072, 1073, 1075 (quoting

*Matsushita*, 475 U.S. at 596-97).   Cascades has adequately pled a "rational" motive for defendants to conspire with one another.   No economic principle is violated by Cascades' complaint and RPX has cited no text or economist's opinion that would support a contrary contention.

Furthermore, RPX is incorrect that it is *implausible* that defendants acted contrary to their economic self-interest in not accepting a license to Cascades' portfolio. As pled in the complaint, the refusal by Motorola, Samsung and HTC to even consider the $5 million/25% rebate offer makes no economic sense whatsoever and, alone, supports the fact of an illegal group boycott. Together, those three companies control over 90% of the Android cell phone market. (See Compl. at ¶ 13). Two of the three have successfully accepted a rebate approach in other negotiations that did not involve RPX to get complete refunds of any license payments made.  So if they were truly acting independently and in their own self-interest, it would make no economic sense to refuse Cascades' license offer.   For example, if Motorola accepted the Cascades proposal and paid $5 million and direct competitors HTC and Samsung were ultimately licensed for $10 million total, Motorola would get a $2.5 million rebate, which would drive its effective royalty to $2.5 million or roughly one-half of its two major competitors. (See *Id*. at ¶ 30).  That makes both business and economic sense, especially when licenses to others (for example, at $5 million more) would drive Motorola's effective royalty to $1.25 million. (*Id*.)  The economic value of this deal is particularly significant in light of the high cost of patent litigation.

So RPX is simply wrong that Cascades' economic theories do not support its claims. They do.  And RPX's own admissions prove it did not act without the full involvement and participation of its self-proclaimed client-members. The Court need not speculate about the precise arrangement organized by and through RPX at this early stage of pleading. Rather,

1  minimal discovery will provided ample opportunity to uncover the specific details of the

2  conspiracy.

3         **B.      Cascades Has Properly Pled Antitrust Injury**

4         RPX argues that Cascades has not pled antitrust injury. It claims that the only injury-

5  based allegation in the complaint "is that the alleged conspiracy caused Cascades to have to

6  undertake the expense of enforcing its intellectual property right in court."  (RPX Br. at 15). This

7  is not true.  RPX ignores entire sections of the complaint entitled "Injury to Competition"

8  (Compl. at ¶¶ 52-54) and "Injury to Cascades" (*Id*. at ¶ 55); worse, it misstates the law on

9  pleading antitrust injury.

10        RPX makes two arguments: (1) that a concerted refusal to license patented technology

11 can never give rise to an antitrust claim, and/or (2) that a complaint for violation of the antitrust

12 laws must specify the harm done to consumers. Despite a plethora of citations, RPX provides no

13 legal support for either of these positions.  Indeed, under the framework provided by the Ninth

14 Circuit, Cascades has adequately pled antitrust injury.

15        To recover under § 4 of the Clayton Act, a plaintiff must show the existence of antitrust

16 injury.  *Atl. Richfield Co. v. USA Petroleum Co*., 495 U.S. 328, 334 (1990).  Antitrust injury is an

17 injury "of the type the antitrust laws were intended to prevent and that flows from that which

18 makes the defendants' acts unlawful." *Id*. (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,

19 429 U.S. 477, 489 (1977)). It is injury "attributable to the anticompetitive aspect of the practice

20 under scrutiny." *Id.* The Ninth Circuit has identified four requirements for antitrust injury: "(1)

21 unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the

22 conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent."

23 *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987 (9th Cir. 2000) (quoting *Am. Ad*

24 *Mgmt. Inc. v. General Tel. Co.*, 190 F.3d 1051, 1055 (9th Cir. 1999)).

25

### 1.      Unlawful Conduct

Group boycotts and concerted refusals to deal amongst direct competitors are *per se* illegal. *See In Re Tableware*, 484 F. Supp. 2d at 1068-70.   Cascades has alleged that manufacturing defendants (direct competitors in the market for cell phones and tablets using the Android operating system) have engaged in a group boycott/concerted refusal to deal, facilitated by and through RPX. (Compl. at ¶¶ 27-32, 36-51). As such, Cascades has pled unlawful conduct. RPX does not contend otherwise.

