United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CASCADES COMPUTER INNOVATION LLC,<br><br>Plaintiff,<br><br>vs.<br><br>RPX CORPORATION *et al.*,<br><br>Defendants. | Case No.: 12-CV-01143 YGR<br><br>**ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS THE COMPLAINT WITH LEAVE TO AMEND** |

Plaintiff Cascades Computer Innovation LLC ("Cascades") brings this antitrust action against Defendants RPX Corporation ("RPX"), Dell, Inc. ("Dell"), HTC Corporation ("HTC"), LG Electronics, Inc. ("LG"), Motorola Mobility, Inc. ("Motorola"), and Samsung Electronics Co. ("Samsung"), alleging that the Defendants formed a group boycott not to license its patents.  Plaintiff brings four claims: (1) Violation of the Federal Antitrust Laws under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2; (2) Monopsonization, Conspiracy to Monopsonize, and Attempt to Monopsonize[1] under Section 2 of the Sherman Act, 15 U.S.C. § 2; (3) Violation of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*; and (4) Violation of California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*

The Defendants have filed three Motions to Dismiss raising numerous grounds for dismissal,[2] namely, the Complaint:  (1) fails to allege a plausible antitrust conspiracy; (2) fails to allege harm to

---

[1] A company that has substantial power in the purchasing-side of the market has monopsony power, "colloquially called a 'buyer's monopoly.'"  *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc.*, 549 U.S. 312, 320 (2007).

[2] In total, the Defendants raise eight grounds for dismissal:  RPX argues the complaint must be dismissed on

the competitive process in a relevant market; (3) fails to allege an antitrust injury; (4) lacks economic

sense; and (5) alleges joint activity related to defending against ongoing patent infringement lawsuits,

which (a) according to Dell, should have been filed as a counterclaim in a pending patent

infringement litigation, or (b) according to HTC, LG, Motorola, and Samsung, is litigation activity

protected by the *Noerr-Pennington* doctrine.

Having carefully considered the papers submitted, the Complaint, and the oral argument of

counsel, for the reasons set forth below, the Court hereby **GRANTS** all three Motions to Dismiss.

**LEAVE TO AMEND** is **GRANTED** to the extent the Complaint can be amended consistent with this

Order and Rule 11.

# I.    BACKGROUND

This action arises out of Cascades' inability to license its technology patents, allegedly

because of Defendants' group boycott. According to the Complaint, although the Defendants

manufacture devices that infringe on Cascades' patents, they have conspired not to license Cascades'

patents. In furtherance of the conspiracy, they have entered into joint defense agreements and shared

information through their joint legal counsel and through co-Defendant RPX.

## A.    THE PARTIES

Cascades is a non-practicing entity ("NPE"), whom the Defendants accuse of being a "patent

troll"—an entity that "enforces patent rights against accused infringers in an attempt to collect

licensing fees, but does not manufacture products or supply services based upon the patents in

question." *Internet Ad Systems, LLC v. Opodo, Ltd.*, 481 F. Supp. 2d 596, 601 (N.D. Tex. 2007).[3] Its

stated purpose is to level the playing field between individual inventors and large multinational

---

the grounds that Cascades' allegations (1) lack economic sense; (2) fail to allege antitrust injury; and (3) do not allege a relevant antitrust market. Dell moves to dismiss on the grounds that (4) Cascades' claims are compulsory counterclaims not pled in another lawsuit; (5) Cascades "pled itself out of court"; and (6) Cascades failed to plead relinquishment of independent decision-making authority by Dell. Defendants HTC, LG, Motorola, and Samsung have filed a Joint Motion to Dismiss on the grounds that Cascades (7) fails to allege a conspiracy; and (8) alleges litigation activity protected by the *Noerr-Pennington* doctrine.

[3] Not all NPEs are referred to as "patent trolls." For example, research universities may develop patented technology but not practice the patents. (*See* Dkt. No. 54-4, FED. TRADE COMM'N, THE EVOLVING IP MARKETPLACE: ALIGNING PATENT NOTICE AND REMEDIES WITH COMPETITION, Exec. Summ., at 8 n.5 (2011).)

1   corporations with vast resources, by providing financial and other assistance to make patent licensing

2   or litigation a more equal contest.  (Complaint ¶ 17.)  Cascades holds rights to a portfolio of 38

3   patents relating to technology that optimizes use of the Android operating system employed in certain

4   mobile phones and computer tablets.  (*Id.* ¶ 13.)

5       Plaintiff alleges Defendants Dell, HTC, LG, Motorola, and Samsung (collectively, the

6   "Manufacturing Defendants") sell devices, including mobile phones and computer tablets, employing

7   the Android operating system.  (*Id.* ¶ 8.)  Together, the Manufacturing Defendants sell more than

8   95% of the devices sold in the United States that use the Android operating system.  (*Id.* ¶ 13.)[4]

9   Accordingly, Cascades alleges that the Manufacturing Defendants have sufficient market power to

10  form a buyer's cartel.  As each Manufacturing Defendants is a member of RPX, the opportunity to

11  collude exists.  (*Id.*)

12      Like Cascades, RPX itself is an NPE, but according to RPX's Form S-1 Registration

13  Statement filed with the Securities and Exchange Commission, it is a defensive patent aggregator or

14  "anti-troll," formed to protect its members from NPEs, like Plaintiff, who file infringement claims.

15  (RPX's Request for Judicial Notice ("RJN"), Ex. B, Dkt. No. 54-3, ("RPX's Form S-1"), at 1, 17, 34,

16  53, 58; Complaint ¶¶ 17, 20.)  RPX frequently acts as an intermediary for its members for purposes

17  of acquiring patents and negotiating licenses on behalf of its more than 110 members.  (*Id.* ¶ 20.)

18  According to the Complaint, RPX effectively discourages its members from dealing independently

19  with patent owners.  (*Id.* ¶¶ 20, 29, 41.)  RPX believes that by making individual inventors, patent

20  owners and NPEs negotiate through RPX, its members are able to acquire patent rights at

21  "wholesale" royalty rates.  (*Id.* ¶ 21.)  The members fund RPX, "each of whom is granted a license in

22  exchange for a payment ranging from $60,000 to $6,000,000."  (*Id.* ¶¶ 2, 20.)  However, in certain

23  transactions involving the acquisition of patents or licenses relevant only to a very small number of

24  RPX members, funding will be provided by the particular members against whom the patents are

25

26

27  [4] According to the Complaint, approximately 40% of all mobile devices use the Android operating system.
    (Complaint ¶ 13.)  The Complaint identifies each Manufacturing Defendant's share of the market for those

28  devices as follows:  HTC (41%), Motorola (35%), Samsung (17%), LG (4%), and Dell (less than 4%).  (*Id.*)

3

1    being or may be asserted.  (*See* RPX's Form S-1, at 36-37 ("Through December 31, 2010, we have

2    completed 11 [such] acquisitions"); Complaint ¶¶ 27-28.)

