DAVIS WRIGHT TREMAINE LLP
MARTIN L. FINEMAN, Bar No. 1104413
505 Montgomery Street
Suite 800
San Francisco, CA 94111
Telephone: (415) 276-6575
Facsimile: (415) 276-6599
Email: martinfineman@dwt.com

NIRO, HALLER & NIRO
Raymond P. Niro (Member of the N.D. Cal. Bar)
Daniel R. Ferri (*Pro Hac Vice*)
Gabriel I. Opatken (*Pro Hac Vice*)
Ashley LaValley (*Pro Hac Vice*)
181 West Madison, Suite 4600
Chicago, IL 60602-4515
Phone: (312) 236-0733
Fax: (312) 236-3137
E-mail: rniro@nshn.com
E-mail: dferri@nshn.com
E-mail: gopatken@nshn.cm
E-mail: alavalley@nshn.com

Attorneys for Plaintiff
Cascades Computer Innovation LLC

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| CASCADES COMPUTER INNOVATION LLC, | |
| Plaintiff, | Case No. 12-CV-01143 (YGR) |
| v. | **AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |
| RPX CORPORATION, HTC CORPORATION, MOTOROLA MOBILITY HOLDINGS, INC. and SAMSUNG ELECTRONICS CO. LTD., | |
| Defendants. | |

Plaintiff Cascades Computer Innovation LLC ("Cascades"), for its Amended Complaint, complains of defendants, RPX Corporation, HTC Corporation, Motorola Mobility Holdings, Inc. and Samsung Electronics Co. Ltd. (collectively, "defendants"), as follows:

**THE PARTIES**

1. Cascades is an Illinois limited liability company having its principal place of business at 500 Skokie Boulevard, Suite 250, Northbrook, Illinois  60062.  It has the exclusive right to license and enforce a portfolio of 38 patents owned by Elbrus International Limited and Elbrus Svarog L.P. (collectively, "Elbrus").

2. RPX Corporation is a Delaware corporation with a principal place of business at One Market Plaza, Steuart Tower, Suite 700, San Francisco, California  94105.  RPX is a patent aggregator that acquires patents (or the right to use patented technology) for its members (now in excess of 120), each of whom enters a subscription agreement and is granted a license under patents in which RPX has acquired rights in exchange for a payment ranging from $60,000 to $6,000,000.  RPX sometimes also acts as a purchasing or negotiating agent for a subset of its members in what it calls structured acquisitions.  In this type of arrangement, the pertinent members provide financing for the acquisition of specific patent rights.  RPX has now accumulated more than 2,950 patents in various fields, not counting the 29,000 patents for which it acquired exclusive licensing rights.

3. HTC Corporation ("HTC") is a foreign corporation with headquarters at 23 Xinghua Road, Taoyuan 330, Taiwan. HTC does substantial business in this judicial district including the marketing, sale, offering for sale and importation of mobile telephones.

4. Motorola Mobility Holdings, Inc. ("Motorola") is a Delaware corporation headquartered at 600 N. U.S. Highway 45, Libertyville, Illinois 60048.  Motorola does substantial business in this judicial district including the marketing, sale, offering for sale and

1    importation of mobile telephone devices.  In August 2011, Motorola was acquired by Google for

2    $12.5 billion, largely to give Google control of more than 17,000 patents (in addition to 7,500

3    filed patent applications) that Google can now use to assert against competitors for its Android

4    operating system.  Google's principal place of business is in this judicial district.

5         5.      Samsung Electronics Co., Ltd. ("Samsung") is a foreign corporation with

6    corporate headquarters at 250, 2-ga, Taepyung-ro, Jung-gu, Seoul 100-742, Republic of Korea.

7    Samsung does substantial business in this judicial district including the marketing, sale, offering

8    for sale and importation of mobile telephone devices and tablet computers.

9         6.      HTC, Motorola and Samsung (collectively, the "manufacturing defendants")

10   manufacture and sell wireless portable communication devices including mobile telephones and

11   computer tablets that employ the Android operating system.  Each is a member of RPX, as is

12   Google, the owner of the Android operating system.  Together, HTC, Motorola and Samsung sell

13   in the United States more than 90% of the mobile phones that use Google's Android operating

14   system and more than 75% of all electronic devices (both mobile phones and tablets) that utilize

15   the Android operating system.

## JURISDICTION AND VENUE

17        7.      This Complaint states claims for violation of the federal antitrust laws and for

18   violation of the Cartwright Act and California unfair competition law.  This Court has subject

19   matter jurisdiction over the federal antitrust claims under 15 U.S.C. §§ 15 and 26 and 28 U.S.C.

20   § 1331.  This Court has supplemental jurisdiction over Cascades' California state law claims

21   under 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form

22   part of the same case or controversy.

23        8.      At all times relevant to these claims, defendants have engaged in and affected

24   interstate commerce and foreign import commerce and have affected United States export

1   commerce all within the meaning of the Sherman Act (15 U.S.C. §§ 1, 2 and 6(a)).

2       9.      The violations of law described in this Complaint have been and are being carried

3   out in the United States and in this judicial district.  Venue in this judicial district is proper under

4   15 U.S.C. §§ 15 and 22 and 28 U.S.C. §§ 1391(c) and (d).

5                   **BACKGROUND FACTS RELEVANT TO ALL CLAIMS**

6                                  **Cascades and Elbrus**

7       10.     After 40 years with the Russian government's Institute of Precision Mechanics

8   and Computer Technology (where he led the development of the Elbrus supercomputers  used in

9   the Russian space mission control center), the lead inventor of the Cascades/Elbrus patents, Boris

10  Babaian, turned his focus to private industry where, as Chairman and Chief Technologist of

11  Elbrus International, he (and the same team that developed three generations of supercomputers)

12  created pioneering software technology like that covered, for example, by United States Patent

13  No. 7,065,750, entitled "Method and Apparatus for Preserving Precise Exceptions in Binary

14  Translated Code," issued June 20, 2006 (the "'750 patent").  Mr. Babaian is an Intel Fellow (a

15  prestigious honor) and the Chairman and Chief Technologist of Elbrus International.   He

16  oversees a design team that traces its roots to the days of Sputnik, the Soviet space satellite often

17  cited as the catalyst for the scientific research that led to many Western technological

18  innovations, such as the Internet.

19      11.     As noted above, Cascades acquired the exclusive right to license and enforce 38

20  Elbrus patents:  5,418,975, 5,781,924, 5,794,029, 5,889,985, 5,923,871, 5,958,048, 5,983,336,

21  6,243,822,  6,265,896,  6,301,706,  6,313,691,  6,320,446,  6,323,688,  6,351,155,  6,363,405,

22  6,366,130,  6,373,149,  6,412,105,  6,424,181,  6,516,462,  6,516,463,  6,526,573,  6,549,903,

23  6,560,775,  6,564,372,  6,567,831,  6,584,611,  6,594,824,  6,668,316,  6,718,541,  6,732,220,

24  6,751,645, 6,820,255,  6,954,927, 7,003,650, 7,065,750, 7,069,412, 7,143,401.  These patents are

25

1   extremely valuable, as shown, for example, by the fact that Elbrus granted a license to Intel

2   under its patents for a substantial, seven-figure lump-sum payment.  Various of these patents are

3   infringed by the manufacturing defendants and all are subject to the antitrust violations

4   complained of herein.  The inventors of the relevant technology have a substantial stake in any

5   license fees, royalties or recoveries obtained by Cascades.  They are world-renowned innovators

6   who do not deserve to be called demeaning names, such as "troll" or "NPE," simply because

7   their business is to invent breakthrough technology, rather than manufacture products.

8   **The Cascades Patents And Google's Android Operating Systems**

9   12.    Google's Android operating system has become the dominant mobile operating

10   system in the world and, in the United States, where it has achieved a greater than 53% market

11   share.  The manufacturing defendants dominate the sale of Android-based products in the United

12   States.  As mobile phone suppliers that use the Android operating systems, HTC reportedly sells

13   41%, Motorola 35% and Samsung 17% of all Android-based mobile phones sold in the United

14   States.

15   13.    More than 300,000 applications are available for use on Android devices and only

16   devices that meet Google's compatibility requirements can install such applications on Android-

17   based phones and tablets.  The technology of the Elbrus '750 patent facilitates the installation

18   and use of such applications on Android devices (such as smartphones), through dependency

19   trees, which permit the optimization of the bytes code used in an application, thus increasing the

20   speed and value of the application.  The '750 patent covers such optimization techniques, is valid

21   and has been infringed by the manufacturing defendants.

