1  LATHAM & WATKINS LLP
    Alfred C. Pfeiffer, Jr. (Bar No. 120965)
2   Charles Crompton (Bar No. 138825)
    Hanno Kaiser (Bar No. 262249)
3   Alan Devlin (Bar No. 282445)
   505 Montgomery Street, Suite 2000
4  San Francisco, California 94111-6538
   Telephone: +1.415.391.0600
5  Facsimile: +1.415.395.8095
   Email: al.pfeiffer@lw.com
6  Email: charles.crompton@lw.com
   Email: hanno.kaiser@lw.com
7  Email: alan.devlin@lw.com

8  Attorneys for Defendant
   RPX CORPORATION

9

10                    UNITED STATES DISTRICT COURT

11                   NORTHERN DISTRICT OF CALIFORNIA

12                           OAKLAND DIVISION

13  CASCADES COMPUTER INNOVATION          CASE NO. 12-CV-01143-YGR
    LLC,
14                                         DEFENDANT RPX CORPORATION'S
                                           NOTICE OF MOTION AND MOTION TO
15              Plaintiff,                 DISMISS PLAINTIFF'S AMENDED
                                           COMPLAINT PURSUANT TO FEDERAL
16       v.                                RULE OF CIVIL PROCEDURE 12(B)(6);
                                           SUPPORTING MEMORANDUM OF POINTS
17  RPX CORPORATION, HTC                   AND AUTHORITIES
    CORPORATION, MOTOROLA
18  MOBILITY, INC., SAMSUNG               Date:      April 30, 2013
    ELECTRONICS CO. LTD.,                 Time:      2:00 pm
19                                        Place:     Courtroom 5
                Defendants.
20                                        The Honorable Yvonne Gonzalez Rogers

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

RPX'S NOTICE OF MOTION AND
MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT
CASE NO. 12-CV-01143-YGR

1

## TABLE OF CONTENTS

2                                                                          <u>PAGE</u>

3    STATEMENT OF THE ISSUES TO BE DECIDED..................................................................... 1

4    INTRODUCTION ................................................................................................................... 2

5    STATEMENT OF FACTS ...................................................................................................... 2

6        A.    Background ............................................................................................................. 2

7        B.    The Court's Prior Decision ..................................................................................... 3

8    CASCADES FAILS TO STATE A CLAIM. .......................................................................... 4

9        A.    Cascades' Conspiracy and Monopsonization Claims Fail Because
              They Are Still Implausible. .................................................................................... 4
10

11            1.    Cascades Demanded Too Great a Price. ...................................................... 4

12            2.    Nothing in the Amended Complaint Changes the Fact that
                  Cascades Demanded an Excessive Price. ..................................................... 5

13       B.    Cascades' Conspiracy Claims Fail Because They Allege Parallel
              Conduct, At Most, and Nothing More. ................................................................... 6
14

15            1.    Cascades' Vertical-Conspiracy Claim Fails. .............................................. 6

16            2.    Cascades' Horizontal-Conspiracy Claims Fail Because
                  There Is No Agreement between the Manufacturing
                  Defendants. ................................................................................................. 6
17

18       C.    Cascades Has Failed to Allege a Plausible Antitrust Market. ............................... 9

19            1.    Cascades Pleads No Facts Whatsoever in Support of its
                  Market. ......................................................................................................... 9

20            2.    The Complaint Pleads Facts Inconsistent with the Claimed
                  Market. ......................................................................................................... 9
21

22            3.    The Failure to Allege a Cognizable Market Dooms
                  Cascades' Monopsonization and Rule-of-Reason Claims. ......................... 10

23       D.    Cascades' Monopsonization Claims Fail as Well................................................. 11

24       E.    Cascades' State Law Claims Necessarily Fail. ................................................... 12

25       F.    The Court Should Dismiss the Complaint with Prejudice Because
              Further Amendments Would Be Futile................................................................. 13
26

27    CONCLUSION...................................................................................................................... 13

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

i

RPX'S NOTICE OF MOTION AND
MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT
CASE NO. 12-CV-01143-YGR

1

## TABLE OF AUTHORITIES

2                                                                    PAGE

3                                **CASES**

4
*Apple Inc. v. Psystar*,
    586 F. Supp. 2d 1190 (N.D. Cal. 2008) ............................................................... 10

5
*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009)......................................................................... 7, 8, 13
6

7
*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).................................................................................. 7

8
*Big Bear Lodging Ass'n v. Snow Summit*,
    *Inc.*, 182 F.3d 1096 (9th Cir. 1999) ........................................................ 9
9

10
*Brooke Group v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993)................................................................................. 8

