DAVIS WRIGHT TREMAINE LLP
MARTIN L. FINEMAN, Bar No. 1104413
505 Montgomery Street
Suite 800
San Francisco, CA 94111
Telephone: (415) 276-6575
Facsimile: (415) 276-6599
E-mail: martinfineman@dwt.com

NIRO, HALLER & NIRO
Raymond P. Niro (Member of the N.D. Cal. Bar)
Daniel R. Ferri (*Pro Hac Vice*)
Gabriel I. Opatken (*Pro Hac Vice*)
Ashley LaValley (*Pro Hac Vice*)
181 West Madison, Suite 4600
Chicago, IL 60602-4515
Phone: (312) 236-0733
Fax: (312) 236-3137
E-mail: rniro@nshn.com
E-mail: dferri@nshn.com
E-mail: alavalley@nshn.com
E-mail: gopatken@nshn.com

Attorneys for Plaintiff
Cascades Computer Innovation LLC

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| CASCADES COMPUTER INNOVATION LLC,<br><br>                    Plaintiff,<br><br>      v.<br><br>RPX CORPORATION, HTC CORPORATION, LG ELECTRONICS, INC., MOTOROLA MOBILITY LLC, SAMSUNG ELECTRONICS CO., LTD., DELL INC.,<br><br>                    Defendants. | Case No. 4:12-cv-1143 (YGR)<br><br>**CASCADES' COMBINED RESPONSE TO THE MOTIONS TO DISMISS OF DEFENDANTS HTC CORPORATION, SAMSUNG ELECTRONICS CO., LTD., AND MOTOROLA MOBILITY LLC (DKT. 98) AND RPX CORPORATION (DKT. 99)**<br><br>Date:  May 28, 2013<br>Time:  2:00 PM<br>Location:  Courtroom 5<br>Honorable Yvonne Gonzalez Rogers |

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

    A.    The Pleading Requirements Of Fed.R.Civ.P. 8 ...................................... 1

    B.    Defendants Demand Much More Than The  Federal Rules And The Supreme Court Require At  The Pleading Stage Of A Case .................................. 1

    C.    The Legal Standard For A Motion To Dismiss Under Fed.R.Civ.P. 12(b)(6) ....... 2

    D.    The Allegations In The Amended Complaint Satisfy The Pleading Requirements Of The Federal Rules And Supreme Court ........................ 2

II.    THE AMENDED COMPLAINT ADDRESSES ALL OF THE ALLEGED DEFICIENCIES THE COURT FOUND IN THE ORIGINAL COMPLAINT ................ 3

    A.    The First Element: Concerted Action Through A Plausible Conspiracy ............... 3

        1.    Cascades Pled The Who, What, When and Where ................................... 3

        2.    Cascades Alleged More Than Mere "Parallel Behavior" ......................... 8

    B.    The Second Element: Unreasonable Restraint of Trade ........................ 9

        1.    *Per Se* Analysis ........................................................................... 9

        2.    Rule of Reason Analysis ............................................................... 9

    C.    The Third Element: Antitrust Injury .................................................. 10

    D.    Economic Sense ................................................................................ 11

    E.    Noerr-Pennington ............................................................................ 11

III.    CASCADES HAS ADEQUATELY PLED ITS ANTITRUST CLAIMS ...................... 11

    A.    Cascades Pled Plausible Horizontal and Vertical Conspiracies ........................ 12

        1.    Cascades Does Not Rely Solely On RPX Membership.......................... 13

        2.    Cascades Has Pled That The Manufacturing Defendants Were Involved In A Horizontal Conspiracy ............................................. 15

        3.    Cascades' Vertical Conspiracy Allegations Are Well Pled.................... 18

    B.    The Conspiracy Allegations Make Economic Sense ............................ 21

        1.    The Manufacturing Defendants Refused To Even Discuss A License..... 23

CASCADES' RESPONSE TO THE JOINT MOTION OF DEFENDANTS HTC CORPORATION, SAMSUNG ELECTRONICS CO.,
LTD., AND MOTOROLA MOBILITY, INC (DOCKET 98)

CASE NO. C:12-cv-1143 YGR

- i -

2.      Cascades Did Not Demand Too Great A Price ........................................... 24

C.      Cascades Pled Plausible Antitrust Violations ......................................... 25

     1.      Cascades' Amended Complaint Clearly Alleges Restraint ..................... 26

     2.      The Amended Complaint Alleges *Per Se* Violations .............................. 27

D.      Cascades' Amended Complaint Pleads A Plausible Market And Submarket ...... 28

E.      Cascades Alleges More Than Mere Parallel Behavior ......................................... 32

F.      Cascades' Monopsonization Claims Are Well Pled ............................................. 35

G.      The Manufacturing Defendants' Noerr-Pennington Defense Is Inapplicable ...... 37

H.      Cascades' State Law Claims Survive Along With Its Sherman Act Claims ........ 39

I.      Dismissal With Prejudice Would Be Improper .................................................... 39

IV.      CONCLUSION ............................................................................................................ 40

**CASCADES' RESPONSE TO THE JOINT MOTION OF DEFENDANTS HTC CORPORATION, SAMSUNG ELECTRONICS CO., LTD., AND MOTOROLA MOBILITY, INC (DOCKET 98)**
CASE NO. C:12-cv-1143 YGR

- ii -

# TABLE OF AUTHORITIES

**Page(s)**

Cases

AD/SAT v. Associated Press
    181 F.3d 216 (2d Cir. 1999)........................................................14

American Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l
    Publ'ns, Inc.,
    108 F.3d 1147 (9th Cir. 1997) ....................................................36

American Tobacco Co. v. United States,
    328 U.S. 781 (1946)............................................................32, 33

Apex Oil Co. v. DiMauro,
    822 F.2d 246 (2d Cir. 1987)........................................................33

Barry v. Blue Cross of Cal.,
    805 F.2d 866 (9th Cir. 1986) ..................................................13, 16

Bell Atl. Corp. v. Twombly,
    550 U.S. 544 (2007)...................................2, 8, 10, 14, 21

Big Bear Lodging Ass'n v. Snow Summit, Inc.,
    182 F.3d 1096 (9th Cir. 1999) ....................................................27

Brennan v. Concord EFS, Inc.,
    369 F. Supp. 2d 1127 (N.D. Cal. 2005) ........................................28

Buffalo Broad. Co., Inc. v. ASCAP,
    744 F.2d 917 (2d Cir. 1984)........................................................26

Business Elecs. Corp. v. Sharp Elecs. Corp.,
    485 U.S. 717 (1988)..................................................................20

C-O-Two Fire Equip. Co. v. United States,
    197 F.2d 489 (9th Cir. 1952) ....................................................22

Campfield v. State Farm Mut. Auto Ins. Co.,
    532 F.3d 1111 (10th Cir. 2008) ..............................................29-30

CBS, Inc. v. ASCAP,
    620 F.2d 930 (2d Cir. 1980)........................................................26

City of Long Beach v. Standard Oil Co. of Cal.,
    872 F.2d 1401 (9th Cir. 1989) ................................................13, 16

CASCADES' RESPONSE TO THE JOINT MOTION OF DEFENDANTS HTC CORPORATION, SAMSUNG ELECTRONICS CO.,
LTD., AND MOTOROLA MOBILITY, INC (DOCKET 98)
CASE NO. C:12-cv-1143 YGR

- iii -

City of Tuscaloosa v. Harcros Chems., Inc.,
   158 F.3d 548 (11th Cir. 1998) .......................................................................22

Confederated Tribes of Siletz Indians v. Weyerhaeuser Co.,
   411 F.3d 1030 (9th Cir. 2005) ......................................................................36

Dickson v. Microsoft Corp.,
   309 F.3d 193 (4th Cir. 2002) ........................................................................17

Freeman v. Lasky,
   410 F.3d 1180 (9th Cir. 2005) ......................................................................37

GSI Tech., Inc. v. Cypress Semiconductor Corp.,
   2012 WL 2711040 (N.D. Cal. July 6, 2012)...........................................12, 13, 14

Illinois Tool Works, Inc. v. Indep. Ink, Inc.,
   547 U.S. 28 (2006)........................................................................................29

Image Technical Servs., Inc. v. Eastman Kodak Co.,
   125 F.3d 1195 (9th Cir. 1997) ................................................................. 35-36

In re Brand Name Prescription Drugs Antitrust Litig.,
   186 F.3d 781 (7th Cir. 1999) ........................................................................33

In re Elec. Books Antitrust Litig.,
   859 F.Supp.2d 671 (S.D.N.Y. 2012)..............................................................12

In re Graphics Processing Units Antitrust Litig.,
   527 F.Supp.2d 1011 (N.D. Cal. 2007) .............................................................3

In re High-Tech Employee Antitrust Litig.,
   856 F.Supp.2d 1103 (N.D. Cal. 2012) ...........................................................12

In re NASDAQ Market-Makers Antitrust Litig.,
   894 F. Supp. 703 (S.D.N.Y. 1995) ................................................................31

In re Text Messaging Antitrust Litig.,
   630 F.3d 622 (7th Cir. 2010) ........................................................................16

In re TFT-LCD (Flat Panel) Antitrust Litig.,
   599 F.Supp.2d 1179 (N.D. Cal. 2009) (Illston, J.)............................................2

In re Travel Agent Comm'n Antitrust Litig.,
   583 F. 3d 896 (6th Cir. 2009) .......................................................................23

In re Webkinz Antitrust Litig.,
   2010 U.S. Dist. LEXIS 111810 (N.D. Cal. Oct. 20, 2010)............................. 31-32

CASCADES' RESPONSE TO THE JOINT MOTION OF DEFENDANTS HTC CORPORATION, SAMSUNG ELECTRONICS CO.,
LTD., AND MOTOROLA MOBILITY, INC (DOCKET 98)
CASE NO. C:12-cv-1143 YGR

- iv -

In re WellPoint, Inc. Out-of-Network "UCR" Rates Litig.,
    865 F.Supp.2d 1002 (C.D. Cal. 2011) ......................................................28

Interstate Circuit, Inc. v. United States,
    306 U.S. 208 (1939)...........................................................13, 32, 34, 35

JamSports & Entm't, LLC v. Paradama Prods., Inc.,
    2003 U.S. Dist. LEXIS 6100 (N.D. Ill., Apr. 15, 2003) ...........................31

Johnson v. Lucent Techs., Inc.,
    653 F.3d 1000 (9th Cir. 2011) ..................................................................2

K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.,
    61 F.3d 123 (2d Cir. 1995)......................................................................20

Kendall v. Visa U.S.A., Inc.,
    518 F.3d 1042 (9th Cir. 2008) ...............................2, 3, 6, 8, 12, 14, 16

Knevelbaard Dairies v. Kraft Foods, Inc.,
    232 F.3d 979 (9th Cir. 2000) ...................................................................10

Leegin Creative Leather Prods. v. PSKS, Inc.,
    551 U.S. 877 (2007)..........................................................................20, 21

Lopez v. G.A. Smith,
    203 F.3d 1122 (9th Cir. 2000) .................................................................39

Mandeville Island Farms, Inc. v. American Crystal Sugar Co.,
    334 U.S. 219 (1948)................................................................................27

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,
    475 U.S. 574 (1986)..........................................................................22, 33

Mayor & City Council of Balt., Md. v. Citigroup, Inc.,
    709 F.3d 129 (2d Cir. 2013)......................................................... 14, 15-16

MedioStream Inc. v. Microsoft Corp.,
    869 F.Supp.2d 1095 (N.D. Cal. 2012) ......................................................22

Mendoza v. Zirkle Fruit Co.,
    301 F.3d 1163 (9th Cir. 2002) .................................................................35

Merck-Medco Managed Care, LLC v. Rite-Aid Corp.,
    201 F.3d 436, 1999 WL 691840 (4th Cir. 1999) .....................................34

Mesirow v. Pepperidge Farm, Inc.,
    703 F.2d 339 (9th Cir. 1983) ...................................................................26

Momento, Inc. v. Seccion Amarilla USA,
    2009 U.S. Dist. LEXIS 85295 (N.D. Cal. Sept. 17, 2009) (Armstrong, J.)..............................2

Monsanto Co. v. Spray-Rite Service Corp.,
    465 U.S. 752 (1984)..........................................................................................................32, 33

Mularkey v. Holsum Bakery, Inc.,
    146 F.3d 1064 (9th Cir. 1988) ...............................................................................................26

Newcal Indus., Inc. v. Ikon Office Solution,
    513 F.3d 1038 (9th Cir. 2008) .........................................................................................29, 35

Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.,
    472 U.S. 284 (1985)........................................................................................................27, 28

Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.,
    585 F.2d 821 (7th Cir. 1978) .................................................................................................26

Orchard Supply Hardware LLC v. Home Depot USA, Inc.,
    2013 U.S. Dist. LEXIS 53214 (N.D. Cal. April 11, 2013) ............................27, 31, 32, 33, 39

Padilla v. Yoo,
    633 F.Supp.2d 1005 (N.D. Cal. 2009), rev'd on other grounds, 678 F.3d 748 (9th Cir.
    2012) ......................................................................................................................................12

PepsiCo, Inc. v. Coca-Cola Co.,
    315 F.3d 101 (2d Cir. 2002)...................................................................................................17

Poller v. Columbia Broad. Sys., Inc.,
    368 U.S. 464 (1962).................................................................................................................2

PSKS, Inc. v. Leegin Creative Leather Prods., Inc.,
    615 F.3d 412 (5th Cir. 2010) .................................................................................................17

Re/MAX Int'l, Inc. v. Realty One, Inc.,
    173 F.3d 995 (6th Cir. 1999) ...........................................................................................22, 34

Rebel Oil Co., Inc. v. Atl. Richfield Co.,
    51 F.3d 1421 (9th Cir. 1995) .................................................................................................36

Sosa v. DirecTV, Inc.,
    437 F.3d 923 (9th Cir. 2006) .................................................................................................38

Spectators' Commc'n Network Inc. v. Colonial Country Club,
    253 F.3d 215 (5th Cir. 2001) .................................................................................................17