### 2.      Injury To Plaintiff

RPX incorrectly states that "[t]he only injury based allegation that Cascades levels at Defendant is that the alleged conspiracy caused Cascades to have to undertake the expense of enforcing its intellectual property rights in court," and then concludes that this is no injury at all "because patents do not confer upon the holder an affirmative right to obtain royalties from third parties…." (RPX Br. at 15-16).

In reality, Cascades has alleged the following specific injuries: (1) that it has suffered the inability "to effect any license agreements with defendants or anyone else under reasonable terms and conditions which it otherwise would have been able to accomplish, and has lost substantial royalty income as a result;" (2) that it has been precluded from business growth which it would otherwise have achieved; and (3) that it has been required to incur extraordinary legal expenses to enforce its patents against the manufacturing defendants and others. (Compl. at ¶ 55). Cascades has also specifically alleged that the conspiracy amongst defendants resulted in the withdrawal of an offer by RPX to license the Cascades Patents for a significant sum. (*Id*. at ¶ 28).

A company's inability to reap the benefits of a free market for licenses to its patented technologies constitutes a proper allegation of antitrust injury. *See Sony Elecs. v. Soundview*

*Techs.*, 157 F. Supp. 2d 180, 181-86 (D. Conn. 2001) (denying a motion to dismiss where the patent-licensor plaintiff alleged monopsonistic price-fixing amongst competing television manufacturers). Indeed, there is nothing unique about patent licensing that renders it immune to the harms suffered as a result of monopsonistic refusals to deal or price fixing. RPX may be correct that "patents do not confer upon the holder an affirmative right to obtain royalties" (RPX Br. at 15), but ***no product or property*** confers upon its holder an affirmative right to profit therefrom. A company can still be injured when the market for its property is corrupted by anticompetitive behavior. This is exactly what has happened to Cascades, and Cascades properly alleged the same in this action. (Compl. at ¶¶ 28, 55).

### 3. The Injury To Cascades Flows From Defendants' Unlawful Conduct

Cascades' inability to fairly license its patents, as well as the corresponding loss of business growth and the expense of litigation, all flow from defendants' concerted refusal to deal. (See *Id*. at ¶¶ 31, 38, 43, 45-47, 52, 55). Defendants do not contend otherwise.

### 4. The Injuries Suffered By Cascades Are Of The Type The Antitrust Laws Were Designed To Prevent

RPX suggests that, for antitrust injury to be properly pled, the complaint must show how consumers are affected by the anticompetitive behavior complained about. (RPX Br. at 16: "The Complaint does not aver that Defendants' actions have caused consumers to pay higher prices.... Nor does the Complaint allege that the supposed conduct caused products not to incorporate value-adding technology that they would otherwise bear."). Leaving aside the fact that the complaint does specifically allege facts constituting harm to consumers (see Compl. at ¶ 52: the reduction of NPEs' incentives to innovate, the restriction on the introduction to market of new technologies, and the inflation of the price of existing technologies), RPX is incorrect in its assertion that the complaint must show harm to consumers.

1   The law is clear that the focus is not on what happens to consumers, but on whether the

2   injury complained about is tied to anticompetitive behavior. *See Atl. Richfield*, 495 U.S. at 334.

3   Thus, in *Knevelbaard*, where plaintiff milk farmers complained of artificially depressed milk

4   prices caused by buyer-side horizontal price fixing, the Ninth Circuit rejected the contention that

5   the allegations must focus on consumers. *Knevelbaard*, 232 F.3d at 988. The court held: "It is

6   competition – not the collusive fixing of prices at levels either low or high – that [antitrust

7   statutes] recognize as vital to the public interest." *Id.*   Indeed, "[c]learly mistaken is the

8   occasional court that considers low buying prices pro-competitive or that thinks sellers receiving

9   illegally low prices do not suffer antitrust injury."  *Id.* at 989; *see also Jane Doe v. Ariz. Hosp. &*

10   *Healthcare Ass'n*, 2009 U.S. Dist. LEXIS 42871, at *14 (D. Ariz. Mar. 19, 2009) (finding that

11   plaintiff pled facts supporting antitrust injury by complaining that the Arizona Hospital and

12   Healthcare Association and defendant hospitals had engaged in horizontal price-fixing.). The

13   Third Circuit has also recognized that, where artificially reduced rates are an anticompetitive

14   effect of the alleged conspiracy, a plaintiff receiving such rates constitutes antitrust injury. *See*

15   *West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 105 (3d Cir. 2010) (finding a

16   plaintiff hospital system to have sufficiently pled antitrust injury when it alleged that the

17   dominant health insurer in the area, conspiring with another hospital system, exercised its

18   monopsony power to provide plaintiff with artificially-reduced reimbursement rates).