3        **B.    LICENSING NEGOTIATIONS**

4        In 2010, RPX, on behalf of its members, entered into licensing negotiations with Cascades.

5    (*Id.* ¶¶ 19, 27, 28.)  Cascades believes that the Defendants entered into a common agreement when

6    RPX attempted to negotiate a license on their behalf.  By agreeing to negotiate only through RPX, the

7    Manufacturing Defendants sought a license at a much lower price than if they acted independently.

8    (*Id.* ¶ 47.)  The negotiations involved a "high seven-figure payment to Cascades for a fully paid-up

9    license."  (*Id.* ¶ 27.)  Subsequently, RPX terminated negotiations and withdrew its offer because one

10   or more of its members would not fund the deal, which Cascades argues is circumstantial evidence of

11   a conspiracy, *i.e.*, one participant invited common action by the others.  (*Id.* ¶ 28.)

12       Either before or after the negotiations ended (the Complaint alleges both) the Manufacturing

13   Defendants, RPX, and others formed a conspiracy not to license Cascades' patents.  Allegedly, the

14   Defendants agreed they would jointly refuse to license Cascades' patents; none would negotiate a

15   license with Cascades independently; and all would infringe on Cascades' patents without paying

16   royalties.  (*Id.* ¶¶ 28, 39.)  The object of the conspiracy was to force Cascades to abandon its efforts

17   to license and enforce its patents, accept a below market-value offer from RPX, or go out of business

18   by virtue of expensive litigation.  (*Id.* ¶¶ 28, 46.)

19       Cascades alleges that each Manufacturing Defendant is openly and notoriously infringing on

20   Cascades' patents.  (*Id.* ¶ 37.)  In its Opposition to the Joint Motion of the Manufacturing Defendants,

21   Cascades accuses them of being "serial infringers."  (*See* Dkt. No. 82, Opp'n to Joint Motion 1.)  It

22   has sued all five Manufacturing Defendants for patent infringement in the Northern District of

23   Illinois, *Cascades Computer Innovation, LLC v. Motorola Mobility Inc. and Samsung Electronics Co.*

24   *Ltd.*, Case No. 11-CV-4574 (filed on July 6, 2011), *Cascades Computer Innovation, LLC v. HTC*

25   *Corporation and LG Electronics, Inc.*, 11-CV-6235 (filed on September 7, 2011), *Cascades*

26   *Computer Innovation, LLC v. Dell, Inc.*, Case No. 11-CV-7264 (filed on October 13, 2011).  (*See*

27   Dkt. No. 54-4, RJN, Ex. C; respectively referred to as the "Illinois Actions" or "Illinois Action.")

28

United States District Court
Northern District of California

Each Manufacturing Defendant has counterclaimed for declarations of invalidity and non-infringement.  (*Id.*)

In furtherance of the alleged conspiracy, the Defendants have engaged in common defense agreements against Cascades' patents.  (Complaint ¶¶ 39-40, 43.)  The common defense agreements allegedly share a common purpose: do not settle with Cascades; do not discuss the possibility of a license; do not negotiate independently; and act consistently with each other.  (*Id.* ¶ 43.)  The Manufacturing Defendants share information through RPX and others, including the law firm of Winston & Strawn, concerning their negotiations with Cascades, and the Defendants have agreed to share expenses and assist each other in attacking Cascades' patents.  (*Id.* ¶¶ 39-44.)

With the exception of RPX, which "withdrew an offer when its members agreed to boycott Cascades," each of the Defendants has refused to engage in any serious licensing negotiations with Cascades.  (*Id.* ¶ 37; *but see*, *id.* ¶ 27 (alleging the conspiracy formed "after negotiations with Cascades ended").)  In January 2012, Cascades tried to negotiate licensing agreements with each of the Manufacturing Defendants individually.  (*Id.* ¶ 30.)  Dell made a "token" offer of less than $100,000 for a fully paid-up license under all of Cascades' patents, which Cascades alleges was "spurious and made in bad faith."  (*Id.* ¶ 36.)  Cascades offered LG, Motorola, Samsung and HTC identical license proposals that, *inter alia*, would have required a lump-sum royalty payment of $5 million with the right to recover some or all of the payment based upon licensing revenues Cascades received from other manufacturers.  (*Id.* ¶ 30.)  None of these Defendants ever responded to the offer, which Cascades alleges is economically irrational behavior that can be explained only by a concerted refusal to deal.  (*Id.*)

Since the filing of this lawsuit, LG and Cascades reached a settlement and LG has been dismissed from this lawsuit.  (*See* Dkt. Nos. 85 & 88.)  The Manufacturing Defendants also have asked the Court to take judicial notice that Philips, who is a member of RPX (*see* Complaint ¶ 19), has settled its patent infringement lawsuit with Cascades, *Cascades Computer Innovation, LLC v. Koninklijke Philips Electronics N.V.*, 11-CV-7387 (N.D. Ill.).

Cascades alleges that the conspiracy to boycott Cascades' patents is a buyers' cartel that has harmed competition by (1) diminishing the value of licenses; (2) reducing NPEs incentives to support

United States District Court
Northern District of California

1    innovation; (3) driving Cascades out of business; (4) raising prices and reducing output in products

2    covered by Cascades' patents; and (5) raising barriers to entry in the market for licenses by

3    implementing a plan to eliminate all NPEs.  (Complaint ¶¶ 53-55.)  Cascades further alleges that the

4    Defendants' conspiracy has harmed competition in the following markets:  (1) patents, (2) patented

5    technology, (3) licenses for patents, (4) licenses for Cascades' patents, (5) licensing of Cascades'

6    patented technology, (6) the "Android market," (7) mobile phones and tablets that use the Android

7    operating system; and (8) products that use Cascades' patented technology.

8    **II.     LEGAL STANDARD**

9         A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in the

10   complaint.  *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1199-1200 (9th Cir. 2003).  "Dismissal can be based

11   on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable

12   legal theory."  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  All allegations

13   of material fact are taken as true.  *Johnson v. Lucent Techs., Inc.,* 653 F.3d 1000, 1010 (9th Cir.

14   2011).[5]

15        To withstand a motion to dismiss, a plaintiff must not merely allege conduct that is

16   conceivable but must instead allege "enough facts to state a claim to relief that is plausible on its

17   face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when

18   the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

19   defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (citing

20   *Twombly*, *supra*, 550 U.S. at 556).  In the antitrust context, "a court must determine whether an

21   antitrust claim is 'plausible' in light of basic economic principles."  *William O. Gilley Enters., Inc. v.*

22   *Atl. Richfield Co.*, 588 F.3d 659, 662 (9th Cir. 2009) (citing *Twombly*, *supra*, 550 U.S. at 556).  "The

23

24   _____

     [5] Review is generally limited to the contents of the complaint and documents attached thereto.  *Allarcom Pay*
     *Television. Ltd. v. Gen. Instrument Corp.*, 69 F.3d 381, 385 (9th Cir. 1995).  A court also may consider

25   documents whose contents are incorporated by reference in a complaint or upon which a complaint necessarily
     relies when authenticity is not contested, and matters subject to judicial notice without converting the motion

26   into one for summary judgment.  *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005); *Lee v. City of Los*
     *Angeles*, 250 F.3d 668, 689 (9th Cir. 2001).  The Court finds that documents submitted in support of the

27   parties' briefs are subject to judicial notice and/or are incorporated by reference into the Complaint.  The Court
     takes judicial notice of the fact that certain documents were publicly-filed and the fact that certain statements

28   were made in those documents on the dates specified, but not the truth of the statements contained therein.