22   14.    Defendant Motorola owns more than 17,000 patents in the area of mobile phone

23   technology, making it one of the dominant patent holders in the mobile phone business.  Google

24   acquired Motorola for $12.5 billion to gain control of its patent portfolio.  Together with HTC

25

1   and Samsung, Motorola (Google) and RPX now own or control most of the patents of

2   significance for mobile phone technology using the Android operating system:

3   Google/Motorola, 22,046; Samsung, 47,348; HTC, 222; and RPX, 2,950.  RPX also became an

4   agent for licensing Alcatel-Lucent's portfolio of 29,000 issued United States patents, allowing it

5   to effectively control the licensing of those patents as well. Together, the defendants own or

6   control nearly 73,000 United States patents.  Cascades owns or controls less than 100 patents.

**The Anti-Troll/Anti-NPE/Anti-Inventor Conspiracy**

8       15.    The term "patent troll" was coined in 2002 by Peter Detkin, then head of litigation

9   for Intel Corporation.  "Trolling for Dollars," <u>The Recorder</u>, Sandburg, B. (July 30, 2001).  Intel

10  had been sued for patent infringement and, later, for defamation for calling its opponent in the

11  then-pending litigation "a patent extortionist."  According to Detkin, a patent troll is "somebody

12  who tries to make a lot of money off a patent that they are not practicing and have no intention of

13  practicing and in most cases never practiced."  Ironically, Detkin is a co-founder of Intellectual

14  Ventures, one of the biggest patent aggregators (and thus by his own definition one of the largest

15  patent trolls) now in existence.  Intellectual Ventures has accumulated more than 30,000 patents

16  on the pledge (like RPX) that it was only acquiring patents for defensive purposes -- a promise

17  that proved to be untrue.

18      16.    Unfortunately, the pejorative troll label has now been extended to nearly all non-

19  manufacturing entities (called "NPEs"), including companies like Cascades that do not

20  manufacture or sell products covered by patents they own or control but, instead, are created to

21  help inventors license the use of their inventions.  Each of the defendants also owns or controls

22  numerous patents that cover products they neither manufacture nor sell.  So, too, do leading

23  companies, like IBM, Texas Instruments, GE and HP, each of whom collects billions of dollars

24  per year in patent licensing fees.

25

17.    "Troll" and "NPE" have also become convenient labels to attack individual inventors lacking the resources to license and enforce their patents on their own.  Data compiled by Patent Freedom and Allied Security Trust shows that 56% of all patents held by NPEs were originally assigned by the inventors to the NPE and that 57% of patents litigated by NPEs were originally assigned by the inventors to the NPE.  This data proves that NPEs, by and large, are companies founded or controlled by the inventors of the patented technology at issue or companies, such as Cascades, in which the inventors have a substantial economic interest.  Using troll or NPE labels has become the way many serial patent infringers, such as the three manufacturing defendants, attack individual inventors who, for  200 years, have been the backbone of creative technology in America.

18.    RPX is a spin-off of Intellectual Ventures and was originally backed by three venture capital firms.  In some cases, RPX works closely with Intellectual Ventures to acquire patents like those formerly owned by Kodak.  RPX's goal is to protect its members from patent infringement claims brought by NPEs and to drive down the price paid by its members to license the use of such patented technology.  In most cases (like in this case), an inventor turns to an NPE for financial or strategic assistance in asserting his or her patent rights, since inventors frequently lack the financial wherewithal or experience to do so themselves.  Thus, if an inventor like Mr. Babaian cannot afford the extraordinary expense of patent enforcement (at least $3 million to $8 million per lawsuit through trial) or is not knowledgeable about how to effectively license and enforce his or her patents, they frequently must turn to a company like Cascades to provide financial and other support.   As in this case, the companies that infringe an inventor's patent are often large multinational companies with vast resources to devote to the defense of any patent claims.  Cascades and other NPE companies try to level the playing field on which large corporations and individual inventors play, by providing financial and technical support for

1   the little guy.

2                              **The RPX Business Model**

3          19.    RPX has more than 120 members, including each of the named manufacturing

4   defendants and other infringers of the '750 patent and various other Cascades patents, including

5   ACER America Corp., Dell, Inc., Hynix Semiconductor, Inc., LG Electronics, Sharp Electronics

6   Corp., Sony-Ericsson and Pantech Wireless, Inc., each of whom were also sued for infringement

7   of a Cascades patent.   By May-June 2011, RPX (through its Head of Acquisitions, Kevin

8   Barhydt) had contacted Cascades' counsel to discuss the possibility of acquiring license rights in

9   the entire Elbrus portfolio; in October 2011, RPX (again, through Barhydt) made a substantial

10  financial offer to Cascades to acquire license rights for its members.   Because patent licensees

11  often want to ensure that they will not be sued on other patents held by a licensor, the licensee

12  often demands that it be licensed on the licensor's entire portfolio of patents.   Here, RPX

13  demanded that it be licensed on all 38 Elbrus patents held by Cascades.   With the exception of

14  Samsung, however, the patent that RPX and the manufacturer defendants specifically needed

15  access to and were already utilizing was the '750 patent.   Cascades, in order to license the '750

16  patent, was willing to include the other 37 patents in the Elbrus portfolio in a license with RPX.

17         20.    RPX has two ways for acquiring patents and licenses under patents.   First, it

18  sometimes does so on behalf of all its members using funds generated by their subscription

19  agreements.   In this way, funding is provided by members' membership fees and each can renew

20  its membership periodically (typically, after three years) by paying additional monies to RPX.

21  Although the subscription contracts RPX has with its members purportedly give members the

22  ability to deal independently in their own self-interest, the whole purpose of RPX and the reason

23  for joining RPX is to form an industry group of potential purchasers who can jointly exercise

24  group purchasing power, which allows RPX and its members to accumulate a sufficient

25

proportion of the market demand (*i.e.*, buyer's side market power) for a patented technology so that the price of licensing is artificially driven down to a below-market rate.   By jointly negotiating for the patented technology and by refusing to pay the competitive market rate, RPX and its members are able to deprive inventors and patentees of the free market forces and bidding competition that would otherwise set price for the licensing of their patented inventions.   In this way, RPX and its members are able to avoid having each of the members who would otherwise express an individual demand for the patented technology individually bid for the use of the technology, or compete against each other with regard to the acquisition of such technology.   As long as the members of RPX act collectively to license or not license the patented technology, each of them also protects itself against competition from the others for the patronage of end users who would prefer the improved performance of the patented invention in question (here, electronic mobile devices) that is attributable to the patented technology.   RPX solicits its members based upon the frequency in which they have been sued for patent infringement by NPEs.   See, e.g., RPX Corporation, S.E.C. 2011 Annual Report (Form 10-K), at 6 (Mar. 26, 2012), *available at* http://www.sec.gov/Archives/edgar/data/1509432/000119312512132298/d280947d 10k.htm.   For example, RPX admittedly targeted for membership 275 companies that have been sued at least twice by an NPE.   RPX calls this first type of acquisition activity a "Defensive Patent Aggregation Service."

21.   Second, RPX sometimes acts as an agent for a small group of its members (called a syndicate) to acquire specific patents or rights in specific patents of interest to the group.   This is the approach that likely was used in this case, where RPX organized the manufacturing defendants (and perhaps other members) as a syndicate for purposes of acquiring the Cascades patents.   RPX calls this a "Syndicated Acquisition" or "Structured Acquisition" and describes this type of program in public SEC filings as follows:

We refer to structured acquisitions where we accept payment from more than one client as a syndicated acquisition. The accounting for structured acquisitions is complex and requires significant judgment on the part of our management. In structured acquisitions that result in the purchase of a patent license by a client, we may recognize revenue on a gross basis related to such purchase. In circumstances where we substantially act as an agent to acquire patent assets from a seller on behalf of clients who are paying for such assets separately from their subscription agreements, we may treat the client payments on a net basis. When treated on a net basis, there is no revenue recognized and the basis of the acquired patent assets excludes the amounts paid by the contributing clients based on our determination that we are not the principal in these transactions.