11
*Colonial Med. Grp., Inc. v. Catholic Healthcare W.*,
    No. 09-cv-2192, 2010 WL 2108123 (N.D. Cal. May 25, 2010).......................... 9
12

13
*Confederated Tribes of Siletz Indians v. Weyerhaeuser Co.*,
    411 F.3d 1030 (9th Cir. 2005) .............................................................. 11

14
*Dickson v. Microsoft Corp.*,
    309 F.3d 193 (4th Cir. 2002) ................................................................. 7
15

16
*Filco v. Amana Refrigeration, Inc.*,
    709 F.2d 1257 (9th Cir. 1983) ............................................................... 7

17
*Golden Gate Pharm. Servs., Inc. v. Pfizer, Inc.*,
    433 Fed. Appx. 598 (9th Cir. May 19, 2011) ........................................... 9
18

19
*Image Technical Servs. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) .............................................................. 11

20
*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010).................................................................. 7
21

22
*JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*,
    190 F.3d 775 (7th Cir. 1999) ................................................................ 8

23
*PepsiCo, Inc. v. Coca-Cola Co.*,
    315 F.3d 101 (2d Cir. 2002)................................................................... 7
24

25
*PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*,
    615 F.3d 412 (5th Cir. 2010), *cert. denied*, 131 S. Ct. 1476 (2011)...................... 7

26
*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997).................................................................. 9
27

28
*Rebel Oil v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ............................................................ 8, 11

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
                                      ii
                                                    RPX'S NOTICE OF MOTION AND
                                    MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT
                                                    CASE NO. 12-CV-01143-YGR

*Spectators' Commc'n Network Inc. v. Colonial Country Club*,
    253 F.3d 215 (5th Cir. 2001) ................................................................................. 7

*Tanaka v. Univ. of S. Cal.*,
    252 F.3d 1059 (9th Cir. 2001) ............................................................................... 9

*Thurman Inds., Inc. v. Pay 'N Pak Stores, Inc.*,
    875 F.2d 1369 (9th Cir. 1989) ............................................................................. 10

*Total Benefits Planning Agency v. Anthem Blue Cross & Blue Shield*,
    552 F.3d 430 (6th Cir. 2008) ................................................................................. 7

*Townsend v. Univ. of Alaska*,
    543 F.3d 478 (9th Cir. 2008) ............................................................................... 12

*Weyerhaeuser Co. v. Ross-Simmons Hardware Lumber Co.*,
    549 U.S. 312 (2007) ............................................................................................. 11

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ............................................................................... 12

## OTHER AUTHORITIES

FTC, The Evolving IP Marketplace: Aligning Patent Notice and
    Remedies with Competition 66-67 (2011) ........................................................... 2

## RULES

Fed. R. Civ. P. 12(b)(6) ............................................................................................... 13

Fed. R. Civ. P. 8 .......................................................................................................... 1

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

RPX'S NOTICE OF MOTION AND
MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT
CASE NO. 12-CV-01143-YGR

1

## NOTICE OF MOTION AND MOTION TO DISMISS

2      PLEASE TAKE NOTICE that on April 30, 2013, at 2:00 pm, or as soon thereafter as the

3  matter may be heard, in the United States District Court, Northern District of California, at 1301

4  Clay Street, Oakland City Center, Oakland, CA 94612, before the Honorable Yvonne G. Rogers,

5  Defendant RPX Corporation will, and hereby does, move the Court for an order dismissing

6  Plaintiffs' Amended Complaint with prejudice pursuant to Rule 12(b)(6) of the Federal Rules of

7  Civil Procedure. This motion is based on the Notice of Motion and Motion, the accompanying

8  Memorandum of Points and Authorities, the Proposed Order, the pleadings on file in this action,

9  and upon such other matters presented to the Court at the time of the hearing.

10

## RELIEF SOUGHT

11      Defendant RPX Corporation seeks dismissal of each claim asserted in plaintiff's

12  Amended Complaint, with prejudice, pursuant to Federal Rule of Civil Procedure 12(b)(6). RPX

13  also joins in and supports the motion to dismiss that co-defendants HTC Corporation, Motorola

14  Mobility, Inc., and Samsung Electronics Co. Ltd. will file concurrently.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
SAN FRANCISCO

RPX'S NOTICE OF MOTION AND
MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT
CASE NO. 12-CV-01143-YGR

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

### STATEMENT OF THE ISSUES TO BE DECIDED

3      1.      Whether Cascades can allege a plausible conspiracy among defendants, and

4   monopsonization on the part of RPX, to depress the price for licenses to Cascades' patents

5   unlawfully, when Cascades' admitted facts show that Cascades simply sought too high a price,

6   which defendants predictably and independently declined to pay.