Standard Oil Co. of Cal. v. United States,
    337 U.S. 293 (1949)...............................................................................................................20

Starr v. Sony BMG Music Entm't,
    592 F.3d 314 (2d Cir. 2010)..........................................................................32, 33, 34

Todd v. Exxon Corp.,
    275 F.3d 191 (2d Cir. 2001)..............................................................................29, 31

Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield,
    552 F.3d 430 (6th Cir. 2008) ....................................................................................17

Toys "R" Us, Inc. v. FTC,
    221 F.3d 928 (7th Cir. 2000) ............................................................17, 32, 33, 35

Toys "R" Us, Inc. v. FTC,
    126 F.T.C. 415 (1988), aff'd, 221 F.3d 928 (7th Cir. 2000)...................................20

United States v. Corinthian Colleges,
    655 F.3d 984 (9th Cir. 2011) ....................................................................................39

United States v. General Motors Corp.,
    384 U.S. 127 (1966).................................................................................................33

Vogel v. Am. Soc'y of Appraisers,
    744 F.2d 598 (7th Cir. 1984) ...................................................................................27

William O. Gilley Enters., Inc. v. Atl. Richfield Co.,
    588 F.3d 659 (9th Cir. 2009) ...................................................................................21

## STATUTES

Fed. R. Civ. P. Rule 8 ...........................................................................................................1

Fed. R. Civ. P. Rule 12(b)(6) ...........................................................................2, 12, 29, 31, 35

## OTHER AUTHORITIES

West Federal Civil Rules Handbook (2013) ..........................................................................1

Robin Feldman & Tom Ewing, The Giants Among Us, 2012 Stan. Tech. L. Rev. 1 (2012) ........15

CASCADES' RESPONSE TO THE JOINT MOTION OF DEFENDANTS HTC CORPORATION, SAMSUNG ELECTRONICS CO.,
LTD., AND MOTOROLA MOBILITY, INC (DOCKET 98)
CASE NO. C:12-cv-1143 YGR

- vii -

## I.      INTRODUCTION

### A.      The Pleading Requirements Of Fed.R.Civ.P. 8

Federal Rule of Civil Procedure 8 requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  The Federal Civil Rules Handbook Commentary on Rule 8 (2013) states that the "short and plain statement" requirement of Rule 8 does not mean that lengthy, detailed, intricate statements of fact are necessary to state a claim but, rather, that discovery and summary judgment (not motions to dismiss) should be used to identify the disputed facts and dispose of unmeritorious claims:

> The pleader must next state, in short and plain terms, a claim showing an entitlement to relief.  This requires pleaders to give their opponents fair notice of their claim and the grounds upon which it rests.  Intricately detailed factual allegations are not necessary, nor need pleaders always set out their legal theories (even asserting an incorrect legal theory will not always be fatal). The Rules rely on discovery and summary judgment, rather than pleadings to flesh out the disputed facts and cull unmeritorious cases.  Thus, the Rules generally impose a more lenient pleading obligation than do many State courts.

West Federal Civil Rules Handbook (2013) at 333.  While pleading an antitrust claim requires more specificity than some other types of claims, it does not require anything close to what the defendants demand of Cascades.

### B.      Defendants Demand Much More Than The Federal Rules And The Supreme Court Require At The Pleading Stage Of A Case

RPX Corporation ("RPX") and the three manufacturing defendants, HTC Corporation ("HTC"), Motorola Mobility LLC ("Motorola") and Samsung Electronics Co., Ltd ("Samsung"), seek dismissal of all of Cascades' claims with prejudice – in effect, final judgment in their favor without any discovery or grant of summary judgment – because, in their view, Cascades' detailed 114-paragraph, 40-page Amended Complaint ("Amend. Compl.") still does not contain enough facts.  But that is just not so.  Every issue raised by the Court in its January 24, 2013 Order ("Op.") has been addressed and every alleged deficiency in the original Complaint has been overcome.

### C.   The Legal Standard For A Motion To Dismiss Under Fed.R.Civ.P. 12(b)(6)

In deciding a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), all facts pled in a complaint must be taken as true and construed in a light most favorable to the nonmoving party. Johnson v. Lucent Techs., Inc., 653 F.3d 1000, 1010 (9th Cir. 2011). Allegations of antitrust violations need only "raise a reasonable expectation that discovery will reveal evidence of illegal agreement." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). "There is no special pleading rule requiring greater factual specificity in antitrust cases." Momento, Inc. v. Seccion Amarilla USA, 2009 U.S. Dist. LEXIS 85295, at *2 (N.D. Cal. Sept. 17, 2009) (Armstrong, J.). "[E]laborate fact pleading" is not required because "'in complex antitrust litigation,' 'motive and intent play leading roles,' and 'the proof is largely in the hands of the alleged conspirators.'" In re TFT-LCD (Flat Panel) Antitrust Litig., 599 F.Supp.2d 1179, 1184 (N.D. Cal. 2009) (Illston, J.) (quoting Poller v. Columbia Broad. Sys., Inc., 368 U.S. 464, 473 (1962)). Twombly and Kendall do not impose an elaborate "who, what, when, where" pleading requirement. In re TFT, 599 F.Supp.2d at 1183 (quoted in Op. at 9). Moreover, motions to dismiss are disfavored where, as here, the antitrust allegations are fact-intensive. Momento, 2009 U.S. Dist. LEXIS 85295, at *2.

### D.   The Allegations In The Amended Complaint Satisfy The Pleading Requirements Of The Federal Rules And Supreme Court

The two renewed motions to dismiss do not address the facts actually alleged in the Amended Complaint (which must be taken as true) and, instead, treat this case as if discovery has concluded and a motion for summary judgment filed. ***This case is only at the pleading stage*** and the standard for a dismissal with prejudice on the pleadings has simply not been met.

Cascades invites the Court to examine the original Complaint and the Amended Complaint side-by-side (Exhibit A). Shown in red are the specific facts added to the Amended Complaint – 5,571 words in 48 new paragraphs.

**II.   THE AMENDED COMPLAINT ADDRESSES ALL OF THE ALLEGED DEFICIENCIES THE COURT FOUND IN THE ORIGINAL COMPLAINT**

The Court's January 24, 2013 Order held that, in certain areas, more specificity was needed in Cascades' pleading – enough to "give rise to a plausible claim for relief"  (Op. at 7). Plausibility permits "a reasonable inference" of liability in light of "basic economic principles" (Id. at 6).  Contrary to both  motions, the Amended Complaint is not a mere rehash of the original Complaint.  Rather, it provides further detail and specificity – facts that create more than a reasonable inference of liability. Any deficiencies found in the original Complaint have now been resolved in the Amended Complaint.

### A.   The First Element: Concerted Action Through A Plausible Conspiracy

Defendants again seek to impose a heightened ***probability*** requirement in pleading an antitrust conspiracy that this Court has already rejected (Id. at 8).  The Court held that plausible grounds to infer that an agreement was made by antitrust co-conspirators "'simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement....'"  (Id., quoting Kendall v. Visa U.S.A., Inc., 518 F.3d 1042, 1047 (9th Cir. 2008)). The Court also held that "an elaborate 'who, what, when, where' pleading requirement" need not be met to successfully allege such an agreement (Op. at 9) and that Cascades need not allege "'specific back-room meetings between specific actors at which specific decisions were made.'" (Id., citing In re Graphics Processing Units Antitrust Litig., 527 F.Supp.2d 1011, 1024 (N.D. Cal. 2007)).

### 1.   Cascades Pled The Who, What, When and Where

Despite the lack of any legal requirement to do so, the Amended Complaint answers the questions of "who, did what, to whom, where, and when" as set forth below:

***Who***:   The three manufacturing defendants – HTC, Motorola and Samsung – manufacture and sell in the United States 75% of all devices (both cell phones and tablets) that use the Android operating system (Amend. Compl., ¶¶ 6, 12, 51, 72).  The invention of the '750 patent improves the functioning of the Android operating systems. (See Id., ¶¶ 13, 47). Each

1   manufacturing defendant is a member of defendant RPX, which functions as a purchasing agent
2   for each of the three manufacturing defendants (Id., ¶¶ 2, 6, 19, 30), and each of the
3   manufacturing defendants knew that the other two had joined RPX and retained RPX as its agent
4   for purposes of negotiating with patentees like Cascades (Id., ¶ 30).

5        RPX acquires patents and patent licenses through subscription agreements in which
6   funding is provided by membership fees (Id., ¶ 20) and also by acting as an agent for a small
7   group of its members, such as the three manufacturing defendants, which then act in
8   combination, not individually (Id., ¶¶ 21, 27).   RPX's publicly stated goal is to drive down the
9   price paid by its members to license the use of patented technology (Id., ¶¶ 21-22).   RPX
10  members, such as the manufacturing defendants, are all RPX "clients" that, in combination,
11  determine what RPX will pay, and they then allow RPX to negotiate collectively on their behalf
12  (Id., ¶¶ 34-36).

13       Each manufacturing defendant has a separate written agreement with RPX (Id., ¶ 38(a)).
14  Additionally, meetings and/or direct contact and communication occurred between and among
15  RPX and the manufacturing defendants to determine whether to accept or refuse a license to the
16  Cascades patents (Id., ¶¶ 32, 34, 106).

17       Cascades went further, identifying not only the entities involved, but also the particular
18  individuals known to Cascades: RPX's Vice President and Head of Acquisitions, **Kevin Barhydt**,
19  acting as RPX's representative, contacted Cascades' counsel to discuss the possibility of
20  acquiring license rights under the Cascades patents (Id., ¶¶ 19, 31, 36).   Ultimately, RPX,
21  through Barhydt, made an offer to acquire license rights to the '750 and other Cascades patents
22  for its members (Id., ¶¶ 19, 31, 32).   The RPX offer was significantly below a competitive rate.
23  The relevant RPX members were required to contribute to this license acquisition (Id., ¶¶ 27, 30,
24  31-32).   Additionally, Motorola's top licensing executive, **Brett Roesslein**, admitted that
25  Motorola would not deal independently with Cascades and that its intention was to deal only
26  through RPX (Id., ¶ 32).

27

28

1   ***When***:  Well before any patent infringement lawsuit was filed against HTC (September 7,

2   2011) or Samsung and Motorola (July 6, 2011) in Illinois, each manufacturing defendant was a

3   member of RPX, had actually met with RPX and each other, had communicated with RPX and

4   each other, and had contacted RPX and each other to agree on combined approaches for

5   purchasing licenses through RPX for patents that might affect their businesses (Id., ¶¶ 101-07).

6   RPX has a series of separate vertical subscription agreements with each of the manufacturing

7   defendants that requires RPX to act on behalf of each manufacturing defendant (Id., ¶¶ 38(a),

8   69).  These agreements pre-date any lawsuit for patent infringement filed by Cascades (Id., ¶

9   106).

10   Further, by May-June 2011, RPX had contacted Cascades' counsel through Barhydt to

11   discuss the possibility of acquiring license rights to the '750 and other Cascades patents –

12   something he said was required by RPX's members (Id., ¶¶ 19, 35-37).  The many meetings,

13   phone calls, emails and discussions among RPX and the manufacturing defendants regarding

14   licensing the Cascades patents all occurred before September 23, 2011 (Id., ¶¶ 32, 106-107).  As

15   noted above, on September 20, 2011, Motorola's top licensing executive, Brett Roesslein,

16   admitted that Motorola would not deal independently with Cascades and that its intention was to

17   deal only through RPX (Id.) ("We would like to resolve this through RPX").

18   By September 23, 2011, Barhydt told Cascades that RPX had met with its relevant

19   members and that RPX had raised sufficient money from them to acquire a license under all of

20   the Cascades patents (Id.).  RPX's action resulted from communication with the manufacturing

21   defendants to discuss the value of the Cascades patents and how much each member was willing

22   to pay for the combined effort (Id., ¶¶ 32, 34).  By October 11, 2011, RPX had negotiated with

23   Cascades to acquire license rights under all of the Cascades patents for each of the

24   manufacturing defendants (Id., ¶ 31).  RPX's clients collectively had the final say in this

25   acquisition and, again, communicated to determine the price to be paid (Id., ¶ 34).  In mid-

26   October 2011, Barhydt told Cascades that RPX had to withdraw its offer because one or more of

27   its members would not fund the license deal at the offered amount (Id., ¶ 33).  Meetings, email

28   
CASCADES' RESPONSE TO THE JOINT MOTION OF DEFENDANTS HTC CORPORATION, SAMSUNG ELECTRONICS CO.,
LTD., AND MOTOROLA MOBILITY, INC (DOCKET 98)
CASE NO. C:12-cv-1143 YGR

- 5 -

1    and telephone contact between RPX and its members continued to take place between October

2    and November 2011 (Id., ¶¶ 33-36).  For example, a meeting between RPX and C.D. Hwang of

3    Pantech (an RPX member) was scheduled for November 7, 2011 to discuss RPX's acquiring a

4    license under Cascades' patents (Id., ¶ 34).  Motorola also admittedly had repeated contact with

5    RPX about the Cascades patents as well (Id., ¶ 32).

6          On November 2, 2011, Barhydt represented that the key RPX client-members wanted "a

7    global solution" to the Cascades matter (Id., ¶ 34).  He also stated on that date that client-

8    members, in combination, have the ultimate say in determining what RPX would pay and that

9    RPX was negotiating collectively for its members (Id.).

10         **_Where_**:  RPX and the manufacturing defendants held meetings and had direct contact and

11   communication with each other via email and telephone in October and November 2011 (Id., ¶¶

12   32, 34).  Most of the facts about these meetings, discussions and communications have been

13   concealed from Cascades (Id., ¶ 62).  Nonetheless, there is a reasonable expectation that

14   "'discovery will reveal [further] evidence of [defendants'] illegal agreement[s]'" (Op. at 8,

15   quoting Kendall, 518 F.3d at 1047).