19   "When horizontal price fixing causes buyers to pay more, or sellers to receive less, than

20   the price that would prevail in a market free of the unlawful trade restraint, antitrust injury

21   occurs." *Knevelbaard*, 232 F.3d at 988. Cascades has alleged a concerted refusal to deal amongst

22   competing cell phone manufacturers in conjunction with RPX and, further, that this concerted

23   refusal to deal has injured Cascades by preventing it from receiving fair compensation for the

24   licensing of its patents. In other words, defendants have fixed the market so that Cascades will

25

1    receive less, or even nothing at all. Accordingly, Cascades sufficiently pled an injury of the type

2    the antitrust laws were meant to prevent.

3        **C.    Cascades Has Also Properly Pled A Relevant Antitrust Market**

4            RPX argues that Cascades has failed to allege a cognizable market in which the

5    anticompetitive conduct occurred. (RPX Br. at 17). As a result, RPX argues that Cascades has

6    failed to adequately allege an antitrust violation under a rule-of-reason analysis. (*Id.*). RPX

7    ignores that its conduct is a *per se* violation of the antitrust laws and misstates the market alleged

8    by Cascades. The alleged market is not simply Cascades' patented technology, as RPX contends.

9    (*Id.* at 18). Rather, the alleged market is the market ***for*** patented technology, particularly

10   technology relating to the Android industry.

11           As a preliminary matter, the law is clear that where a *per se* antitrust violation is alleged,

12   a plaintiff need not identify the relevant geographic and product markets. *See Big Bear Lodging*

13   *Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1101-02, 1104 (9th Cir. 1999); *see also Campfield v.*

14   *State Farm Mut. Auto Ins. Co.*, 532 F.3d 1111, 1119 (10th Cir. 2008).  Further, analysis under

15   the Cartwright Act mirrors analysis under § 1 of the Sherman Act and, thus, recognizes *per se*

16   allegations of antitrust violations.  *Free Freehand Corp. v. Adobe Sys., Inc.*, 2012 U.S. Dist.

17   LEXIS 17254, at *33 (N.D. Cal. Feb. 12, 2012). Additionally, allegations of a *per se* violation of

18   § 1 of the Sherman Act are sufficient to constitute unfair and unlawful activity under the

19   California law of unfair competition. *Apple, Inc. v. Samsung Elecs. Co.*, 2012 U.S. Dist. LEXIS

20   67102, at *30 (N.D. Cal., May 14, 2012); *Cel-Tech Commc'ns Inc. v. L.A. Cellular Tel. Co.*, 20

21   Cal.4th 163, 180 (1999).

22           Cascades has alleged a *per se* violation of § 1 of the Sherman Act. This *per se* allegation

23   additionally suffices for Cascades' claims under the Cartwright Act and the California law of

24

25

1    unfair competition. Thus, RPX's argument can only relate to Cascades' claims under § 2 of the

2    Sherman Act.

3            However, even under a rule of reason analysis, Cascades has properly pled the relevant

4    antitrust market and submarkets. Specifically, Cascades has identified "the entire mobile phone

5    and tablet industry that uses Android operating systems," and the "submarket for licenses under

6    the Cascades' patents." (Compl. at ¶ 35). Cascades also explained in its complaint that the

7    technology of the Cascades Patents facilitates the installation and use of applications on Android

8    devices (*Id*. at ¶ 13); that defendants dominate the market for Android devices, with a 95%

9    market share (*Id*. at ¶¶ 13, 46); and that defendants constitute nearly the total demand for the

10   licensing of Cascades' patented technology (*Id*. at ¶ 46). Indeed, RPX itself has recognized the

11   existence of a market of the type pled by Cascades: "We refer to the market in which participants

12   exchange value related to patents as the 'patent market.'" (RPX Br., Ex. B, S-1 Form at p. 1).