1  plausibility standard is not akin to a probability requirement, but it asks for more than a sheer

2  possibility that a defendant has acted unlawfully ….  When a complaint pleads facts that are merely

3  consistent with a defendant's liability, it stops short of the line between possibility and plausibility of

4  entitlement to relief." *Iqbal*, *supra*, 556 U.S. at 679 (quoting *Twombly*, *supra*, 550 U.S. at 556-57)

5  (internal quotation marks omitted).  In sum, if the facts alleged foster a reasonable inference of

6  liability—stronger than a mere possibility—the claim may proceed; if not, the claim must be

7  dismissed.  *See id*.

8          Courts acknowledge that "proceeding to antitrust discovery can be expensive." *Twombly*,

9  *supra*, 550 U.S. at 558.  For that reason, this Court must "insist upon some specificity in pleading

10  before allowing a potentially massive factual controversy to proceed." *Id*.  Accordingly, if the

11  allegations in the complaint fail to give rise to a plausible claim for relief, "'this basic deficiency

12  should … be exposed at the point of minimum expenditure of time and money by the parties and the

13  court.'" *Id*. (citations omitted).

14  **III.  DISCUSSION**

15          Section 1 of the Sherman Act makes illegal "[e]very contract, combination …, or conspiracy,

16  in restraint of trade or commerce." 15 U.S.C. § 1.[6]  To state a Section 1 Sherman Act claim, the

17  claimant must plead not just ultimate facts (such as a conspiracy), but evidentiary facts which, if true,

18  will prove: (A) a contract, combination or conspiracy among two or more persons or distinct business

19  entities; (B) by which the persons or entities intended to harm or restrain trade or commerce; (C) that

20  actually injures competition. *Twombly*, *supra*, 550 U.S. at 548.

21          Section 2 of the Sherman Act makes it unlawful to monopolize, attempt to monopolize, or

22  combine or conspire to monopolize any part of the nation's interstate or foreign commerce.  15

23  U.S.C. § 2.[7]  To state a cause of action for the offense of monopoly under Section 2 of the Sherman

---

25  [6] 15 U.S.C. § 1.  Trusts, etc., in restraint of trade illegal; penalty
26          Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of
           trade or commerce among the several States, or with foreign nations, is declared to be illegal.
           Every person who shall make any contract or engage in any combination or conspiracy hereby
27          declared to be illegal shall be deemed guilty of a felony …

28  [7] 15 U.S.C. § 2.  Monopolizing trade a felony; penalty
           Every person who shall monopolize, or attempt to monopolize, or combine or conspire with

Act, a plaintiff must plead two elements: (1) the possession of monopoly power in the relevant market; and (2) willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.  *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).  If a defendant does not possess monopoly power, a Section 2 Sherman Act claim may be maintained for attempted monopolization if (1) there is "a dangerous probability" that the defendant may be able to achieve monopoly power and (2) the defendant is engaged in predatory or anticompetitive conduct (3) with "a specific intent to monopolize."  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993); *Cost Mgmt. Servs., Inc. v. Washington Natural Gas Co.*, 99 F.3d 937, 949 (9th Cir. 1996).

Given the parties' overlapping arguments regarding the sufficiency of the antitrust allegations, the Court's analysis will be issue based:

### A.  FIRST ELEMENT:  CONCERTED ACTION

Defendants HTC, LG, Motorola, and Samsung argue in their Joint Motion to Dismiss that Cascades' Complaint fails to allege a plausible conspiracy.  Cascades alleges that Defendants' group boycott claim violates Sections 1 and 2 of the Sherman Act.

#### *1.     Requirement for pleading an antitrust conspiracy.*

Pleading an antitrust conspiracy "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made.  Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement …. [A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice."  *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008) (quoting *Twombly*, *supra*, 550 U.S. at 556-57).  Rather, a complaint must state facts "plausibly suggesting (not merely consistent with) agreement" among the purported co-conspirators rather than individual decisions.  *See Twombly*, *supra*, 550 U.S. at 557.

---

any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony …

United States District Court
Northern District of California

To allege an "agreement between antitrust co-conspirators, the complaint must allege facts such as a 'specific time, place, or person involved in the alleged conspiracies' to give a defendant seeking to respond to allegations of a conspiracy an idea of where to begin." *Kendall*, *supra*, 518 F.3d at 1047 (quoting *Twombly*, *supra*, 550 U.S. at 565 n.10).  A plaintiff need not allege "specific back-room meetings between specific actors at which specific decisions were made." *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007); *see In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1183 (N.D. Cal. 2009) (*Twombly* and *Kendall* do not impose an elaborate "who, what, when, where" pleading requirement).  However, "a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Twombly*, *supra*, 550 U.S. at 556-57.

Because conspiracy is an essential element of each of Cascades' claims, each of its claims requires that it plead a plausible conspiracy, and it must do so with the required specificity.  *See Kendall*, *supra*, 518 F.3d at 1047 n. 5 ("[a]t least for the purposes of adequate pleading in anti-trust cases, the Court specifically abrogated the usual 'notice pleading' rule").

### 2.   *Whether Cascades has pled a plausible conspiracy.*

Cascades complains of a "group boycott and concerted refusal to deal."  (Complaint ¶ 12.)  As set forth above, Cascades alleges that the Manufacturing Defendants "conspired," but Cascades "does not answer [any of] the basic questions:  who, did what, to whom (or with whom), where, and when?" *Kendall*, *supra*, 518 F.3d at 1048; *see also, Rick-Mik Enters. v. Equilon Enters.*, LLC, 532 F.3d 963, 976 (9th Cir. 2008) ("All that is alleged is there was an agreement on price.  The co-conspirator banks or financial institutions are not mentioned.  The nature of the conspiracy or agreement is not alleged.  The type of agreements are [*sic*] not alleged.").  Instead, the allegations in the Complaint consist primarily of threadbare recitals of conspiracy.[8]  Cascades alleges that the Manufacturing Defendants conspired, combined and/or entered into "agreements with RPX, joint

---

[8] "Terms like 'conspiracy,' or even 'agreement,' are border-line: they might well be sufficient in conjunction with a more specific allegation—for example, identifying a written agreement or even a basis for inferring a tacit agreement—but a court is not required to accept such terms as a sufficient basis for a complaint." *Twombly*, *supra*, 550 U.S. at 557 (quoting *DM Research, Inc. v. Coll. of Am. Pathologists*, 170 F.3d 53, 56 (1st Cir. 1999)).

defense agreements, NPE insurance, common counsel, meetings, phone calls, emails, and discussions with RPX and otherwise" to agree to "not accept licenses from Cascades." (Complaint ¶ 39.)[9]  As to when this alleged conspiracy formed, Cascades alleges that "after negotiations with Cascades ended, RPX and the other defendants conspired." (*Id.* ¶ 28.)  Cascades also alleges that RPX "withdrew its offer when its members agreed to boycott Cascades." (*Id.* ¶ 37.)  Other than Cascades' allegation that negotiations with RPX broke down when one or more RPX members would not agree to fund the deal, all Cascades has alleged is "parallel behavior."[10]  This is the sort of generic pleading—alleging misconduct against various defendants without specifics as to the role each played—that was rejected by *Twombly*:

> the pleadings mention[s] no specific time, place, or person involved in the alleged conspiracies …. [T]he complaint here furnishes no clue as to which of the [defendants] (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place …. [A] defendant seeking to respond to plaintiffs' conclusory allegations in the § 1 context would have little idea where to begin.