* * * *

… we have no inventory risk as the clients generally enter into their contractual obligations with us prior to or contemporaneous with our entry into a contractual obligation with the seller;

* * * *

… we have limited or no credit risk, as each respective client has a contractually binding obligation, and in many instances we collect the client contribution prior to making a payment to the seller.

Id. at 34-35.  In structured acquisitions, RPX clients (or members) enter into agreements with RPX to fund the purchase of patent licenses before an NPE or individual inventor is approached for a license.  The purpose and effect of these structured acquisitions is the same as alleged in paragraph 20 above.  RPX describes the following benefits of "Syndicated Acquisitions" to its members on its website:

… we are uniquely situated to structure transactions that are ultimately less costly and deliver more value to participating clients than if any attempted individual licensing or unilateral purchasing of the portfolios

* * * *

In effect, RPX can buy "wholesale" on behalf of our client network, while our clients otherwise would pay "retail" if transacting on our own

http://www.rpxcorp.com/index.cfm?pageid=61.

22.   On its website, RPX boasts of its ability to force lower prices (reducing payments

by tens of millions of dollars) through the use of monopsony power generated by its joint representation of multiple technology purchasers and the collective action RPX takes on behalf of its members and against NPEs:

> But even after an NPE has acquired an asset, RPX can help.  NPEs acquire patents and in the process, take on the significant cost and risk of litigating against a large number of companies.  RPX is often able to achieve "wholesale" pricing terms, where we can acquire rights for our members at significantly reduced cost relative to what the NPE might charge an individual company on its own.  RPX believes we have saved our members tens of millions of dollars through these wholesale-priced transactions.

*Previously available at*, http://www.rpxcorp.com/index.cfm?pageid=43 (removed from RPX's website after the filing of the original Complaint).

23.     RPX also gathers intelligence and data on patent acquisition opportunities and patent litigation and licensing activities and trends, all for the purpose of forcing lower-than-market royalty payments for licensing by combining the efforts of its members at the expense of their independent actions.

24.     Further, RPX is not merely a defensive patent aggregator, as it represents.   Its subscription agreements with members are highly coercive in the sense that a failure to renew beyond the initial term (typically, three years) results in a loss of license rights for patents RPX acquired during all or part of the agreement term and, in some cases, to potential exposure to lawsuits for patent infringement if RPX chooses to sell the relevant acquired patents.

25.     RPX has been accused of using coercive tactics with potential members to force them to join RPX.  For example, RPX engaged in extortive and fraudulent practices against Kaspersky Labs by threatening that, if Kaspersky Labs did not join RPX, it could face lawsuits on patents RPX might acquire or that patents RPX already owned could be released to RPX members Kaspersky Labs had sued for infringement for possible retaliatory use against Kaspersky  Labs.  See,  http://gametimeip.com/2011/05/31/patent-aggregator-rpx-accused-of-

1 extortion-racketeering-wire-fraud.

2       26.     RPX's business model and its public statements of its purpose and goal of

3 ensuring its members that, if they act in concert in dealing with NPEs and individual inventor-

4 controlled companies seeking to license their patents, they will all benefit from the joint action.

5 In the absence of such assurances and knowledge by each of the defendant manufacturers, as

6 further explained in paragraph 30 below, each of the manufacturing defendants herein would

7 have likely acted independently.

8       27.     As noted above, RPX funds many patent acquisitions (at least 11 so far) through

9 direct contributions from a subset of its members (or "syndicate") who have a particular interest

10 in the targeted patents.  For larger acquisitions ($5 million or more), RPX looks for at least two

11 times or $10 million in funding.  In smaller deals, the leverage can be four times or more, e.g., $4

12 million in funding for a $1 million acquisition. In either case, members of the syndicate fund the

13 patent acquisition and, thus, act in combination, not individually, in negotiating license terms.

14      28.     These structured acquisitions typically involve more costly patents and, hence,

15 those of greater value.  As RPX explains it:

16          Patent assets that cost more than we are prepared to spend with our own capital
           resources or that may be relevant only to a very small number of clients do not
17          generally fit within our self-financed acquisition model. When such patent assets
           are available for sale, we may work to acquire them with financial assistance from
18          the particular clients against whom the assets are being or may be asserted. Such
           clients either pay amounts separate from their subscription fee or, less frequently,
19          lend us funds to be used in the transaction.

20 RPX Corporation, S.E.C. Registration Statement (Form S-1), at 36 (Jan. 21, 2011), *available at*

21 http://www.sec.gov/Archives/edgar/data/1509432/000119312511012087/ds1.htm.  In either the

22 subscription or structured acquisition model, RPX members are encouraged not to negotiate

23 separately and independently for licenses.  RPX has an obvious financial incentive to encourage

24 structured acquisition, since funding comes from a select group of its members, rather than

25

1   requiring RPX to use its own capital, and RPX collects a fee from that group over and above the

2   costs of the acquisition.

3       29.     RPX admits that its practices, particularly those related to structured acquisitions,

4   may be illegal (specifically, in violation of competition and antitrust practices) and, in fact,

5   openly acknowledges this possibility in its SEC filings:

6       It is possible that courts or other governmental authorities will interpret existing
        laws regulating risk management and insurance, competition and antitrust
7       practices, taxation, the practice of law and patent usage and transfers in a manner
        that is inconsistent with our business practices. Our business, prospects, financial
8       condition and results of operations may be harmed if our operations are found to
        be in violation of any existing laws or any other governmental regulations that
9       may apply to us.

10  RPX Corporation, S.E.C. Registration Statement (Form S-1), at 17 (Jan. 21, 2011), *available at*

11  http://www.sec.gov/Archives/edgar/data/1509432/000119312511012087/ds1.htm.

12      30.     The publicly stated goals of RPX and its stated intention to use the collective

13  purchasing power of its members to drive down the cost of acquiring patented technology serves

14  as an invitation to each potential licensee of the '750 and other Cascades patents to join the

15  group in concerted action.  Each of the defendant manufacturers herein, each of which was a

16  potential licensee of at least the '750 patented technology, knew that the invitation to join the

17  RPX group had been extended to each of the other defendant manufacturers and also knew that

18  each, in fact, had joined RPX and that, if all of them participated in the proposed group

19  purchasing negotiation and declined to individually negotiate a '750 patent license, all would

20  benefit either because they would all be able to obtain a patent license at below the competitive

21  rate or because none of their competitors would license the '750 patent independently, in which

22  case they would all jointly defend any patent infringement suit.

23                          **The RPX-Led Concerted Refusal to Deal**

24      31.     By October 11, 2011, RPX had negotiated with Cascades to acquire license rights

1  under all of the Cascades patents for most of its 100-plus members (including each of the

2  manufacturing defendants).    The relevant RPX members, including the manufacturing

3  defendants, were required to contribute to the license acquisition which would have resulted in a

4  high, seven-figure payment to Cascades for a fully paid-up license under all the Cascades/Elbrus

5  patents.  RPX's initial offer to license demonstrates its recognition of the validity and value of

6  the '750 and other Cascades patents.  Kevin Barhydt, who was then Vice President and Head of

7  Acquisitions for RPX, acted as RPX's representative in its negotiations with Cascades.

8        32.    By September 23, 2011, Barhydt told Cascades that RPX had raised sufficient

9  money from its members to acquire a license under all the Cascades patents, including the '750

10 patent.    Meetings and/or direct contact and communication between RPX and defendants

11 Motorola, Samsung, HTC and other RPX members preceded the September 23, 2011 offer to

12 Cascades and continued thereafter.  On September 20, 2011, Motorola's top licensing executive,

13 Brett Roesslein, admitted that Motorola would not deal independently with Cascades and that its

14 intention was to deal only through RPX, stating, "We would like to resolve this through RPX."

15       33.    Later, in mid-October 2011, Barhydt told Cascades that RPX had to withdraw its

16 offer because one or more of its members would not fund the license deal at the offered amount,

17 admitting, in effect, that all relevant members either had to agree to a license or none would

18 agree.