7      2.      Whether Cascades can allege an actionable "hub-and-spoke" conspiracy when it

8   admits that defendants' agreements expressly permit independent conduct, pleads no more than

9   parallel behavior, and alleges in conclusory terms that the manufacturing defendants merely had

10   a "tacit" understanding that none would independently negotiate a separate license to the '750

11   patent.

12      3.      Whether Cascades can meet the pleading requirements of Federal Rule of Civil

13   Procedure 8 by conclusorily alleging an antitrust market limited to its own patents without

14   addressing demand- or supply-side substitutability, cross-price elasticity, or entry barriers.

15      4.      Whether Cascades can allege viable monopsonization and attempted-

16   monopsonization claims against RPX, in light of Cascades' failure to allege a plausible market,

17   its admissions showing that the class of potential purchasers is far larger than manufacturers of

18   Android devices, and its concession that RPX has not agreed with any of its members that they

19   would not negotiate independently for patent licenses.

20      5.      Whether the Amended Complaint should be dismissed with prejudice.

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

RPX'S NOTICE OF MOTION AND
MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT
CASE NO. 12-CV-01143-YGR

**INTRODUCTION**

Cascades tried to license its patents to RPX and to the manufacturing defendants. Each of them initially declined, though two subsequently agreed. Cascades blames its limited ability to license on convoluted conspiracy and monopsonization theories, rather than the obvious and much simpler explanation: the price was too high. Cascades' original complaint failed because of this economic reality, which no amendment can change.

Moreover, Cascades does not and cannot plead the elements required to establish a vertical conspiracy because the manufacturing defendants retained their right to deal independently. In fact, two of them have exercised that right since the original complaint was filed. Cascades also fails to plead the elements required to establish a horizontal conspiracy among the manufacturing defendants. Cascades alleges no facts that they conspired directly with each other. Nor does it allege facts that they agreed with each other via RPX. Cascades alleges only parallel behavior, which is not actionable under the antitrust laws.

Lastly, Cascades fails to plead any facts supporting its relevant antitrust market. It tries to draw a circle around four companies that it approached to take a license, and then declares that they constitute the relevant (buyer-) market. But Cascades does not plead why it could not offer a license to others, so it has not delineated a relevant market from the seller's point of view.

For these reasons, and as explained in greater detail below, the Court should dismiss the Amended Complaint and Demand for Jury Trial ("Amended Complaint") with prejudice this time.

**STATEMENT OF FACTS**

**A.      Background**

RPX is a defensive buying fund, which "take[s] patents 'off the street' by preventing a PAE [patent-asserted entity] from acquiring and asserting the patents against members." FTC, THE EVOLVING IP MARKETPLACE: ALIGNING PATENT NOTICE AND REMEDIES WITH COMPETITION 66-67 (2011). There is no mystery why Cascades brought this lawsuit. Its lawyer has admitted that RPX "is a new business model that has emerged. And it is not favorable to my client, and we are attacking it." (July 12, 2012 Tr., RJN, Ex. 2, at 5.) In a transparent attempt to distract from

1    this truth, Cascades now vaunts the nonexistent benefits of its operations. (Amended Compl., ¶¶

2    11, 16.) The reality, however, is that Cascades, having failed to extort the sums it had hoped for

3    in the market, has concocted conspiracy and monopsonization to seek them via litigation.

### B.    The Court's Prior Decision

5        On January 24, 2013, the Court dismissed the original Complaint. It found that Cascades

6    had "provided insufficient facts from which to plausibly infer that the reason it suffered this

7    harm is due to a conspiracy in a particular market, rather than due to individual business disputes

8    between independent actors." (Order, Dkt. 93, p. 17.) It further recognized that, "[w]here the

9    facts alleged in the complaint demonstrate that an alleged conspiracy makes no economic sense,

10   the claim must be dismissed." (*Id.*) The Court observed that RPX, in arguing that "the more

11   plausible explanation for the Manufacturing Defendants' decision to decline a $5 million

12   licensing offer was that the offer price was too high," had "offered well-reasoned justifications

13   for the Manufacturing Defendants' behavior." (*Id.* 18.) In granting the previous motion to

14   dismiss on this basis, the Court stated that "Cascades . . . will need to provide *specific facts* to

15   clarify why, absent a conspiracy, it is economically irrational for the Manufacturing

16   Defendants—who are being sued by Cascades for infringement of one patent, the '750 patent—

17   to decline an offer to license Cascades' entire portfolio of 38 patents." (*Id.* 19-20 (emphasis

18   added).) The Court concluded that, "[w]ithout clarification and specificity, [it] will not presume

19   economic rationality where the circumstances giving rise to the lawsuit plausibly suggest nothing

20   more than a tactical ploy to regain economic leverage that Plaintiff lost in the licensing

21   negotiations." (*Id.* 20)

22       Furthermore, the Court found that Cascades had failed to plead an actionable Section 1

23   claim because "the allegations in the Complaint consist primarily of threadbare recitals of

24   conspiracy." (Order, Dkt. 93, p. 9.) Cascades had merely presented "generic pleading," which

25   failed as a matter of law. (*Id.* 10.) The Court dismissed the Complaint's rule-of-reason claims

26   because Cascades had failed both to plead "a coherent market definition" and to "provide

27   sufficient specificity of each violation in each alleged market or sub-market." (*Id.* 14-15.)