16         **_What_**:  RPX and the manufacturing defendants agreed to a uniform, concerted course of

17   action in refusing to accept a license under the Cascades patents.  Support for the defendants'

18   conspiracy claim is found in the written agreements and/or tacit agreements to the effect that

19   each manufacturing defendant act only jointly through RPX, fund a license only through RPX

20   and jointly reach agreement on a bulk license for all of them or not at all (Amend. Compl., ¶¶ 38,

21   53).  The facts alleged in the Amended Complaint show that an actual agreement was made

22   among the co-conspirator defendants through RPX's separate written (vertical) agreements with

23   the manufacturing defendants, which require them to pay RPX an initial fee for membership and

24   on-going fees (Id., ¶ 38(a)).  RPX is required under these agreements to act on behalf of each

25   manufacturing defendant (Id., ¶¶ 69-71).

26         Each of the manufacturing defendants is a competitor of the other two in the sale of

27   Android operated cell phones and/or tablets and knew that use of the '750 patent technology

28

1   improves the performance of their Android operated devices. (<u>Id.</u>, ¶¶ 6, 38(e)). Each also knew

2   that it would, therefore, be at a competitive disadvantage vis-à-vis the other two manufacturing

3   defendants if they licensed the '750 patent but it did not. (<u>Id.</u>, 38(e)). Each manufacturing

4   defendant also knew that RPX had invited all of them to participate in a scheme to jointly

5   negotiate licenses with technology providers, such as Cascades, in order to drive down the price

6   paid for such technology licenses. (<u>Id.</u>). In the absence of that common invitation issued by RPX

7   and the knowledge by each of the manufacturing defendants that the common invitation had been

8   issued, each of the manufacturing defendants, in the furtherance of its own individual self-

9   interest, would have individually and competitively bid to license the '750 patent and would

10  have bid the competitive rate for the right to utilize that performance-enhancing technology so as

11  to better compete against each of the other two manufacturing defendants in the sale of Android-

12  based mobile electronic devices. (<u>Id.</u>). However, because of the common invitation, each

13  manufacturing defendant understood and tacitly agreed that they would act together, in which

14  case it would not be contrary to their self-interest to refrain from individually negotiating a

15  license for the '750 patent at the competitive rate because not one of them would gain a

16  competitive advantage over the others and all of them would benefit from being able to jointly

17  suppress the rate at which all of them could obtain the '750 patented technology. (<u>Id</u>.). In other

18  words, in the absence of an agreement, tacit or otherwise, among the manufacturing defendants

19  and RPX to have RPX negotiate for all of them collectively, it would have been contrary to the

20  individual economic self-interest of a manufacturing defendant to decline to individually license

21  the '750 patent at the competitive rate, but in the presence of such a conspiracy or understanding

22  it was to the benefit of all of them to negotiate only jointly with Cascades and to refuse to pay the

23  competitive rate that each would otherwise have been willing to pay. (<u>Id.</u>).

24          This horizontal combination or agreement was furthered by the written vertical

25  agreements between RPX and each manufacturing defendant appointing RPX as the negotiating

26  agent for each of them (<u>Id.</u>, ¶ 70) and the agreement among the manufacturing defendants to

27  jointly fund the purchase of the license rights from Cascades (<u>Id.</u>, ¶ 38(c)).

28

Each manufacturing defendant, in accordance with its prior written and/or tacit agreements, refused to individually negotiate with Cascades (Id., ¶ 49). Motorola made clear that its intention was to deal only through RPX (Id., ¶¶ 32, 49). Samsung and HTC refused even to respond to Cascades' license offers (Id., ¶ 49). In essence, the manufacturing defendants agreed to limit their individual freedom of action in dealing with Cascades (Id., ¶ 58).

Cascades' Amended Complaint "'raises a reasonable expectation that discovery will reveal [further] evidence of [defendants'] illegal agreement.'" (Op. at 8, quoting Kendall, 518 F.3d at 1047). If more is required, no antitrust claims can survive the pleading stage.

## 2.     Cascades Alleged More Than Mere "Parallel Behavior"

The Court held that, "[o]ther than Cascades' allegation that negotiations with RPX broke down when one or more RPX members would not agree to fund the deal, all Cascades has alleged is 'parallel behavior'" (Op. at 10). The Amended Complaint resolves any doubt whether Cascades has merely pled parallel conduct such as that in Twombly. As one example, it specifically identifies the existence of ***actual agreements*** between RPX and the manufacturing defendants (Amend. Compl., ¶ 38(a)). If the Supreme Court in Twombly had been confronted with the additional allegation of actual agreements between one or more of the parties, dismissal would have been denied. See Twombly, 550 U.S. at 557 ("An allegation of parallel conduct … gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility."). The allegations of actual agreements, the allegations of specific individuals, the allegations of RPX's stated goals to drive down prices to "wholesale" levels, and the many other specific allegations in the Amended Complaint satisfy the "some further factual enhancement" that Twombly lacked (see, e.g., Amend. Compl., ¶¶ 19, 21, 22, 31, 32, 34, 38(e), 85). Demanding more at the pleading stage effectively requires a plaintiff to prove its entire case without any discovery.

In sum, the Amended Complaint alleges not mere parallel conduct but actual agreements, motivations to conspire and defendants' success at driving down the price for a license to monopsonistic levels (Id., ¶¶ 38, 49-51, 58-63).

CASCADES' RESPONSE TO THE JOINT MOTION OF DEFENDANTS HTC CORPORATION, SAMSUNG ELECTRONICS CO., LTD., AND MOTOROLA MOBILITY, INC (DOCKET 98)
CASE NO. C:12-CV-1143 YGR

- 8 -

**B.      The Second Element: Unreasonable Restraint of Trade**

The "Second Element" that the Court addressed was whether Cascades adequately pled *per se* and rule of reason restraints of trade.  Namely, is there a restraint (Op. at 13)?  Does it have an anticompetitive effect (Id.)?  Is there any procompetitive justification (Id.)?  Is a relevant market alleged (Id. at 14-15)? And, is the required specificity for each alleged violation in each market or submarket pled (Id. at 15)?

The Amended Complaint addresses each of these issues:  the restraint is defined in paragraphs 49-51, 53-63, 66, 69-71, 76, 80-81, 88; that there is anticompetitive effect is defined in paragraphs 72-76, 83, 83, 90; paragraphs 41-43 allege no procompetitive justification; paragraphs 92-94 define the relevant market; and paragraphs 72-77, 82-83 and 86-91 describe each alleged violation in each market or submarket.

**1.      *Per Se* Analysis**

The Court refused to dismiss the original Complaint based on a failure to plead a *per se* unreasonable restraint of trade (Op. at 14).  The Amended Complaint now provides even stronger support for a *per se* violation of the antitrust laws. (See discussion at § III.C.2, *infra*).

**2.      Rule of Reason Analysis**

An analysis under the rule of reason requires that "a plaintiff must plead that the challenged agreement, by virtue of the defendants' market power, was unreasonably restrictive of competition in a relevant market and that the plaintiff suffered antitrust injury" (Op. at 14).  The Amended Complaint provides specific allegations of restraint (Amend. Compl., ¶¶ 49-51, 53-63, 66, 69-71, 76, 80-81, 88), anticompetitive effect and injury (Id., ¶¶ 72-76, 83-90), lack of procompetitive justification (Id., ¶¶ 41-43), relevant market (Id., ¶¶ 92-94), and violations in the relevant market and submarket (Id., ¶¶ 72-77, 82-83, 86-91).

There is sufficient specificity of the alleged violations in each market and submarket sufficient to withstand the motions to dismiss.

C.      **The Third Element: Antitrust Injury**

In addressing the third element of a Section 1 claim, the Court identified four requirements for antitrust injury: "(1) unlawful conduct, (2) causing an injury to the plaintiffs, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent" (Op. at 16). The Court recognized that Cascades' original Complaint included an entire section entitled "Injury to Competition" that specified the following injuries: loss of substantial royalties, legal expenses, damage to business growth, possible closure of business, and receiving less for licensing than it would have in a market that was free of an unlawful conspiracy (Id.). Additionally, the Court acknowledged that anticompetitive conduct need not harm consumers in order to cause antitrust injury (Id., quoting Knevelbaard Dairies v. Kraft Foods, Inc., 232 F.3d 979, 988 (9th Cir. 2000)).

Nonetheless, the Court found that Cascades did not allege sufficient facts to show that the injury Cascades suffered flows from the defendants' unlawful conduct (Op. at 17).  According to the Court, "Cascades has provided insufficient facts from which to plausibly infer that the reason it suffered this harm is due to a conspiracy in a particular market, rather than due to individual business disputes between independent actors." (Id.). In the Amended Complaint, Cascades has alleged not only a plausible conspiracy that can be inferred from well-pled factual allegations, but has alleged ***actual agreements*** that provide the "further factual enhancement that Twombly lacked" (See § II.A.2, *supra*).

Thus, these questions have now been answered:

- **Does the Amended Complaint now adequately allege antitrust injury?** (Op. at 16-17).

Yes.  Paragraphs 72-76 and 95-97 clearly allege antitrust injury.

- **Does Cascades' injury flow from the defendants' conduct, that is, from "a conspiracy in a particular market"?** (Op. at 17).

Yes. Paragraphs 74-77, 82-83, 90 and 98-100 allege facts demonstrating that the reason Cascades suffered harm is due to the conspiracy.

CASCADES' RESPONSE TO THE JOINT MOTION OF DEFENDANTS HTC CORPORATION, SAMSUNG ELECTRONICS CO., LTD., AND MOTOROLA MOBILITY, INC (DOCKET 98)
CASE NO. C:12-cv-1143 YGR

- 10 -

**D.     Economic Sense**

The Court also required Cascades to plead "specific facts to clarify why, absent a conspiracy, it [was] economically irrational for the Manufacturing Defendants – who are being sued by Cascades for infringement of one patent, the '750 patent – to decline an offer to license Cascades' entire portfolio of 38 patents" (Op. at 19-20).   Those facts are now provided in paragraphs 19-20, 35-36, 38, 41 and 43 of the Amended Complaint.

**E.     Noerr-Pennington**

The question here is whether the <u>Noerr-Pennington</u> doctrine even applies, *i.e.*, "whether the alleged conspiracy preceded the alleged joint litigation conduct" (<u>Id.</u> at 23).   Paragraphs 101-107 of the Amended Complaint spell out the timing of the conspiracy and the timing and scope of the threats of litigation:

> Hence, the structure and approach for acquiring [a] license through RPX under patents that might impact the manufacturing defendants, Samsung, Motorola and HTC, was put in place well before any lawsuits were filed against them for infringement of the Cascades '750 patent.  Further, the group conduct complained of herein is not related to any litigation activity in the Illinois patent infringement lawsuits, in part, because the master plan for refusing to negotiate independently was put in place well before the July-September 2011 lawsuits were filed.

(Amend. Compl., ¶ 107).

## III.   CASCADES HAS ADEQUATELY PLED ITS ANTITRUST CLAIMS

RPX and the manufacturing defendants claim that the Amended Complaint should be dismissed with prejudice under Fed.R.Civ.P. 12(b)(6) for: (A) failure to plead plausible horizontal and vertical conspiracies (Defs. Br., § III.A.1-2; RPX Br., § B.1-2); (B) failure to plead conspiracies that make economic sense (Defs. Br., §III.A.3; RPX Br., § A.1-2); (C) failure to plead plausible antitrust violations (Defs. Br., § III.B.1-2); (D) failure to plead a plausible antitrust market (RPX Br., § C.1-3); (E) failure to allege anything more than parallel behavior (RPX Br. at 6); and (F) failure to adequately plead monopsonization (RPX Br., § D.).

The manufacturing defendants also claim that dismissal is appropriate based on the <u>Noerr-Pennington</u> doctrine (Defs. Br., § III.D). Further, RPX and the manufacturing defendants

CASCADES' RESPONSE TO THE JOINT MOTION OF DEFENDANTS HTC CORPORATION, SAMSUNG ELECTRONICS CO., LTD., AND MOTOROLA MOBILITY, INC (DOCKET 98)
CASE NO. C:12-cv-1143 YGR

- 11 -

1   both argue that Cascades' state law claims fail (RPX Br., § E; Defs. Br., § III.C), and that

2   dismissal **with** prejudice is the appropriate remedy (RPX Br., § F; Defs. Br. § III.E).

### A.      Cascades Pled Plausible Horizontal and Vertical Conspiracies

4          The manufacturing defendants argue that the Amended Complaint still fails to allege a

5   plausible conspiracy because (1) Cascades' horizontal conspiracy allegations are conclusory and

6   unsupported and (2) Cascades' vertical conspiracy allegations fail because membership in RPX

7   does not constitute a conspiracy (Defs. Br., § III.A.1-2).   RPX further argues that (1) Cascades

8   has admitted that the written agreements between RPX and each member gives members the

9   ability to deal independently and (2) there is no agreement of any kind between the

10  manufacturing defendants (RPX Br., § B.1-2).

11         To plead an unlawful agreement, what is required is:

12         Enough factual matter (taken as true) to suggest that an agreement was made.
           Asking for plausible grounds to infer an agreement does not impose a probability
13         requirement at the pleading stage; it simply calls for fact[s] to raise a reasonable
           expectation that discovery will reveal evidence of illegal agreement.
14

15  GSI Tech., Inc. v. Cypress Semiconductor Corp., 2012 WL 2711040, at *3-4 (N.D. Cal. July 6,

16  2012) (quoting Kendall, 518 F.3d at 1047).   At the pleading stage, "[t]he issue is not whether a

17  plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support

18  the claims."   Padilla v. Yoo, 633 F.Supp.2d 1005, 1019 (N.D. Cal. 2009), *rev'd on other*

19  *grounds*, 678 F.3d 748 (9th Cir. 2012); see also In re High-Tech Employee Antitrust Litig., 856

20  F.Supp.2d 1103, 1120 (N.D. Cal. 2012) ("Whether Plaintiffs can adduce sufficient evidence in

21  discovery to *prove* an overreaching conspiracy is a question not before the Court [at the pleading

22  stage].").   A court ruling on a Rule 12(b)(6) motion "may not properly dismiss a complaint that

23  states a plausible version of events merely because the court finds a different version more

24  plausible."   In re Elec. Books Antitrust Litig., 859 F.Supp.2d 671, 688 (S.D.N.Y. 2012).