13           "[A]n antitrust complaint survives a Rule 12(b)(6) motion that attacks the definition of

14   the relevant market unless it is apparent from the face of the complaint that the alleged market

15   suffers a fatal defect." *Apple*, 2012 U.S. Dist. LEXIS 67102 at *19. Generally, the relevant

16   market is defined by products or producers. *Id*. However, "[I]n the context of a buyer-side

17   conspiracy ... the market is not the market of competing sellers but of competing buyers." *See*

18   *Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001). Additionally, the relevant market need

19   not be for products but, rather, may be for a technology. *See Apple*, 2012 U.S. Dist. LEXIS

20   67102 at *21. Here, Cascades has identified a buyer-side market for certain specified patented

21   technology.

22           RPX suggests that an antitrust complaint must make specific reference to the

23   interchangeability of the market's products or technology. (RPX Br. at 18). Not so. An alleged

24   product market need only "***bear a rational relation*** to the methodology courts prescribe to define

1  a market for antitrust purposes – analysis of the interchangeability of use or the cross-elasticity

2  of demand." *Todd*, 275 F.3d at 201 (emphasis added).

3       Generally, "two products or services are [considered] reasonably interchangeable where

4  there is sufficient cross-elasticity of demand. Cross-elasticity of demand exists if consumers

5  would respond to a slight increase in the price of one product by switching to another product."

6  *Id*. at 201-02.   However, in the context of buyer-side conspiracy, these considerations are

7  reversed.  *Id.* at 202.  Cross-elasticity of demand is defined by the options available to sellers.

8  *See id.* Here, Cascades' complaint pleads the market for patented technology amongst

9  manufacturers of phones and tablets using the Android operating system and the sub-market for

10 the licensing of Cascades' patented technology. Absent the group conspiracy present here,

11 Cascades would have a number of potential licensees in the Android phone industry from which

12 to seek the highest possible royalty rate. Thus, in a market free from a buyer-side conspiracy,

13 Cascades would have far more licensing options and individual manufacturers would have less

14 power to force a lower price for a license. *See id.* ("A greater availability of substitute buyers

15 indicates a smaller quantum of market power on the part of the buyers in question.").

16      Accordingly, by pointing to the Android market for patented technology and the sub-

17 market for licenses to its patents and technology, Cascades has thoroughly identified markets that

18 stand up to a reasonable interchangeability analysis and adequately pled a relevant antitrust

19 market for the purposes of a rule-of-reason analysis.

20 **VI.   DISCOVERY WILL PROVIDE MORE SUPPORT FOR CASCADES' CLAIMS**

21      As the Supreme Court held in *Twombly*, 550 U.S. at 555, allegations of antitrust

22 violations must only "raise a reasonable expectation that discovery will reveal evidence of illegal

23 agreement." The admissions already made by RPX, together with the following allegations of

24

25

Cascades' complaint, raise a reasonable expectation that discovery will reveal illegal conduct by the defendants:

- Cascades is an NPE with an exclusive right to license and enforce a portfolio of patents. (Compl. at ¶¶ 1, 12-14).

- All of the manufacturing defendants, which comprise over 90% of the Android market, are infringing at least one patent in the Cascades portfolio. (*Id*. at ¶¶ 8, 13, 37).

- All of the manufacturing defendants are members of RPX. (*Id*. at ¶ 13).

- The stated goal of RPX is to protect its members from claims of infringement by NPEs. (*Id*. at ¶ 17).

- RPX boasts of its ability to achieve wholesale pricing terms from NPEs. (*Id*. at ¶ 21).

- RPX facilitates joint defense agreements for its members who are targeted by NPEs and provides NPE patent insurance for its members. (*Id*. at ¶ 24-26).

- RPX made a high seven-figure offer to take a license under the Cascades Patents for its members. (*Id*. at ¶¶ 27, 28).

- RPX withdrew that offer when one or more of its members refused to fund the deal. (*Id*. at ¶ 28).

- After the withdrawal of the offer by RPX, Cascades was unable to initiate discussions with any of the manufacturing defendants regarding the licensing of the Cascades Patents. (*Id*. at ¶¶ 28, 36).

- Each of HTC, LG, Samsung, and Motorola did not even respond to a licensing offer that would have allowed it to potentially recover all money paid for a license to over 30 patents. (*Id*. at ¶¶ 30, 36).