*Id.* at 565, n.10.

Based on the foregoing analysis, the Court **GRANTS** the Joint Motion to Dismiss on this basis **WITH LEAVE TO AMEND**.

> 3.      *Whether Cascades has "pled itself out of court" with respect to Dell.*

Dell focuses on Cascades' own allegations to challenge the plausibility of the conspiracy allegations that Dell itself participated in the group boycott.  According to Dell, by

---

[9] In its Opposition to the Joint Motion, Cascades argues that it has alleged a contract because "there is an acknowledged agreement" because each manufacturing defendant is a member of RPX, "and there may be many more" agreements.  (Opp'n to Joint Motion 7.)  Each Defendant's initial disclosures identified individuals with knowledge of and/or documents reflecting Cascades-related communications between the defendant and RPX.  (*Id.* at 7-8.)  On the basis of these initial disclosures (which are not facts alleged in the complaint), Cascades argues that "'Cascades-related communications with manufacturing defendants' exist, suggesting further meeting of the minds between the co-conspirators beyond the initial membership agreement."  (*Id.* at 8:9-11.)

[10] A footnote in *Twombly* describes the type of evidence that enables parallel conduct, *i.e.*, similar conduct by different entities, to be interpreted as collusive:  "'parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties' … [;] 'conduct [that] indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement.'"  550 U.S. at 557 n.4.

United States District Court
Northern District of California

1   alleging that Dell negotiated with Cascades, albeit in bad faith, Cascades has "pled itself out of court

2   with respect to Dell."  (Dell's Mot. 11.)  On this same basis, Dell argues that Cascades failed to plead

3   sufficiently the relinquishment of independent decision-making authority, an essential part of all

4   claims against Dell.  Although these are separate bases for dismissal, Dell makes the same arguments

5   in support of both, and the Court will analyze them together.

6        The Complaint alleges a group boycott and concerted refusal to deal that consisted of

7   agreeing: (1) "none of [the Manufacturing Defendants] would separately negotiate with Cascades for

8   a license"; (2) "all would act together to oppose Cascades' effort to license and enforce [its patents]";

9   and (3) "not to accept a license at any price" from Cascades.  (Complaint ¶¶ 28, 47, 53.)  Dell argues

10  that Cascades has "pleaded itself out of court" by admitting that:  Dell independently and directly

11  negotiated with Cascades regarding a license for use of Cascades' patented technology, and Dell

12  directly made an independent settlement offer for a license to use the technology.

13       According to Cascades, Dell ignores relevant allegations in the Complaint.  Specifically,

14  Cascades points to the following: "the individual manufacturing defendants all agreed among

15  themselves and with RPX not to negotiate independently with Cascades" (*id*. ¶ 28); "RPX enables its

16  members to act in concert in dealing with NPEs seeking to license their patents and eliminates the

17  ability of its individual members to act independently" (*id*. ¶ 22); and "Defendants have contracted,

18  combined and conspired to restrain trade by jointly refusing to negotiate or accept licenses under the

19  Cascades patents" (*id*. ¶ 31).  In its Opposition, Cascades implies that "[t]o make it seem as if it was

20  negotiating independently, Dell made a ridiculous offer of less than $100,000."  (Dkt. No. 60,

21  Combined Opposition to Motions of Defendants Dell and RPX ("Combined Opp'n"), at 3.)

22       While Cascades' Complaint characterizes Dell's offer as "spurious" and "made in bad faith,"

23  it does not indicate that Dell only pretended to negotiate independently to make it seem as if it was

24  not involved in a conspiracy.  (*See* Complaint ¶ 36.)  The alleged conspiracy was not to negotiate a

25  license or pay for a license at any price, even $1.  Any offer to license Cascades' patents, even a

26  spurious and bad faith offer, is not conduct consistent with participation in the conspiracy as pled.

27  Rather, and without more, the conduct more plausibly suggests that Dell considered paying a

28  nuisance fee to avoid litigation than the conduct suggests that Dell pretended to negotiate

1    independently.  Therefore, as to Defendant Dell, only, the allegations in the Complaint fail

2    adequately to allege Dell's participation in the conspiracy.

3          Based on the foregoing analysis, the Court **GRANTS** Dell's Motion to Dismiss on this basis

4    **WITH LEAVE TO AMEND**.

5          **B.    SECOND ELEMENT:  UNREASONABLE RESTRAINT OF TRADE**

6          Not all agreements in restraint of trade violate Section 1 of the Sherman Act.  Only those

7    agreements that *unreasonably* restrain trade will run afoul of the antitrust laws.  *See Big Bear*

8    *Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1101 (9th Cir. 1999) (citing 15 U.S.C. § 1).  The

9    second element of a Section 1 Sherman Act claim requires that the challenged agreement be an

10   unlawful restraint of trade.  *See State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997); 15 U.S.C. § 1.

11         There are two types of analyses used to determine the lawfulness of an agreement between

12   competitors:  *per se* and rule of reason.  *See National Soc'y of Prof'l. Eng'rs v. United States*, 435

13   U.S. 679, 692 (1978).  Certain agreements are considered so harmful to competition and to have no

14   significant benefits that they almost always are illegal.  *See Continental TV, Inc. v. GTE Sylvania*

15   *Inc.*, 433 U.S. 36, 50 n.16 (1977).  These agreements are "*per se*" violations of the Sherman Act; no

16   defense or justification is allowed.  *Per se* violations include agreements amongst competitors to fix

17   prices, rig bids, or share or divide markets.  *Northwest Wholesale Stationers, Inc. v. Pac. Stationery*

18   *& Printing Co.*, 472 U.S. 284, 298 (1985) (the category of restraints classified as group boycotts to

19   which the *per se* approach applies "generally involve joint efforts by a firm or firms to disadvantage

20   competitors by 'either directly denying or persuading or coercing suppliers or customers to deny

21   relationships the competitors need in the competitive struggle.'").[11]  All other agreements are

22   evaluated under a "rule of reason" analysis.  Cascades asserts both *per se* and rule of reason claims

23   under Section 1 of the Sherman Act.

24

25

26   [11] The following three criteria "are indicative of *per se* illegal conduct":  (1) the boycott cuts off access to a
     supply, facility, or market necessary for the victim firm to compete; (2) the boycotting firms possess dominant
27   market positions; and (3) the practices are not justified by plausible arguments that they enhanced overall
     efficiency or competition.  *Adaptive Power Solutions, LLC v. Hughes Missile Systems Co.,* 141 F.3d 947, 950
28   (9th Cir. 1998) (quoting *Hahn v. Oregon Physicians' Serv.,* 868 F.2d 1022, 1030 (9th Cir. 1988)).