19       34.    On November 2, 2011, Barhydt referred to the relevant RPX members as "our

20 clients" and represented that the key RPX client-members wanted "a global solution" to the

21 Cascades matter.  He also admitted that client-members in combination, not RPX, have the

22 ultimate say in determining what RPX would pay and that RPX was negotiating collectively for

23 its members:

24

25  AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL – CASE NO. 12-CV-01143 (YGR)                                - 14 -

Solving problems for our clients is the role of RPX- but we aren't in a position where we can pay more for something than what our clients value it at.

Meetings, email and telephone contact between RPX and its key members took place in October and November 2011.  Cascades is aware, for example, that a meeting between RPX and C.D. Hwang of Pantech (an RPX member that was sued for infringement of the' 750 patent) was scheduled for November 7, 2011 to discuss RPX's acquisition of a license under the Cascades patents.  Motorola, Philips and other RPX members also admittedly had contact with RPX on the Cascades patents as well.

35.     RPX admitted through Barhydt that it was negotiating collectively on behalf of its key members for a license under all the Cascades/Elbrus patents: "***our clients*** don't want to hear about Cascades again."   Later, he told Cascades why RPX wanted a license under all the Cascades patents, not just the '750 patent:

> my point was that ***our clients*** don't want to solve this one Cascades case (on the '750 patent) – only to basically fund additional litigations from Cascades.  ***They*** want a global solution to Cascades – not just a solution on this one particular case – knowing that there will be others to follow.

> It wasn't that I (or ***our clients***) didn't want to hear about Cascades again. We/they just don't want to have to solve this problem multiple times.

36.     These communications show that RPX was the negotiating agent for its members, including the three manufacturing defendants, that RPX was negotiating for them collectively and that they would all refuse to license the '750 patent either at a competitive price or in the absence of licenses on the other Cascades patents.  When Cascades suggested RPX negotiate a license under just the '750 patent, RPX refused, prompting a November 2, 2011 email from Kevin Barhydt of RPX in response to Cascades' question whether the parties should "discuss an exclusive license under just [the '750] patent, forgetting about the entire portfolio":

[O]ur clients don't want to hear about Cascades again- so unfortunately solving the problem on one asset [the '750 patent] isn't a workable solution for us.

In short, a license under the entire Cascades-Elbrus portfolio is what RPX, the manufacturing defendants and other infringers of the '750 patent required and, although the manufacturing defendants were only sued for infringement of the '750 patent, it would make no economic sense for the manufacturing defendants to decline a license under all the Cascades/Elbrus patents effectively for the price of a license under the '750 patent.

37.     By insisting on a license under all the Cascades/Elbrus patents and by refusing even to discuss a separate license under the '750 patent, RPX and its members, in effect, further lowered the already anti-competitively low price that was being offered for the '750 patent.

**The Agreements**

38.     Agreement among the co-conspirators RPX, Samsung, Motorola and HTC has occurred as follows:

(a)     RPX has a separate written (vertical) agreement with Samsung, Motorola and HTC requiring them to pay RPX an initial fee for membership and on-going fees;

(b)     Samsung, Motorola and HTC cannot terminate their membership (that is, not continue to pay for future years) without severe penalties, including the loss of license rights in acquired patents;

(c)     Samsung, Motorola and HTC (who dominate the Android mobile phone sales in the United States) agreed with RPX to jointly fund the purchase of license rights under the Cascades patents;

(d)     Samsung, Motorola and HTC also agreed (horizontally) that, unless each of them contributed its share, the purchase of license rights would not occur and that Samsung, Motorola and HTC would not negotiate separately with Cascades.  Motorola

admitted its unwillingness to negotiate individually as set forth above; and

(e)     RPX, by publicly stating its intention to accumulate purchaser-side market power (*i.e.*, monopsony power) to allow it to drive down the price that participating members would otherwise have to pay for the acquisition of various patented technologies, has, in essence, invited each of the manufacturing defendants to participate in a scheme to artificially drive the price or license fee of acquiring the '750 patent below the competitive rate.   Each of the manufacturing defendants knows that the other two have been extended the opportunity to participate in this scheme and each of them knows that the other two are, in fact, members of RPX.   Each of them also knows that it is far more likely than not that the '750 patent is valid and infringed by the mobile electronic devices which each of them currently sell.   In the absence of the common invitation to each by RPX to join in concerted action, each of the manufacturing defendants would perceive it to be in its individual self-interest to negotiate a license for the use of the '750 patent and to pay a competitive rate for that license.   In the absence of such a license, each of the manufacturing defendants would correctly fear that, if it did not individually negotiate a license of the '750 patent at the market rate, one or more of the other two would do so and it would then be at a competitive disadvantage in the market for sale of mobile electronic devices due to the improved performance of its competitor's device and its inability to get a license under favorable terms.   Due to the common invitation by RPX to jointly negotiate for all the manufacturing defendants, those defendants have engaged in conduct that would be contrary to their individual economic self-interest in the absence of a tacit agreement or understanding among the manufacturing defendants that RPX would represent all of them jointly in their negotiation with Cascades for access to the '750 patent and that all of them would participate jointly in an RPX-organized defense of

1    any patent suit brought against them.  Knowing that each of the other two manufacturing

2    defendants has been invited to participate in the RPX scheme and is already an RPX

3    member, the conduct of each manufacturing defendant in refusing to act in what would

4    be its independent self-interest by individually negotiating a license with Cascades for the

5    '750 patent, and instead negotiating only jointly through the common agent RPX,

6    constitutes a tacit agreement among the three manufacturing defendants and RPX to

7    accumulate purchaser-side market power to drive the license fees of the '750 patent

8    below the market rate or, in the alternative, to jointly and collectively decline to license

9    the '750 patent at all.

10       39.    In effect, with the assistance of RPX, the manufacturing defendants agreed that

11   none of them would separately negotiate with Cascades for a license and that all would act

12   together to oppose Cascades' efforts to license and enforce the '750 and other Cascades patents.

13   This agreement not to negotiate independently with Cascades and to present a unified, concerted

14   effort to oppose licensing and enforcement of any of the Cascades patents has put Cascades in

15   the position of having to choose whether to abandon its efforts entirely, accept a below-market-

16   value offer by RPX or go out of business by virtue of the enormous expense of patent litigation.

17       40.    As noted above, each RPX member signs a vertical agreement with RPX that

18   effectively limits its freedom to negotiate a license independently.  RPX represents that, by

19   negotiating licenses through it, royalty amounts can be reduced.  By penalizing those who do not

20   renew and continue their membership in RPX, members are economically encouraged not to deal

21   independently with patent owners like Cascades.  RPX previously boasted that more NPE

22   activity spurs companies to join the RPX network -- the network being the 120 RPX members

23   that, together with RPX, combine to accept, reject or negotiate licenses with NPEs.

24   ///

25

**Further Conduct That Would Be Contrary To One's
Economic Self-Interest In The Absence Of A Tacit Conspiracy**

41.     The manufacturing defendants (HTC, Motorola and Samsung) have acted against their individual economic interests.  In January 2012, Cascades offered each of Motorola, Samsung and HTC an identical low-priced license that would have required a lump-sum royalty payment of only $5 million for a fully paid-up license under all the Cascades patents with the right (of the first party to accept) to recover up to all of the payment made based on 25% of the licensing revenues that Cascades received from any other accused infringer. Thus, for example, if any individual RPX member had accepted the offer and paid $5 million for a license and Cascades then subsequently received an additional $15 million of licensing revenues from other sources, the first member to accept would recoup $3.75 million (25% of $15 million), so the net cost for a license would be only $1.25 million, not $5 million.  If Cascades subsequently received $20 million or more, then the member who was first to accept a license would recoup all its costs.  This offer to each of the manufacturing defendants was well below the rate that would be established by the free market forces and in the absence of the tacit conspiracy or agreement among the defendants.  Indeed, this was a bargain price offered by Cascades that would be in the individual economic self-interest of each manufacturing defendant to accept. Yet, despite that fact, no manufacturing defendant even responded to the offer, clearly showing that the combination, agreement and conspiracy between them caused each individual defendant to act contrary to its own private economic interests.  In the absence of an RPX-led scheme, Samsung and Motorola had previously entered into such pay-back arrangements with other patent owners resulting in a complete 100% refund of their royalty payment.  Hence, they understood the financial benefit of such a proposal.