28       Cascades' Amended Complaint fails to cure these fatal flaws.

1    **CASCADES FAILS TO STATE A CLAIM.**

2    **A.    Cascades' Conspiracy and Monopsonization Claims Fail Because They Are**
3    **Still Implausible.**

4          The alleged facts in the Amended Complaint fail because they remain susceptible to one

5    obvious reading: Cascades tried to license its patents at too high a price, predictably attracting

6    little interest. Indeed, RPX explained to Cascades that "we aren't in a position where we can pay

7    more for something than what our clients value it at." (Amended Compl., ¶ 34.) Replacing that

8    simple explanation with conspiracy and monopsonization theories is profoundly implausible.[1]

9          1.    **Cascades Demanded Too Great a Price.**

10         Cascades tells us that, by October 11, 2011, "for most of its 100-plus members" and for

11   "all of the Cascades patents" RPX had engaged in licensing negotiations with Cascades "which

12   would have resulted in a high seven-figure payment"—i.e., necessarily less than $10 million. (*Id.*

13   ¶ 31.) According to Cascades, this "demonstrates [RPX's] recognition of the validity and value

14   of the '750 and other Cascades patents." (*Id.* ¶¶ 19, 31.) Assuming all of this to be true means

15   that Cascades considered less than $10 million to be a reasonable valuation for a license – not

16   merely for its '750 patent, but for its entire portfolio, and not merely for the manufacturing

17   defendants, but for RPX's full membership at the time.

18         Against this baseline (i.e., less than $10 million for 38 patents, for the benefit of over 100

19   RPX members), Cascades' assertion that the manufacturing defendants acted against their

20   independent self-interests in refusing to take $5 million licenses, *each*, simply does not follow.

21   (*Id.* ¶ 41.) Under Cascades' explanation of the licensing scheme, if HTC, Motorola, and

22   Samsung had all taken licenses, the last two alone would have paid a combined $10 million—

23

24   _____
[1] Cascades alleges that "RPX admits that its practices . . . may be illegal (specifically, in
25   violation of competition and antitrust practices)." (Amended Compl., ¶ 29.) The source Cascades
     relies on is an SEC filing in which RPX routinely discloses over 17 pages of material risk factors
26   that include "natural disasters, acts of war, [and] terrorism or widespread illness at our domestic
     and international locations." RPX Corporation, S.E.C. Registration Statement (Form S-1), at 9-
27   26   (2011),   http://www.sec.gov/Archives/edgar/data/1509432/000119312511012087/ds1.htm.
     This supposed "admission" is, of course, nothing of the kind. The SEC filing merely points out
28   that "[i]t is possible that courts . . . will . . . interpret existing laws . . . in a manner that is
     inconsistent with our business practices." *Id.* at 17. RPX firmly denies that any of its practices
     violates the antitrust laws.

1   more than the "substantial financial offer" that RPX made on behalf of almost its entire 100+

2   members—while the first would have paid $2.5 million ("25% of the licensing revenues that

3   Cascades received from any other accused infringer.") (*Id.*) In short, Cascades claims that an all-

4   up $12.5 million license for just the three manufacturing defendants is "well below the rate that

5   would be established by the [*sic*] free market forces and in the absence of the tacit conspiracy or

6   agreement among the defendants." (*Id.*) But this naked characterization is irreconcilable with

7   Cascades' allegations about the seven-figure October 11, 2011 sum, which was supposedly "a

8   substantial financial offer" "demonstrat[ing] [RPX's] recognition of the validity and value of the

9   '750 and other Cascades patents." (*Id.* ¶¶ 19, 31.)   Rejecting Cascades' later, vastly more

10  expensive proposal was entirely consistent with the manufacturing defendants' self-interest.

11          2.     **Nothing in the Amended Complaint Changes the Fact that Cascades**

12               **Demanded an Excessive Price.**

13        Cascades alleges that Intel took a license to the Elbrus patents "for a substantial, seven-

14  figure lump-sum payment," but Cascades never discloses the actual price paid, the patents

15  involved, the terms, or the time until the patents' expiration. Cascades argues that this license

16  establishes the value of its portfolio. (*Id.* ¶ 11.) But it is irrelevant, because Cascades never

17  alleges, nor could it, that Intel and the manufacturing defendants are similarly situated relative to

18  the Cascades portfolio. If anything, Cascades makes clear that Intel's situation was unique,

19  coming in the context of Intel hiring the patents' lead inventor, Mr. Boris Babayan. (*Id.* ¶ 10.)