25         In addition, to adequately plead a tacit conspiracy under the doctrine of conscious

26  parallelism within the Ninth Circuit, a plaintiff must allege that each participant (1) knew that

27  concerted action was contemplated and invited, (2) gave its adherence to and participated in the

28

scheme, and (3) understood that cooperation was essential to the plan. <u>City of Long Beach</u> v. <u>Standard Oil Co. of Cal.</u>, 872 F.2d 1401, 1407 (9th Cir. 1989); <u>see also</u> <u>Barry</u> v. <u>Blue Cross of Cal.</u>, 805 F.2d 866, 869 (9th Cir. 1986) (citing <u>Interstate Circuit, Inc.</u> v. <u>United States</u>, 306 U.S. 208, 226 (1939)).

The facts alleged in the 114-paragraph Amended Complaint, when taken as true (as they must be), are sufficient at this early stage in the litigation to support an inference that defendants conspired both horizontally and vertically.

### 1.    Cascades Does Not Rely Solely On RPX Membership

The manufacturing defendants again argue that the amended allegations only amount to a complaint about organizational membership and parallel conduct (Defs. Br. at 11).  But, the Amended Complaint alleges more.  It alleges details of RPX's admitted purpose to leverage economic power to achieve wholesale prices (Amend. Compl., ¶¶ 21-22).  Likewise, the Amended Complaint alleges that the manufacturing defendants agreed to contribute funds – above and beyond their membership fees with RPX – to acquire rights in all of the Cascades patents (<u>Id.</u>, ¶¶ 31, 38(c)).  Moreover, the Amended Complaint alleges that meetings and direct contact and communication took place between RPX and defendants Motorola, Samsung and HTC (<u>Id.</u>, ¶¶ 32, 34). Facts such as these take the allegations of the Amended Complaint from possible to plausible.

The Northern District of California's decision in <u>GSI Technology</u> supports the sufficiency of Cascades' Amended Complaint.  There, the plaintiff and defendant were competing manufacturers of SRAM memory chips.  2012 WL 2711040, at *1.  There, this Court found that the plaintiff had alleged enough facts to plausibly support an inference that the defendant conspired with competitors to restrain trade by pleading that (1) the defendant and others had announced the formation of a consortium with the purpose of defining and developing new networking SRAM architectures; and (2) the defendant had denied the plaintiff's request for admission into the consortium "on behalf of the Consortium."  <u>Id.</u> at *4.  Based on these

CASCADES' RESPONSE TO THE JOINT MOTION OF DEFENDANTS HTC CORPORATION, SAMSUNG ELECTRONICS CO., LTD., AND MOTOROLA MOBILITY, INC (DOCKET 98)
CASE NO. C:12-CV-1143 YGR

- 13 -

somewhat meager allegations, this Court determined that there were "plausible grounds to infer an agreement" since the defendant "[had] been a member from the group's inception." Id.

The manufacturing defendants rely on Kendall and AD/SAT, but these cases are inapplicable because, in both cases, the plaintiffs were given an opportunity to conduct discovery to determine whether an illegal agreement existed. In Kendall, the complaint was dismissed because, *after the plaintiffs conducted discovery*, they still could not allege *any facts* to support their contention that the defendants conspired or agreed with one another to restrain trade. See Kendall, 518 F.3d at 1048. And again, as discussed in Cascades' initial Opposition to Defendants' Motion to Dismiss (Dkt. No. 82 at 10), the court in AD/SAT v. Associated Press affirmed summary judgment because, *even after significant discovery*, the plaintiff was still unable to present evidence sufficient to create a "reasonable inference of concerted action." 181 F.3d 216, 233 (2d Cir. 1999).

Mayor & City Council of Balt., Md. v. Citigroup, Inc. is also inapplicable: there, the plaintiff based its allegations that the defendants conspired with one another *solely* on the defendants' parallel conduct, *e.g.*, withdrawing from the Auction Rate Securities Market in a "virtually" simultaneous manner. 709 F.3d 129, 138 (2d Cir. 2013). The defendants' interdependent conduct was not enough on its own to support an inference of a horizontal agreement because the plaintiff failed to support it with any other evidence. Id. at 136.

The manufacturing defendants contend: (1) that allegations of parallel conduct are insufficient; (2) that allegations of organizational membership are insufficient and, hence, (3) that allegations of membership and parallel conduct together are insufficient. But, even accepting premises (1) and (2), conclusion (3) does not follow. To the contrary, the organizational membership in RPX, along with the stated goals of RPX and the knowledge and consent of each of the manufacturing defendants to those goals, creates the "further factual enhancement" that the Supreme Court in Twombly required to avoid dismissal.

The manufacturing defendants also claim that Cascades is using the antitrust laws to attack RPX's business model (Defs. Br. at 6). Not so. The Amended Complaint alleges that it is

CASCADES' RESPONSE TO THE JOINT MOTION OF DEFENDANTS HTC CORPORATION, SAMSUNG ELECTRONICS CO., LTD., AND MOTOROLA MOBILITY, INC (DOCKET 98)
CASE NO. C:12-cv-1143 YGR

- 14 -

the *way* in which RPX and its members act within the RPX business model (not just the model itself) that violates the antitrust laws (Amend. Compl., ¶¶ 32-37).  Nonetheless, the legality of the RPX business model has been openly questioned by scholars in antitrust law:

> We note, as an initial point, that the extensive ties among the various mass aggregators should raise questions and concerns about horizontal collusion. The complexity and opaque nature of the corporate structures make it extremely difficult to track the interactions and connect the dots.
>
> * * * *
>
> For example, consider the scenario suggested above in which the mass aggregator negotiates a license from a troublesome troll on behalf of its members. Under certain circumstances, one might consider this to be an example of horizontal collusion in which competitor producing companies join together to force a lower price from a supplier.

Robin Feldman & Tom Ewing, *The Giants Among Us*, 2012 Stan. Tech. L. Rev. 1, ¶¶ 132-33 (2012).

Proof of illegal concerted action is clear from the statements of Kevin Barhydt that relevant RPX members had collectively decided they would only take a license to all of Cascades' patents – not just the '750 patent (Amend. Compl., ¶¶ 35-36).  Further proof is the manufacturing defendants' refusal to independently negotiate with Cascades; they did not even respond to Cascades' offer, which was a considerable bargain. (Id., ¶ 41.). This, despite the fact that Samsung and Motorola had previously entered into arrangements such as that proposed by Cascades and received complete 100% refunds of their royalty payments (Id.).

### 2. Cascades Has Pled That The Manufacturing Defendants Were Involved In A Horizontal Conspiracy

RPX says that Cascades' horizontal conspiracy claim is conclusory, citing one line of the 40-page Amended Complaint (RPX Br. at 6-7).  According to RPX, to allege a horizontal conspiracy, Cascades is required to "suggest that the manufacturing defendants sat down in the same room and entered into an illegal agreement" (Id. at 7).  The law does not require such evidence at the pleading stage and, indeed, courts have recognized that this type of direct evidence of illegal agreement is rare.  See Mayor & City Council of Balt., 709 F.3d at 136 ("[I]n many antitrust cases, [a] 'smoking gun' can be hard to come by, especially at the pleading

CASCADES' RESPONSE TO THE JOINT MOTION OF DEFENDANTS HTC CORPORATION, SAMSUNG ELECTRONICS CO., LTD., AND MOTOROLA MOBILITY, INC (DOCKET 98)
CASE NO. C:12-cv-1143 YGR

- 15 -

stage."). This is especially true because RPX's inner dealings with the manufacturing defendants are conducted in secrecy (See Amend. Compl., ¶ 62; Feldman & Ewing, *The Giants Among Us*, Stan. Tech. L.R. 1, ¶ 143 (2012) (noting that "details of mass [patent] aggregator behaviors are difficult to come by or to confirm" when discussing the "troubling market behavior" of RPX)). Nonetheless, Cascades has offered direct evidence of ***actual agreements*** as well as circumstantial evidence that supports the inference of further communications between the manufacturing defendants, which is more than sufficient at the pleading stage. See, e.g., In re Text Messaging Antitrust Litig., 630 F.3d 622, 629 (7th Cir. 2010) ("Circumstantial evidence can establish an antitrust conspiracy.").

Kevin Barhydt of RPX told Cascades that RPX had met with its relevant members and had raised sufficient money from its members to acquire a license under the Cascades patents (Amend. Compl., ¶ 32). Additionally, Barhydt admitted that it was RPX's clients, in combination, that had the final say in determining whether RPX would purchase a license under the Cascades patents (Id., ¶ 34). These statements acknowledge that the members communicated with one another, at least through RPX, on the value of the Cascades patents and the price each member was willing to pay. Proof of concerted action is also supported from statements made by Barhydt indicating that relevant members had collectively decided that they would only take a license to all of Cascades' patents – not just the '750 patent (Id., ¶¶ 35-36). The allegations in the Amended Complaint make an illegal conspiracy more than ***plausible***. See In re Text Messaging, 630 F.3d at 629.

Additionally, Cascades has pled a tacit horizontal conspiracy. RPX does not address this allegation and, instead, claims that Cascades merely alleged conclusory assertions that defendants shared a tacit understanding (RPX Br. at 8). Although RPX argues that tacit collusion is entirely lawful, the Ninth Circuit has recognized that a tacit conspiracy can violate the Sherman Act. See, e.g., City of Long Beach, 872 F.2d at 1407; Barry, 805 F.2d at 869; see also Kendall, 518 F.3d at 1047 (recognizing that basis for inferring tacit agreement between conspirators may be sufficient to support a cause of action under the Sherman Act). As required

CASCADES' RESPONSE TO THE JOINT MOTION OF DEFENDANTS HTC CORPORATION, SAMSUNG ELECTRONICS CO., LTD., AND MOTOROLA MOBILITY, INC (DOCKET 98)
CASE NO. C:12-cv-1143 YGR

- 16 -

by the Ninth Circuit, Cascades has pled that concerted action amongst defendants was contemplated and invited, each defendant gave adherence to and participated in the scheme, and every defendant understood that cooperation was essential to the plan (Amend. Compl., ¶¶ 30, 40-41, 59-60; see also § III.E, *infra*).

RPX nonetheless argues that there is no "rim," but its six-case string citation does not support its argument because the cases are inapposite. In each of RPX's cases, the plaintiff failed to identify or, in those cases that were decided at the summary judgment stage, *prove* any agreements between competitors. See Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield, 552 F.3d 430, 435-36 (6th Cir. 2008) (complaint dismissed for failing to identify horizontal agreement between competitors); PSKS, Inc. v. Leegin Creative Leather Prods., Inc., 615 F.3d 412, 420-21 (5th Cir. 2010) (plaintiff failed to allege agreements between retailers); Spectators' Commc'n Network Inc. v. Colonial Country Club, 253 F.3d 215, 224-25 (5th Cir. 2001) (plaintiff presented no evidence on summary judgment that competitors agreed among themselves); Dickson v. Microsoft Corp., 309 F.3d 193, 203-04 (4th Cir. 2002) (holding that plaintiff had adequately pled two separate conspiracies between common defendant and each additional defendant but failed to plead a horizontal conspiracy because plaintiff did not allege, or even argue, any connection between other defendants); PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 110 (2d Cir. 2002) (affirming summary judgment in defendants' favor because plaintiff had not adduced any evidence of horizontal agreement between competitors).

The facts here are more like those in Toys "R" Us, Inc. v. FTC, 221 F.3d 928 (7th Cir. 2000). There, Toys "R" Us ("TRU") had vertical agreements with a number of leading toy manufacturers restricting the products sold to competing warehouse retailers. TRU acted as the "ringmaster" and the purported "rim" was proven by evidence that the manufacturers would only agree to TRU's demand on the condition that their competitors agreed to go along with it. Id. at 934-36. Here, Cascades has alleged similar conduct, even without the benefit of a full FTC investigation and a "voluminous record" of facts, as was the case in Toys "R" Us. Id. at 930. Cascades has pled that, through RPX, each of the defendants in combination needed to

CASCADES' RESPONSE TO THE JOINT MOTION OF DEFENDANTS HTC CORPORATION, SAMSUNG ELECTRONICS CO., LTD., AND MOTOROLA MOBILITY, INC (DOCKET 98)
CASE NO. C:12-cv-1143 YGR

- 17 -

collectively agree to fund the Cascades deal for it to proceed (Amend. Compl., ¶ 33 ("Barhydt told Cascades that RPX had to withdraw its offer ... admitting, in effect, that all relevant members either had to agree to a license or none would agree."); Id., ¶ 34 ("[C]lient-members in combination, not RPX, have the ultimate say in determining what RPX would pay and [] RPX was negotiating collectively for its members....")).  Because "one or more of [RPX's] members would not fund the license deal," the purchase of the license rights did not occur and the manufacturing defendants agreed not to negotiate separately with Cascades (Id., ¶¶ 33, 38(d)).

In sum, Cascades has alleged far more than mere parallel conduct (Id., ¶ 50). It has pled the existence of *actual agreements* between RPX and each manufacturing defendant (Id., ¶¶ 38(a), 50), as well as additional circumstantial evidence of a horizontal agreement amongst defendants, including: common motives to conspire (Id., ¶¶ 20-22), knowledge by each manufacturing defendant of the motivations of the other defendants as members of RPX (Id., ¶¶ 26, 30), evidence showing that the manufacturing defendants' parallel actions were against their individual economic self-interests (Id., ¶¶ 41-43), discussions, either directly or through Barhydt, concerning each manufacturing defendant's contribution to the Cascades deal relative to one another (Id., ¶¶ 32, 34) and a concurrent refusal to independently negotiate with Cascades after one or more of the manufacturing defendants pulled their financial support (Id., ¶¶ 33, 50). These allegations are more than sufficient to support the plausible inference that the manufacturing defendants conspired.