1   Here, there is already much more than a reasonable expectation that discovery will reveal

2   evidence of illegal activity – the defendants' admissions already show a combination to refuse to

3   deal.  Discovery will uncover even more illegal activity and provide the evidence required for

4   Cascades to prove its case at trial.

5   **VII.   CONCLUSION**

6   Dell and RPX are simply not entitled to have Cascades' detailed, fact-specific complaint

7   dismissed.  Plaintiff Cascades respectfully submits that the motions to dismiss should be denied.

8   Dated: June 5, 2012                                    Respectfully Submitted,

9                                                          NIRO, HALLER & NIRO
                                                           DAVIS WRIGHT TREMAINE LLP

10
                                                           By:____/s/ Martin L. Fineman_____
11                                                                 MARTIN L. FINEMAN

12                                                         Attorneys for Plaintiff
                                                           Cascades Computer Innovation LLC

13

14

15

16

17

18

19

20

21

22

23

24

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 5, 2012 the foregoing

**PLAINTIFF CASCADES COMPUTER INNOVATION'S COMBINED OPPOSITION TO MOTIONS OF DEFENDANTS DELL AND RPX TO DISMISS**

was filed with the Clerk of Court using the CM/ECF system, which will then send a notification

of such filing to the following counsel of record.

| | |
|---|---|
| Paul R. Griffin<br>pgriffin@winston.com<br>Sean D. Meenan<br>smeenan@winston.com<br>WINSTON & STRAWN LLP<br>101 California Street<br>San Francisco, CA  94111-5802<br>Tel:  (415) 591-1000<br>Fax:  (415) 591-1400<br><br>Kimball R. Anderson (*pro hac vice*)<br>kanderson@winston.com<br>Samuel Mendenhall (*pro hac vice*)<br>smeenan@winston.com<br>WINSTON & STRAWN LLP<br>35 W. Wacker Drive<br>Chicago, IL  60601<br>Tel:  (312) 558-5755<br>Fax:  (312) 558-5700<br><br>***Attorneys for Defendant Dell Inc.*** | Charles S. Crompton, III<br>Charles.crompton@lw.com<br>Hanno Kaiser<br>Hanno.kaiser@lw.com<br>Alfred Carroll Pfeiffer, Jr.<br>Al.pfeiffer@lw.com<br>Latham & Watkins<br>505 Montgomery Street – Suite 2000<br>San Francisco, CA 94111<br>Tel: 415-391-0600<br>Fax: 415-395-8095<br><br>***Attorneys for Defendant RPX Corporation*** |
| Elliot R. Peters<br>epeters@kvn.com<br>Paula L. Blizzard<br>pblizzard@kvn.com<br>Thomas E. Borman<br>tgorman@kvn.com<br>633 Battery Street<br>San Francisco, CA  94111-1809<br>Tel:  (415) 391-5400<br>Fax:  (415) 397-7188<br><br>***Attorneys for Defendant LG Electronics, Inc.*** | Jonathan M. Jacobson<br>Chul Pak (Pro Hac Vice)<br>Daniel P. Weick (Pro Hac Vice)<br>Wilson Sonsini Goodrich & Rosati<br>Professional Corporation<br>1301 Avenue of the Americas, 40th Floor<br>New York, New York  10019<br>Tel:  (212) 497-7700<br>Fax:  (212) 999-5899<br>jjacobsen@wsgr.com<br><br>Lisa A. Davis<br>Wilson Sonsini Goodrich & Rosati<br>Professional Corporation<br>650 Page Mill Road<br>Palo Alto, CA  94304<br>Tel:  (650) 493-9300<br>Fax:  (650) 493-6811<br>ldavis@wsgr.com<br><br>***Attorneys for Defendant HTC Corporation*** |

I certify that all parties in this case are represented by counsel who are CM/ECF participants.

_/s/_      Martin L. Fineman
DAVIS WRIGHT TREMAINE LLP
Attorneys for Plaintiff
Cascades Computer Innovation LLC

Plaintiff Cascades Computer Innovation's combined Opposition To motions of Defendants Dell And RPX To Dismiss – Cascades v. RPX, _et al._, Case No. 12-cv-01143-YGR

- 2 -