United States District Court
Northern District of California

*1.      Per Se.*

To succeed on a *per se* claim, a plaintiff must establish that the defendant entered into an agreement amounting to a hardcore offense, such as naked horizontal price-fixing or market-sharing, and that the plaintiff has suffered "antitrust injury" as a result. *Broadcast Music v. Columbia Broadcasting Sys.*, 441 U.S. 1, 8 (1979). Where a plaintiff alleges a *per se* antitrust violation, harm to competition is presumed and the plaintiff does not need to identify the relevant market in which the defendants' conduct has had an anticompetitive effect. *Big Bear Lodging Ass'n*, *supra*, 182 F.3d at 1104-05.

The Manufacturing Defendants challenge Cascades' contention that the alleged group boycott is *per se* illegal. They argue that their contracts with RPX permit members of the alleged conspiracy to negotiate independently with Cascades, and therefore, the alleged agreement imposed no restraint on the market and the rule of reason applies.[12] Although the Complaint is far from clear on this issue, Cascades appears to challenge an alleged agreement among the Defendants not to deal with Cascades specifically, and not, more broadly, the Manufacturing Defendants' membership agreements with RPX. While Defendants are correct that, as a threshold matter, the challenged conduct must involve concerted action, as opposed to independent behavior, the critical question here is whether the concerted refusal to deal with Cascades is a restraint exhibiting a "predictable and pernicious anticompetitive effect" without potential for procompetitive benefit. *See State Oil Co.*, *supra*, 522 U.S. at 10. Defendants do not address whether the Complaint, on its face, shows any procompetitive justification to form a group boycott of Cascades' patents. *See Brennan v. Concord EFS, Inc.*, 369 F. Supp. 2d 1127, 1131, 1133 (N.D. Cal. 2005) (applying *per se* analysis when reviewing complaint because "[w]hatever the merits of the [defendants' procompetitive] arguments, they are intrinsically factual, contrary to plaintiffs' pleading and inappropriate for resolution at the motion to dismiss stage").[13]

---

[12] On this same basis, the Manufacturing Defendants argue that the claims also should not be analyzed under the rule of reason either. That, however, would leave no framework from which to analyze the lawfulness of the alleged agreement.

[13] As the cases cited by the Manufacturing Defendants demonstrate (*see* Joint Motion 16-17), determining whether a group boycott is *per se* unlawful tends to be a fact specific inquiry that requires examination of market conditions, and which procedurally is determined on a motion for summary judgment (*Northwest*

1    Based on the foregoing, the Court will not dismiss the allegations of *per se* illegality of the

2    group boycott on this basis.[14]   Therefore, this basis for dismissal of the Complaint is **DENIED**

3    **WITHOUT PREJUDICE**.

4          2.    *Rule of Reason.*

5    RPX argues that, to the extent that Cascades claims are analyzed under the rule of

6    reason, Cascades fails to identify the relevant product market.   Under the rule of reason, a plaintiff

7    must plead that the challenged agreement, by virtue of the defendants' market power, was

8    unreasonably restrictive of competition in a relevant market and that the plaintiff suffered antitrust

9    injury.   *Nat'l Soc. of Prof'l Engineers v. United States*, 435 U.S. 679, 690 (1978).   Unlike a *per se*

10   violation, where harm to competition is presumed, in a rule of reason analysis "[t]he focus is on the

11   actual effects that the challenged restraint has had on competition in a relevant market."   *Bhan v.*

12   *NME Hosp., Inc.*, 929 F.2d 1404, 1410 (9th Cir. 1991).

13   The relevant market has two dimensions:   the "relevant geographic market" and the "relevant

14   product market."   *See Brown Shoe v. United States*, 370 U.S. 294, 325 (1962).   The parties dispute

15   whether Cascades has defined adequately the scope of the "relevant product market" in which the

16   Defendants are alleged to have restrained competition.[15]   Because the validity of the relevant market

17   typically is a factual rather than a legal issue, an antitrust complaint survives dismissal under Rule

18   12(b)(6) "unless the alleged market suffers a fatal legal defect."   *Newcal Indus., Inc. v. Ikon Office*

19   *Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008) ("a complaint may be dismissed under Rule 12(b)(6) if

20

21

22   *Wholesale Stationers*, *supra*, 472 U.S. 284; *Mesirow v. Pepperidge Farm Inc.*, 703 F.2d 339, 343 (9th Cir.
     1983)) or after a full trial on the merits (*Broadcast Music, Inc. v. Columbia Broadcasting Sys.*, 441 U.S. 1

23   (1979); *Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 585 F.2d 821, 836-38 (7th Cir. 1978)).

24   [14] This is not a determination of whether the group boycott alleged is *per se* unlawful or should be analyzed
     under the rule of reason, only that there are insufficient facts alleged in the Complaint from which the Court

25   can make this determination as a matter of law.

26   [15] Charges of monopolization under Section 2 of the Sherman Act also need to be analyzed within the context
     of the relevant market.   Count I alleges violations of both Section 1 and Section 2.   Count II alleges only a

27   violation of Section 2 (monopsony and attempt to monopsonize).   None of the Defendants moved to dismiss
     on the additional basis that, to the extent that the claims are brought under Section 2, Count II fails to allege

28   the relevant product market.

the complaint's 'relevant market' definition is facially unsustainable") (citing *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436-37 (3d Cir. 1997)).

To the extent that Cascades' claims are analyzed under the rule of reason, Cascades has failed to identify specifically what it considers to be the relevant market.  In its Complaint, Cascades avoids its pleading obligation with subterfuge, it defines the relevant product market as broadly as "licenses" (Complaint ¶¶ 52, 54), the "Android market" (*id.* ¶¶ 13, 36, 38, 46), and mobile phones and tablets that use the Android operating system (*id.* ¶¶ 13, 35); and as narrowly as Cascades' patents (*id.* ¶¶ 28, 35, 46), licenses for Cascades' patents (*id.* ¶¶ 35, 48, 57, 58), and products that use Cascades' patented technology (*id.* ¶¶ 46, 53).  In its opposition, Cascades further obfuscates the analysis when it attempts to clarify that "the alleged market is the market *for* patented technology, particularly technology relating to the Android industry" (*see* Combined Opp'n 25) (emphasis in original), but then equivocates by arguing that the markets and submarkets are "the entire mobile phone and tablet industry that uses Android operating systems," the "submarket for licenses under the Cascades' patents," and "the market for Android devices."  (*Id.* at 26.)  While Cascades does not need to limit its antitrust allegations to a single market or sub-market, it does need to specify the market or markets in which the allegedly anticompetitive acts occurred (and the effects of those anticompetitive acts on those specific markets).  Otherwise, it is impossible to determine the actual effect the alleged challenged conduct has had on competition.  Without a coherent market definition, the Complaint necessarily fails to allege a contract, combination, or conspiracy in restraint of trade or monopolization of the relevant market.[16]  To survive a motion to dismiss, Cascades must provide sufficient specificity of each alleged violation in each alleged market or sub-market.