42.     Some RPX members (such as, LG Electronics (4% share) and Philips (0% share))

broke from the RPX-driven conspiracy and independently negotiated settlements with Cascades after the filing of this antitrust action.  The payments made by LG and Philips were below the reasonable level that a patentee would expect for a license under the Cascades-Elbrus patents, primarily because the dominant sellers of Android mobile phones (Samsung, Motorola and HTC) were not licensed at all.

43.    In sum, each of the three manufacturing defendants engaged in conduct contrary to its individual self-interest -- conduct that lacks economic sense, absent at least a tacit understanding among them and RPX to negotiate collectively and not individually with Cascades, so that the price of a license would be driven below a competitive market rate. Further, the series of separate vertical agreements between RPX and each of the three manufacturing defendants (and RPX's other members) create the same market effect as the tacit understanding that the three members not deal independently with Cascades, thus driving the price of a license under the Cascades patents below a competitive market rate.

### VIOLATION OF THE FEDERAL ANTITRUST LAWS

44.    Cascades claims four separate bases for violation of the antitrust laws:  (1) a (horizontal) conspiracy to restrain trade in violation of § 1 of the Sherman Act by all defendants, (2) a (vertical) conspiracy to restrain trade in violation of § 1 of the Sherman Act by all defendants, (3) a conspiracy to monopolize (monopsonize) by all defendants in violation of § 2 of the Sherman Act; and (4) an attempt to monopolize (monopsonize) and actual monopsonization by RPX in violation of § 2 of the Sherman Act.

45.    These antitrust claims are brought under §§ 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26):  (a) to recover damages, including treble damages, sustained by Cascades as a result of its being injured in its business and property by reason of defendants' violations of the antitrust laws, particularly Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2), (b) to

1    obtain injunctive relief against threatened loss or damage as a result of such violations and (c) to

2    recover the expense of bringing and maintaining this action, including reasonable attorneys' fees.

3         46.    Cascades has the exclusive right to license and enforce the '750 patent, as well as

4    the 37 other patents owned by Elbrus.  Though the '750 patent is the primary Cascades/Elbrus

5    patent presently of interest to the defendants (Samsung infringes at least one other patent relating

6    to its DRAM business), efforts to license the entire portfolio of Cascades/Elbrus patents have

7    been impacted by the horizontal and vertical combination and conspiracy among the defendants

8    and other RPX members and, as noted above, RPX actually required a license under all the

9    Cascades/Elbrus patents for its members, not just the '750 patent.

10        47.    The '750 patent relates to software embedded in mobile phones and tablet

11   computers that permits optimization of applications when Android operating systems are used.

12   Cascades has actively sought to license the '750 patent, together with its other patents, so that the

13   patented technology could be legally shared with the entire mobile phone and tablet industry that

14   uses Android operating systems.

15        48.    Many separate companies have been repeatedly contacted by Cascades in an

16   effort to grant lienses, including the defendants and other RPX members (such as Hynix, ASUS,

17   Pantech Wireless, Philips Electronics, Dell and Sharp Electronics).  Each of the manufacturing

18   defendants has a commercial and competitive need to utilize the technology incorporated in the

19   '750 patent and each of them believes that it is more likely than not that the '750 patent is valid

20   and infringed by the mobile devices they sell.  None of the three manufacturing defendants,

21   however, has engaged in independent, good-faith discussions or negotiations with Cascades or

22   even acknowledged letters offering licenses, thus acting contrary to their own private interests

23   and, ultimately, the public good.  As noted above, Motorola, Samsung and HTC, who dominate

24   the Android mobile phone business in the United States, refused to even discuss a license,

25

1   despite being offered terms that could effectively result in a zero royalty.

2          49.    Each of the manufacturing defendants has openly infringed at least the '750 patent

3   and/or contributed to or induced the infringement of the '750 patent.  Once RPX did not acquire

4   a license under the Cascades patents (because of its members refusal to fund), each

5   manufacturing defendant, in accordance with their prior written and/or tacit agreements with

6   RPX, refused to individually negotiate with Cascades.   As noted above, Motorola openly

7   admitted it would deal only through RPX and  Samsung and HTC refused even to respond to

8   Cascades' license offers.

9          50.    In addition to this parallel behavior, the three manufacturing defendants have

10  written agreements with RPX, have agreed to refuse to independently discuss licensing with

11  Cascades, have agreed either to fund licenses as a group or not to fund at all and have agreed to

12  negotiate only through RPX.  No individual license counteroffer was made to Cascades by any of

13  the three manufacturing defendants.

14         51.    Despite its efforts to license the '750 patent (and the other patents), Cascades has

15  been unsuccessful in granting a license to the three named manufacturing defendants.  Through

16  their control of more than 90% of the mobile phone Android business and 75% of the mobile and

17  tablet business in the United States, these defendants clearly have market power.  Prospective

18  licensees have made no independent contact with Cascades because of the concerted efforts on

19  the part of defendants (as counseled by RPX) to refuse licenses under the Cascades patents.  This

20  behavior has continued, despite defendant RPX's previously expressed interest in purchasing

21  license rights for its members under the Cascades patents.  This uniformity of action (indeed, of

22  inaction) demonstrates an organized effort to refuse to license, thereby forcing license prices

23  below a competitive level.  When Cascades did finally negotiate independently with LG only

24  after this antitrust case was filed, it was forced to accept license terms that, if applied to the

25

1   manufacturing defendants, would yield only $20 million from all infringers, well below the value

2   of the Cascades portfolio as reported to RPX on September 8, 2011 -- Samsung alone was then

3   valued at $50 million.

### FIRST CLAIM FOR RELIEF

**Horizontal Combination And Conspiracy In Restraint Of Trade**
**In Violation of Section 1 Of The Sherman Act**
**Against All Defendants**

7   52.   Cascades repeats and incorporates by reference the allegations made in

8   paragraphs 10 through 51 above.

9   53.   The nature of the conspiracy and combination are the written agreements and/or

10  tacit agreement that each manufacturing defendant act only through RPX, fund a license only

11  through RPX and reach agreement on a bulk license for all of them or not at all.

12  54.   The types of horizontal agreements involved are set forth specifically in

13  paragraph 38 above:  written agreements between the three manufacturing defendants and RPX

14  and tacit agreements among the manufacturing defendants themselves.

15  55.   Under the auspices of these agreements with RPX, of NPE insurance, and of

16  meetings, phone calls, emails and discussions with RPX, all occurring at least in 2011,

17  defendants have met, conferred, conspired, combined and agreed among themselves  that they

18  would not accept licenses from Cascades under terms and conditions offered by Cascades (even

19  with the potential of no royalty) but, instead, have decided they would infringe the '750 patent,

20  and at least one other Cascades patent, without the payment of any royalties unless negotiated by

21  RPX and, thus, would collectively continue to jointly refuse to license the Cascades patents.

22  This has become clear both from the uniformity of action by defendants, even against their own

23  economic interests, and from published statements made about the need to negotiate with NPEs

24  collectively or not at all.

25

56.     As one example of such public statements, many of the manufacturing defendants (including Motorola) have used common counsel to reinforce their uniform action in refusing to consider or accept (or, for that matter, even discuss) a license under the Cascades/Elbrus patented technology.  The common representation has been actively solicited and then used with RPX to be certain that the defendants do not operate independently in evaluating the terms and conditions of a license under the Cascades/Elbrus patents. See, e.g., http://wlflegalpulse.com/2010/09/22/web-seminar-makes-case-for-patent-troll-lawsuit-targets-to-fight-back;http://winston.com;http://wlf legal pulse.files. wordpress.com/2010/troll-presentation-5.pdf.

57.     The '750 patent has been discussed by the manufacturing defendants and RPX outside the context of litigation, and agreements and understandings have been made to attack the '750 patent rather than to accept a license under it.  RPX, which itself accumulates patents, was directly involved in the combination and conspiracy and knows that the manufacturing defendants have combined to refuse any reasonable license offer.  RPX encourages individual entities not to independently accept licenses from NPEs. See, http://rpxcorp.com.