20  And even if the Intel license were sufficiently specified and circumstantially similar to form an

21  apt comparison, the world's biggest semiconductor chip maker paying a seven-figure licensing

22  fee for Cascades' entire portfolio hardly shows that it was illogical for the three manufacturing

23  defendants' to decline to pay eight figures, whether it was to license Cascades' entire portfolio or

24  the single patent in that portfolio they stand accused of infringing.

25        Equally vague and unpersuasive is Cascades' cryptic assertion that the undisclosed

26  amount for which it settled with LG, "if applied to the manufacturing defendants, would yield

27  only $20 million from all infringers, well below the value of the Cascades portfolio." (*Id.* ¶ 51.)

28  This is flatly inconsistent with Cascades' assertion that less than $10 million "recogni[zes] . . .

the validity and value" of the portfolio for almost 110 RPX members.[2] (*Id.* ¶ 31.)

### B.   Cascades' Conspiracy Claims Fail Because They Allege Parallel Conduct, At Most, and Nothing More.

Cascades brings claims of vertical and horizontal conspiracy. (Amended Compl., ¶¶ 52-83.) Its vertical claim is that RPX, through separate contracts, agreed with each manufacturing defendant that the latter would "not negotiate separately or independently" for a license. (*Id.* ¶¶ 70-71.) Its horizontal claim is that the manufacturing defendants conspired with one another through RPX to the same effect. (*Id.* ¶¶ 70-71.) Both claims are not only contrary to the admitted facts; they fail as a matter of law.

#### 1.   Cascades' Vertical-Conspiracy Claim Fails.

Cascades bases its vertical-conspiracy claim on RPX's having a "series of *written* vertical agreements," pursuant to which "each member will not negotiate separately or independently." (Amended Compl., ¶¶ 69-70) (emphasis added). But this claim fails on its face because Cascades explicitly admits that "the subscription contracts RPX has with its members purportedly give members the ability to deal independently." (*Id.* ¶ 20.)[3] Furthermore, Cascades admits that several RPX members have not just negotiated independently with it, but have finalized licenses. (*Id.* ¶¶ 42, 48.) Cascades cannot reconcile these admissions with a theory of vertical conspiracy.

#### 2.   Cascades' Horizontal-Conspiracy Claims Fail Because There Is No Agreement between the Manufacturing Defendants.

##### a.   Cascades' Allegations of Horizontal Conspiracy Are Conclusory.

The Amended Complaint's horizontal-conspiracy counts also fail. First, the allegation that the manufacturing defendants agreed with one another exemplifies conclusory pleading.

---

[2] Again pleading in the most ambiguous terms, Cascades references $20 million as being "well below the value of the Cascades portfolio as reported to RPX on September 8, 2011 - Samsung alone was then valued at $50 million." (*Id.* ¶ 51.) Cascades' use of passive voice masks the crucial details: reported by whom?; valued by whom?; calculated how?; based on what? Regardless, Cascades' allegation that less than $10 million was a reasonable price for more than 100 RPX members, including Samsung, undercuts its contention that the patents were worth $50 million to Samsung alone.

[3] To the extent Cascades attempts to salvage this claim by suggesting that each manufacturing defendant had a "tacit agreement" with the others not to license, its argument becomes indistinguishable from its horizontal-conspiracy claims, and fails for the reasons discussed immediately below. (*Id.* ¶ 69.)

1   (Amended Compl., ¶ 38 ("Samsung, Motorola and HTC also agreed (horizontally) that, unless

2   each of them contributed its share, the purchase of license rights would not occur and that

3   Samsung, Motorola and HTC would not negotiate separately with Cascades."). Second, this

4   allegation lacks the detail that the Court has deemed indispensable to pleading a plausible

5   conspiracy. (Order, Dkt. 93, pp. 9-10 (holding that "threadbare recitals of conspiracy" and

6   "generic pleading" are insufficient).)

7                  b.      Cascades Fails To Allege the Required "Rim."