### 3.   Cascades' Vertical Conspiracy Allegations Are Well Pled

Cascades has also alleged facts supporting the existence of vertical agreements that violate the antitrust laws.  In response, RPX and the manufacturing defendants each claim that the parties followed their independent interests and that Cascades' price for licensing its patent was too high (Defs. Br. at 4, 8; RPX Br. at 4-5).  If that is so, why did LG (with a 4% market share) pay the equivalent of $20 million for a license when its payment is extrapolated to the entire market? (Amend. Compl., ¶¶ 42, 51).

CASCADES' RESPONSE TO THE JOINT MOTION OF DEFENDANTS HTC CORPORATION, SAMSUNG ELECTRONICS CO., LTD., AND MOTOROLA MOBILITY, INC (DOCKET 98)
CASE NO. C:12-CV-1143 YGR

- 18 -

When Cascades did finally negotiate independently with LG only after this antitrust case was filed, it was forced to accept license terms that, if applied to the manufacturing defendants, would yield only $20 million from all infringers, well below the value of the Cascades portfolio as reported to RPX on September 8, 2011 – Samsung alone was then valued at $50 million.

(Id., ¶ 51).  With the three manufacturing defendants controlling more than 90% of the Android mobile phone market, a seven-figure settlement would have cost around $3 million each if the RPX proposal had been accepted.  A refusal to accept a license for effectively $1.25 million (which could potentially be reduced to zero) is clearly contrary to any manufacturing defendant's individual self-interest (Id., ¶ 41).

Further, these allegations undermine RPX and the manufacturing defendants' contentions that they acted independently in their own self-interest:

• RPX, through Kevin Barhydt, admitted that it was RPX's clients, in combination and not based upon unilateral assessments, that had the final say in determining whether RPX would purchase licenses under the Cascades patents (Id., ¶ 34).

• Mr. Barhydt admitted that relevant members had collectively (not independently) decided that they would only take a license to all of Cascades' patents – not just the '750 patent (Id., ¶¶ 35-36).

• In the absence of a conspiracy, it would be against the economic self-interest of the manufacturing defendants to refuse to negotiate a license to the '750 patent.  Each of the manufacturing defendants knew that it was far more likely than not that the '750 patent was valid and infringed by the mobile electronics which they sell.  In the absence of a license, each of the manufacturing defendants would correctly fear that its competitors would negotiate a license to the '750 patent, and that it would then be at a competitive disadvantage in the market for sale of mobile electronic devices using the Android operating system due to improved performance of its competitors' devices and its inability to get a license under favorable terms.  Only through a conspiracy, whereby the price for the '750 patent would be driven below the competitive market rate, do defendants' actions collectively (and not as unilateral assessments) make economic sense (Id., ¶ 38).

• The manufacturing defendants did not just refuse a license from Cascades, they did not even respond to Cascades' offer, which was a considerable bargain. This, despite the fact that Samsung and Motorola had previously entered into arrangements such as that proposed by Cascades and received complete 100% refunds of their royalty payments (Id., ¶ 41).

RPX's communications to Cascades demonstrate that a vertical conspiracy is not just *plausible*, as pleading standards require, but is, in fact, probable. Motorola explicitly stated that it would not deal directly with Cascades, pursuant to its agreement with RPX (Id., ¶ 32).  HTC's

CASCADES' RESPONSE TO THE JOINT MOTION OF DEFENDANTS HTC CORPORATION, SAMSUNG ELECTRONICS CO., LTD., AND MOTOROLA MOBILITY, INC (DOCKET 98)
CASE NO. C:12-cv-1143 YGR

- 19 -

1   and Samsung's analogous conduct and membership in RPX support an inference that each

2   conspired with RPX in the same manner.

3          The Section 1 prohibition against "every contract, combination or conspiracy" that

4   unreasonably restrains competition includes both vertical and horizontal agreements.   Unlike

5   agreements among competitors that limit horizontal price competition and are *per se* illegal,

6   vertical agreements between different distributive levels of a market are usually judged under the

7   rule of reason.  Business Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 724 (1988); K.M.B.

8   Warehouse Distribs., Inc. v. Walker Mfg. Co., 61 F.3d 123, 127 (2d Cir. 1995) (vertical

9   agreement between manufacturer and distributor judged under rule of reason).

10         In Leegin Creative Leather Prods. v. PSKS, Inc., 551 U.S. 877 (2007), the Supreme Court

11  addressed the legality of a series of restrictive vertical agreements entered into by the defendant.

12  The Court pointed out that vertical agreements have the potential to assist in organizing cartels,

13  eliminating horizontal competition and discouraging price competition and held that the

14  anticompetitive consequences of vertical restraints "must not be ignored or underestimated." Id.

15  at 892-93.  In determining whether a vertical restraint is anticompetitive, the Court stated that

16  "the number of [firms] that make use of the practice in a given industry can provide important

17  instruction," and held that the vertical agreement "should be subject to more careful scrutiny …

18  if many competing [firms] adopt the practice."  Id. at 897; see also Standard Oil Co. of Cal. v.

19  United States, 337 U.S. 293, 309, 314 (1949) (anticompetitive market impact of vertical

20  agreements determined by looking at the number of competitors that employ such agreements

21  and whether there is "widespread adoption of such contracts"); Toys "R" Us, Inc. v. FTC, 126

22  F.T.C. 415, 612-614 (1988), *aff'd*, 221 F.3d 928 (7th Cir. 2000) (rule of reason requires analysis

23  of the anticompetitive impact of the series of vertical agreements because "an examination

24  limited to each individual agreement in isolation … would blind us to the anticompetitive nature

25  and effect of [the] course of conduct").

26         Here, Cascades has plainly alleged (1) that RPX entered into a series of vertical

27  agreements with each of the manufacturing defendants whereby RPX was retained as the

28

negotiating agent for each of the manufacturing defendants (Amend. Compl., ¶¶ 38(a)); (2) that the purpose of each vertical agreement, in keeping with RPX's public mission statement, was to allow RPX to acquire sufficient purchase side market power to drive down and suppress the price of acquiring technology including the '750 patent for the manufacturing defendants (Id., ¶ 30); (3) that the three manufacturing defendants collectively constitute at least 75% of the entire market demand for the acquisition of a '750 patent license (Id., ¶¶ 6, 12, 51, 72); and (4) that the effect of this series of vertical agreements has been the actual suppression of the price that each manufacturing defendant would otherwise have paid in the absence of the vertical agreements and the refusal by each of them to deal with Cascades except at prices substantially below the competitive rate (Id., ¶¶ 75-76).

In other words, this series of vertical agreements has led to the organization of a buyer's cartel with monopsony power.  It is just such vertical agreements which the Supreme Court warned in Leegin "must not be ignored or underestimated."   Leegin, 551 U.S. at 894. Furthermore, because the series of vertical agreements interface with the free market forces that establish price, there is no question but that it constitutes an unreasonable effect on competition (Amend. Compl., ¶¶ 74-76).

### B.    The Conspiracy Allegations Make Economic Sense

The manufacturing defendants cite William O. Gilley for the proposition that "[a]n antitrust conspiracy allegation, to be plausible, must make economic sense" (Defs. Br. at 14). Yet, that court never considered any economic principles in holding that a network of agreements arguably allowed the defendants to unlawfully coordinate their production and output. William O. Gilley Enters., Inc. v. Atl. Richfield Co., 588 F.3d 659, 669 (9th Cir. 2009). Thus, the Ninth Circuit actually recognized the viability of Cascades' claim that the defendants violated the antitrust laws through a series of vertical agreements with RPX as pled in the Amended Complaint (Amend. Compl., ¶ 38, 68-71).

Twombly stands for the proposition that "allegations of parallel business conduct, *taken alone*, do not state a claim under § 1." 550 U.S. at 544 (emphasis added).  But, the Supreme

CASCADES' RESPONSE TO THE JOINT MOTION OF DEFENDANTS HTC CORPORATION, SAMSUNG ELECTRONICS CO., LTD., AND MOTOROLA MOBILITY, INC (DOCKET 98)
CASE NO. C:12-cv-1143 YGR

- 21 -

1  Court also found that "the complaint leaves no doubt that plaintiffs rest their § 1 claim on

2  descriptions of parallel conduct and ***not on any independent allegation of actual agreement***."

3  <u>Id.</u> at 564 (emphasis added). Here, the Amended Complaint does not simply plead parallel

4  business conduct; rather, it alleges the existence of ***actual agreements*** between each

5  manufacturing defendant and RPX (Amend. Compl., ¶ 38(a)). It also alleges circumstances

6  which would make defendants' conduct contrary to their individual self-interest unless they

7  conspired to drive prices lower. (See § III.E. *infra*). That is the most powerful plus element there

8  is and when combined with conscious parallel behavior allows the inference of conspiracy.

9  <u>Re/MAX Int'l, Inc.</u> v. <u>Realty One, Inc.</u>, 173 F.3d 995, 1009-10 (6th Cir. 1999) (inference of

10  conspiracy allowed where defendants' parallel conduct would not have been in the interest of

11  either defendant absent an agreement between them); <u>City of Tuscaloosa</u> v. <u>Harcros Chems.,</u>

12  <u>Inc.</u>, 158 F.3d 548, 572 (11th Cir. 1998) (evidence that defendants' parallel conduct would not

13  have been in their economic self-interest allows inference of conspiracy); <u>C-O-Two Fire Equip.</u>

14  <u>Co.</u> v. <u>United States</u>, 197 F.2d 489, 497 (9th Cir. 1952) (same).

15       In <u>Matsushita Elec. Indus. Co., Ltd.</u> v. <u>Zenith Radio Corp.</u>, the plaintiff alleged that the

16  defendants had conspired to lose money through predatory pricing for over fifteen years – which

17  the Court found implausible.  475 U.S. 574, 595-97 (1986).  No such defect in logic is present

18  here.  The defendants here conspired to immediately push down the cost of an efficiency-

19  enhancing input.

20       The manufacturing defendants also cite <u>MedioStream Inc.</u> v. <u>Microsoft Corp.</u> for the

21  proposition that "[d]ismissal of conspiracy claims is appropriate where the conduct alleged 'is at

22  least as likely to be explained by 'lawful … free-market behavior' as by anticompetitive

23  agreements.'" 869 F.Supp.2d 1095, 1104 (N.D. Cal. 2012).  The court stated: "MedioStream has

24  therefore failed to place its allegations 'in a context that raises a ***suggestion of a preceding***

25  ***agreement***.'" <u>Id.</u> (emphasis added).  Here, the defendants acted in a manner contrary to their

26  self-interest absent a conspiracy and express preceding agreements with RPX.  An agreement can

27  clearly be inferred from such evidence.

28

1    Finally, <u>In re Travel Agent Comm'n Antitrust Litig.</u> involved only parallel conduct and

2    "an ***opportunity to conspire***."  583 F. 3d 896, 905 (6th Cir. 2009).  Plaintiff here has alleged

3    much more – including actual vertical agreements and conduct that is contrary to their economic

4    interests unless they conspired. (Amend. Compl. ¶¶ 38, 41-43).  Indeed, <u>In re Travel Agent</u>

5    concluded that the most important "plus factor" when evaluating "***circumstantial evidence*** of

6    concerted action … [is] whether the defendants' action, if taken independently, would be

7    contrary to their economic self-interest….  Ordinarily, an affirmative answer to the first of these

8    factors will consistently tend to exclude the likelihood of independent conduct."  583 F. 3d at

9    907 (emphasis added).  Defendants turn this analysis on its head by arguing that actions that

10   would be in one's self interest necessarily indicate that a conspiracy does not exist.  Not only is

11   this position unsupported logically, it is also irrelevant in light of the existence of direct evidence

12   of actual agreements.

13        In sum, Cascades pled more than enough to demonstrate that defendant (1) entered into a

14   series of vertical agreements that had the effect of unreasonably injuring horizontal price

15   competition among the manufacturing defendants for a '750 patent license, and (2) entered into a

16   tacit horizontal conspiracy.  Defendants' efforts to impose an obligation on Cascades to prove its

17   entire case now without the benefit of any discovery or expert analysis from reliable economists

18   is not supported by any case law.  Moreover, the arguments about economic sense are purely

19   subjective and involve questions of fact better reserved for the trier of fact.   In short, the

20   existence of agreements obviates the need to analyze whether agreements made "economic

21   sense." To the extent such an inquiry is appropriate, defendants' motions demonstrate the

22   importance of discovery into the actual communications between the defendants, the economic

23   considerations that went into the agreements, and subsequent decisions based upon the

24   agreements.

25        **1.      The Manufacturing Defendants Refused To Even Discuss A License**

26        No manufacturing defendant even discussed a possible license with Cascades, behavior

27   that does not suggest separate independent action.  Rather, the well-pled facts – that each

28

CASCADES' RESPONSE TO THE JOINT MOTION OF DEFENDANTS HTC CORPORATION, SAMSUNG ELECTRONICS CO.,
LTD., AND MOTOROLA MOBILITY, INC (DOCKET 98)
CASE NO. C:12-CV-1143 YGR

- 23 -

1  manufacturing defendant is a member of RPX (Amend. Compl., ¶ 6), each manufacturing

2  defendant knew that the other manufacturing defendants were also members of RPX (Id., ¶ 30),

3  and RPX has the stated goal of driving down prices of licenses to "wholesale" or monopsonistic

4  levels (Id., ¶¶ 18, 21-22, 30, 59) – demonstrate that each of the manufacturing defendants agreed

5  at least tacitly to act in concert for the benefit of all of them.

6      In the absence of a conspiracy, it would be against the economic self-interest of each

7  manufacturing defendant to refuse to negotiate a license to the '750 patent.   Each of the

8  manufacturing defendants knew that it is far more likely than not that the '750 patent is valid and

9  infringed by the mobile electronic devices they sell.   Without a license, each of the

10 manufacturing defendants would correctly fear that its competitors would negotiate a license to

11 the '750 patent, and that it would then be at a competitive disadvantage in the market for sale of

12 mobile electronic devices due to improved performance of its competitors' devices and its

13 inability to get a license under favorable terms.   Only through a conspiracy, whereby the price

14 for the '750 patent would be driven below the competitive market rate, do defendants' combined

15 actions make economic sense (Id., ¶ 38).