Based on the foregoing analysis, the Court **GRANTS** RPX's Motion to Dismiss on this basis **WITH LEAVE TO AMEND**.

---

[16] RPX argues that Cascades also fails to plead facts pertaining to several requirements for market definition: reasonable interchangeability between substitutes, supply-side substitution, cross-price elasticity of demand, or barriers to entry.  *See Brown Shoe, supra*, 370 U.S. at 325 ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.").

United States District Court
Northern District of California

15

United States District Court
Northern District of California

**C.      THIRD ELEMENT:  HARM TO COMPETITION & ANTITRUST INJURY**

Only those who possess antitrust standing by virtue of having suffered antitrust injury may bring a private action for damages for violation of the antitrust laws.  *See Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 371 (9th Cir. 2003).  Because Cascades seeks relief under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, it must allege that it has suffered (Section 4) or faces the threat of (Section 16) antitrust injury of "'the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful.'"  *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 113 (1986) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).  There are "four requirements for antitrust injury:  (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent."  *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*, 190 F.3d 1051, 1055 (9th Cir. 1999).

RPX challenges Cascades' standing to bring this antitrust action, arguing that Cascades has not alleged an injury that is the type the antitrust laws were intended to prevent.  RPX argues (1) the only injury alleged is litigation expenses of enforcing its patents; and (2) Cascades does not alleged harm to consumers.  This first argument ignores an entire section of the Complaint entitled "Injury to Competition."  In that section Cascades specifies the following injuries:  a loss of substantial royalties to which it would be entitled under licenses (Complaint ¶¶ 47, 55)[17]; legal expenses incurred in enforcing its patents (*id.*); damage to business growth (*id.* ¶ 55); to the possible point of closure (*id.* ¶ 53).  Additionally, Cascades alleges that it has received less for licensing its patents than it would in a market that was free of an unlawful conspiracy.

RPX's second argument, that Cascades fails to allege antitrust injury because of the lack of allegations regarding possible consumer injury, takes too restrictive a view of the type of injury the antitrust laws were intended to prevent.  Anticompetitive conduct need not harm consumers specifically in order to cause antitrust injury.  *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d

---

[17] As to the right to royalties, RPX, without citation to any legal authority, argues that Cascades has no such right, only a right to bring suit to enforce its patents.  In this context, the argument lacks merit.

979, 988 (9th Cir. 2000).[18]  The cases upon which RPX relies to argue the contrary are not on point—those cases are between competitors, not buyers and sellers.  *See id.* at 988-89 ("A seller who is paid less suffers antitrust injury, and this is even so if the savings are passed on to the consumers.  Most courts understand that a buying cartel's low buying prices are illegal and bring antitrust injury and standing to the victimized suppliers.  Clearly mistaken is the occasional court that considers low buying prices pro-competitive or that thinks sellers receiving illegally low prices do not suffer antitrust injury.").  Actionable antitrust injury is not limited to situations where prices are increased or products are less innovative.  *Glen Holly Entm't*, *supra*, 352 F.3d at 374 (noting "this understanding of antitrust injury is too restrictive").

That said, due to Cascades' vague allegations of a group boycott, Cascades has not alleged sufficient facts to show that the injury Cascades has suffered flows from the Defendants' unlawful conduct.  All of the harm alleged—lost royalties, depressed market value for the patents, litigation expenses, loss of business growth—derives from Cascades' inability to license its patents.  However, Cascades has provided insufficient facts from which to plausibly infer that the reason it suffered this harm is due to a conspiracy in a particular market, rather than due to individual business disputes between independent actors.  Accordingly, Cascades has not alleged that Defendants' unlawful conduct caused Cascades to suffer the type of injury that the antitrust laws were meant to prevent.

Based on the foregoing analysis, the Court **GRANTS** the motion to dismiss on this basis **WITH LEAVE TO AMEND**.

### D.    ECONOMIC SENSE

Where the facts alleged in the complaint demonstrate that an alleged conspiracy makes no economic sense, the claim must be dismissed.  *Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998) ("Antitrust claims must make economic sense") (citing

---

[18]    [T]he central purpose of the antitrust laws, state and federal, is to preserve competition.  It is competition—not the collusive fixing of prices at levels either low or high—that these statutes recognize as vital to the public interest.  The Supreme Court's references to the goals of achieving "the lowest prices, the highest quality and the greatest material progress," and of "assur[ing] customers the benefits of price competition," do not mean that conspiracies among buyers to depress acquisition prices are tolerated.

*Knevelbaard Dairies*, *supra*, 232 F.3d at 988 (internal citations omitted).

United States District Court
Northern District of California

*Eastman Kodak Co. v. Image Technical Servs. Inc.*, 504 U.S. 451, 468 (1992)).  "Allegations of facts that could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy are insufficient to plead a violation of the antitrust laws."  *Kendall*, *supra*, 518 F.3d at 1049 (citing *Twombly*, *supra*, 550 U.S. at 553-56 & n.5).  The issue is not as simple as determining whether there is "a plausible and justifiable reason for defendant[s'] conduct that is consistent with proper business behavior."  *See In re Citric Acid Litigation*, 191 F.3d 1090, 1094 (9th Cir. 1999).  At the motion to dismiss stage, the determination turns on whether the defendants had "any rational motive" to join the alleged conspiracy; and whether the conduct alleged "was consistent with the defendant's independent interest."  *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 596-97 (1986).

RPX argues that Cascades' group-boycott theory—that the Manufacturing Defendants acted against their own best interests when they declined $5 million licensing deals—does not make economic sense and, therefore, is implausible.  In its motion, RPX has offered well-reasoned justifications for the Manufacturing Defendants' behavior.  According to RPX, the more plausible explanation for the Manufacturing Defendants' decision to decline a $5 million licensing offer was that the offer price was too high:  RPX had been negotiating a $10 million deal for *all* of its 110 members, which makes a $5 million offer to *each* of LG, Motorola, Samsung and HTC too high (collectively $20 million).[19]  Cascades counters that due to the rebate structure of its licensing offers, it makes no economic sense to refuse the licensing offers, which it argues supports an inference of a group boycott.  (Combined Opp'n 20 ("if Motorola accepted the Cascades proposal and paid $5 million and direct competitors HTC and Samsung were ultimately licensed for $10 million total, Motorola would get a $2.5 million rebate, which would drive its effective royalty to $2.5 million or roughly one-half of its two major competitors").)  Although not based on facts alleged in the

---

[19] In its Combined Opposition, Cascades raises additional facts not alleged in the Complaint, including that RPX structures these deals so that its members pay 3-4 times the price RPX pays for a license.  (Combined Opp'n 16.)  "At higher purchase prices, like the $9 million proposed for a license under the Cascades patents, the pre-sale amount would be around 2 times or $18 million."  (*Id.*)  Multiplying each manufacturing defendant's alleged market share by the $18 million RPX would charge its members rather than the $9 million "wholesale" price RPX would pay, HTC ($7.38 million) and Motorola ($6.3 million) would save money by directly negotiating a $5 million license with Cascades, while Samsung ($3.06 million) and LG ($720,000) would not.  This would make a $5 million licensing offer more reasonable.