58.     In furtherance of the horizontal conspiracy and combination, the three manufacturing defendants have agreed to limit their individual freedom of action in dealing with Cascades, even against their private economic interests; they have shared information through RPX concerning Cascades and its patents; they have agreed to cooperate and to share expenses for and to assist each other in attacking the Cascades patents; they have, through RPX, also attempted to persuade other potential licensees not to discuss or accept a license from Cascades under any terms or conditions not acceptable to RPX; and, they have agreed not to negotiate with Cascades without consulting and agreeing with other members of the conspiracy concerning the acceptability of the terms offered by Cascades, all for the purpose of assuring uniformity of

1   action in accepting or rejecting Cascades' efforts to grant licenses under its patents and, thus,

2   controlling the effective royalty rate and terms under which the patents are licensed.

3       59.   RPX has recommended to its members, including the three manufacturing

4   defendants, that they refuse to individually negotiate licenses for patents, in part, through RPX's

5   stated business model of achieving "wholesale" pricing terms for its members at a significantly

6   reduced cost relative to what an NPE might charge an individual company on its own.  See,

7   http://www.rpxcorp.com/index.cfm?pageid=61 ("In effect, RPX can buy 'wholesale' on behalf

8   of our client network, while our clients otherwise would pay 'retail' if transacting on their

9   own.").  Each of the three manufacturing defendants knew that this was the stated and advertised

10  business model of RPX.

11      60.   If one of the three manufacturing defendants negotiated a license with Cascades

12  individually, RPX would have been left with significantly less market power with which to force

13  a lower "wholesale" price for a license.  Additionally, that "wholesale" price would have to be

14  paid by one less company, which would be economically significant to each remaining

15  constituent in the relevant market and submarket which consists of only a handful of companies.

16  Thus, the three manufacturing defendants and RPX were economically interdependent such that

17  the cooperation of the defendants was essential to achieving the lowest (below market) price for

18  a license under the '750 and the other Cascades patents.

19      61.   When all of the manufacturing defendants effectively agreed to only negotiate a

20  license through RPX, then RPX becomes endowed with sufficient market power to force a low

21  enough price for a license that makes it economically advantageous to negotiate only through

22  RPX and to pay RPX's fee.  These agreements are intended to lower the market value of the '750

23  and other Cascades patents.

24      62.   As set forth above, the meetings, discussions and communications between

25

1   defendants and others (most of which have been concealed from Cascades) have taken place for

2   the express purpose and with the effect of creating a uniform, agreed-upon course of action

3   among them in refusing to accept a license under the Cascades patents except upon terms which

4   defendants could jointly dictate.

5       63.    The purpose and effect of the horizontal combination or agreement is to (1)

6   combine the purchasing power of manufacturers of mobile electronic devices that utilize the

7   Android operating system with respect to the acquisition of the rights to use the '750 patented

8   technology, and (2) acquire a sufficient share of the purchasing power for the '750 patent so as to

9   be able to drive the price paid for the use of the '750 patent below the rates that would be set by

10  the unfettered competitive market forces or, in the alternative, to have the manufacturing

11  defendants collectively refuse to deal with Cascades at all if Cascades would not meet their joint

12  demand for a license of the '750 patent at below a competitive market rate.

13      64.    For these reasons, the defendants have combined and conspired within the

14  meaning of §1 of the Sherman Act so as to unreasonably injure competition and suppress the

15  price paid for or the acquisition of the right to utilize the technology encompassed by the '750

16  patent.

17      65.    Cascades has been injured in its business or property by its inability to obtain the

18  competitive market rate for the licensing of its '750 patent that it would have been able to

19  achieve, but for the tacit conspiracy alleged herein.

20      66.    Unless restrained by this Court, the defendants will continue to combine or

21  conspire so as to anti-competitively and artificially suppress the price paid by the manufacturing

22  defendants for a '750 license or, in the alternative, to effectuate a collective group refusal to

23  license the '750 patent at competitive rates.

24      67.    In sum, the manufacturing defendants have entered into horizontal agreements

25

that amount to a violation of the antitrust laws -- a horizontal price-fixing agreement among direct competitors, e.g., setting the limit on what they will agree to pay for a license.  If the manufacturing defendants negotiated with Cascades independently and separately, a price could be set for each license and each patent independent of the other and those who are late to accept a license might justifiably pay a greater royalty.  Such actions by RPX and the manufacturing defendants are illegal *per se*.

### SECOND CLAIM FOR RELIEF

**Vertical Conspiracy And Combination To Restrain Trade
In Violation Of Section 1 Of The Sherman Act
Against All Defendants**

68.     Cascades repeats and incorporates by reference the allegations made in paragraphs 10-51 and 53-67 above.

69.     As set forth above, RPX has a series of separate vertical membership or subscription agreements with each of the three manufacturing defendants and others that require RPX to act on behalf of each manufacturing defendant.  Each manufacturing defendant knows that each other manufacturing defendant is an RPX member, also creating a tacit agreement between the three.

70.     Through these series of written vertical agreements, the three manufacturing defendants agree that RPX will negotiate license deals with inventors or the companies they own, control or have an economic interest in and, that each member will not negotiate separately or independently.

71.     The understanding, based upon the fact that Samsung, HTC and Motorola are all members of RPX, is that  RPX will negotiate for a license at below market levels and that no member individually negotiate for a license.  RPX admits its entire business model is based upon such illegal conduct.

**EFFECTS OF BOTH THE HORIZONTAL
AND VERTICAL CONSPIRACIES AND COMBINATION**

72.     Defendants HTC, Motorola and Samsung sell more than 90% of all mobile phones that use the Android operating systems in the United States and 75% of all tablets that use such operating systems and are, thus, an important part of the Android mobile phone and tablet business requiring a license from Cascades under its patented technology.   The manufacturing defendants constitute nearly the total demand for the licensing of Cascades' patented technology and collectively enjoy substantial market power; together, they have exercised their power to control the acceptance and terms and conditions of licenses from Cascades.   This power is augmented by the willingness and agreement of the manufacturing defendants to infringe Cascades' patents until such time as Cascades capitulates by either going out of business, declining to enforce the patents or offering defendants patent license terms below fair market value.

73.     As a direct and proximate result of the aforesaid conspiracies, Cascades has been unable to independently negotiate licenses with any of the three manufacturing defendants on terms and conditions that would have been established by the forces of supply and demand in an unrestrained market.  Cascades has been unable to consummate a license with any manufacturing defendant; it has been prevented from obtaining royalties and other compensation it would otherwise have received for licenses under the Cascades patents; and, it has been forced to incur the expense of enforcing the Cascades patents against defendants and others -- all as a result of the defendants' unlawful conduct.  That not a single major supplier of mobile phones using the Android operating systems would even discuss or consider a license or even acknowledge Cascades' letters or efforts to grant licenses before this antitrust action was filed shows the uniformity of the illegal conduct.  The agreements between the defendants (whether reduced to

1  writing or not) share a common purpose:  do not settle with Cascades; do not discuss the

2  possibility of a license; do not negotiate independently; act consistently with each other.  Further,

3  by agreeing to negotiate only through RPX, the manufacturing defendants have effectively

4  sought a license at a much lower price than if they acted independently and, although some

5  defendants acting through RPX initially supported the idea of accepting a license, that support

6  eroded as the defendants then joined forces to not accept a license at any price.

7       74.    The purpose of these horizontal and vertical agreements is to allow RPX to

8  accumulate sufficient purchaser-side market power to drive down the competitive market rate

9  that the manufacturing defendants would otherwise have to pay to acquire access to

10  competitively-needed technology, including the '750 patent.

11      75.    The effect of the series of the horizontal and vertical agreements has been the

12  suppression of the market price that each individual manufacturing defendant would have

13  otherwise paid in the absence of the agreements and the refusal by each of the manufacturing

14  defendants to deal with Cascades except at prices substantially below the competitive rate.

15      76.    The effect of the series of horizontal and vertical agreements alleged above has

16  been to unreasonably injure competition for the acquisition of the rights to utilize the '750

17  patented technology and to substantially injure and restrain competition within the relevant

18  market and submarket.

19      77.    Cascades has been injured in its business or property by its inability to license the

20  '750 patent (or its other patents) in an uninjured competitive market.  In an uninjured market,

21  Cascades would have been able to license the '750 patent alone or in combination with its other

22  patents to each of the manufacturing defendants at a competitive market rate that would have

23  been far higher than the rate that Cascades was forced by the unlawful acts alleged herein to

24  offer to RPX and which RPX, on behalf of the manufacturing defendants, nonetheless refused.