8          Cascades does not suggest that the manufacturing defendants sat down in the same room

9   and entered into an illegal agreement. Instead, it alleges that they agreed with one another via

10  RPX. This alleged hub-and-spoke conspiracy, however, fails because there is no alleged rim. *See*

11  *Total Benefits Planning Agency v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 435-36 (6th

12  Cir. 2008). The Amended Complaint does not allege that RPX (the hub) facilitated an agreement

13  between the manufacturing defendants (spokes) by relaying messages or otherwise being their

14  go-between. It only alleges that each spoke contracted independently with RPX, being aware that

15  the other manufacturing defendants were entering into similar agreements. (Amended Compl., ¶¶

16  *passim*.) Such parallel behavior means there is no rim, and hence no horizontal conspiracy. *See*

17  *Total Benefits*, 552 F.3d at 435; *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 327-28 (3d

18  Cir. 2010); *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 420 (5th Cir.

19  2010), *cert. denied*, 131 S. Ct. 1476 (2011); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203-04

20  (4th Cir. 2002); *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 110 (2d Cir. 2002); *Spectators'*

21  *Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 224 (5th Cir. 2001).

22         It is black-letter law that "parallel conduct does not suggest conspiracy" because it "could

23  just as well be independent action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007); *see*

24  *also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009); *Filco v. Amana Refrigeration, Inc.*, 709

25  F.2d 1257, 1267 (9th Cir. 1983). The Amended Complaint, alleging no more than parallel

26  behavior, fails to state a claim for horizontal conspiracy. Here is what Cascades alleges:

27         Between May/June and November 2011, Cascades negotiated with RPX to license its 38

28  patents, including the '750 Patent. (Amended Compl., ¶¶ 31-36.) At one point, RPX allegedly

1    made an offer, which it later withdrew. (*Id.* ¶¶ 31-32.) RPX continued to negotiate with Cascades

2    on behalf of its members, without reaching terms. (*Id.*, ¶¶ 31-36.) Later, Cascades approached

3    the manufacturing defendants, offering each of them a $5 million license, with a potential

4    discount for the first mover. (*Id.* ¶ 41.) None of them accepted. (*Id.*) Later, however, Cascades

5    entered into a licensing agreement with two RPX members (and supposed conspirators) LG

6    Electronics and Philips. (*Id.* ¶ 42.) Cascades claims that, separately, it sought to sell licenses to

7    RPX members Hynix, ASUS, Pantech Wireless, and Sharp Electronics. (*Id.* ¶ 48.) There is no

8    allegation that any of them refused to negotiate individually with Cascades. (*Id.*)

9            These allegations show independent parallel conduct (i.e., each manufacturer dealing

10   with RPX based on its own self-interest) but nothing more. Having paid RPX to acquire licenses

11   on its behalf, each manufacturing defendant could reasonably conclude that it would prefer to let

12   RPX negotiate for patent licenses, and decline Cascades' demanded price. No conspiracy is

13   required to explain the manufacturing defendants' actions, which were economically rational on

14   their own. The alleged facts simply provide no basis to infer a conspiracy.

15           The most that Cascades can muster are conclusory assertions that the manufacturing

16   defendants shared a "tacit" understanding that none would license independent of RPX.

17   (Amended Compl., ¶¶ 38e, 40-41, 43, 49, 53-54, 65, 69, 94.) Such conclusory pleading fails to

18   satisfy the Federal Rules and amounts to no more than an allegation of independent action in any

19   event. "Tacit collusion" is perfectly lawful because it does not entail any agreement at all.

20   *Brooke Group v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993) ("Tacit

21   collusion . . . describes the process, not in itself unlawful, by which firms in a concentrated

22   market might in effect share monopoly power . . . by recognizing their shared economic interests

23   and their interdependence with respect to price and output decisions."); *see also JTC Petroleum

24   Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775, 780 (7th Cir. 1999) (observing that "the Ninth

25   Circuit has rejected . . . outright . . . [t]he question whether purely tacit collusion . . . might

26   violate the Sherman Act") (citing *Rebel Oil v. Atl. Richfield Co.*, 51 F.3d 1421, 1443 (9th Cir.

27   1995)).

28           Cascades' claim of action contrary to self-interest fails because the manufacturing

1   defendants' alleged conduct is "not only compatible with, but indeed more likely explained by,

2   lawful, unchoreographed free-market behavior." *Iqbal*, 129 S. Ct. at 1950. Cascades' horizontal-

3   conspiracy claims thus fail as a matter of law.

### C.     Cascades Has Failed to Allege a Plausible Antitrust Market.

5       In dismissing Cascades' original Complaint on account of its failure to identify a relevant

6   market, the Court noted, but had no need to address, RPX's observation that Cascades had also

7   failed "to plead facts pertaining to several requirements for market definition: reasonable

8   interchangeability between substitutes, supply-side substitution, cross-price elasticity of demand,

9   or barriers to entry." (Order, Dkt. 93, p. 15 n.16.) This time, Cascades offers a proposed market

10  (and sub-market) limited to the technology covered by its portfolio (and '750 Patent), but once

11  again fails to allege any facts rendering its claimed market cognizable under the antitrust laws.