### 2.    Cascades Did Not Demand Too Great A Price

17     RPX asserts that "Cascades demanded too great a price" (RPX Br. at 4-5). But, the

18 Amended Complaint details the efforts by RPX, which was able to leverage the 90% Android

19 cellphone market share of its members, to lower the price of the Cascades portfolio well below

20 market value (Amend. Compl., ¶¶ 31, 51, 72).   While RPX contends that "Cascades considered

21 less than $10 million to be a reasonable valuation for a license – not merely for its '750 patent,

22 but for its entire portfolio," it does so without any support.   The reality as actually pled in the

23 Amended Complaint is that the portfolio was valued much higher by Cascades (see, e.g., Id., ¶

24 51), but that RPX and the manufacturing defendants were able to pool their collective bargaining

25 power to drive the price down to a figure under $10 million (see, e.g., Id., ¶¶ 38(e), 80-81).   This

26 is monopsonization achieving its illegal purpose and RPX has cited no law suggesting otherwise.

27

28
CASCADES' RESPONSE TO THE JOINT MOTION OF DEFENDANTS HTC CORPORATION, SAMSUNG ELECTRONICS CO.,
LTD., AND MOTOROLA MOBILITY, INC (DOCKET 98)
CASE NO. C:12-cv-1143 YGR

- 24 -

RPX argues that against the baseline of $10 million for 38 patents for 100+ RPX members, the manufacturing defendants did not act against their independent self-interest in refusing to take separate $5 million licenses (RPX Br. at 4). But, a license for less than $10 million was not the price Cascades **wanted**. Rather, it was the price that Cascades was forced to accept in light of the monopsonization and buyer-side price-fixing. ***After the negotiations with RPX broke down***, each of the manufacturing defendants was offered a license at the bargain price of $5 million, which would have resulted in a total payment of ***at least*** $11.25 million net (Amend. Compl., ¶ 41). Cascades was actually expecting, outside of the negotiations attempted with RPX, to obtain at least $50 million or more (Id., ¶ 51). Accordingly, the $5 million offer (with potential for refund) was not excessive; rather, it was already depressed based on defendants' successful monopsonization efforts.

RPX further argues that declining the offer was compatible with each defendant's own self-interest (RPX Br. at 5). But, each defendant in a free market would have wanted to jump on the offer first to obtain the benefit of the refund (Amend. Compl., ¶ 41). There is no case law to support RPX's argument and there is no expert report from an economist trained to proffer such opinions.

RPX also argues that the Intel license is irrelevant yet, again, cites no case law or any sound economic principles in support. Intel made a seven-figure lump-sum payment for a license and the remaining manufacturing defendants have made no lump-sum payment (despite collectively having annual revenues more than five times that of Intel). (Id., ¶ 11).

## C. Cascades Pled Plausible Antitrust Violations

Under the heading, "Cascades Fails to Plead an Antitrust Violation," the manufacturing defendants make three separate arguments: first, that no restraint has been alleged because membership in RPX does not preclude members from negotiating separately; second, that even if there was a restraint, there was no *per se* violation; and third, that Cascades has failed to define a relevant market (addressed at § III.D, *infra*).

CASCADES' RESPONSE TO THE JOINT MOTION OF DEFENDANTS HTC CORPORATION, SAMSUNG ELECTRONICS CO., LTD., AND MOTOROLA MOBILITY, INC (DOCKET 98)
CASE NO. C:12-cv-1143 YGR

- 25 -

1

### 1.      Cascades' Amended Complaint Clearly Alleges Restraint

2

3        The manufacturing defendants contend, incorrectly, that it is not enough for a plaintiff to

4   allege a conspiracy amongst competitors to suppress prices, but the complaint must also establish

5   "a bar to independent negotiation" (Defs. Br. at 17). Specifically, the manufacturing defendants

6   argue that Cascades must show that RPX somehow had the power to prevent HTC, Samsung and

7   Motorola from independently dealing with Cascades. This proposition has no basis in the law

8   and its logic is contradicted by the language of §1 of the Sherman Act which declares contracts

9   *or conspiracies* in restraint of trade to be illegal.

10       Defendants rely on the Second Circuit's decision in <u>CBS, Inc.</u> v. <u>ASCAP</u>, which involved

11  the legality of blanket licenses to copyrighted music.  620 F.2d 930, 932 (2d Cir. 1980). There

12  the Second Circuit examined the district court's findings – *following a full trial on the merits* –

13  to determine whether a blanket copyright license was a restraint at all.  <u>Id.</u> at 935.  The court

14  found that there was no restraint, <u>Id.</u> at 936, because CBS could obtain non-exclusive licenses for

15  performing rights directly from the individual copyright owners/members of BMI and ASCAP,

16  <u>Id.</u> at 933.  Unlike the allegations in Cascades' Amended Complaint, there was no allegation in

17  <u>CBS</u> that the copyright owners/members had tacitly or expressly agreed not to deal with CBS.

18       The manufacturing defendants' other cases do not support the proposition that members

19  of an organization can only conspire to restrain trade if the organization is somehow able to bar

20  those members from independent negotiation.  See <u>Buffalo Broad. Co., Inc.</u> v. <u>ASCAP</u>, 744 F.2d

21  917, 928-29, 933 (2d Cir. 1984) (where there were available alternatives to the challenged

22  blanket license, including direct negotiation with the individual copyright holders); <u>Mularkey</u> v.

23  <u>Holsum Bakery, Inc.</u>, 146 F.3d 1064, 1065 (9th Cir. 1988) (involving an agreement between a

24  manufacturer and a retailer); <u>Mesirow</u> v. <u>Pepperidge Farm, Inc.</u>, 703 F.2d 339, 341-43 (9th Cir.

25  1983) (reviewing whether the wholesale price set by Pepperidge Farm for its direct-billed

26  customers was a *per se* violation of the antitrust laws); <u>Ohio-Sealy Mattress Mfg. Co.</u> v. <u>Sealy,</u>

27  <u>Inc.</u>, 585 F.2d 821, 837 (7th Cir. 1978) (reviewing the legality of manufacturers' agreements

28  with nation-wide retailers).

CASCADES' RESPONSE TO THE JOINT MOTION OF DEFENDANTS HTC CORPORATION, SAMSUNG ELECTRONICS CO.,
LTD., AND MOTOROLA MOBILITY, INC (DOCKET 98)
CASE NO. C:12-CV-1143 YGR

- 26 -

1   Finally, the manufacturing defendants contend that Cascades has admitted that RPX

2 members could engage in independent negotiations (Defs. Br. at 18).  Not so.  Cascades alleged

3 that agreements with RPX *purportedly* allow for independent action but, in reality, the

4 manufacturing defendants have expressly and tacitly agreed not to negotiate independently (see,

5 e.g., Amend. Compl., ¶¶ 32, 36, 38(d), 38(e),  39, 53-63, 69-71).

6    **2. The Amended Complaint Alleges *Per Se* Violations**

7   Defendants re-argue that Cascades has failed to adequately allege a *per se* violation of

8 Sherman Act § 1 (Defs. Br. at 18-20).  The Court previously rejected this contention (Op. at 13-

9 14), and defendants' renewed argument offers nothing new to overcome the fact that Cascades

10 clearly alleges a naked restraint of trade.

11     "Horizontal price-fixing, market division, and certain types of group boycotts are

12 unlawful *per se*."  Big Bear Lodging Ass'n v. Snow Summit, Inc., 182 F.3d 1096, 1101 (9th Cir.

13 1999); see also Orchard Supply Hardware LLC v. Home Depot USA, Inc., 2013 U.S. Dist.

14 LEXIS 53214, *6 (N.D. Cal. April 11, 2013) ("An unlawful group boycott is one type of *per se*

15 violation of Section 1"); Vogel v. Am. Soc'y of Appraisers, 744 F.2d 598, 600-01 (7th Cir. 1984)

16 (holding that group boycotts or refusals to deal that are employed to fix prices are illegal *per se*);

17 Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 223-24 (1948)

18 (holding that buyer cartels, the object of which is to force the prices that suppliers charge the

19 members of the cartel below the competitive level, are illegal *per se*).  Cascades alleges a

20 horizontal price-fixing agreement amongst defendants (Amend. Compl., at ¶ 67) and that the

21 purpose and effect of the horizontal agreement amongst defendants is the suppression of the

22 price for a license to the '750 patent (Id., ¶¶ 61-63).

23   The Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co. case relied

24 on by the defendants did not involve allegations of horizontal price-fixing. 472 U.S. 284 (1985).

25 Rather, it involved a cooperative trade association's expulsion and boycott of a former member.

26 Id. at 287, 295.  The alleged anticompetitive injury was to the expelled member's ability to

27 compete without access to the association's services. Id. at 287-88. There, "the record was

28

CASCADES' RESPONSE TO THE JOINT MOTION OF DEFENDANTS HTC CORPORATION, SAMSUNG ELECTRONICS CO.,
LTD., AND MOTOROLA MOBILITY, INC (DOCKET 98)
CASE NO. C:12-cv-1143 YGR

- 27 -

1  devoid of allegations indicating the nature and extent of competitive injury the expulsion caused

2  [the plaintiff] to suffer." Id. at 287

3        Here, Cascades has specifically alleged a conspiracy between the three manufacturing

4  defendants (who are direct competitors and dominate the market for Android devices) to

5  suppress the price to be paid for Cascades' patented technology (Amend. Compl., ¶¶ 52-67).

6  There is no basis for dismissing Cascades' *per se* claims on the pleadings based on vague

7  references to "global peace for RPX members" and "economies of scale."  See In re WellPoint,

8  Inc. Out-of-Network "UCR" Rates Litig., 865 F.Supp.2d 1002, 1027 (C.D. Cal. 2011) (where

9  horizontal price-fixing was alleged, holding that "[e]ven if the restraint alleged was ancillary to

10  some pro-competitive venture, it would be inappropriate to dismiss the *per se* complaint at this

11  time."); Op. at 13, quoting Brennan v. Concord EFS, Inc., 369 F. Supp. 2d 1127, 1131, 1133

12  (N.D. Cal. 2005) ("applying *per se* analysis when reviewing complaint because '[w]hatever the

13  merits of the [defendants' procompetitive] arguments, they are intrinsically factual, contrary to

14  plaintiffs' pleading and inappropriate for resolution at the motion to dismiss stage.'").  Moreover,

15  nothing suggests a procompetitive benefit is achieved from the concerted refusal to deal.

16  Defendants' inability to articulate a single justification for this refusal only highlights the *per se*

17  illegality of their conduct.

18        **D.    Cascades' Amended Complaint Pleads A Plausible Market And Submarket**

19        The Amended Complaint now clearly defines the relevant market as "the market ***for the***

20  ***purchase, acquisition or licensing of technology*** covered by the Cascades '750 patent (and,

21  because of the requirements of RPX and the manufacturing defendants, the other Cascades

22  patents)" (Amend. Compl., ¶ 92).   As explained in the Amended Complaint, RPX and its

23  members refused to consider negotiating with Cascades for the '750  patent only and, instead,

24  insisted that a license to all of the patents within Cascades' portfolio be a part of any negotiation

25  (Id., ¶¶ 35-37).  Cascades has also pled a relevant submarket:  "the market ***for licenses under the***

26  ***patented technology*** of just the Cascades '750 patent" (Id., ¶ 94).

27

28

1      Defendants have restrained trade within the market and submarket by, expressly and

2 tacitly, conspiring to refuse to individually deal with Cascades for rights to its patented

3 technology (Id., ¶¶ 52-71).  Defendants have also conspired to obtain monopsony power within

4 the relevant market and submarket (Id., ¶¶ 79-83).

5      The effects of defendants' anti-competitive behavior within the relevant markets include

6 the inability of Cascades to license its patents to defendants, the expense to Cascades of having

7 to enforce its patents against the defendants through litigation and the artificial suppression of

8 price for Cascades' patented technology (Id., ¶¶ 51, 73-77, 81-83, 98-99).

9      As the Court recognized, the validity of the relevant market typically is a factual issue

10 and "an antitrust complaint survives dismissal under Rule 12(b)(6) 'unless the alleged market

11 suffers a fatal legal defect.'"  (Op. at 14, quoting Newcal Indus., Inc. v. Ikon Office Solution,

12 513 F.3d 1038, 1045 (9th Cir. 2008)).  Cascades' alleged markets, now clarified, do not suffer

13 any legal defect.

14      Defendants now say that, because the Supreme Court held that "a patent does not

15 necessarily confer market power upon the patentee," a company's patents cannot plausibly

16 constitute a relevant market absent some facts to suggest otherwise (Defs. Br. at 21, quoting

17 Illinois Tool Works, Inc. v. Indep. Ink, Inc., 547 U.S. 28 (2006)).  The premise for this argument

18 is upside-down.  The conspiracy alleged by Cascades is on the ***buyer side***, not the seller side, and

19 Cascades has alleged a ***monopsony***, not a monopoly.  The relevant market, therefore, is not

20 Cascades' patents (Defs. Br. at 21) but, rather, the market *for* a license under the technology of

21 Cascades' patents, which defendants dominate (Amend. Compl., ¶¶ 12, 13, 47, 51, 72).  As the

22 Second Circuit has stated, in the context of a buyer-side conspiracy "the market is not the market

23 of competing sellers but of competing buyers.  ***This market is comprised of buyers*** who are seen

24 by sellers as being reasonably good substitutes."  Todd v. Exxon Corp., 275 F.3d 191, 202 (2d

25 Cir. 2001) (emphasis added) (analyzing a buyer-side conspiracy claim in which the alleged

26 market was the market *for* the services of employees in the oil and petrochemical industries and

27 the defendants were fourteen companies within those industries); see also Campfield v. State

28

CASCADES' RESPONSE TO THE JOINT MOTION OF DEFENDANTS HTC CORPORATION, SAMSUNG ELECTRONICS CO.,
LTD., AND MOTOROLA MOBILITY, INC (DOCKET 98)
CASE NO. C:12-cv-1143 YGR

- 29 -

1   Farm Mut. Auto Ins. Co., 532 F.3d 1111, 117 (10th Cir. 2008) ("When considering market

2   power in a monopsony situation, 'the market is not the market of competing sellers but of

3   competing buyers. This market is comprised of buyers who are seen by sellers as being

4   reasonably good substitutes.'").