United States District Court
Northern District of California

1    Complaint, Cascades also argues that "[t]wo of the three [Manufacturing Defendants] have

2    successfully accepted a rebate approach in other negotiations that did not involve RPX."  (*Id.*)

3           RPX additionally argues that it would be nonsensical for the Manufacturing Defendants to

4    refuse to negotiate licenses for valid and infringed patents because the price of litigation is too high

5    and it would subject each of them to liability for treble damages for willful infringement in ongoing

6    patent infringement lawsuits.  That said, RPX's argument requires the Court to assume that the

7    allegations of infringement are not true (*i.e.*, that both the infringement allegations in this lawsuit and

8    the infringement allegations in the Illinois Actions are false).  Given the procedural posture of this

9    action, the Court cannot do so and rejects this argument.

10          The Manufacturing Defendants argue that irrespective of infringement or validity,

11   "[a]ccepting the offer Cascades purportedly made would have been contrary to the economic interests

12   of each individual Defendant, for it would have attracted nuisance suits."  (*See* Joint Motion 13).)[20]

13   Having to pay a high price for a patent or face a patent infringement lawsuit may not be an optimal

14   choice, but this does not render the allegations that the Defendants conspired not to license Cascades'

15   patents "nonsensical," as RPX argues.[21]

16          Notwithstanding the foregoing, Cascades has fastidiously avoided providing specific facts

17   with respect to the timing of the alleged negotiations and the interplay with the filing of the Illinois

18   Actions for patent infringement.  Cascades also will need to provide specific facts to clarify why,

19   _____

20   [20] The case on which RPX relies, *Matsushita*, *supra*, 475 U.S. 574, was decided at the summary judgment
     stage.  In *Matsushita*, the Court found no evidence of any agreement to fix prices below cost to drive

21   competitors out of business, and the "absence of any rational motive to conspire" because the defendants had
     every incentive not to engage in the alleged conduct which required them to sustain losses for decades with no

22   foreseeable profits.  *Id.* at 597.

23   [21] RPX also argues that Cascades' group-boycott theory makes no economic sense because the allegations (and
     the incorporated SEC filing) demonstrate that the RPX members that allegedly declined to fund a licensing

24   transaction between RPX and Cascades had already paid for, and would have directly benefitted from, RPX's
     acquiring a license to Cascades' patents.  This argument ignores allegations in the Complaint.  Cascades

25   alleges that RPX members pay amounts in excess of their subscription fees to fund certain license deals.
     (Complaint ¶ 28 ("RPX terminated negotiations with Cascades and [withdrew] its offer because one or more of

26   its members allegedly would not fund the license deal.").)  RPX disputes that this particular licensing deal
     would subject its members to fees in excess of their subscription fees, and creates a factual dispute not suitable

27   for resolution on a motion to dismiss.  This argument is not a basis for the Court's dismissal of the claims
     under Rule 12(b)(6).

28

United States District Court
Northern District of California

1  absent a conspiracy, it is economically irrational for the Manufacturing Defendants—who are being

2  sued by Cascades for infringement of one patent, the '750 Patent—to decline an offer to license

3  Cascades' entire portfolio of 38 patents.  Without clarification and specificity, the Court will not

4  presume economic rationality where the circumstances giving rise to the lawsuit plausibly suggest

5  nothing more than a tactical ploy to regain economic leverage that Plaintiff lost in the licensing

6  negotiations.

7  Based on the foregoing analysis, the Court **GRANTS** the motion to dismiss on this basis **WITH**

8  **LEAVE TO AMEND**.

9  **E.**      **RELATIONSHIP BETWEEN THESE ANTITRUST CLAIMS AND THE PATENT**

10  **INFRINGEMENT CLAIMS IN THE ILLINOIS ACTIONS**

11  All of the Manufacturing Defendants argue that the antitrust activity alleged in this case arises

12  out of refusing to settle the Illinois Actions.  On that basis, Dell argues that Cascades' claims against

13  it must be dismissed because they are compulsory counterclaims under Rule 13(a) of the Federal

14  Rules of Civil Procedure that should have been, but were not, asserted in the Illinois Action.  The rest

15  of the Manufacturing Defendants argue they are immune from antitrust liability under the *Noerr-*

16  *Pennington* doctrine, which provides immunity from antitrust liability for certain litigation related

17  conduct, because the conduct at issue stems from their defense of the patent infringement claims in

18  the Illinois Actions.  The Court will address each argument in turn.

19  *1.      Whether the claims against Dell are compulsory counterclaims.*

20  Under Federal Rule of Civil Procedure 13(a)(1), a pleader must state as a counterclaim

21  "any claim that … the pleader has against an opposing party if the claim arises: (A) out of the

22  transaction or occurrence that is the subject matter of the opposing party's claim; and (B) does not

23  require adding another party over whom the court cannot acquire jurisdiction."  Fed. R. Civ. P.

24  13(a)(1).[22]  This Court should apply the "logical relationship" test to determine whether the two

25  claims arise out of the same "transaction or occurrence" for purposes of Rule 13.  *Burlington*

26

27

28  _____

[22] No party suggests that the Illinois Court would not have jurisdiction over RPX as required by subsection 13(a)(1)(B).  (*See* Dell's Mot. 2.)  Thus, the Court views the issue conceded for purposes of this motion.

*Northern R.R. Co. v. Strong*, 907 F.2d 707, 711 (7th Cir. 1990).[23]  The approach is a flexible one:  "A court should consider the totality of the claims, including the nature of the claims, the legal basis for recovery, the law involved, and the respective factual backgrounds."  *Bd. of Regents of Univ. of Wisconsin Sys. v. Phoenix Int'l Software, Inc.*, 653 F.3d 448, 470 (7th Cir. 2011) (quoting *Burlington Northern R.R.*, *supra*, 907 F.2d at 711).

Dell characterizes the subject matter of this lawsuit as a "concerted refusal to settle the Illinois Action," which it argues should have been filed as a counterclaim to Dell's counterclaim in the Illinois Action.  According to Dell, Cascades and Dell engaged in settlement negotiations in the Illinois Action in January 2012; after the parties' settlement efforts failed, and as recourse, Cascades filed this antitrust lawsuit.  On this basis, Dell contends that Cascades' claims for antitrust and unfair competition in this action arise out of the same transaction or occurrence as the claims in the Illinois Action.  Dell's arguments are not based on an impartial reading of the Complaint.

The nature of the antitrust claims, the legal basis for recovery, the law involved,[24] and the facts giving rise to the antitrust claims all differ from the patent infringement claim asserted in the Illinois Action.  The controversy in the Illinois Action concerns whether Dell's Venue smartphone and Streak 7 tablet infringe, either directly or indirectly, on one of the Cascades patents (the '750 Patent).  Dell counterclaimed seeking declaratory judgments of non-infringement and invalidity of the '750 Patent.  The controversy in this antitrust action is whether the Manufacturing Defendants, including Dell, have formed a group boycott and concerted refusal to deal with Cascades to license all of Cascades' patents, not just the '750 Patent, albeit the '750 Patent appears to be the primary patent at issue in this case.