25

78.     Unless restrained by this Court, Cascades is threatened with continuous injury or loss due to the effect of the unlawful horizontal and vertical agreements alleged herein.

### THIRD CLAIM FOR RELIEF

**Combination And Conspiracy to Monopsonize By All Defendants
In Violation Of Section 2 Of The Sherman Act
Against All Defendants**

79.     Cascades realleges and reincorporates paragraphs 10-51, 53-67 and 69-78 above as though specifically set forth herein.

80.     Defendants have combined and conspired for the specifically anticompetitive purpose of obtaining monopsony power within the relevant market so as to eliminate competition between themselves in the acquisition of licenses from Cascades under its patented technology and also for the specifically anticompetitive purpose and with the effect of obtaining and maintaining the power to control the royalty rate (i.e., prices) and terms and conditions under which such patented technology would be licensed and to anti-competitively drive down the competitive rate that would otherwise be paid.  Defendants have accordingly conspired to monopsonize (i.e., accumulate market power over the buyer's side of the relevant market and submarkets alleged herein) in violation of Section 2 of the Sherman Act.

81.     RPX and the manufacturing defendants actually have accumulated and maintained monopsony power over the relevant market and submarket and have used that monopsony power to prevent Cascades from being able to license the '750 patent and its other patents at competitive rates and to refuse to pay competitive market rates for access to the patented technology.

82.     Defendants' unlawful conduct alleged herein has been undertaken for the specifically anticompetitive purpose of obtaining or maintaining monopsony power over terms and conditions upon which Cascades can license its patented technology (including the '750

1   patent) to buyers thereof.  Unless restrained by this Court, there is a dangerous likelihood that

2   defendants will succeed in the illegal scheme and enhance their monopsony power within the

3   relevant market or submarkets alleged herein in violation of Section 2 of the Sherman Act.

4        83.    Through anti-competitive conduct which is not the result of good business skill or

5   acumen, defendants have obtained and maintained monopsony power which allows them to

6   control the terms and conditions upon which the prospective licensees of the patented technology

7   will agree to license such technology, all to the exclusion of competition for licenses and so as to

8   monopsonize the relevant market and submarkets alleged herein in violation of Section 2 of the

9   Sherman Act.

10                   **FOURTH CLAIM FOR RELIEF**

11          **Attempt To Monopsonize And Actual Monopsonization**
              **By RPX In Violation Of Section 2 Of The Sherman Act**

12                       **Against RPX**

13        84.    Cascades repeats and incorporates by reference the allegations made in

14   paragraphs 10-51, 53-67, 69-78 and 80-83 above.

15        85.    RPX has a stated business model of achieving "wholesale" pricing terms for its

16   members at a significantly reduced cost relative to what an "NPE" might charge an individual

17   company on its own.

18        86.    RPX admits an intent to control prices or destroy competition for licenses under

19   patents that are infringed by its members, especially if those patents are owned or controlled by

20   so-called NPEs.  The predatory and anticompetitive conduct is detailed above -- competitors

21   negotiate for licenses through RPX to drive prices down.  And there is not only a dangerous

22   probability of success, the RPX-driven action has been successful.  Finally, there is antitrust

23   injury as set forth below.

24        87.    It is RPX's stated specific intention to achieve sufficient purchasing power to

25

control and drive down the price it agrees to pay on behalf of its members for the right to utilize patented technology, and to reduce the price relative to what an "NPE" might otherwise be able to charge one of its individual members negotiating for the use of patented technology.  In other words, it is RPX's specific intent to obtain and maintain monopsony power over the licensing of technology to its members, including monopsony power over the relevant market alleged herein and to use that power to extract anti-competitively low prices from sellers such as Cascades.

88.     RPX has attempted to and actually has obtained and maintained such monopsony power over the relevant market not through good business skill or acumen or by other procompetitive conduct.  Rather, RPX has obtained monopsony power over the relevant market by entering into membership agreements that make it the negotiating or purchasing agent for the manufacturing defendants who collectively control more than 90% of the mobile phone business using the Android operating system and 75% of the combined mobile phone and tablet business. RPX has used that monopsony power to deprive Cascades of the licenses of the '750 patent that it otherwise would have entered into at competitive market rates.

89.     At a minimum, there is a dangerous probability that, unless restrained by this Court, RPX will succeed in obtaining or maintaining monopsony power over the relevant market.

90.     Cascades has been injured in its business or property by RPX's attempt and actual monopsonization of the relevant market and submarket, in that Cascades has been deprived of a competitive market within which it could license its patents and has been unable to negotiate a license with any of the manufacturing defendants at competitive rates they would otherwise likely have paid in the absence of RPX's unlawful conduct.

91.     RPX's series of subscription agreements and the separate agreements for the structured acquisition of patent rights demonstrate RPX's intent to sign-up as many members as

it can based upon the promise that it can negotiate lower licensing prices through uniform (not independent) action by its members.  This undermines the interaction of competitive forces and limits the freedom of its members, like the three manufacturing defendants, to negotiate independently.  Hence, there is not free competition for license rights to practice the relevant technology, all of which flows from the unlawful conduct alleged above.

**Relevant Product Market**

92.    The relevant product market is the market for the purchase, acquisition or licensing of technology covered by the Cascades '750 patent (and, because of the requirements of RPX and the manufacturing defendants, the other Cascades patents) to manufacturers of mobile phones and tablets that use the Android operating system.  This is the market in which the defendants are attempting to monopsonize and conspiring to monopsonize by entering into contracts or combinations that have the effect of unreasonably injuring competition in the relevant market by accumulating monopsony power (i.e., the buyer side market power to drive price down below the market rate that would prevail in an uninjured market).   The three manufacturing defendants dominate this market.

**Relevant Geographic Market**

93.    The relevant geographic market is the United States.

**Relevant Submarket**

94.    A relevant submarket is the market for licenses under the patented technology of just the Cascades '750 patent.  Each of the manufacturing defendants is a purchaser or potential purchaser of the right to utilize the technology encompassed within the '750 patent. Collectively, the three manufacturing defendants have substantial monopsony power within the relevant submarket.  RPX, in its capacity as the purchasing or negotiating agent for the three manufacturing defendants, also has substantial monopsony power over the relevant submarket

1   and, like the three manufacturing defendants when acting collectively through tacit or explicit

2   agreements, has the power to suppress the price paid for the acquisition of the rights to utilize the

3   technology incorporated in the '750 patent substantially below the rate that would obtain in a

4   free and unfettered market.

**Injury To Competition -- Impact Of The Anticompetitive Activity**

6   95.    The illegal conduct set forth above has been led by RPX and implemented by the

7   manufacturing defendants and has injured competition in at least the following ways.

8   Defendants' combination and concerted activities have the purpose and effect of artificially and

9   unlawfully diminishing the value of products in the relevant market and submarket.  Such

10  artificial devaluation has the purpose and effect of reducing plaintiff's and any individual

11  inventor's incentives to innovate or support innovation, and restricts plaintiff's activities in

12  pursuit of its business purpose of developing or supporting the development of technology for

13  new and useful products that would compete in the marketplace with the existing products of the

14  manufacturing defendants and Google.  Thus, output of new technologies is restricted, and prices

15  of existing technologies are inflated.  Further, by acting together against Cascades (and most

16  other NPEs), defendants as a group, and RPX and its members, have created a buyer cartel, the

17  object of which is to force the price for a license below a competitive level, indeed, to

18  monopsony prices or, in this case, no price at all.

19  96.    Defendants' conduct also has the purpose and effect of driving plaintiff Cascades

20  (and others like it) out of business.  By refusing a license at any price and further concentrating

21  market power (through the accumulation of patents), RPX and the other defendants have

22  effectively raised prices and reduced output in products covered under the relevant patents.

23  97.    Defendants' conduct also has the purpose and effect of raising barriers to entry in

24  the market for licenses.  With buyers setting interdependent, collusive and artificially diminished

25

1   prices, chances of any NPE or inventor-owned or controlled company being willing to undertake

2   the risk and expense of negotiating licenses for new technology are greatly reduced. Defendants

3   know this and are implementing a plan to eliminate all NPEs (at least those that seek to license

4   their patent rights), effectively eliminating a major source supporting innovation and invention in

5   the United States.