12  Its failure to do so requires dismissal of its monopsonization and rule-of-reason claims.

### 1.     Cascades Pleads No Facts Whatsoever in Support of its Market.

14      Ninth Circuit law requires Cascades to allege facts plausibly demonstrating an antitrust

15  market. "Where the plaintiff fails to define its proposed relevant market with reference to the rule

16  of reasonable interchangeability and cross-elasticity of demand . . . the relevant market is legally

17  insufficient and a motion to dismiss may be granted." *Colonial Med. Grp., Inc. v. Catholic

18  Healthcare W.*, No. 09-cv-2192, 2010 WL 2108123, at *3 (N.D. Cal. May 25, 2010) (citing

19  *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436-37 (3d Cir. 1997)); *see also

20  Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1065 (9th Cir. 2001); *Big Bear Lodging Ass'n v. Snow

21  Summit, Inc.*, 182 F.3d 1096, 1105 (9th Cir. 1999); *Golden Gate Pharm. Servs., Inc. v. Pfizer,

22  Inc.*, 433 Fed. App'x 598, 599 (9th Cir. May 19, 2011). Cascades has not even tried to meet the

23  Ninth Circuit's requirements.

### 2.     The Complaint Pleads Facts Inconsistent with the Claimed Market.

25      Cascades alleges facts that flatly contradict its claimed market. Cascades restricts the

26  purchasers—i.e., consumers—operating in the market to "manufacturers of mobile phones and

27  tablets that use the Android operating system." (Amended Compl., ¶ 92.) In doing so, however, it

28  alleges no facts explaining why its portfolio generally, and '750 Patent specifically, claim

technology relevant only to manufacturers of mobile phones and tablets using the Android operating system. Of course, there is no mystery why Cascades seeks to define the market in this restrictive manner—it wishes to define the market to maximize defendants' market share, so as to bolster a claim under Section 2.

In fact, the Amended Complaint itself makes clear that, to the extent the '750 Patent is valid,[4] it applies beyond the world of Android mobile devices. Remarkably, Cascades admits that it has sold a license to Philips, which has "0% share" of Android sales. (*Id.* ¶ 42.) That shows that the market for the '750 Patent, from a seller's point of view, cannot be limited to Android mobile devices.

Similarly, Cascades claims that it approached Hynix and Pantech for licenses. (*Id.* ¶ 48.) Neither makes Android mobile devices. So again, the market must be broader by Cascades' own definition. Most fundamentally of all, the '750 Patent makes no reference to the Android operating system and does not limit itself thereto. (U.S. Patent No. 7,065,750, RJN, Ex. 1.) That is unsurprising because the patent application was filed on April 18, 2001—years before Android existed. (*Id.*)

The fact that Cascades approached only a handful of potential licensees out of a much larger universe does not make them alone the "relevant market." Cascades' claimed market definition fails as a matter of law. Nor does Cascades' "relevant submarket" fare any better, for the Amended Complaint alleges no facts explaining why "[a] relevant submarket is the market for licenses under the patented technology of just the Cascades '750 patent." (Amended Compl., ¶ 94.) For the reasons explained above, that omission is fatal.

3.   **The Failure to Allege a Cognizable Market Dooms Cascades' Monopsonization and Rule-of-Reason Claims.**

This Court has already held that, in the absence of a relevant antitrust market, a rule-of-reason claim under Section 1 cannot stand and "[c]harges of monopolization under Section 2 . . . also need to be analyzed within the context of the relevant market." (Order, Dkt. 93, p. 14-15,

---

[4] RPX in no way concedes that the '750 patent, or any of Cascades' other patents, is valid or infringed.

1    n.15.) This holding reflects long-established law. *See Apple Inc. v. Psystar*, 586 F. Supp. 2d

2    1190, 1196 (N.D. Cal. 2008); *Thurman Inds., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369,

3    1373 (9th Cir. 1989). Because Cascades has failed to allege a plausible market, its rule-of-reason

4    and monopsonization claims must be dismissed.

5                 **D.    Cascades' Monopsonization Claims Fail as Well.**

6              Cascades claims that RPX attempted to, and actually did, monopsonize a market and

7    submarket variously limited to Cascades' patent portfolio and to the '750 Patent alone.

8    (Amended Compl., ¶¶ 84-94.) Of course, this claim fails in light of Cascades' failure to allege a

9    relevant market. But it also fails because Cascades has not alleged facts supporting market power

10   or market shares.