5         Thus, defendants' arguments about whether a patent owner's own products themselves

6   comprise a relevant product market, or whether a patent confers market power, are irrelevant

7   (Defs. Br. at 21).   It is not the market power or the actions of Cascades that the Amended

8   Complaint is concerned about.   Rather, it is the manufacturing defendants' power in the market

9   for the patented technology and how they have exercised this power to restrain trade and injure

10  both Cascades and competition generally of which the Amended Complaint complains (Amend.

11  Compl. ¶¶ 58-61).

12        Unlike the manufacturing defendants, RPX appears to at least recognize that Cascades

13  has alleged a buyer-side conspiracy and a monopsony (RPX Br. at 9-10).   RPX, nonetheless,

14  argues that Cascades has not pled any facts supporting its defined markets (Id.).   This is not so.

15  The markets are defined with reference to Cascades' patented technology (Amend. Compl., ¶¶

16  92, 94) – the need for the '750 patent technology lies with manufacturers of phones and tablets

17  using the Android operating system (Id., ¶¶ 13, 47).   The relevant market and submarket alleged

18  in Cascades' Amended Complaint, thus, encompass all potential licensees of the Cascades'

19  patents (Id., ¶¶ 92, 94).    The three manufacturing defendants that sell 90% of the Android cell

20  phones are essentially all the important buyers.

21        RPX points to the Amended Complaint's allegation that Philips has a 0% market share in

22  the Android mobile market (RPX Br. at 10).    Paragraph 42, however, is not an allegation that

23  Philips does not manufacture mobile devices using the Android operating system; rather, it

24  means that Philips' sales of Android devices are *de minimus*.   To the extent there is truly a

25  dispute over whether Philips manufactures Android devices, and thus is part of the market for the

26  '750 patent, this is a question of fact and not appropriately resolved on a motion to dismiss.

27

28  CASCADES' RESPONSE TO THE JOINT MOTION OF DEFENDANTS HTC CORPORATION, SAMSUNG ELECTRONICS CO.,
LTD., AND MOTOROLA MOBILITY, INC (DOCKET 98)
CASE NO. C:12-cv-1143 YGR

- 30 -

1    Similarly, RPX points to the Amended Complaint's allegation that Cascades approached

2  Hynix for a license (Id.).  Hynix does not manufacture Android mobile devices, but it does make

3  chip products that infringe other Cascades/Elbrus patents.  Moreover, the Amended Complaint

4  never alleges that the basis for Cascades' offer to Hynix was the '750 patent.  Thus, the mere fact

5  of an offer to Hynix for a license under patents other than the '750 patent cannot contradict the

6  fact that the market for licenses under the '750 patent is comprised of those companies that

7  manufacture Android devices.

8    The Amended Complaint clearly explains that the '750 patent covers specific technology

9  incorporated into Android mobile devices (Amend. Compl., ¶¶ 13, 47), and nothing within the

10  Amended Complaint suggests that the technology of the '750 patent is currently incorporated in

11  non-Android devices or desired by the manufacturers of other devices.   Although it is

12  hypothetically possible that the demand/need for licenses under the '750 patent extends beyond

13  the manufacturers of Android devices, this is simply not a concern at the pleading stage where

14  there is no requirement that a plaintiff **prove** the relevant market.  See Orchard, 2013 U.S. Dist.

15  LEXIS 53214, at * 15 ("[S]ince the validity of the 'relevant market' is typically a factual element

16  rather than a legal element, alleged markets may survive scrutiny under Rule 12(b)(6) subject to

17  factual testing by summary judgment or trial.") (citations omitted); Todd, 275 F.3d at 204-05 (2d

18  Cir. 2001) ("[W]e do not indicate whether plaintiff will succeed in proving the alleged market….

19  We find only that the allegation of a market limited to employers in the oil and petrochemical

20  industry is plausible on its face."); In re NASDAQ Market-Makers Antitrust Litig., 894 F. Supp.

21  703, 710 (S.D.N.Y. 1995) ("a complaint that specifically defines the alleged relevant product

22  market need not prove on the face of the complaint that the market is the proper one");

23  JamSports & Entm't, LLC v. Paradama Prods., Inc., 2003 U.S. Dist. LEXIS 6100, at *18 (N.D.

24  Ill., Apr. 15, 2003) ("[A]t the pleading stage, we need only find it conceivable that JamSports

25  could prove a set of facts supporting the relevant market definition that it has alleged."); see also

26  In re Webkinz Antitrust Litig., 2010 U.S. Dist. LEXIS 111810, at *12 (N.D. Cal. Oct. 20, 2010)

27

28

1    ("On a motion to dismiss, the court need not engage in extensive analyses of reasonable

2    interchangeability and cross elasticity of demand.").

3        **E.    Cascades Alleges More Than Mere Parallel Behavior**

4            As discussed above at §§ II.A.2, Cascades alleges more than mere parallel behavior.  A

5    "hub-and-spoke" agreement, conspiracy or combination within the meaning of § 1 of the

6    Sherman Act is clearly alleged (See, e.g., Amend. Compl. ¶¶ 19, 21, 22, 31, 32, 34, 38(a), 38(e),

7    85).  In a hub-and-spoke conspiracy, there is a central "hub" that is vertically related to a series

8    of "spokes," each of which competes with the other spokes.  Without more, there is no horizontal

9    conspiracy among the competitor-spokes, but if each competitor engages in conduct that would

10   be contrary to its self-interest if done independently, then the existence of a horizontal

11   conspiracy among them will be inferred.  See, e.g., Interstate Circuit, 306 U.S. at 217-22;

12   Orchard, 2013 U.S. Dist. LEXIS 53214 at *7-9; Toys "R" Us, 221 F.3d at 934-36; Starr v. Sony

13   BMG Music Entm't, 592 F.3d 314, 327 (2d Cir. 2010).

14           In this case, the "hub" is RPX and the "spokes" are the manufacturing defendants.  The

15   conduct that would be contrary to the self-interest of each manufacturing defendant if done

16   independently is the refusal by each of them to individually negotiate a license for the '750

17   patent at the competitive rate so as to either obtain a competitive advantage or avoid a

18   competitive disadvantage vis-à-vis the others.  But this conduct is easily understood if it is

19   pursuant to a "conscious commitment to a common scheme," Monsanto Co. v. Spray-Rite

20   Service Corp., 465 U.S. 752, 764 (1984), among the manufacturing defendants and RPX.  Then,

21   each manufacturer is assured that its mobile electronic device will not suffer by having a lower-

22   quality interface with apps than its competitors if they suppress the price they have to pay for the

23   quality enhancing '750 patent.  In other words, the conduct would be contrary to each

24   manufacturing defendant's independent self-interest, but is perfectly understandable and in their

25   mutual self-interest if done collectively.

26           A "contract, combination … or conspiracy" within the meaning of Section 1 of the

27   Sherman Act need not be formal, written or even express.  American Tobacco Co. v. United

CASCADES' RESPONSE TO THE JOINT MOTION OF DEFENDANTS HTC CORPORATION, SAMSUNG ELECTRONICS CO.,
LTD., AND MOTOROLA MOBILITY, INC (DOCKET 98)
CASE NO. C:12-CV-1143 YGR

- 32 -

28

States, 328 U.S. 781, 809 (1946) ("no formal agreement is necessary to constitute an unlawful conspiracy"); United States v. General Motors Corp., 384 U.S. 127, 142-43 (1966) ("it has long been settled that explicit agreement is not a necessary part of a Sherman Act conspiracy"). Rather, a conspiracy may be tacit or inferred from "a course of dealings or other circumstances." American Tobacco, 328 U.S. at 809-10; see also Starr, 592 F.3d at 321 ("the crucial question … is whether the challenged conduct 'stems from an independent decision or from an agreement, tacit or express'") (citation omitted); Apex Oil Co. v. DiMauro, 822 F.2d 246 (2d Cir. 1987) ("the best proof available most often will only tend to show the existence of an informal, perhaps even tacit, rather than explicit, agreement").

The plaintiff may prove a conspiracy, whether express or tacit, by "either direct or circumstantial evidence." Toys "R" Us, 221 F.3d at 934; Apex Oil, 822 F.2d at 252; see also Orchard, 2013 U.S. Dist. LEXIS 53214, at *12 ("Circumstantial evidence can establish an antitrust conspiracy at trial or at summary judgment."). When circumstantial evidence is used, the standards announced in Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 761 (1984) are applicable and a conspiracy may be shown by evidence that "tends to exclude the possibility that the [defendants] were acting independently" or that "reasonably tends to prove … 'a conscious commitment to a common scheme.'" Id. at 764 (citation omitted); see also Matsushita, 475 U.S. at 588.

In order to satisfy the Monsanto test, it is not necessary for the plaintiff "to exclude all possibility that the [defendant] acted independently" because "that would amount to an absurd and legally unfounded burden to prove with 100% certainty that an antitrust violation occurred." Toys "R" Us, 221 F.3d at 934-35; In re Brand Name Prescription Drugs Antitrust Litig., 186 F.3d 781, 787 (7th Cir. 1999). Rather, Monsanto requires "only that there must be *some* evidence which, if believed, would support a finding of concerted behavior." Toys "R" Us, 221 F.3d at 935.

The most frequently used and most powerful evidence that tends to exclude the possibility that each competitor acted independently is evidence that the conduct in question

CASCADES' RESPONSE TO THE JOINT MOTION OF DEFENDANTS HTC CORPORATION, SAMSUNG ELECTRONICS CO., LTD., AND MOTOROLA MOBILITY, INC (DOCKET 98)
CASE NO. C:12-cv-1143 YGR

- 33 -

would be contrary to the self-interest of the competitor if done independently, but redounds to the benefit if done pursuant to a conscious commitment to a common scheme with the other competitors.  <u>Merck-Medco Managed Care, LLC</u> v. <u>Rite-Aid Corp.</u>, 201 F.3d 436, 1999 WL 691840 at *10 (4th Cir. 1999) ("Evidence of acts contrary to an alleged conspirator's economic interest is perhaps the strongest plus factor indicative of a conspiracy"); <u>Re/MAX</u>, 173 F.3d at 1009 (determination that conduct in question would be contrary to defendants' economic self-interest if done independently "will consistently tend to exclude the likelihood of independent conduct"); <u>Starr</u>, 592 F.3d at 327 (conspiracy can be proved by "behavior that would … contravene each defendant's self-interest 'in the absence of similar behavior by rivals'") (citation omitted).

The leading case is <u>Interstate Circuit</u>.  There, eight motion picture distributors were asked by one exhibitor to refuse to provide films to exhibitor competitors that charged less than 25 cents for admission or showed double features.  306 U.S. at 217.  Each of the distributors complied with the request.  <u>Id.</u> at 216-17.  The Supreme Court found no direct evidence of an agreement between the eight distributors, but held that a conspiracy could be established by "inferences drawn from the course of conduct."  <u>Id.</u> at 221.  In holding that a horizontal conspiracy among the distributors had been proved, the Court pointed out that each of the distributors knew that the requesting exhibitor (*i.e.*, the hub) had made the same request of each of the other distributors (*i.e.*, the spokes) and also that:

> Each [distributor] was aware that all were in active competition and that without substantially unanimous action with respect to the restrictions … there was risk of a substantial loss of the business … of the … independent exhibitors, but that with it there was a prospect of increased profits.

<u>Id.</u> at 222.  In other words, if any one distributor had independently tried to impose these unattractive restraints on exhibitors, it would have lost business to the other seven distributors and the conduct would have been contrary to its self-interest.  But if all the distributors acted together, each would know that it would not lose business to its rivals due to the restraints that each of them imposed on all the exhibitors because all of them would be doing it.  From this

CASCADES' RESPONSE TO THE JOINT MOTION OF DEFENDANTS HTC CORPORATION, SAMSUNG ELECTRONICS CO.,
LTD., AND MOTOROLA MOBILITY, INC (DOCKET 98)
CASE NO. C:12-cv-1143 YGR

- 34 -

1    evidence, the Supreme Court inferred a horizontal conspiracy among the eight distributors. (Id. at

2    221)

3           The decision in Toys "R" Us is to the same effect.  There, manufacturer competitors were

4    asked by one retailer to refuse to sell to discounters and all of them complied.  The issue was

5    whether "a horizontal agreement among the … manufacturers" had been proven.  221 F.3d at

6    934.  The FTC characterized the case as the modern equivalent of Interstate Circuit.  The

7    Seventh Circuit agreed.  Id. at 935.  Judge Wood (formerly a professor of antitrust law at the

8    University of Chicago Law School) pointed out that each manufacturer was afraid it would lose

9    sales to its rivals if it acted independently, but that each manufacturer would agree to the

10   proposal of the hub "if it could be sure its competitors were doing the same thing."  Id. at 935-36.

11   As the court bluntly concluded, "[t]hat is a horizontal agreement."  Id. at 936.

12          The same is true here.  It would be plainly contrary to the economic self-interest of each

13   manufacturing defendant to refuse to individually negotiate a license of the '750 patent at the

14   competitive rate – unless, of course, it was sure that its major competitors would also decline to

15   individually negotiate such a license.  In that case, all of the manufacturing defendants would

16   benefit, just as in Interstate Circuit and Toys "R" Us.

17          **F.    Cascades' Monopsonization Claims Are Well Pled**

18          RPX separately argues that Cascades' claim against RPX for attempted and actual

19   monopsony (Amend. Compl., ¶¶ 84-91) should be dismissed because Cascades has not alleged

20   enough facts supporting market power or market shares (RPX Br. at 11-12).  RPX cites no case

21   holding that an analysis of a defendant's market power is appropriate at the pleading stage.