---

[23] The Ninth Circuit has ruled that the law of the circuit where the original patent infringement litigation occurred, here, the Seventh Circuit, determines whether an antitrust claim is a mandatory counterclaim in a patent infringement action.  *Destiny Tool v. SGS Tools Co.*, 344 Fed. App'x 320, 323 (9th Cir. 2009) (applying Sixth Circuit law to determine whether antitrust claim was compulsory counterclaim to patent infringement lawsuit) (citing *Springs v. First Nat'l Bank of Cut Bank*, 835 F.2d 1293, 1295 (9th Cir. 1988)).

[24] Although not dispositive of the issue, another distinction between the claims raised in the two lawsuits is that jurisdiction over an appeal of the patent action would be with the Federal Circuit, while any appeal of this antitrust suit would be to the regional circuit court of appeals, here, the Ninth Circuit.

United States District Court
Northern District of California

1    Although the subject matter is related—*i.e.*, but for the antitrust conspiracy alleged in this

2    case, Dell would not be infringing on the '750 Patent, which is the subject matter of the Illinois

3    Action—the counterclaim is permissive, not compulsory.  Determining whether Dell's Venue

4    smartphone and Streak 7 tablet infringe on the '750 Patent does not depend on whether Dell

5    conspired not to license the '750 Patent.  Conversely, determining whether Dell conspired not to

6    license Cascades' entire patent portfolio may be informed by whether Dell is infringing on the '750

7    Patent.  The extent of overlap is not obvious.  Accordingly, the Court does not find that the claims

8    arise out of the same transaction or occurrence so as to be compulsory counterclaims under Rule

9    13(a).  Fed. R. Civ. P. 13(a); *Burlington Northern R.R.*, *supra*, 907 F.2d at 711.

10    Based on the foregoing analysis, the Court **DENIES** this basis for dismissal of the Complaint.

11          2.      *Noerr-Pennington* doctrine.

12    The Manufacturing Defendants argue that this lawsuit is based on protected litigation

13    conduct of defending against patent infringement charges in the Illinois Actions and argue that

14    *Noerr-Pennington* immunity applies because their alleged cooperative conduct began only after they

15    were either charged with or sued for patent infringement.  The *Noerr-Pennington* doctrine provides

16    immunity from antitrust liability for litigation related conduct–filing a complaint, an answer,

17    negotiating a settlement–that is not otherwise a "sham."  *See Prof'l Real Estate Investors, Inc. v.*

18    *Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56-60 (1993).

19    The Manufacturing Defendants characterize the Complaint as alleging that "Defendants

20    'conspired' to defend themselves against Cascades' patent claims and to resolve those claims jointly

21    ….  When the negotiations [with RPX] failed, Cascades attempted to secure funding for a litigation

22    campaign by offering various companies a license requiring a large up-front payment that would be

23    rebated as Cascades extracted licenses from others through litigation threats."  (Joint Motion 6-7.)

24    Cascades argues that the Complaint alleges a buyer's cartel, not defending against patent

25    infringement charges, and that the conduct at issue started before any contemplated or perceived

26    threat of litigation.

27    The Complaint alleges that "[i]n 2010, RPX contacted Cascades about the possibility of

28    acquiring licensing rights."  (Complaint ¶ 19.)  On July 6, 2011, Cascades sued Motorola and

United States District Court
Northern District of California

Samsung for patent infringement in the Northern District of Illinois[25] and on September 7, 2011, Cascades sued HTC and LG for patent infringement, also in the Northern District of Illinois.[26]  The Complaint in this action alleges that in January 2012, Cascades offered each of the Manufacturing Defendants identical license proposals but no Manufacturing Defendant responded to its offer.  (*Id.* ¶ 30.)  Cascades filed this antitrust lawsuit on March 7, 2012.

Based on the allegations in the Complaint, the Court cannot conclude that the *Noerr-Pennington* doctrine applies.  Determining whether the alleged conspiracy preceded the alleged joint litigation conduct necessarily requires an inquiry into the timing of the conspiracy itself, the timing of any perceived threats of litigation, the scope of any such perceived threat, etc.  As a consequence of Cascades' failure to plead the necessary specifics of the alleged conspiracy, the Court cannot determine at this time whether Defendants are immune from suit under the *Noerr-Pennington* doctrine or even whether resolution of this issue will be appropriate at the pleading stage.

Based on the foregoing analysis, the Court **DENIES WITHOUT PREJUDICE** this basis for dismissal of the Complaint.

### F.   REMAINING CLAIMS FOR RELIEF:  VIOLATIONS OF CALIFORNIA'S CARTWRIGHT ACT AND UNFAIR COMPETITION LAW

The disposition of the Sherman Act claims disposes of the Cartwright Act and Unfair Competition claims ("UCL") as well.  The Cartwright Act is patterned after the Sherman Act, and "federal cases interpreting the Sherman Act are applicable to problems arising under the Cartwright Act."  *Marin County Bd. of Realtors*, *supra*, 16 Cal.3d at 926.  Because Cascades has not adequately pled its federal antitrust claims, its Cartwright Act claim fails.  Additionally, because Cascades' UCL claim is not materially different than its federal and state antitrust claims, its UCL claim necessarily fails as well.  *See Ingels v. Westwood One Broad. Servs., Inc.*, 129 Cal. App. 4th 1050, 1060 (Cal. Ct. App. 2005) ("'If the [underlying] claim is dismissed, then there is no 'unlawful' act upon which to base [ ] the derivative Unfair Competition claim.'") (second alteration in original); *Scripps Clinic v.*

---

[25] *Cascades Computer Innovation, LLC v. Motorola Mobility Holdings Inc. and Samsung Electronics Co., Ltd.*, 11-CV-4574 (N.D. Ill. 2011).

[26] *Cascades Computer Innovation, LLC v. HTC Corp. and LG Electronics, Inc.*, 11-CV-6235 (N.D. Ill. 2011).

*Sup. Ct.*, 108 Cal. App. 4th 917, 934-39 (Cal. Ct. App. 2003); *see also Krantz, supra*, 89 Cal. App. 4th 164 (Cal. Ct. App. 2001) (viability of unlawful UCL claim stands or falls with the underlying claim).

Based on the foregoing analysis, the Court **GRANTS** the motions to dismiss Cascades' Cartwright Act Claim and the motions to dismiss Cascades' claim for violation of California's Unfair Competition Law **WITH LEAVE TO AMEND**.

## IV.    CONCLUSION

For the reasons set forth above:

1. RPX's Motion to Dismiss is **GRANTED**;

2. Dell's Motion to Dismiss is **GRANTED**;

3. HTC, LG, Motorola, and Samsung's *Joint* Motion to Dismiss is **GRANTED**;

4. The Complaint is **DISMISSED WITH LEAVE TO AMEND** consistent with this Order;

5. Cascades shall file an amended complaint within 28 days of the date this Order is filed.

This Order Terminates Docket Numbers 54, 55 & 76.

**IT IS SO ORDERED**.

**Date: January 24, 2013**

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

24