**Injury To Cascades**

7   98.   As a direct result of the illegal acts set forth above, Cascades has been injured in

8   its business and property as follows:

9         a.   Cascades has been unable to effect any license agreements with the three

10   manufacturing defendants under reasonable terms and conditions which it otherwise

11   should have been able to accomplish, and has lost substantial royalty income as a result;

12         b.   Cascades has been precluded from business growth which it should

13   otherwise have achieved;

14         c.   Cascades has been required to incur significant legal expenses to enforce

15   its patents against the manufacturing defendants and others; and,

16         d.   Cascades has been forced to grant licenses to LG and Philips at below-

17   market conditions, e.g., below what it would have achieved if there had been no

18   concerted group action.

19   99.   These injuries flow from the defendants' unlawful conduct in that, without RPX

20   and the group action, each manufacturing defendant would have negotiated with Cascades

21   independently, which would yield a proper value-based royalty for use of the patented

22   technology.  The reason for this harm is the conspiracy and combination of the defendants, not

23   from mere individual business disputes between truly independent parties in that, as set forth

24   above, without RPX and the group action, each manufacturing defendant would inevitably have

25

1   negotiated with Cascades independently, which would yield a proper value-based royalty for use

2   of the patented technology.

3       100.   Google, who is also a member of RPX, benefits from the group boycott as well

4   because it lessens the royalty burden on its Android operating system.   Google, like RPX,

5   encourages others not to accept licenses under patents owned by NPEs.

6   **Chronology Of Key Events and The Noerr-Pennington Doctrine**

7       101.   Cascades' counsel negotiated numerous patent acquisition-licensing arrangements

8   with RPX immediately after its formation in March 2008 and continuing through 2011.   Kevin

9   Barhydt, who had previously worked at Intellectual Ventures before joining RPX, was RPX's

10   principal contact with Cascades' counsel in the acquisition of patent assets.   He and a co-founder

11   of RPX, Eran Zur, frequently visited with Cascades' counsel to solicit patent licensing and sale

12   opportunities.

13       102.   As a result, RPX actually acquired patent licenses from numerous entities

14   represented by Cascades' counsel and negotiated arrangements with many others in the years

15   2008 through 2011.   By July 2010, for example, RPX had obtained a license under significant

16   patents in the mobile phone field.   In May-June 2011, RPX was negotiating license rights in the

17   field of relational databases.   In September 2011, RPX was presented with a licensing acquisition

18   opportunity for patents in the field of monitoring and conferencing systems.

19       103.   Mr. Barhydt repeatedly represented that RPX was always looking for acquisition

20   opportunities and it was on this basis that the possibility of acquiring rights in the Cascades-

21   Elbrus patent portfolio arose at least as early as May-June 2011.   On June 26, 2011, Cascades

22   filed suit for patent infringement of a Cascades/Elbrus patent relating to DRAM designs against

23   an RPX member, Hynix, in Chicago, Illinois.   On July 6, 2011, Cascades filed a suit for patent

24   infringement of the '750 patent against defendants Samsung and Motorola.   On September 7,

25

1   2011, Cascades filed suit for infringement of the '750 patent against defendant HTC and former

2   defendant LG.

3       104.    Further, RPX's business model exists independently of any litigation conduct

4   and HTC, Samsung and Motorola were all members of RPX, independent of any lawsuits and

5   well before the Illinois patent infringement suits were filed.  Thus, the RPX model existed and

6   still exists independently of any litigation conduct of the defendants.

7       105.    At no time have the defendants sought to petition the government to take a

8   particular action regarding infringement of the Cascades '750 patent or any of the other patents

9   owned by Cascades.  Nor did their concerted action begin only after the manufacturing

10  defendants were sued for patent infringement.

11      106.    Well before Samsung, HTC and Motorola were sued for patent infringement in

12  Illinois, they each were members of RPX, had met with RPX and each other, had communicated

13  with RPX and each other and had contacted RPX and each other, all for the purpose of

14  discussing and agreeing to discuss and agree to approaches for purchasing (through RPX)

15  licenses in patents that might affect their businesses.  They also discussed providing possible

16  funding to RPX to acquire licenses under patents, including the Cascades patents, and in not

17  separately licensing patents in which RPX would seek to obtain licenses for them.

18      107.    Hence, the structure and approach for acquiring license through RPX under

19  patents that might impact the manufacturing defendants, Samsung, Motorola and HTC, was put

20  in place well before any lawsuits were filed against them for infringement of the Cascades '750

21  patent.  Further, the group conduct complained of herein is not related to any litigation activity in

22  the Illinois patent infringement lawsuits, in part, because the master plan for refusing to negotiate

23  independently was put in place well before the July-September 2011 lawsuits were filed.

24  ///

25  AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL – CASE NO. 12-CV-01143 (YGR)                    - 37 -

**FIFTH CLAIM FOR RELIEF**

**Violation Of the Cartwright Act**
**(Cal. Bus. & Prof. Code §§ 16700, *et seq.*)**
**Against All Defendants**

108.    Cascades realleges and reincorporates paragraphs 10-51, 53-67, 69-78, 80-83 and 85-107 above as though specifically set forth herein.

109.    Defendants formed and operate a trust and have combined their resources as set forth above.  The purpose and effect of the trust is to restrain trade and competition.  The anti-competitive effect of this restraint outweighs any beneficial effect on competition.

110.    Defendants' illegal conduct described herein constitutes an unlawful trust that restrains trade, commerce, and competition in violation of California Business and Professions Code § 16700.

**SIXTH CLAIM FOR RELIEF**

**Violation of California Unfair Competition Law**
**(Cal. Bus. & Prof. Code §§ 17200 *et seq.*)**
**Against All Defendants**

111.    Cascades realleges and reincorporates paragraphs 53-67, 69-78, 80-83, 85-107 and 109-110 above as though specifically set forth herein.

112.    Defendants' conduct has caused injury to Cascades and defendants' conduct is a substantial factor in that injury.

113.    Defendants' conduct has been unlawful and in violation of the California unfair competition law and, as alleged above, the conduct is an unlawful and unfair business practice.  The conduct violates both the Sherman Act and the California Cartwright Act and offends the established public policy of California.  The harm caused by defendants' conduct outweighs any benefits the conduct could possibly have.

114.    Defendants' "unfair" and "unlawful" actions discussed herein constitute unfair

1   competition within the meaning of California Business and Professions Code § 17200.

2   Defendants' violations of Federal and California antitrust laws have caused irreparable harm to

3   Cascades, entitling it to immediate and permanent injunctive relief and to restitution.

### PRAYER FOR RELIEF

5       WHEREFORE, Cascades asks this Court to enter judgment against defendants, their

6   subsidiaries, affiliates, agents, servants, employees, attorneys and all persons in active concert or

7   participation with them, granting it the following relief:

8       1.      A finding that the conspiracy, combination, understanding and agreement by and

9   among the defendants, and the other actions alleged above, are in violation of Sections 1 and 2 of

10  the Sherman Act;

11      2.      A finding that RPX has engaged in anti-competitive conduct in violation of

12  Section 2 of the Sherman Act;

13      3.      A judgment in Cascades' favor and against defendants, jointly and severally, in an

14  amount, which the evidence will show Cascades has sustained as a result of its being injured in

15  its business and property as a result of defendants' violations of the antitrust laws, including an

16  award of treble damages, all as provided for under Section 4 of the Clayton Act (15 U.S.C. § 15);

17      4.      An injunction against each of the unlawful practices alleged, including under the

18  federal antitrust laws and under the California Business and Professions Code §§ 17200, et seq.,

19  together with restitution as appropriate;

20      5.      An award to Cascades of the costs of suit, including its reasonable attorneys' fees;

21      6.      An award of damages for violation of the Cartwright Act; and

22      7.      Such other and further relief as this Court and/or a jury may deem proper and just.

23  ///

24  ///

25  AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL – CASE NO. 12-CV-01143 (YGR)          - 39 -

**<u>JURY DEMAND</u>**

Cascades demands a trial by jury of all issues so triable.

DAVIS WRIGHT TREMAINE LLP
NIRO, HALLER & NIRO


By:/s/ Martin L. Fineman
    Martin L. Fineman

One of the Attorneys for Plaintiff
Cascades Computer Innovation LLC