11             A monopsonization claim requires that a defendant possess at least 65% of a market

12   subject to entry barriers. *See Image Technical Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206

13   (9th Cir. 1997); *Confederated Tribes of Siletz Indians v. Weyerhaeuser Co.*, 411 F.3d 1030, 1043

14   (9th Cir. 2005), *vacated on other grounds sub nom. Weyerhaeuser Co. v. Ross-Simmons*

15   *Hardware Lumber Co.*, 549 U.S. 312 (2007). For an attempted monopolization claim, a plaintiff

16   must allege facts showing a dangerous probability of success, which requires a market share of

17   more than 30%. *See Rebel Oil*, 51 F.3d at 1438.

18             It does not matter that the Android operating system "has achieved a greater than 53%

19   market share," (Amended Compl. ¶ 12), because Cascades has not alleged that RPX or the

20   manufacturing defendants have monopolized the mobile operating system market. It does not

21   matter that the "manufacturing defendants … collectively control more than 90% of the mobile

22   phone business using the Android operating system and 75% of the combined mobile phone and

23   tablet business" (*id.* ¶ 88), because the fact that four potential buyers—out of an entirely

24   undefined universe of potential buyers—have a collectively alleged high share of a particular

25   *downstream* product market (Android mobile devices) tells us nothing about their buyer share in

26   the *upstream* input market ('750 patent), which is at issue here. If a gas station owner claimed

27   that its prices were depressed because of buyer power among the four largest moving truck

28   companies in the area, we would say: "So what? Gas stations sell to hundreds of potential

buyers. They do not sell exclusively to movers. How much of *your* actual and potential business do the four companies account for?" Unless we learn about the percentage of gasoline sales to moving trucks relative to all gasoline sales, we would have no factual basis to infer anything about the movers' buyer power or buyer market shares in the upstream gasoline market. The situation here is analogous. Cascades alleges facts about "markets" that are simply irrelevant to its monopsonization claims.

Cascades' monopsonization claims flounder for other reasons, too. Cascades alleges that RPX violated Section 2 "by entering into membership agreements that make it the negotiating or purchasing agent for the manufacturing defendants." (*Id.* ¶ 88.) Cascades' theory is therefore that, by becoming the sole representative of its members regarding the purchase of a license to the '750 Patent, RPX achieves monopsony power. (*Id.* ¶¶ 84-94.) This makes no sense unless Cascades shows that those represented purchasers constitute the relevant buyer market, which Cascades does not show. But this theory also fails because Cascades admits that RPX is not the sole negotiating representative of its members: "the subscription contracts RPX has with its members purportedly give members the ability to deal independently." (*Id.* ¶ 20.) Because each RPX member remains free to bargain independently of RPX—and because several RPX members have *in fact* done so, reaching terms with Cascades (*id.* ¶¶ 42, 48)—Cascades' monopsonization claims cannot stand.

### E.   Cascades' State Law Claims Necessarily Fail.

Cascades has not stated a claim under the antitrust laws. As the Court has previously recognized, "[t]he disposition of the Sherman Act claims disposes of the Cartwright Act and Unfair Competition claims ('UCL') as well." (Order, Dkt. 93, p. 23-24.) Indeed, Cascades has itself admitted that "the relationship between the Sherman Act, the Cartwright Act and the asserted California business torts are such that a deficient pleading under statue [*sic*] would likely lead to a deficient pleading under the other." (Opp., Dkt. 82, p. 22.) Cascades' state law claims therefore fail.

**F.      The Court Should Dismiss the Complaint with Prejudice Because Further Amendments Would Be Futile.**

In its Order dismissing the original Complaint, the Court explained in detail the Complaint's deficiencies and laid out the kind of facts that Cascades would have to allege to state a claim. (Order, Dkt. 93, *passim*.) Cascades' new effort is equally deficient, and it is now clear that Cascades simply cannot allege facts giving rise to a plausible claim for relief—or avoid the admitted facts disproving one. The Court should therefore dismiss the Amended Complaint with prejudice. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009); *Townsend v. Univ. of Alaska*, 543 F.3d 478, 485 (9th Cir. 2008). Cascades' inability to license to every potential licensee at its preferred price is the result not of conspiracy or monopsonization, but of the asking price being too high. Defendants' conduct is "explained by, lawful, unchoreographed free-market behavior." *Iqbal*, 129 S. Ct. at 1950. It is time for this lawsuit to come a close.

## CONCLUSION

For the preceding reasons, the Amended Complaint should be dismissed with prejudice under Federal Rule of Civil Procedure 12(b)(6).


Dated: March 20, 2013                                    Respectfully submitted,

                                                         LATHAM & WATKINS LLP
                                                         Alfred C. Pfeiffer, Jr.
                                                         Charles Crompton
                                                         Hanno Kaiser
                                                         Alan Devlin


                                                         By /s/ Alfred C. Pfeiffer, Jr.
                                                         Alfred C. Pfeiffer, Jr.
                                                         Attorneys for Defendant
                                                         RPX CORPORATION

13