22   Indeed, the Ninth Circuit has repeatedly stated otherwise.  Newcal, 513 F.3d at 1052

23   ("Resolution of the market power question on a Rule 12(b)(6) motion is therefore inappropriate

24   in this case"); Mendoza v. Zirkle Fruit Co., 301 F.3d 1163, 1171 (9th Cir. 2002) ("For now, it is

25   sufficient that the employees have alleged market power – they must not be put to the test to

26   prove this allegation at the pleading stage.").  Notably, not one of the cases cited by RPX

27   involved a motion to dismiss (RPX Br. at 11-12) (citing Image Technical Servs., Inc. v. Eastman

28

1   Kodak Co., 125 F.3d 1195 (9th Cir. 1997); Confederated Tribes of Siletz Indians v.

2   Weyerhaeuser Co., 411 F.3d 1030 (9th Cir. 2005); Rebel Oil Co., Inc. v. Atl. Richfield Co., 51

3   F.3d 1421 (9th Cir. 1995).

4        To adequately plead actual monopsonization, a plaintiff must allege: (1) monopsony

5   power in the relevant markets, (2) that was willfully acquired and (3) caused antitrust injury. See

6   American Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.,

7   108 F.3d 1147, 1151 (9th Cir. 1997). For attempted monopsonization, a plaintiff must allege: (1)

8   specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct

9   directed at accomplishing that purpose; (3) a dangerous probability of achieving monopsony

10  power; and (4) causal antitrust injury. Rebel Oil, 51 F.3d at 1433.  Cascades has alleged all of

11  this (Amend. Compl., ¶¶ 84-91).

12       Even in the summary judgment context, the Ninth Circuit has stated that courts "should

13  be 'wary of the numbers game of market percentage' when considering attempt-to-monopolize

14  claims." Rebel Oil, 51 F.3d at 1438 n.10.  A numbers game is exactly what RPX is trying to

15  play (RPX Br. at 11-12).  Regardless, Cascades alleges specific facts showing that RPX has

16  willfully acquired monopsony power in the relevant market. In particular, Cascades has alleged

17  that RPX is the "negotiating or purchasing agent for the manufacturing defendants who

18  collectively control more than 90% of the mobile phone business using the Android operating

19  system and 75% of the combined mobile phone and tablet business" and that "RPX has a stated

20  business model of achieving 'wholesale' pricing terms for its members at a significantly reduced

21  cost relative to what an 'NPE' might charge an individual company on its own" (Amend.

22  Compl., ¶¶ 85, 88).

23       RPX argues that the manufacturing defendants' "collectively [] high share of a particular

24  *downstream* product market (Android mobile devices) tells us nothing about their buyer share in

25  the *upstream* input market ('750 patent)" (RPX Br. at 11).  But, it does. The fact that the

26  manufacturing defendants sell 75-90% of the relevant Android products is evidence that they

27

28  CASCADES' RESPONSE TO THE JOINT MOTION OF DEFENDANTS HTC CORPORATION, SAMSUNG ELECTRONICS CO.,
LTD., AND MOTOROLA MOBILITY, INC (DOCKET 98)
CASE NO. C:12-cv-1143 YGR

- 36 -

manufacture 75-90% of the relevant Android products. This, in turn, means that they control 75-90% of the market for the technology of the '750 patent.

Notably, RPX does not address Cascades' claim of attempted monopsony.  As discussed above (§ III.D, *supra*), with a specific intent to exercise wholesale purchasing power (Amend. Compl., ¶¶ 21, 22, 85), RPX actively accumulated as members those companies which comprise over 75-90% of the relevant markets (Id., ¶¶ 6, 92, 94).  To the extent RPX can possibly raise any factual dispute about whether it has yet achieved monopsony power, it cannot deny that there is a dangerous probability that it will do so.

### G.    The Manufacturing Defendants' <u>Noerr-Pennington</u> Defense Is Inapplicable

The manufacturing defendants (not RPX) resort again to the <u>Noerr-Pennington</u> doctrine in a final effort to avoid liability for their antitrust violations (Defs. Br., § III.D.). Notably, the Court previously denied the manufacturing defendants' prior motion on this ground (Op. at 23). The only concern raised by the Court was that, "[a]s a consequence of Cascades' failure to plead the necessary specifics of the alleged conspiracy, the Court cannot determine at this time whether Defendants are immune from suit under the <u>Noerr-Pennington</u> doctrine or even whether resolution of this issue will be appropriate at the pleading stage" (Id.).

Cascades' Amended Complaint now provides detailed factual allegations sufficient to demonstrate that the manufacturing defendants engaged in the unlawful conduct *before* the filing of, or even threat of, any litigation, and well before any "petitioning of the government." "Because the <u>Noerr-Pennington</u> doctrine grows out of the Petition Clause, its reach extends only so far as necessary to steer the Sherman Act clear of violating the First Amendment." <u>Freeman</u> v. <u>Lasky</u>, 410 F.3d 1180, 1184 (9th Cir. 2005).  Accordingly, a "complaint, answer, a counterclaim and other assorted documents and pleadings, in which plaintiffs or defendants make representations and present arguments to support their request that the court do or not do something, can be described as petitions without doing violence to the concept." <u>Id.</u>

The manufacturing defendants argue that the relevant events all took place after the filing of Cascades' patent infringement complaints (Defs. Br. at 22-23).  But, the chronology contained

CASCADES' RESPONSE TO THE JOINT MOTION OF DEFENDANTS HTC CORPORATION, SAMSUNG ELECTRONICS CO., LTD., AND MOTOROLA MOBILITY, INC (DOCKET 98)
CASE NO. C:12-cv-1143 YGR

- 37 -

in Paragraphs 101-107 of the Amended Complaint and these alleged facts demonstrate otherwise:

- The manufacturing defendants all have written membership agreements with RPX (Amend. Compl., ¶¶ 6, 38), and had communicated with RPX and each other regarding approaches for purchasing licenses in patents that might affect their business *well before they were sued for patent infringement* by Cascades (Id., ¶¶ 104, 106).

- *Before the Cascades litigation*, RPX's stated goal was to acquire patents for small groups of its members at "wholesale" prices (Id., ¶¶ 21-22, 85). RPX's business model and its approach for acquiring licenses that might impact the manufacturing defendants existed independently of and long prior to any litigation by Cascades (Id., ¶¶ 104, 107).

- *Well before the filing of Cascades patent infringement complaints* (indeed, *by May-June 2011*), RPX, through Kevin Barhydt, had direct contact with Cascades' counsel to discuss the possibility of acquiring license rights (Id., ¶ 19). *This preceded the filings of any patent infringement lawsuits* by Cascades (Id., ¶¶ 101-103).

- The foundation for the tacit agreement amongst the manufacturing defendants not to negotiate with Cascades was the written vertical agreement each manufacturing defendant had with RPX. *They also predate any lawsuit* for patent infringement by Cascades (Id., ¶¶ 69-71).

- The manufacturing defendants' combination and conspiracy to monopsonize occurred through their membership in RPX, all *before any lawsuit was filed* by Cascades (Id., ¶¶ 80-81).

The Amended Complaint makes clear that, to the extent the manufacturing defendants petitioned the government (by filing an answer or counterclaims), they did so after they joined RPX, after they successfully conspired to drive down the price of the Cascades patents to monopsony levels and after they agreed to refuse a license even at the reduced monopsonistic rate.

The manufacturing defendants also argue that "[e]ven if there had been communications prior to the filing of the [patent] complaint[s], they still would have been protected" (Defs. Br. at 23). Defendants are wrong for two reasons. First, the Amended Complaint does not allege that the manufacturing defendants had any reason to anticipate litigation and, thus, defendants improperly rely on Sosa v. DirecTV, Inc., 437 F.3d 923 (9th Cir. 2006). Second, the defendants' assertion leads to illogical consequences when patent rights are involved. Under defendants' view, direct competitors could always conspire amongst themselves without fear of antitrust

CASCADES' RESPONSE TO THE JOINT MOTION OF DEFENDANTS HTC CORPORATION, SAMSUNG ELECTRONICS CO., LTD., AND MOTOROLA MOBILITY, INC (DOCKET 98)
CASE NO. C:12-cv-1143 YGR

- 38 -

scrutiny. Why? Because a patent is not simply a commodity, it is also a right. Therefore, any time a patentee offered a license to a manufacturer, that manufacturer could arguably "anticipate a lawsuit" sufficient to not only file a declaratory judgment action, but also, conspire with its direct competitors to drive down the price of a license.

In any event, as the Court rightly surmised, resolution of the <u>Noerr-Pennington</u> defense at this stage in the proceedings would be improper given the intensive factual inquiries required.

### H.   Cascades' State Law Claims Survive Along With Its Sherman Act Claims

Cascades agrees that, at least under these circumstances, the California State Law claims live or die with the Federal Sherman Act claims. While both RPX and the manufacturing defendants argue that the state law claims must fail (RPX Br., § E; Defs. Br., § III.C), the Amended Complaint clearly states claims for relief based on the Federal Antitrust Laws and, therefore, the Cartwright Act and other California claims necessarily survive as well. <u>See</u> <u>Orchard</u>, 2013 U.S. Dist. LEXIS 53214, at *17 ("The Cartwright Act, California's antitrust law, was modeled after the Sherman Act, and therefore the Court's analysis mirrors the analysis under federal law.") (citations omitted).

### I.   Dismissal With Prejudice Would Be Improper

To the extent the Court determines that the Amended Complaint is deficient with respect to any of the arguments made by RPX or the manufacturing defendants, dismissal with prejudice is not warranted. Cascades' Amended Complaint addresses each of the deficiencies identified by the Court in its prior dismissal (See § II.A-E, *supra*). Recognizing that Cascades succeeded in amending its original Complaint to overcome any perceived deficiencies, defendants now rely on previously omitted arguments. Hence, if any such pending argument is deemed persuasive, leave to amend would be proper. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Corinthian Colleges</u>, 655 F.3d 984, 995-96 (9th Cir. 2011); <u>Lopez</u> v. <u>G.A. Smith</u>, 203 F.3d 1122, 1129-30 (9th Cir. 2000); <u>Orchard</u>, 2013 U.S. Dist. LEXIS 53214, at * 6 ("Dismissal with prejudice and without leave to amend is not appropriate unless it is clear on *de novo* review that the complaint could not be saved by amendment.").

CASCADES' RESPONSE TO THE JOINT MOTION OF DEFENDANTS HTC CORPORATION, SAMSUNG ELECTRONICS CO., LTD., AND MOTOROLA MOBILITY, INC (DOCKET 98)
CASE NO. C:12-cv-1143 YGR

- 39 -

1

## IV.     CONCLUSION

2          This case is at the pleading stage without any discovery being taken and without a motion

3 for summary judgment being filed.  Yet, the defendants seek a dismissal, with prejudice, without

4 accepting any alleged fact as true and without allowing any inference in favor of Cascades.

5 Using this standard, no complaint alleging an antitrust violation could survive.

6          Defendants' motions to dismiss should be denied.

7

8

9 Dated: April 17, 2013                          Respectfully Submitted,

10                                               NIRO, HALLER & NIRO
                                                 DAVIS WRIGHT TREMAINE LLP
11
12                                               By:  _____/s/ Martin L. Fineman_____
                                                     MARTIN L. FINEMAN
13
14                                               *Attorneys for Plaintiff*
                                                 *Cascades Computer Innovation LLC*
15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 17, 2013 the foregoing

**CASCADES' COMBINED RESPONSE TO THE MOTIONS TO DISMISS OF DEFENDANTS HTC CORPORATION, SAMSUNG ELECTRONICS CO., LTD., AND MOTOROLA MOBILITY LLC (DKT. 98) AND RPX CORPORATION (DKT. 99)**

as filed with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the following counsel of record.

| | |
|---|---|
| Charles S. Crompton, III<br>Charles.crompton@lw.com<br>Hanno Kaiser<br>Hanno.kaiser@lw.com<br>Alfred Carroll Pfeiffer, Jr.<br>Al.pfeiffer@lw.com<br>Alan J. Devlin<br>Alan.devlin@lw.com<br>LATHAM & WATKINS<br>505 Montgomery Street - Suite 2000<br>San Francisco, CA 94111<br>Phone: (415) 391-0600<br>***Attorneys for RPX Corporation***<br><br>Richard L. Grossman<br>rgrossman@kilpatricktownsend.com<br>Gene Crew<br>gcrew@kilpatricktownsend.com<br>Jessica L. Hannah<br>jhannah@kilpatricktownsend.com<br>KILPATRICK TOWNSEND & STOCKTON<br>Eighth Floor, Two Embarcadero Center<br>San Francisco, CA 94111<br>Phone: (415) 576-0200<br>***Attorneys for Motorola Mobility LLC*** | Jonathan M. Jacobson<br>jjacobson@wsgr.com<br>Chul Pak (*Pro Hac Vice*)<br>cpak@wsgr.com<br>Daniel P. Weick (*Pro Hac Vice*)<br>dweick@wsgr.com<br>WILSON SONSINI GOODRICH & ROSATI P.C.<br>1301 Avenue of the Americas, 40th Floor<br>New York, NY 10019<br>Phone: (212) 497-7700<br><br>Lisa A. Davis<br>ldavis@wsgr.com<br>WILSON SONSINI GOODRICH & ROSATI P.C.<br>650 Page Mill Road<br>Palo Alto, CA 94304<br>Phone: (650) 493-9300<br>Fax: (650) 493-6811<br>***Attorneys for HTC Corporation***<br><br>Michael W. Scarborough<br>mscarborough@smrh.com<br>SHEPPARD MULLIN RICHTER & HAMPTON LLP<br>Four Embarcadero Center, 17th Floor<br>San Francisco, CA 94111−4106<br>Phone: (415) 434-9100<br>***Attorneys for Samsung Electronics Co. Ltd.*** |

I certify that all parties in this case are represented by counsel who are CM/ECF participants.

*/s/ Martin L. Fineman*
DAVIS WRIGHT TREMAINE LLP
***Attorneys for Plaintiff,***
***Cascades Computer Innovation LLC***

CASCADES' RESPONSE TO THE JOINT MOTION OF DEFENDANTS HTC CORPORATION, SAMSUNG ELECTRONICS CO., LTD., AND MOTOROLA MOBILITY, INC (DOCKET 98)<br>CASE NO. C:12-cv-1143 YGR

- 41 -