UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE YVONNE GONZALEZ ROGERS, JUDGE

| | | |
|---|---|---|
| CASCADES COMPUTER | ) | **ORIGINAL** |
| INNOVATION, LLC, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | NO. C 12-01143 YGR |
| | ) | |
| RPX CORPORATION, HTC | ) | |
| CORPORATION, LG ELECTRONICS,) | | PAGES 1 - 42 |
| INC., MOTOROLA MOBILITY | ) | |
| HOLDINGS, INC., SAMSUNG | ) | |
| ELECTRONICS CO. LTD., DELL, ) | | |
| INC., | ) | |
| | ) | |
| DEFENDANTS. | ) | OAKLAND, CALIFORNIA |
| _____) | | TUESDAY, MAY 28, 2013 |

### TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

FOR PLAINTIFF:            NIRO, HALLER & NIRO
                         181 W. MADISON STREET, SUITE 4600
                         CHICAGO, ILLINOIS  60602
                 BY:  RAYMOND NIRO, ATTORNEY AT LAW

                         DAVIS WRIGHT TREMAINE LLP
                         ONE EMBARCADERO CENTER, SUITE 600
                         SAN FRANCISCO, CALIFORNIA  94111-3611
                 BY:  MARTIN L. FINEMAN, ATTORNEY AT LAW

           (APPEARANCES CONTINUED NEXT PAGE)

REPORTED BY:            RAYNEE H. MERCADO, CSR NO. 8258

    PROCEEDINGS REPORTED BY ELECTRONIC/MECHANICAL STENOGRAPHY;
TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

```
 1              A P P E A R A N C E S  (CONT'D.)

 2

 3   FOR DEFENDANT RPX:      LATHAM & WATKINS
                             505 MONTGOMERY STREET, SUITE 1900
 4                           SAN FRANCISCO, CALIFORNIA  94111
                        BY:  CHARLES S. CROMPTON, III,
 5                           ALAN J. DEVLIN, ATTORNEYS AT LAW

 6

 7   FOR DEFENDANT HTC:      WILSON, SONSINI, GOODRICH & ROSATI
                             1301 AVENUE OF THE AMERICAS, 40TH FL.
 8                           NEW YORK, NEW YORK  10019
                        BY:  JONATHAN M. JACOBSON,
 9                           DANIEL P. WEICK, ATTORNEYS AT LAW

10

11   FOR DEFENDANT          SHEPPARD, MULLIN, RICHTER & HAMPTON
     SAMSUNG ELECTRONICS    FOUR EMBARCADERO CENTER, 17TH FLOOR
12   CO. LTD.:              SAN FRANCISCO, CALIFORNIA  94111-4106
                        BY:  MICHAEL W. SCARBOROUGH, ESQ.
13

14

15   FOR DEFENDANT MOTOROLA  KILPATRICK TOWNSEND & STOCKTON LLP
     MOBILITY, INC.:         607 14TH STREET NW, SUITE 900,
16                           WASHINGTON, DC  20005
                        BY:  PETER M. BOYLE, ATTORNEY AT LAW
17

18                           KILPATRICK TOWNSEND & STOCKTON LLP
                             TWO EMBARCADERO CENTER, EIGHTH FLOOR
19                           SAN FRANCISCO, CALIFORNIA  94111
                        BY:  JESSICA L. HANNAH, ATTORNEY AT LAW
20

21

22                           --OOO--

23

24

25
```

| | |
|---|---|
| 1 | TUESDAY, MAY 28, 2013                                    2:03 P.M. |
| 2 | P R O C E E D I N G S |
| 3 | **THE CLERK:** CALLING CIVIL ACTION 12-1143, CASCADES |
| 4 | COMPUTER VERSUS RPX, ET AL. |
| 5 | COUNSEL, COME FORWARD AND STATE YOUR APPEARANCES. |
| 6 | **MR. FINEMAN:** GOOD AFTERNOON, YOUR HONOR. I'M MARTIN |
| 7 | FINEMAN WITH DAVIS WRIGHT TREMAINE LLP OF SAN FRANCISCO ON |
| 8 | BEHALF OF PLAINTIFF. AND WITH ME I WOULD LIKE TO INTRODUCE |
| 9 | MR. RAY NIRO OF CHICAGO, ILLINOIS. MR. NIRO IS A LONG-TIME |
| 10 | MEMBER OF THE BAR OF THIS COURT. |
| 11 | AND WE'RE HERE ON BEHALF -- |
| 12 | **MR. NIRO:** GOOD AFTERNOON, YOUR HONOR. |
| 13 | **THE COURT:** GOOD AFTERNOON, GENTLEMEN. |
| 14 | **MR. FINEMAN:** ALSO WITH US IS MR. TONY BROWN, WHO IS |
| 15 | THE CEO OF THE PLAINTIFF HERE PRESENT IN THE COURTROOM. |
| 16 | **THE COURT:** OKAY. THANK YOU. |
| 17 | **MR. DEVLIN:** GOOD AFTERNOON, YOUR HONOR. ALAN DEVLIN |
| 18 | AND CHARLIE CROMPTON ON BEHALF OF DEFENDANT RPX CORPORATION. |
| 19 | **THE COURT:** OKAY. GOOD AFTERNOON. |
| 20 | **MS. HANNAH:** JESSICA HANNAH FROM KILPATRICK TOWNSEND |
| 21 | HERE ON BEHALF OF MOTOROLA MOBILITY. |
| 22 | **THE COURT:** HOLD ON. HOLD ON. |
| 23 | (PAUSE IN THE PROCEEDINGS.) |
| 24 | **THE COURT:** ARE YOU NOT ON OUR DOCKET? |
| 25 | **MS. HANNAH:** I SHOULD BE. |

1    **THE CLERK:**  SHE'S WAY ON THE BACK, I THINK.  WAY --

2                   (PAUSE IN THE PROCEEDINGS.)

3                   (OFF-THE-RECORD DISCUSSION.)

4    **THE COURT:**  OH, I SEE.  OKAY.  ALL RIGHT.

5    **MR. BOYLE:**  PETER BOYLE FROM KILPATRICK TOWNSEND

6    BEHALF OF MOTOROLA MOBILITY.

7    **MR. SCARBOROUGH:**  GOOD AFTERNOON, YOUR HONOR.  MIKE

8    SCARBOROUGH FROM SHEPPARD MULLIN FOR DEFENDANT SAMSUNG

9    ELECTRONICS.

10   **THE COURT:**  GOOD AFTERNOON.

11   **MR. JACOBSON:**  YOUR HONOR, JONATHAN JACOBSON.  I'M

12   HERE WITH DAN WEICK.  WE'RE BOTH FROM WILSON SONSINI FOR HTC,

13   AND I'LL BE ARGUING ON BEHALF OF ALL OF THE THREE

14   MANUFACTURING DEFENDANTS.

15   **THE COURT:**  OKAY.  GOOD AFTERNOON.

16       ALL RIGHT.  AND WHO'S ARGUING ON BEHALF OF RPX?

17   **MR. DEVLIN:**  ALAN DEVLIN, YOUR HONOR.

18   **THE COURT:**  I'M SORRY.  COME UP TO THE MIC.

19   **MR. DEVLIN:**  SORRY.

20   **THE COURT:**  ALAN DEVLIN?

21   **MR. DEVLIN:**  THAT'S RIGHT, YOUR HONOR.  THANK YOU.

22   **THE COURT:**  OKAY.  AND COUNSEL FOR CASCADES?  WHO'S

23   ARGUING?

24   **MR. NIRO:**  RAY NIRO, YOUR HONOR, ON BEHALF OF

25   CASCADES.

```
 1            THE COURT:  OKAY.  LET'S START WITH YOU, MR. NIRO.

 2       SO CLEARLY THE COMPLAINT LOOKS SIGNIFICANTLY DIFFERENT, IN

 3   MY VIEW, THAN THE ORIGINAL COMPLAINT THAT WAS FILED.  I DO

 4   HAVE A FEW QUESTIONS.  ONE, EXPLAIN TO ME YOUR THEORY AS

 5   ALLEGED IN THE COMPLAINT ON THE HORIZONTAL ALLEGATIONS.

 6       RPX IS FUNDAMENTALLY DIFFERENT FROM THE MANUFACTURING

 7   DEFENDANTS.  SO HOW CAN THERE BE A HORIZONTAL ARRANGEMENT WITH

 8   RPX?

 9            MR. NIRO:  WELL --

10            THE COURT:  I MEAN, I UNDERSTAND IT WITH RESPECT TO

11   THE MANUFACTURING DEFENDANTS.

12            MR. NIRO:  CORRECT.

13            THE COURT:  I DON'T QUITE UNDERSTAND IT WITH RESPECT

14   TO RPX.

15            MR. NIRO:  RPX HAS VERTICAL AGREEMENTS.

16            THE COURT:  RIGHT, BUT THAT'S NOT WHAT YOU ALLEGE IN

17   THE --

18                      (SIMULTANEOUS COLLOQUY.)

19            THE COURT:  THAT'S NOT WHAT YOU ALLEGE IN THE

20   COMPLAINT.  I MEAN, I GUESS YOU ALLEGE BOTH, BUT YOU ALLEGE

21   WITH RESPECT TO THE FIRST CLAIM THAT RPX SHOULD BE HELD

22   RESPONSIBLE FOR HORIZONTAL CONSPIRACY AS WELL.

23            MR. NIRO:  CORRECT.

24            THE COURT:  OKAY.  GO AHEAD.

25            MR. NIRO:  BECAUSE -- BECAUSE RPX, THROUGH ITS
```

1    VERTICAL ARRANGEMENTS, EFFECTIVELY PROVIDES TACIT AGREEMENTS

2    AMONG THE MANUFACTURING DEFENDANTS WHO, USING THIS ANALOGY OF

3    HUB AND SPOKES, THEY'RE THE HUB.  THE THREE MANUFACTURING

4    DEFENDANTS AND OTHERS ARE THE -- THE -- AT THE PERIMETER OF

5    THE HUB, THE SPOKES.  AND THEY KNOW THAT EACH IS ALSO -- IS

6    ALSO A MEMBER.  AND BY KNOWING THAT EACH IS ALSO A MEMBER,

7    THEY CAN ENGAGE IN A TACIT AGREEMENT NOT TO DEAL.

8        THAT'S PRECISELY THE KIND OF ANALYSIS OF THE INTERSTATE

9    CASE AND OTHER CASES THAT CREATE A TACIT AGREEMENT THAT'S

10   HORIZONTAL.

11       SO YOUR HONOR'S RIGHT.  THERE IS A VERTICAL ARRANGEMENT,

12   BUT IT CAN, IN FACT, BE HORIZONTAL BECAUSE OF THE ARRANGEMENT

13   WITH THE -- WITH THE SPOKES KNOWING THAT THEY'RE MEMBERS.

14           THE COURT:  ALL RIGHT.  BUT JUST TO -- IF I WANTED TO

15   HAVE -- I'M GOING TO SEE THESE AGAIN ON SUMMARY JUDGMENT IF IT

16   GOES THROUGH.  RIGHT?

17           MR. NIRO:  RIGHT.

18           THE COURT:  AND WE DON'T HAVE KIND OF A

19   QUASI-HORIZONTAL/QUASI-VERTICAL COMBINATION.  I MEAN,

20   TYPICALLY, WE WOULD HAVE ONE OR THE OTHER.

21       ARE YOU SAYING THAT IF THERE -- I MEAN, ISN'T ONE GOOD

22   ENOUGH?  THAT IS, WHY DO YOU HAVE TO HAVE BOTH?

23           MR. NIRO:  WELL, ONE CAN BE GOOD ENOUGH.  THE REASON

24   FOR BOTH IS THAT RPX REALLY IS THE FACILITATOR OF THE

25   COMBINATION.  RPX PROMOTES THE FACT THAT ITS GOAL IS TO CREATE

1    A BUYER CARTEL TO NEGOTIATE LICENSES WITH THE PURPOSE OF

2    DRIVING THE PRICE DOWN.  ON ITS FACE, THERE'S NOTHING WRONG

3    WITH THAT UNLESS THERE'S A CONSPIRACY THAT IS EFFECTUATED, AND

4    THAT'S, IN FACT, WHAT HAPPENED HERE, YOUR HONOR.

5        TWO THINGS OF SIGNIFICANCE FACTUALLY.  NUMBER ONE,

6    MOTOROLA SAID WE'RE NOT GOING TO DEAL WITH ANYONE EXCEPT RPX,

7    AND THAT'S A NEW ALLEGATION IN THE PLEADING.

8             **THE COURT:**  RIGHT.  I SAW THAT.

9             **MR. NIRO:**  AND SECONDLY, MR. BARHYDT WHO ACTS ON

10   BEHALF OF AND ACTED ON BEHALF OF RPX SAID THAT THIS GROUP IS

11   WORKING TOGETHER TO SET THE PRICE, TO DETERMINE WHAT THE

12   AMOUNT WILL BE, TO DETERMINE THE NUMBER OF PATENTS, FOR

13   EXAMPLE, THAT WOULD BE LICENSED, NOT JUST THE '750, BUT ALL,

14   IS WHAT THEY WANTED.  AND --

15            **THE COURT:**  HOW COULD -- HOW COULD ONE EVER DETERMINE

16   WHAT A MARKET RATE IS WHEN THERE IS -- WHEN IT IS A UNIQUE

17   LICENSE?  THERE IS NO COMPARISON SO -- SO HOW DO WE HAVE --

18   WHY -- WHAT TURNS THIS INTO A MARKET VIOLATION AS OPPOSED TO

19   AN INDEPENDENT CONTRACTUAL DISPUTE?

20            **MR. NIRO:**  WELL, THE FACT OF AN AGREEMENT NOT TO DEAL

21   TURNS IT INTO -- TO THE --

22            **THE COURT:**  I WANT YOU TO FOCUS ON THE MARKET.

23            **MR. NIRO:**  OKAY.

24            **THE COURT:**  BECAUSE -- BECAUSE FOR -- THE '750

25   PATENT.

1      **MR. NIRO:**  YES.

2      **THE COURT:**  THERE IS NO OTHER '750 PATENT.

3      **MR. NIRO:**  CORRECT.

4      **THE COURT:**  THERE IS NO PRICE THAT CAN BE -- I'M

5  TRYING TO UNDERSTAND HOW ONE GETS A MARKET PRICE.  YOU MAKE --

6  YOU ALLEGE IN YOUR COMPLAINT THAT IT IS BELOW MARKET.

7      **MR. NIRO:**  RIGHT.

8      **THE COURT:**  BUT HOW IS THERE A MARKET?

9      **MR. NIRO:**  WELL --

10     **THE COURT:**  HOW CAN I EVER DEFINE THAT?  HOW COULD

11  ANYONE EVER DEFINE IT?

12             (SIMULTANEOUS COLLOQUY.)

13     **MR. NIRO:**  YOU CAN DEFINE IT IF THE NATURAL FORCES OF

14  NEGOTIATION TAKE PLACE.  IN EVERY NEGOTIATION FOR A LICENSE,

15  THERE IS A PRICE THAT WILL BE ESTABLISHED BY THE MARKETPLACE,

16  AND THAT'S A MATTER OF THE NEGOTIATION BETWEEN THE PATENT

17  OWNER AND THE POTENTIAL LICENSEES.

18     PATENT OWNER MAY SAY, WELL, THE PRICE HAS GOT TO BE THERE.

19  THE -- THE LICENSEES MAY SAY, NO, I'LL PAY A DIFFERENT PRICE.

20  BUT WHATEVER -- AS LONG AS THEY'RE FREELY NEGOTIATING,

21  ULTIMATELY, THERE WILL BE SOME PRICE.

22     **THE COURT:**  AND HOW CAN IT BE FREE NEGOTIATION WHEN

23  ALL OF THESE CASES SEEM TO GET POSTURED IN THE CONTEXT OF A --

24  OF A PATENT SUIT BEING FILED?  HOW IS THAT FREE NEGOTIATION?

25     **MR. NIRO:**  WELL, YOU DON'T ALWAYS HAVE A PATENT SUIT.

1          **THE COURT:**  BUT WE HAD ONE HERE.

2          **MR. NIRO:**  -- EVEN WITH A --

3          **THE COURT:**  WE CERTAINLY HAVE IT HERE.

4          **MR. NIRO:**  THAT'S RIGHT.  AND MOST PATENT SUITS,

5   INDEED 93 PERCENT OR MORE GET SETTLED; THAT IS, THE PARTIES

6   REACH AN AGREEMENT.  IF THE MATTER ISN'T RESOLVED BEFORE

7   TRIAL, THEY REACH AN AGREEMENT TO SETTLE THROUGH A LICENSE.

8   AND THE NATURAL FORCES OF THE COMPETITIVE MARKETPLACE

9   ESTABLISH WHAT THAT AMOUNT WILL BE.

10          ONCE ONE PARTY AGREES TO A LICENSE AMOUNT, THAT PRETTY

11   MUCH DETERMINES WHAT THE OTHERS WILL PAY.  IT'S NOT -- IT

12   DOESN'T HAVE TO BE THAT, BUT IN GENERAL IT IS THAT, BECAUSE

13   THE COMPETITIVE ASPECTS OF THIS BEING WHAT THEY ARE, THAT

14   BECOMES AN ESTABLISHED ROYALTY.  AND MOST FREQUENTLY, THAT IS

15   WHAT THE AMOUNT WILL BE.

16          HERE, THERE WAS NO NEGOTIATION.  THE COMBINATION, THE

17   CONSPIRACY PREVENTED NEGOTIATION.  AND IT WAS ALL PART OF WHAT

18   RPX SAYS IS THEIR ABILITY TO COMBINE GROUPS OF BUYERS INTO IS

19   A CARTEL FOR THE PURPOSE OF PREVENTING THAT NEGOTIATION.  AND

20   THAT'S WHAT HAPPENS.

21          IF THE NATURAL FORCES OF GIVE AND TAKE IN NEGOTIATION HAD

22   TAKEN PLACE, THERE WOULD BE A PRICE.  I CAN'T SAY TO THE COURT

23   WHAT THAT IS.  I KNOW WHAT OUR CLIENT THINKS IT SHOULD BE.

24   THE QUESTION WOULD BE WHAT WOULD -- IN A FREE MARKET, WHAT

25   WOULD THE DEFENDANTS HAVE AGREED TO.

1     **THE COURT:**  ALL RIGHT.  WHY DON'T YOU STAY THERE.

2  I'LL HEAR FROM THE RPX LAWYER ON THAT TOPIC.

3     **MR. DEVLIN:**  THANK YOU VERY MUCH, YOUR HONOR.

4    AND MY DISTINGUISHED OPPOSING COUNSEL SUGGESTED THERE WAS

5  NO NEGOTIATION.

6     **THE COURT:**  YOU'RE GOING TO NEED TO SPEAK UP

7  MR. DEVLIN.

8     **MR. DEVLIN:**  CERTAINLY.  MY DISTINGUISHED OPPOSING

9  COUNSEL ARGUED THAT THERE WAS NO NEGOTIATION WHEN OF COURSE WE

10  KNOW FROM AMENDED COMPLAINTS AND THE ORIGINAL COMPLAINT THAT

11  THAT'S NOT TRUE.  RPX AND CASCADES NEGOTIATED.  CASCADES HAS

12  ALLEGED THAT RPX MADE AN OFFER.  WE NOW KNOW FROM PARAGRAPH 42

13  OF THE AMENDED COMPLAINT THAT NO LESS THAN TWO RPX MEMBERS

14  HAVE INDIVIDUALLY AND SEPARATE AND APART FROM RPX NEGOTIATED

15  LICENSES WITH CASCADES.

16     **THE COURT:**  RIGHT.  BUT THEY'RE SMALL PLAYERS.  IF I

17  TAKE, WHICH I WILL AND I MUST, EVERYTHING IN THE COMPLAINT TO

18  BE TRUE FOR PURPOSES OF A 12(B)(6), WHICH MAY NOT END UP BEING

19  TRUE BUT FOR PURPOSES OF THESE PROCEEDINGS, I'M ASSUMING

20  THEY'RE TRUE, THOSE ARE MINOR PLAYERS WHO DON'T REALLY HAVE AN

21  IMPACT OR DON'T REALLY CONTROL THAT PARTICULAR MARKET AS I

22  UNDERSTAND IT, CORRECT?

23     **MR. NIRO:**  THAT'S CORRECT, YOUR HONOR.  LG HAD A 4

24  PERCENT MARKET SHARE.  PHILLIPS WAS ESSENTIALLY A 0 PERCENT

25  MARKET SHARE.  THEY WERE JUST ENTERING.  AT 4 PERCENT MARKET

1    SHARE, THEY PAID 800,000, WHICH WOULD EXTRAPOLATE OUT INTO 20

2    MILLION FOR ALL OF THEM.

3       THAT DOESN'T MEAN THAT THAT'S WHAT THE BOTTOM LINE WOULD

4    BE, BUT THAT'S AN INDICATION OF WHAT WOULD BE NEGOTIATED IN

5    ALL LIKELIHOOD HAD THE MARKETPLACE PERMITTED IT.

6       **MR. DEVLIN:** YOUR HONOR, MAY I --

7       **THE COURT:** YOU MAY ADDRESS THAT.

8       **MR. DEVLIN:** THANK YOU VERY MUCH.

9       PLAINTIFFS' THEORY HERE IS THAT THERE WAS AN OVERARCHING

10   CONSPIRACY BETWEEN RPX AND THE MANUFACTURING DEFENDANTS --

11   THAT IS, RPX MEMBERS -- NOT TO DEAL WITH CASCADES EXCEPT

12   THROUGH RPX.  IN PARAGRAPH 20, THEY ADMIT THAT THE MEMBERSHIP

13   AGREEMENTS LEAVE EACH MEMBER FREE TO NEGOTIATE.

14       **THE COURT:** LET'S -- YOU KNOW WHAT?  DOES IT

15   MATTER --

16       **MR. DEVLIN:** WELL --

17       **THE COURT:** -- IF THERE'S ONLY THREE?  I MEAN, DOES

18   THE CONSPIRACY HAVE TO HAVE ALL HUNDRED AND TEN MEMBERS OF

19   RPX?  CAN WE NOT HAVE A CONSPIRACY WITH A PORTION?

20       **MR. DEVLIN:** YOUR HONOR, THE QUESTION IS ONE OF

21   PLAUSIBILITY.  IT'S A QUESTION OF <u>TWOMBLY</u> POINTING OUT, IS

22   THERE AN OBVIOUS ALTERNATIVE EXPLANATION.  FOR EXAMPLE --

23       **THE COURT:** FOR THE FACT THAT YOU WANT TO BRING THE

24   PRICE DOWN?

25       **MR. DEVLIN:** NO.

1      **THE COURT:** IF I LOOK AT THEIR COMPLAINT, THAT SEEMS

2  PLAUSIBLE, DOESN'T IT?

3      **MR. DEVLIN:** YOUR HONOR, THERE'S AN IMPORTANT

4  DISTINCTION BETWEEN CONCLUSIONS AND ALLEGED FACTS.  AND THE

5  ALLEGED FACTS HERE PAINT A STORY OF HIGHLY DISSIMILAR BEHAVIOR

6  IN THE PRIOR COMPLAINT.  IN PARAGRAPH 36, THERE WAS AN

7  ALLEGATION THAT DELL AND PANTECH BOTH INDIVIDUALLY OF RPX MADE

8  OFFERS.  SO THIS IS A WHITTLING AWAY CONSPIRACY.  YOU'RE ONLY

9  IN THE CONSPIRACY IF YOU HAVEN'T SETTLED WITH CASCADES WHICH

10  HAS SUED YOU FOR PATENT INFRINGEMENT.

11      IF THAT THEORY IS CORRECT, ANY PATENTEE SUING A GROUP, TWO

12  OR MORE, AT COMPANIES FOR PATENT INFRINGEMENT THAT MADE AN

13  OFFER THAT THOSE DEFENDANTS THEREAFTER DECLINED -- IF HIS

14  THEORY IS CORRECT, THEN YOU WOULD HAVE A PLAUSIBLE ANTITRUST

15  CLAIM.  THAT JUST CAN'T BE CORRECT.

16      AND HERE, WHEN YOU LOOK AT THE ALLEGED FACTS AS DISTINCT

17  FROM THE LEGAL CONCLUSIONS ATTACHED TO THEM, YOU SEE HIGHLY

18  DISSIMILAR BEHAVIOR.  AT PARAGRAPHS 50 AND 51, THEY TALK ABOUT

19  PARALLEL BEHAVIOR.  THEY TALK ABOUT UNIFORMITY OF ACTION

20  DEMONSTRATES AN ORGANIZED EFFORT NOT TO DEAL.

21      THERE IS NO PARALLEL BEHAVIOR.  YOU'VE GOT THREE

22  MANUFACTURING DEFENDANTS THAT HAVE DECIDED TO LITIGATE, AND

23  RPX MADE AN OFFER, AND WE KNOW THAT NO LESS THAN FOUR RPX

24  MEMBERS HAVE INDEPENDENTLY OF RPX EITHER REACHED TERMS WITH

25  CASCADES OR MADE OFFERS.

1      NOW, THE POINT ABOUT WHETHER THEY'RE SMALL OR MAJOR

2   PLAYERS IS LARGELY BESIDES THE POINT BECAUSE THAT IF --

3          **THE COURT:**  WELL, NOT NECESSARILY.  I KNOW YOU'D LIKE

4   ME TO THINK THAT, BUT GO AHEAD.

5          **MR. DEVLIN:**  WELL, THE QUESTION IS ONE OF OVERARCHING

6   CONSPIRACY.  THE ALLEGED CONSPIRACY HERE IS NOT THAT THREE

7   MANUFACTURING DEFENDANTS HAVE AGREED, YOU KNOW, NOT TO DEAL

8   WITH CASCADES EXCEPT THROUGH RPX.  AND IT'S A CONTINUALLY

9   WHITTLING NUMBER.

10         **THE COURT:**  IT'S NOT THE QUESTION OF THE FUNDAMENTAL

11  NUMBER.  IT'S THE QUESTION OF HOW MUCH OF THE MARKET THEY

12  CONTROL.  AS I UNDERSTAND THE COMPLAINT AS IT IS NOW ALLEGED,

13  IT'S OVER 50 PERCENT OF THE MARKET.  IS THAT NOT RIGHT?

14         **MR. DEVLIN:**  WELL, IT DEPENDS WHICH MARKET YOU'RE

15  REFERRING TO.  I MEAN, THERE ARE HUGE PROBLEMS WITH THE

16  RELEVANT MARKET THAT'S BEEN ALLEGED IN THIS CASE.  AND -- BUT

17  SOMEWHAT CONFUSEDLY, THE AMENDED COMPLAINT TALKS ABOUT, YOU

18  KNOW, MARKETS OTHER THAN FOR THE LICENSING OF INTELLECTUAL

19  PROPERTY.

20      NOW, IF YOU ACCEPT THE IMPLAUSIBLE AND COUNTER-FACTUAL

21  RELEVANT MARKET ALLEGED IN THE COMPLAINT, YOU KNOW, I COULD

22  SEE HOW YOU COULD FOLLOW TO THAT LEVEL.  BUT IF YOU LOOK AT

23  THE MARKET AS ALLEGED ITSELF, THERE ARE HUGE PROBLEMS WITH IT.

24      THEY TRY TO LIMIT IT JUST TO THE MANUFACTURERS OF MOBILE

25  PHONES AND TABLETS USING ANDROID OPERATING SYSTEMS.  WHEN

1   THEY'VE ALSO ALLEGED THAT THEY'VE SOLD PROPERTY RIGHTS,

2   PATENTS, AND TO AT LEAST TWO COMPANIES OR ONE COMPANY --

3   EXCUSE ME -- TO -- TO PHILLIPS WITH 0 PERCENT MARKET SHARE.

4        AND THEY ALSO ADMIT TO HAVING MADE AN OFFER TO HYNIX,

5   WHICH THEY ADMIT, AS THEY MUST IN OPPOSITION, AND DOES NOT

6   MANUFACTURE ANYTHING WITH AN ANDROID.  SO WHAT WE HAVE HERE IS

7   AN ARTIFICIAL MARKET DRAWN TO CREATE A LAWSUIT AND TO CREATE,

8   YOU KNOW, A CLAIM OF MONOPSYZATION (PHONETIC), AND --

9        **THE COURT:**  I UNDERSTAND THAT THERE ARE ISSUES ON

10  BOTH SIDES.  IT DOES CONTINUE TO APPEAR TO ME, ALTHOUGH I

11  THINK IT IS MORE CLEAR NOW THAN IT WAS BEFORE, THAT CASCADES

12  IS FUNDAMENTALLY ATTACKING THE NATURE OF THIS STRUCTURE THAT

13  RPX HAS PUT TOGETHER, WHICH IS TO -- AND THEY ARE ALLEGING

14  THAT RPX IS KIND OF THE LYNCHPIN IN TERMS OF CREATING

15  COLLUSIVE BEHAVIOR BETWEEN BUYERS OF PARTICULAR PATENT

16  LICENSES AND THIS ONE, THE '750 AND ITS -- AND ITS RELATED

17  PATENTS, AND THAT THAT PARTICULAR MODEL OF OPERATING IS -- YOU

18  KNOW, VIOLATES THE SHERMAN ACT.

19       **MR. DEVLIN:**  WELL, YOUR HONOR, I'VE NEVER HEARD OF A

20  LAWSUIT FOUNDED ONLY ON A BUSINESS MODEL ITSELF AS DISTINCT

21  FROM PRACTICES AND CONSTITUTES AN ANTITRUST VIOLATION.

22       THE QUESTION IS WHETHER ANYTHING RPX UNILATERALLY OR IN

23  CONJUNCTION WITH ITS MEMBERS HAS DONE THAT CONSTITUTES AN

24  ANTITRUST VIOLATION.

25       **THE COURT:**  WELL, THAT'S -- I MEAN, THEY'RE ALLEGING,

1    AS I UNDERSTAND IT, THAT -- THAT YOU STOPPED -- THAT RPX

2    STOPPED THE MANUFACTURING DEFENDANTS AND/OR THAT THE

3    MANUFACTURING DEFENDANTS ON THEIR OWN AGREED THAT THEY WEREN'T

4    GOING TO NEGOTIATE INDEPENDENTLY OR AT LEAST THESE THREE

5    PARTICULAR ONES THAT SEEM TO HAVE A SUBSTANTIAL PART OF THE

6    MARKET FOR THEIR PARTICULAR PRODUCT.

7              **MR. DEVLIN:**  WELL, YOUR HONOR, I UNDERSTAND YOUR

8    CONCERN, BUT I DIRECT YOU TO PARAGRAPH 34 OF THE AMENDED

9    COMPLAINT WHERE KEVIN BARHYDT ON BEHALF OF RPX EXPLAINS RPX IS

10   NOT IN A POSITION WHERE IT CAN PAY MORE FOR SOMETHING THAN

11   WHAT ITS CLIENTS VALUE IT AT.  CASCADES TRIED TO PAINT THAT IN

12   NEGATIVE TERMS.  THAT'S SIMPLY A STATEMENT --

13             **THE COURT:**  BUT REMEMBER, WE'RE AT A 12(B)(6).

14                      (SIMULTANEOUS COLLOQUY.)

15             **THE COURT:**  RIGHT.  AND SO I HAVE TO ASSUME THAT --

16   NOT ONLY THAT IT'S TRUE BUT THAT ALL INFERENCES ARE IN THEIR

17   FAVOR.

18             **MR. DEVLIN:**  NOT QUITE, YOUR HONOR.  ALL REASONABLE

19   INFERENCES.  I MEAN, THEY TRY --

20             **THE COURT:**  I'M ALWAYS REASONABLE.

21             **MR. DEVLIN:**  OF COURSE, YOUR HONOR.  AS WE ALL ARE, I

22   HOPE.

23        AND -- BUT THE PRIMARY WORD THAT CASCADE (SIC) SEEMS TO

24   USE TO VAULT THIS INTO SOME KIND OF NEFARIOUS ACTIVITY IS

25   "WHOLESALE."  AND IF THAT THEORY IS TRUE, COSTCO WOULD BE

1    ILLEGAL BECAUSE PEOPLE WOULD BE -- YOU KNOW, ENTER INTO

2    MEMBERSHIP AGREEMENTS TO GET DISCOUNTED PRICES.  IT'S NOT A

3    REASONABLE INFERENCE IN THE WORD "WHOLESALE" THAT IT'S AN

4    INVITATION TO JOIN A BUYER SIDE (SIC) CARTEL.

5        IT'S UNDISPUTED -- I MEAN, PARAGRAPH 2 OF THE AMENDED

6    COMPLAINT DIRECTLY POINTS OUT THAT RPX HAS OVER 120 MEMBERS.

7    IT'S 140 NOW.  AND A PATENTEE WISHING TO LICENSE ITS

8    INTELLECTUAL PROPERTY AND ENJOYS GREAT CONVENIENCE IN GOING TO

9    A ONE-STOP SHOP, WHERE IT CAN GO TO RPX AND IN ONE NEGOTIATION

10   SETTING, LICENSE A LARGE NUMBER OF PEOPLE.

11       IT'S -- IT'S -- YOU KNOW, IT GOES BEYOND THE REALM OF

12   REASONABLE INFERENCES TO SUGGEST THAT COMES DOWN TO SOME

13   CONSPIRACY AS OPPOSED TO SIMPLY, YOU KNOW, A VOLUME DISCOUNT,

14   WHICH ARE UBIQUITOUS AND EFFICIENT.

15       AND WHEN YOU LOOK AT WHAT'S ACTUALLY BEEN ALLEGED HERE,

16   YOUR HONOR, THIS IS NOT A CASE WHERE IT'S ALLEGED THAT RPX

17   AGREES WITH EACH OF ITS MEMBERS IN THE CONTRACT THAT THEY WILL

18   NOT DEAL INDEPENDENT OF RPX.  IF THAT WERE THE CASE, THEN

19   YOU'D HAVE SPOKES.  YOU'D HAVE RESTRICTIONS.

20       CASCADES IN ITS OPPOSITION REPEATEDLY REFERS, OFTEN IN

21   BOLD AND ITALICS, TO ACTUAL AGREEMENTS BY WHICH I UNDERSTAND

22   THEY'RE REFERRING TO MEMBERSHIP AGREEMENTS.  BUT THOSE

23   MEMBERSHIP AGREEMENTS SAY ABSOLUTELY NOTHING ABOUT -- PROHIBIT

24   COMPANIES FROM INDEPENDENTLY DEALING.

25       AND WHEN YOU COUPLE THAT AND -- WITH AS WE EXPLAINED IN

1    OUR BRIEF AND I'D BE HAPPY TO TALK ABOUT NOW IF YOU'D LIKE,

2    AND HOW THE FACTS DRAWING ALL REASONABLE INFERENCES IN

3    CASCADES FAVOR DO NOT, AS MONSANTO SAID IN 1994 IN THE

4    SUPREME COURT OPINION, TEND TO EXCLUDE THE POSSIBILITY OF

5    INDEPENDENT CONDUCT.

6        AS IQBAL POINTED OUT, BEHAVIOR THAT IS NOT ONLY CONSISTENT

7    WITH BUT MORE LIKELY EXPLAINED BY LAWFUL UNCHOREOGRAPHED FREE

8    MARKET BEHAVIOR FAILS TO STATE A CLAIM AS A MATTER OF LAW.

9        AND WHAT CASCADES HAS ALLEGED HERE, TAKING ALL THOSE FACTS

10   AS TRUE, IS MEMBERSHIP AGREEMENTS THAT DO NOT RESTRICT FREE

11   BARGAINING, NO LESS THAN FOUR RPX MEMBERS INDIVIDUALLY

12   BARGAINING, AND ALL YOU'RE LEFT WITH IS THIS IDEA THAT -- YOU

13   KNOW, THE FACT THAT RPX OFFERS A SERVICE WHERE YOU CAN

14   NEGOTIATE WITH RPX OR GO TO ONE OF ITS MEMBERS, WHICH CASCADES

15   HAS DONE, AND THEY TRY TO DRAW THE INFERENCE OF CONSPIRACY.

16       YOUR HONOR, THERE'S -- THERE'S NO HOOK ON WHICH TO HANG A

17   PLAUSIBLE COMPLAINT.

18            **THE COURT:**  COUNSEL?

19            **MR. NIRO:**  YOUR HONOR, FIRST OF ALL, IT'S 90 PERCENT,

20   NOT 50, OF THE CELL PHONE MARKET, THE ANDROID CELL PHONE

21   MARKET, THAT'S CONTROLLED BY THESE THREE MANUFACTURING

22   DEFENDANTS, SAMSUNG, MOTOROLA AND HTC.  IF YOU THROW TABLETS

23   IN, IT'S MORE THAN 70 PERCENT.  AND THE NATURE OF THE

24   AGREEMENTS IS NOT JUST THE VERTICAL AGREEMENT.  THERE ARE

25   HORIZONTAL AGREEMENTS THAT RPX ADMITS IN ITS OWN S.E.C.

1    FILINGS.

2         ON -- IN PARAGRAPH 21, FOR EXAMPLE, THEY SAY THAT

3    SYNDICATED ACQUISITIONS, WHERE YOU GET A SUBSET OF THE

4    100-PLUS MEMBERS -- IN THIS CASE, 3 -- AND IT SAYS THEY

5    COLLECT MONEY FROM THEM AS EACH RESPECTIVE CLIENT HAS A

6    CONTRACTUALLY BINDING OBLIGATION.  AND IN MANY INSTANCES, WE

7    COLLECT THE CLIENT CONTRIBUTION PRIOR TO MAKING A PAYMENT TO

8    THE SELLER.

9         SO THEY'RE SAYING THAT THEY HAVE, IN ADDITION TO THESE

10   VERTICAL AGREEMENTS, EFFECTUATED HORIZONTAL AGREEMENTS THROUGH

11   THE MANUFACTURING DEFENDANTS THAT THEY GO TO FOR THE PURPOSE

12   OF RAISING MONEY NECESSARY TO GO OUT AND ACQUIRE SYNDICATED

13   DEALS.

14        SO THERE'S -- THERE'S A LITTLE MORE COMPLEXITY IN DETAIL

15   TO THEIR ARRANGEMENT THAN JUST THESE SUBSCRIPTION AGREEMENTS,

16   AS THEY ADMIT.

17        **MR. DEVLIN:**  YOUR HONOR, THAT DOES NOT AMOUNT TO A

18   HORIZONTAL RESTRAINT OF TRADE BY ANY STRETCH OF THE

19   IMAGINATION.

20        **THE COURT:**  I SEE YOU.  KEEP YOUR HAND DOWN.  I'LL

21   GET TO YOU.

22        GO AHEAD.

23        **MR. DEVLIN:**  OH, I -- I WAS GOING TO -- WELL, I JUST

24   MADE MY POINT, BUT I WAS ALSO GOING TO MENTION, I BELIEVE THE

25   MANUFACTURING DEFENDANTS' COUNSEL WOULD BE EAGER TO ADDRESS

1    THAT POINT AS WELL.

2            **THE COURT:**  I'LL GET TO HIM.

3            **MR. DEVLIN:**  VERY GOOD, YOUR HONOR.

4            **THE COURT:**  YOU BETTER REPEAT YOUR POINT, THOUGH,

5    BECAUSE I WAS -- HE WAS DISTRACTING ME OUT OF THE CORNER OF MY

6    EYE.

7            **MR. DEVLIN:**  NO PROBLEM.  HORIZONTALLY, NOTHING IN

8    THOSE MATERIALS IS PLAUSIBLY SUGGESTIVE OF A HORIZONTAL

9    RESTRAINT OF TRADE.

10       THERE'S A VERY IMPORTANT THING HERE.  THE FACT THAT YOU

11   CONTRACT WITH SOMEONE DOESN'T CREATE A HORIZONTAL AGREEMENT.

12   AND MY DISTINGUISHED OPPOSING COUNSEL EARLIER TRIED TO SUGGEST

13   THAT THERE'S HORIZONTALITY BECAUSE OF SOME HUB AND SPOKE.  BUT

14   THAT MISUNDERSTANDS THE NATURE OF HUB AND SPOKES.  SPOKES ARE

15   VERTICAL RESTRAINTS.

16           **THE COURT:**  BUT WHY DID RPX IN ITS S.E.C.

17   REGISTRATION STATEMENT AT PARAGRAPH 29 TALK ABOUT THE

18   POSSIBILITY THAT COURTS MIGHT INTERPRET THEIR CONDUCT AS

19   VIOLATING ANTITRUST LAWS.

20           **MR. DEVLIN:**  I'M GLAD YOU ASKED THAT, YOUR HONOR.

21   AND THEY ALSO TALK ABOUT WAR AND NATURAL DISASTERS AND --

22           **THE COURT:**  THAT'S THE -- THAT'S THE ARGUMENT YOU

23   WANT TO MAKE?

24           **MR. DEVLIN:**  NO, YOUR HONOR.  I WANT TO MAKE THIS

25   VERY CLEAR.  WE LIVE IN A WORLD OF -- WHERE ANYTHING IS

1    MATHEMATICALLY POSSIBLE.  ANYTHING.  AND THE IDEA THAT YOU

2    WOULD DISCLOSE IN AN S.E.C. FILING ANY CONCEIVABLE RISK YOU

3    COULD THINK OF.  AND IT IS POSSIBLE THAT AS A MATTER OF

4    MATHEMATICAL POSSIBILITY, THAT SOME COURT AT SOME STAGE COULD

5    TAKE THAT VIEW AND HENCE THE REASON FOR THAT.

6        BUT THAT'S NOT THE QUESTION FOR THE COURT TODAY.  THE

7    COURT -- THE COURT'S QUESTION TODAY IS ONE OF PLAUSIBILITY.

8    IT'S A QUESTION OF INDEPENDENT BEHAVIOR.  AND IT'S A QUESTION

9    OF WHETHER THERE'S AN -- AN OBVIOUS ALTERNATIVE EXPLANATION.

10        **THE COURT:**  WELL, IT WAS INTERESTING TO ME IN THE

11   FIRST GO-AROUND OF THIS COMPLAINT -- I WAS OBVIOUSLY VERY

12   CONCERNED, AND I'M STILL CONCERNED AT THE TIMING OF IT.  BUT

13   IT IS A NEW FACT OR, AT LEAST AS IT'S ALLEGED, THAT RPX ITSELF

14   WENT SEEKING PURCHASE OF THESE PATENTS, WHICH MEANS THAT THEY

15   MUST HAVE SOME VALUE TO RPX.

16        **MR. DEVLIN:**  WELL, YOUR HONOR, IF YOU TAKE --

17        **THE COURT:**  THAT IT'S NOT NECESSARILY JUST TRYING TO

18   GET OUT OF PATENT LITIGATION BY PAYING SOME NUISANCE VALUE.

19   RPX SOUGHT THESE PATENTS.

20        **MR. DEVLIN:**  WELL, TAKING THAT FACT ALLEGED AS TRUE,

21   THAT ACTUALLY DISPROVES THEIR COMPLAINT.

22        **THE COURT:**  AND WHY IS THAT?

23        **MR. DEVLIN:**  BECAUSE THE FACTS THAT THEY ALLEGE THAT

24   RPX MADE A LESS THAN $10 MILLION OFFER ON BEHALF OF ITS MORE

25   THAN A HUNDRED MEMBERS FOR THE BENEFIT OF MORE THAN A HUNDRED

1   MEMBERS AND THAT, ACCORDING TO THE COMPLAINT, THAT AMOUNT

2   CONSTITUTED A RECOGNITION OF VALIDITY AND VALUE OF THE

3   PATENTS.

4       AND THEN WHAT CASCADES TRIES TO DO IS TO CREATE A

5   PLAUSIBLE INFERENCE OF CONSPIRACY BASED ON ACTION CONTRARY TO

6   SELF INTEREST BY SAYING THAT MANUFACTURING DEFENDANTS FAILED

7   TO TAKE A LICENSE THAT WOULD AMOUNT TO 12.5 MILLION, WHICH

8   WOULD BE MORE THAN THE RPX OFFER.

9       I MEAN, THIS IS, AS YOU POINTED OUT QUITE ASTUTELY

10  EARLIER, COMES DOWN TO THE QUESTION OF MARKET VALUE AND WHAT

11  THAT MEANS.  WHAT IT MEANS IS NEGOTIATING IN A MARKET FOR AN

12  AMOUNT.  AND WHEN RPX SAYS THAT WE'RE NOT IN A POSITION TO PAY

13  SOMETHING FOR MORE THAN WHAT OUR CLIENTS VALUE IT AT, ALL

14  THAT'S TELLING YOU IS THAT THIS ISN'T A GOOD VALUE

15  PROPOSITION.

16      **THE COURT:**  OR IT COULD TELL THAT I'VE TALKED TO MY

17  CLIENTS, AND THEY'RE NOT WILLING TO PAY THIS PRICE, AND WE'VE

18  HAD THESE MEETINGS, AND I'M ACTING ON THEIR BEHALF BECAUSE

19  THERE'S ALL OF THESE OTHER THINGS GOING ON BEHIND CLOSED

20  DOORS.

21      IT COULD ALSO TELL ME THAT.

22      **MR. DEVLIN:**  WELL, WHAT YOUR HONOR SAYS AND -- WOULD

23  HAVE WEIGHT IN THE WORLD IN WHICH WE DIDN'T HAVE ADMISSIONS

24  THAT AT LEAST 4 RPX MEMBERS HAVE, IN FACT, INDEPENDENTLY

25  MOVED.  I MEAN, THE NATURE OF ALLEGATION --

1     **THE COURT:** BUT WE HAVE -- NO, I HAVE NOT A SINGLE

2  MEMBER THAT HAS MOVED WHO HAS A SIGNIFICANT INTEREST IN THESE

3  PATENTS.

4          **MR. DEVLIN:** WELL, YOUR HONOR --

5      **THE COURT:** RIGHT? AM I WRONG? AM I WRONG? HAVE

6  ANY OF THE DEFENDANTS WHO HAVE TRIED TO GET OUT OF WHAT IS

7  ALWAYS VERY COSTLY LITIGATION -- HOW MANY LAWYERS DO I HAVE

8  HERE TODAY? SIX, EIGHT, TEN?

9    HAVE ANY OF THEM HAD ANY SIGNIFICANT INTEREST IN THESE

10  PATENTS?

11          **MR. DEVLIN:** WELL, YOUR HONOR --

12      **THE COURT:** UNLESS I'M MISSING SOMETHING.

13          **MR. DEVLIN:** WELL, I'M NOT ENTIRELY SURE WHAT

14  "SIGNIFICANT" MEANS.

15      **THE COURT:** LET'S SAY -- HOW ABOUT MORE THAN 10

16  PERCENT? MORE THAN -- IT'S PRETTY MINIMAL.

17          **MR. DEVLIN:** WELL, THAT ASSUMES, BY THE WAY, THAT

18  MARKET DEFENSE IS TRUE TO LIMIT IT TO ANDROIDS, WHICH WE KNOW

19  CANNOT BE TRUE FROM THE FACTS ALLEGED IN THE COMPLAINT ABOUT

20  PANTECH AND ABOUT -- AND ABOUT PHILLIPS WITH ZERO PERCENT

21  SHARE. THAT JUST DOESN'T FOLLOW.

22      **THE COURT:** AND I UNDERSTAND ZERO PERCENT SHARE TO BE

23  SOMETHING LESS THAN POINT ONE BUT MORE THAN --

24          **MR. NIRO:** IT'S LESS THAN ONE. I THINK PHILLIPS,

25  WHICH WAS JUST LAUNCHING ITS PRODUCT LINE, HAD 50,000 PHONES.

1          **THE COURT:**  ALL RIGHT.

2          **MR. NIRO:**  SO IT WAS --

3          **THE COURT:**  COUNSEL FOR THE MANUFACTURING DEFENDANTS?

4          **MR. DEVLIN:**  THANK YOU, YOUR HONOR.

5          **THE COURT:**  AND I CAN SEE YOU.  MY CHILDREN SAY I

6  HAVE EYES BEHIND MY HEAD.

7          **MR. JACOBSON:**  I ALWAYS TRY TO BE DISTRACTING BUT NOT

8  IN THAT WAY, YOUR HONOR.  SO PLEASE ACCEPT MY APOLOGIES.

9          **THE COURT:**  IT'S JACOBSON?

10         **MR. JACOBSON:**  YOUR HONOR --

11         **THE COURT:**  COUNSEL, LET ME GET YOUR NAME AGAIN,

12  PLEASE.

13         **MR. JACOBSON:**  YES, JONATHAN JACOBSON.

14         **THE COURT:**  JUST MAKING SURE.

15         **MR. JACOBSON:**  IF I COULD START WITH A COUPLE OF

16  POINTS IN YOUR HONOR'S OPINION.  YOU SAID FIRST AT PAGE 9, THE

17  CONSPIRACY IS AN ESSENTIAL ELEMENT OF EACH OF CASCADES'

18  CLAIMS.  I'D ADD THAT THAT'S TRUE OF THE UNILATERAL CONDUCT

19  CLAIMS AGAINST RPX AS WELL BECAUSE UNLESS THE MANUFACTURING

20  DEFENDANTS HAVE CONSPIRED WITH RPX, THEN RPX CAN'T SPEAK TO

21  THEIR MARKET SHARE IN WHATEVER MARKET THE PLAINTIFF MAY BE

22  DEFINING.  SO HAVING SOME CONSPIRACY, SOME AGREEMENT AMONG THE

23  MANUFACTURING DEFENDANTS IS ESSENTIAL TO EVERY ASPECT OF THE

24  CASE.

25     NOW YOUR HONOR ALSO -- FACED WITH THE COMPLAINT THAT

1 ALLEGED VERY CLEARLY MEMBERSHIP IN RPX, THE GOALS AND PURPOSES

2 OF RPX, AND THE FACT OF PARALLEL CONDUCT, YOUR HONOR HELD THAT

3 THOSE FACTS WERE INSUFFICIENT TO STATE A CLAIM UNDER TWOMBLY

4 AND KENDALL. AND, IN FACT, YOU SAID THAT THIS WAS THE SORT OF

5 GENERIC PLEADING ALLEGING MISCONDUCT AGAINST VARIOUS

6 DEFENDANTS WITHOUT SPECIFICS AS TO THE ROLE EACH PLAYED THAT

7 WAS REJECTED BY TWOMBLY. AND WE -- WE AGREE WITH THAT.

8 IF YOU LOOK AT THE NEW ALLEGATIONS, THE ONLY THING THAT IS

9 ALLEGED OF ANY SUBSTANCE IS THE STATEMENT BY MOTOROLA THAT,

10 QUOTE, IT WOULD LIKE TO RESOLVE THIS THROUGH RPX IN PARAGRAPH

11 32, BUT, IN FACT, THAT'S NOT NEW. THAT STATEMENT, WITHOUT THE

12 QUOTATION MARKS AROUND IT, IS IN FACT IN THE ORIGINAL

13 COMPLAINT. THAT'S WHAT WAS HERE BEFORE. THERE IS NOTHING IN

14 THAT STATEMENT I WOULD SAY, YOUR HONOR, THAT IS --

15 **THE COURT:** WELL, EXCEPT THAT I NOW HAVE A SPECIFIC

16 PERSON FROM A SPECIFIC COMPANY WHICH WAS NOT PREVIOUSLY

17 ALLEGED. AND I HAVE SPECIFIC CONDUCT FROM -- WHAT'S HIS

18 NAME -- OR AT LEAST A SPECIFIC ALLEGATIONS FROM --

19 **MR. NIRO:** MR. BARHYDT.

20 **THE COURT:** HOW DO I SAY THAT?

21 **MR. NIRO:** BARHYDT.

22 **THE COURT:** BARHYDT?

23 **MR. NIRO:** YES, YOUR HONOR.

24 (SIMULTANEOUS COLLOQUY.)

25 **THE COURT:** SO THAT IS DIFFERENT.

1    GO AHEAD.

2        **MR. JACOBSON:** IT'S DIFFERENT BUT NOT MATERIAL, YOUR

3    HONOR, NOT FOR PURPOSES OF TWOMBLY AND KENDALL. KENDALL HOLDS

4    AS SQUARELY AS A COURT CAN THAT ORGANIZATIONAL MEMBERSHIP IN

5    AN ORGANIZATION, WHOSE PURPOSE IN THAT CASE WAS TO FIX

6    INTERCHANGE RATES, IS NOT SUFFICIENT EVIDENCE OF CONSPIRACY

7    UNDER TWOMBLY TO GET PAST RULE 12.

8        PLAINTIFF -- CASCADES CAN'T DISTINGUISH THAT CASE AT ALL.

9    THE ONLY DISTINCTION IT MAKES IS THAT THERE WAS, QUOTE,

10   UNQUOTE, DISCOVERY IN THAT CASE. WELL, DISCOVERY CONSISTED OF

11   TWO DEPOSITIONS, A DEPOSITION OF --

12       **THE COURT:** IT PASSED -- WHAT WAS THE -- REMIND ME

13   WHAT WAS THE PROCEDURAL POSTURE?

14       **MR. JACOBSON:** IT WAS 12(B)(6). JUDGE WHITE GAVE

15   THEM TWO DEPOSITIONS BUT KEPT IT UNDER RULE 12(B)(6), AND THE

16   DECISION OF COURT OF APPEALS WAS ALSO UNDER 12(B)(6).

17       I WOULD ADD THAT IN TWOMBLY ITSELF, THERE WAS PLENTY OF

18   ORGANIZATIONAL MEMBERSHIP PLUS PARALLEL CONDUCT, PLUS THE

19   STATEMENT THAT THE ACTIONS WERE CONTRARY TO INDEPENDENT SELF

20   INTEREST, WHICH THE SUPREME COURT EXAMINED, AND SAID, AS -- AS

21   MR. DEVLIN POINTED OUT, THAT THIS IS EQUALLY CONSISTENT

22   WITH -- WITH UNILATERAL CONDUCT AS WITH CONSPIRACY.

23       THERE'S NOT A WORD IN HERE ABOUT ANYTHING THAT SAMSUNG

24   DID. THERE'S NOT A WORD IN HERE ABOUT ANYTHING THAT HTC DID.

25   THE STATEMENT ATTRIBUTABLE TO MOTOROLA, ALTHOUGH IT'S MORE

1  SPECIFIC, IS THAT THEY WOULD LIKE TO RESOLVE THIS THROUGH RPX.

2  THAT'S NOT PROBATIVE OF CONSPIRACY AT ALL.

3      NOW, I DO WANT TO JUST SIT BACK A SECOND AND CLARIFY

4  WHAT -- WHAT A HUB-AND-SPOKE CONSPIRACY IS.

5      AND I THINK YOUR HONOR, IF YOUR HONOR HAS THE ANTITRUST

6  LAW DEVELOPMENTS TREATISE, IT'S SET FORTH THERE WELL.  WE HAVE

7  A DISCUSSION OF HORIZONTAL AND A DISCUSSION OF VERTICAL

8  FOLLOWED BY A DISCUSSION OF HUB AND SPOKE, WHICH IS SORT OF A

9  HYBRID BETWEEN THE TWO.  BUT THE CENTERPIECE OF ANY

10 HUB-AND-SPOKE CONSPIRACY IS A CONSPIRACY AMONG (SIC) THE RIM.

11 THERE MUST BE A RIM.  THE SPOKES MUST CONSPIRE AMONG

12 THEMSELVES, AND THAT'S WHAT'S MISSING HERE.

13     NOTHING IN TOYS "R" US, NOTHING IN INTERSTATE CIRCUIT

14 SUGGESTS THE CONTRARY.

15     NOW, INTERSTATE CIRCUIT IS -- IS OCCASIONALLY READ AS --

16 AS HAVING GONE OUT ON A LIMB IN TERMS OF WHAT'S NECESSARY TO

17 PROVE A CONSPIRACY.  BUT IF YOU LOOK AT JUSTICE STONE'S

18 OPINION, YOUR HONOR, YOU'LL SEE THAT THERE WAS THE LETTER FROM

19 INTERSTATE CIRCUIT TO THE EIGHT DISTRIBUTORS ASKING THEM TO

20 RAISE THE PRICE ON SECOND-RUN FILMS.  ALL OF THEM COMPLIED.

21     AT THIS POINT, WE HAVE UNILATERAL CONDUCT PLUS A LETTER

22 CIRCULATED AMONG ALL OF THEM THAT ALL OF THEM KNEW ABOUT.  BUT

23 WHAT TURNED THE TIDE IN THAT CASE WAS THAT THEY EACH AGREED,

24 EXCEPT FOR AUSTIN AND THE RIO GRANDE, WHICH HAD NOTHING TO DO

25 WITH WHAT WAS IN THE LETTER.  IT WAS THE TYPE OF CONDUCT

1    THAT'S REFERRED TO IN FOOTNOTE 4 OF TWOMBLY AS EXPLICABLE ONLY

2    HAD THERE BEEN A CONSPIRACY IN FACT AMONG THE EXHIBITORS WHO

3    CONSTITUTED THE SPOKES AND A -- AN AGREEMENT AMONG THEM WOULD

4    BE THE RIM.

5         THERE'S NOTHING IN INTERSTATE CIRCUIT, THERE'S NOTHING IN

6    TOYS "R" US THAT CONTRADICTS THE CASES SUCH AS PEPSICO THAT WE

7    CITE IN THE BRIEF THAT SAY THERE MUST BE, IN FACT, BE AN

8    AGREEMENT AMONG THE COMPANIES CONSTITUTING THE SPOKES FOR

9    THERE TO BE AN ACTIONABLE CONSPIRACY.  AND THAT -- THAT IS

10   SIMPLY WHAT'S MISSING HERE.

11        AND, IN FACT, IN THEIR BRIEF, YOUR HONOR, AT PAGE 14,

12   CASCADES MAKES CLEAR THAT IT IS ARGUING THAT ORGANIZATIONAL

13   MEMBERSHIP PLUS PARALLEL CONDUCT IS ENOUGH.  THEY SAY THAT

14   IN -- IN PRECISELY THOSE WORDS, YOUR HONOR.  AND THE RATIONALE

15   IS THAT, WELL, THAT -- THE PURPOSE OF RPX IS TO NEGOTIATE ON

16   BEHALF OF ITS MEMBERS.

17        AGAIN, YOUR HONOR, THOSE ARE THE PRECISE SAME FACTS AS IN

18   KENDALL.  IN KENDALL, THE DEFENDANT BANKS WERE ACTUALLY

19   MEMBERS OF THE BOARD OF DIRECTORS OF VISA AND MASTERCARD, A

20   FACT WHICH IS NOT PRESENT HERE.  AND YET, THOSE

21   ORGANIZATIONS -- THE WHOLE PURPOSE OF VISA AND MASTERCARD IS

22   TO SET UP A CONSORTIUM THAT ALLOWS THE SETTING OF AN

23   INTERCHANGE RATE, AND THAT WAS THE CONSPIRACY ALLEGED IN THE

24   COMPLAINT.

25        NOTWITHSTANDING THAT THAT WAS THE PURPOSE OF THE

1    ORGANIZATION AND SIMILAR TO WHAT CASCADES IS ALLEGING HERE,

2    THE COURT OF APPEALS FOUND IT LEGALLY INSUFFICIENT TO FIND

3    THAT THERE WAS A CONSPIRACY AMONG THE BANKS TO SET THE

4    INTERCHANGE RATES.

5         AND KENDALL IS A RULE 12 DECISION.  WE BELIEVE IT IS AS ON

6    POINT AS ONE CAN GET AND IS, IN FACT, DISPOSITIVE HERE.

7              **THE COURT:**  RESPONSE, MR. NIRO, ON THAT?

8              **MR. NIRO:**  YES, YOUR HONOR.  THE GSI CASE, WHICH

9    FOLLOWED KENDALL, WHICH IS A DISTRICT COURT CASE, I THINK

10   IS -- IS AS CLOSE TO BEING THIS CASE AS YOU CAN HAVE.

11        THERE, THE DISTRICT COURT, WHICH WAS THE -- THIS -- THIS

12   DISTRICT, FOUND THAT THE STANDARD --

13             **THE COURT:**  WHO IS THE JUDGE?

14             **MR. NIRO:**  JUDGE FROM SAN JOSE WHOSE NAME ESCAPES ME

15   AT THE MOMENT.  I THINK DAVILA?

16             **THE COURT:**  DAVILA?

17             **MR. NIRO:**  YES.  YES.  I BELIEVE THAT'S RIGHT, YOUR

18   HONOR.  IT WAS DECIDED IN JULY OF 2012, I BELIEVE.

19        AND IN GSI, THE COURT MADE CLEAR IN DENYING A -- A MOTION

20   UNDER 12(B)(6) THAT THE APPROPRIATE LEGAL STANDARD IS NOT THE

21   PROBABILITY OF A CONSPIRACY.  IT IS, ARE THERE SUFFICIENT

22   FACTS ALLEGED TO CREATE A REASONABLE EXPECTATION THAT

23   DISCOVERY WILL REVEAL IMPROPER CONDUCT?  THAT'S THE STANDARD.

24   IT'S NOT EVEN --

25             **THE COURT:**  WELL, THAT'S -- IS THAT REALLY THE

1  STANDARD?

2          **MR. NIRO:**  THAT'S EXACTLY WHAT GSI SAYS.

3          **THE COURT:**  I KNOW THAT'S WHAT IT SAYS.

4                  (SIMULTANEOUS COLLOQUY.)

5          **THE COURT:**  BUT IS THAT THE STANDARD?

6                  (SIMULTANEOUS COLLOQUY.)

7          **THE COURT:**  YOU GO BACK TO IQBAL AND TWOMBLY.

8          **MR. NIRO:**  YES.

9          **THE COURT:**  AND THOSE ARE ANTITRUST CASES DECIDED BY

10  THE SUPREME COURT WHICH INDICATES THE DISTRICT COURT IS THE

11  GATEKEEPER FUNDAMENTALLY.  FUNDAMENTALLY.

12          **MR. NIRO:**  I AGREE.

13          **THE COURT:**  IT IS A DIFFERENT STANDARD --

14                  (SIMULTANEOUS COLLOQUY.)

15          **THE COURT:**  -- THAN THE NORMAL -- THAN THE NORMAL

16  CASE.  I MEAN, THERE ARE MANY PEOPLE WHO ARGUE THAT IT

17  SHOULDN'T HAVE BEEN EXTENDED TO ALL OF THESE OTHER CASES.  WE

18  WOULDN'T HAVE SO MUCH WORK IN THE DISTRICT COURT.

19      BUT -- BUT THERE IS NO ESCAPING THAT THOSE WERE THE -- IN

20  AN ANTITRUST CONTEXT.

21          **MR. NIRO:**  WE AGREE, BUT IT DIDN'T CREATE A STANDARD

22  AT THE LEVEL THESE FOLKS ARE -- ARE SUGGESTING.  KENDALL WAS

23  QUOTED IN GSI AS BEING THE APPROPRIATE STANDARD.  KENDALL

24  SAID -- ALTHOUGH IT WENT THE OTHER WAY, KENDALL SAID THAT THE

25  STANDARD IS, IN FACT, ARE THERE SUFFICIENT FACTS THAT ARE PLED

1    TO CREATE A REASONABLE EXPECTATION THAT DISCOVERY WILL REVEAL

2    THE IMPROPER CONDUCT?

3         THE COURT IN GSI QUOTED KENDALL, WHICH IN TURN RELIED UPON

4    THE TWOMBLY CASE.  THERE'S NO QUESTION YOUR HONOR'S RIGHT.

5              **THE COURT:**  ALL RIGHT.

6    MR. JACOBSON?

7              **MR. NIRO:**  A HIGHER STANDARD EXISTS FOR ANTITRUST --

8              **THE COURT:**  MR. JACOBSON --

9              **MR. NIRO:**  -- MET IT HERE.

10             **THE COURT:**  -- ON THAT POINT.

11             **MR. NIRO:**  I'M SORRY, YOUR HONOR.

12             **MR. JACOBSON:**  THE GSI CASE, YOUR HONOR, IS A SIMPLE

13   CARTEL.  THERE WAS A GRAND JURY, IN FACT, CONVENED TO

14   INVESTIGATE THE -- THE ALLEGATIONS THERE.  THERE'S ALL SORT OF

15   HORIZONTAL ACTIVITY IN THE GSI CASE.  NO ONE WOULD EVER

16   SUGGEST THAT IT'S A SIMPLE PARALLEL CONDUCT PLUS

17   ORGANIZATIONAL MEMBERSHIP CASE.  I'M NOT -- I DON'T EVEN

18   BELIEVE THERE WAS AN ORGANIZATION AT ISSUE IN THE -- IN THE

19   GSI CASE.

20        YOUR -- YOUR HONOR, THE -- THE STATEMENT OF -- IN THE

21   ABSTRACT, IS THERE ENOUGH HERE TO THINK THAT DISCOVERY MIGHT

22   GIVE US AN ACTUAL CASE, IS AT ITS CORE PRECISELY AS YOUR HONOR

23   INDICATED WHAT TWOMBLY SAID "NO" TO.

24        IN -- IN TWOMBLY, ITSELF, WE HAVE ALL OF THE TELEPHONE

25   COMPANIES NOT COMPETING IN ANY SORT OF LOOSE TERRITORIES.  WE

1    HAVE ALL THE TELEPHONE COMPANIES, MEMBERS OF A NUMBER OF

2    ORGANIZATIONS.  THEY HAVE MEETINGS TOGETHER.  THAT WOULD MEET

3    THE STANDARD THAT CASCADES IS ADVOCATING HERE.

4        BUT TWOMBLY SAID THERE NEEDS TO BE SOMETHING MORE TO

5    UNDERGO THE ENORMOUS EXPENSE THAT ANTITRUST DISCOVERY ENTAILS.

6    AND THEY DIDN'T LIMIT IT TO ANTITRUST, BUT ANTITRUST WAS THE

7    FOCUS THERE.  WE HAVE TO HAVE SOMETHING MORE, SOMETHING THAT

8    TELLS US NOT THAT IT'S NECESSARILY PROBABLE -- THIS IS NOT A

9    PROBABILITY STANDARD -- BUT THAT IT'S PLAUSIBLE.

10       AND THEY SAID THE PARALLEL CONDUCT ALONE DOES NOT CROSS

11   THE LINE SUFFICIENTLY FROM -- FROM POSSIBILITY TO

12   PLAUSIBILITY.  AND THAT'S WHY WE'RE NOT GOING TO REQUIRE THESE

13   DEFENDANTS TO SPEND MILLIONS AND MILLIONS OF DOLLARS IN THE

14   HOPE THAT SOMETHING MAY TURN UP.

15           **THE COURT:**  ALL RIGHT.  LET'S MOVE TO

16   *NOERR-PENNINGTON*.

17       CAN I EVEN DECIDE THAT GIVEN THE STATE OF THE COMPLAINT ON

18   A 12(B)(6)?  ISN'T THAT REALLY SOMETHING I WOULD HAVE TO DO IN

19   THE CONTEXT OF SUMMARY JUDGMENT.

20           **MR. JACOBSON:**  YOUR HONOR COULD DO IT IN THE CONTEXT

21   OF SUMMARY JUDGMENT.  THIS IS THE DISCUSSION THAT -- THAT WE

22   HAD THE LAST TIME, BUT SINCE THEN, THERE HAS BEEN SOME CLARITY

23   ADDED TO THE COMPLAINT IN TERMS OF THE *NOERR-PENNINGTON* FACTS.

24   AND WE KNOW THERE WAS SOME ACTIVITY BY RPX IN ADVANCE OF THE

25   LITIGATION.

1      BUT EVERYTHING ALLEGED AGAINST THE MANUFACTURING

2   DEFENDANTS WHO ARE NECESSARY TO ANY CLAIM AGAINST RPX FOR THE

3   REASONS I EXPLAINED -- EVERYTHING ABOUT THEM IS POST-FILING OF

4   THE LITIGATION.  IT'S ON THE FACE OF THE COMPLAINT.  AND THERE

5   ARE A NUMBER OF CASES IN THIS CIRCUIT -- YOUR HONOR IS

6   FAMILIAR WITH THE SOSA AGAINST DIRECTTV CASE, WHICH IS A RULE

7   12(B)(6) CASE; THE FREEMAN AGAINST LASKY CASE, WHICH IS A RULE

8   12(B)(6) CASE; THAT SAY, YES, WHERE THE COMPLAINT MAKES CLEAR

9   THAT THE ALLEGATIONS INTRUDE ON THE RIGHT TO PETITION THE

10  COURTS EITHER FOR A DEFENSIVE JUDGMENT OR AN OFFENSIVE

11  JUDGMENT, THAT THAT IS BARRED BY *NOERR-PENNINGTON* AND IS

12  COGNIZABLE ON A MOTION UNDER RULE 12(B)(6).

13      SO YES, I THINK THERE IS -- THERE IS ENOUGH HERE.  WE

14  HONESTLY THOUGHT THERE WAS ENOUGH IN THE INITIAL COMPLAINT.

15  YOU DENIED OUR MOTION IN THAT RESPECT WITHOUT PREJUDICE.  BUT

16  WE THINK NOW THAT IT'S SO CLEAR FROM THE COMPLAINT THAT THE

17  ONLY ACTIVITY ANTEDATING THE LITIGATION WAS WITH RPX, THAT

18  THERE IS -- THERE IS AMPLE BASIS TO DISMISS THE CASE ON

19  *NOERR-PENNINGTON* GROUNDS.

20          **THE COURT:**  MR. NIRO?

21          **MR. NIRO:**  YOUR HONOR, I THINK YOUR INITIAL REACTION

22  IS THE CORRECT ONE.  THAT'S A SUMMARY JUDGMENT ISSUE.

23  PARAGRAPHS 101 THROUGH 107 OF THE AMENDED COMPLAINT NOW SET

24  FORTH A CHRONOLOGY OF THE KEY EVENTS IN THE *NOERR-PENNINGTON*

25  DOCTRINE, AND THEY ESTABLISH, IF TRUE, THAT THE CRITICAL ACTS

1 TOOK PLACE BEFORE ANY LITIGATION; THAT IS, THE PLAN WAS PUT IN

2 PLACE TO USE RPX AS A -- AS A GROUP OF -- OF PURCHASERS TO

3 CREATE A BUYER CARTEL. AND THAT WAS DONE BEFORE THE

4 ORGANIZATIONAL STRUCTURE AND THE ACTUAL AGREEMENTS TOOK PLACE

5 BEFORE.

6 NOW, THEY CAN SAY NO, THAT'S NOT SO, BUT I THINK DISCOVERY

7 WILL SHOW THAT, INDEED, THAT WAS SO, BECAUSE MR. BARHYDT IS

8 NEGOTIATING ON BEHALF OF THE MEMBERS WELL IN ADVANCE OF ANY

9 LAWSUIT BEING FILED. HE ADMITTED THAT.

10 **THE COURT:** SO YOU CONCEDE THAT YOU DON'T HAVE ANY

11 ALLEGATIONS SPECIFIC TO THE MANUFACTURING DEFENDANTS BEFORE

12 THE FILING OF THE PATENT INFRINGEMENT CASE, THAT IT ALL

13 HINGES -- I JUST WANT TO MAKE SURE I UNDERSTAND -- IT ALL

14 HINGES ON THE FACT THAT IT IS RPX ACTING ON BEHALF OF THE

15 MANUFACTURING DEFENDANTS.

16 AM I UNDERSTANDING YOUR ARGUMENT CORRECTLY?

17 **MR. NIRO:** THAT'S -- THAT'S CORRECT. WE DO NOT HAVE

18 THE DISCOVERY NECESSARY TO SHOW AN ACTUAL MEETING TAKING PLACE

19 BEFORE THE FILING OF THE LAWSUITS. HOWEVER, WHAT WE DO HAVE

20 IS CONSIDERABLE ACTION AND ACTIVITIES BY RPX ON BEHALF OF THE

21 MANUFACTURING DEFENDANTS AT THIS EARLY STAGE. THEY HAVE THE

22 STRUCTURE IN PLACE. THEY WERE RAISING THE MONEY. THEY HAD

23 MEETINGS TO DISCUSS THE PLAN ON EXACTLY HOW THEY WERE GOING TO

24 DO THIS.

25 AND WHAT THEY DID IS THEY FLAT OUT SAID WE DON'T CARE WHAT

1   YOU OFFER, WE'RE NOT GOING TO TALK EXCEPT THROUGH RPX.  AND

2   THAT'S THE BUYER CARTEL.  THAT'S THE HORIZONTAL ARRANGEMENT.

3   AND WHAT MIGHT -- MIGHT NOTE IN THAT REGARD THAT THE

4   INTERSTATE CIRCUIT CASE SAID VERY CLEARLY THAT YOU CAN INFER

5   THE EXISTENCE OF A HORIZONTAL CONSPIRACY IF THE -- THE SPOKES

6   ENGAGE IN CONDUCT -- THAT'S THE MANUFACTURING DEFENDANTS --

7   ENGAGE IN CONDUCT THAT'S CONTRARY TO THEIR OWN INDEPENDENT

8   BEST INTERESTS.

9       AND I HAVE TO SAY AS THE PERSON WHO OFFERED THE $5 MILLION

10  WITH THAT PAYBACK REBATE ARRANGEMENT THAT IT WAS SHOCKING THAT

11  NOT ONE OF THE MANUFACTURING DEFENDANTS EVEN CAME BACK AND

12  SAID WE WILL CONSIDER THAT.

13      I NEGOTIATED AGREEMENTS WITH BOTH SAMSUNG AND MOTOROLA IN

14  WHICH THEY GOT A HUNDRED PERCENT OF THEIR MONEY BACK.  THAT'S

15  A ZERO ROYALTY POTENTIAL.  IT'S SOMETHING THAT PEOPLE THAT

16  AREN'T ENGAGED IN ACTIONS THAT ARE CONTRARY TO THEIR OWN

17  SELF-INTEREST WOULD JUMP ON.  THEY DIDN'T.

18      THERE, YOU HAVE ACTING IN -- IN A WAY THAT'S CONTRARY TO

19  SELF-INTEREST.  AND THAT'S THE CRITICAL COMPONENT FROM WHICH

20  YOU INFER A HORIZONTAL TACIT AGREEMENT.  THAT'S WHAT -- THAT'S

21  WHAT INTERSTATE CIRCUIT SAYS.  AND THAT'S EXACTLY WHAT APPLIES

22  HERE.

23          **THE COURT:**  MR. JACOBSON?

24          **MR. JACOBSON:**  JUST -- JUST BRIEFLY.  YOUR HONOR HAS

25  ALREADY REJECTED THAT -- THAT ARGUMENT IN -- IN YOUR INITIAL

```
1   DECISION, AND THERE ARE NO FACTS THAT -- THAT CHANGE THE
2   ANALOGIES THAT YOUR HONOR MADE.  WE'VE -- WE'VE EXPLAINED WHY
3   THE MATH IS SUCH THAT $5 MILLION IS -- IS AN AWFUL LOT OF
4   MONEY WHEN THERE IS ALSO A NEGOTIATION FOR A LICENSE ON BEHALF
5   OF THE ENTIRETY OF RPX'S MEMBERSHIP FOR $10 MILLION AND THAT
6   THE PROSPECT OF -- OF REDUCING THE $5 MILLION THROUGH MORE
7   LITIGATION BY CASCADES WAS ONE THAT IS, AT BEST, SPECULATIVE
8   AND ONE WHICH ANY RATIONAL PERSON WHO WOULD -- WOULD LOOK --
9   LOOK HARD AT BEFORE -- BEFORE ACCEPTING, JUST AS -- JUST AS
10  YOUR HONOR SAID.
11       IN TERMS OF THE -- OF THE ACTIVITY BEFORE THE LITIGATION,
12  I DO WANT TO MAKE ONE OTHER POINT, WHICH IS THAT A CAUSE OF
13  ACTION IN ANTITRUST DOES NOT ACCRUE -- THE CAUSE OF ACTION
14  DOES NOT EXIST UNTIL INJURY OCCURS.  NO INJURY IS ALLEGED BY
15  CASCADES UNTIL AFTER THE LITIGATION HAD BEGAN WHEN THIS
16  BECAME, AS I THINK WE'VE DESCRIBED IT IN OTHER CONTEXTS, AS AN
17  ARGUMENT OF CONSPIRACY NOT TO SETTLE.  CONSPIRACY NOT TO
18  SETTLE IS SPECIFICALLY PROTECTED BY THE NINTH CIRCUIT'S
19  DECISION IN COLUMBIA AGAINST PRE.
20       MR. NIRO:  YOUR HONOR, I WOULD NOTE IT'S NOT A
21  CONSPIRACY NOT TO SETTLE.  IT'S A CONSPIRACY NOT TO NEGOTIATE
22  A LICENSE THAT PRECEDED ANY --
23       THE COURT:  WHAT ABOUT THE --
24            (SIMULTANEOUS COLLOQUY.)
25       THE COURT:  WHAT ABOUT THE ISSUE OF INJURY?
```

1          **MR. NIRO:**  THE INJURY OCCURS WHEN THE CONSPIRACY

2     BEGINS, WHEN THE -- WHEN THE REFUSAL TO NEGOTIATE LICENSE

3     TERMS IN THE RELEVANT MARKET EXISTS.  THAT'S WHEN THE INJURY

4     OCCURS, AND THAT'S MADE CLEAR IN THE -- IN THE SPECIFICATION

5     AGAIN IN -- THE AMENDED COMPLAINT SPECIFIES THE BASIS FOR

6     INJURY TO COMPETITION AND INJURY TO CASCADES.  AND THAT'S IN

7     PARAGRAPHS 95 THROUGH 97, INJURY TO COMPETITION IN '98, '99.

8     I'M SORRY.

9          **THE COURT:**  DO YOU HAVE ANY CASE LAW WITH RESPECT TO

10    THE NATURE OR KIND OF INJURY FOR FAILURE TO NEGOTIATE.  I

11    MEAN, INJURY HAS TO BE RELATIVELY CERTAIN.  IT CAN'T BE

12    SPECULATIVE.

13         **MR. NIRO:**  RIGHT.

14         **THE COURT:**  AND HERE, IT'S SOMEWHAT AMORPHOUS BECAUSE

15    YOU'RE CLAIMING THAT YOUR INJURY IS A FAILURE TO NEGOTIATE.

16    IT WOULD BE ONE THING IF IT WAS MILK PRODUCT, AND WE COULD

17    HAVE -- AGAIN, THIS GOES BACK TO THE ISSUE OF -- OF WHAT'S

18    BEING NEGOTIATED, RIGHT?

19         IF IT WAS MILK PRODUCT, WE WOULD HAVE A LOT OF EVIDENCE

20    ABOUT WHAT WOULD BE AN APPROPRIATE PRICE WHEN YOU WERE -- WHEN

21    A -- WHEN A SELLER WAS SOMEHOW BLOCKED OUT BY BUYERS.  HERE,

22    BECAUSE IT IS A UNIQUE ITEM AND THERE IS NO PRICE BUT FOR THE

23    NEGOTIATION, HOW -- ANY LAW?

24         **MR. NIRO:**  THERE -- THERE IS LAW ON CONCERTED

25    REFUSALS TO DEAL IN THE CONTEXT OF LICENSING DATING ALL THE

1  WAY BACK TO THE JONES KNITTING CASE OUT OF THE EASTERN

2  DISTRICT OF PENNSYLVANIA.  I THINK WE CITED SOME OF THOSE

3  CASES, MAYBE ALL OF THOSE CASES, IN THE INITIAL ROUND OF

4  BRIEFING ON THIS.

5      BUT IN ESSENCE, IT'S THIS, INJURY TO COMPETITION TAKES

6  PLACE IN THE CONTEXT OF THESE LICENSING THINGS IN THAT YOU ARE

7  DOING A COUPLE OF THINGS.  YOU'RE -- YOU'RE CAUSING INJURY TO

8  THE -- THE PATENT OWNER BECAUSE THE PATENT OWNER NOW HAS TO

9  SPEND MONEY IN LITIGATION, INCUR THOSE KINDS OF EXPENSES, AND

10  DOESN'T HAVE THE ABILITY TO LICENSE THE TECHNOLOGY AT THE

11  APPROPRIATE FREE MARKET RATE.

12      YOU'RE RIGHT.  WHAT THAT NUMBER IS IS -- IS DEPENDENT UPON

13  WHAT HAPPENS IN THE NEGOTIATION, BUT THERE ARE SOME -- SOME --

14  SOME POINTS THAT CAN BE DISCUSSED HERE.  FOR EXAMPLE, THE --

15  THE 800,000 PAID FOR A 4 PERCENT PROJECTS THE 20 MILLION.  YOU

16  COULD SAY AT LEAST 20 MILLION, MAYBE MORE.

17      THERE WERE EARLIER COMMUNICATIONS WHEN RPX SAID, WELL,

18  WHAT DO YOU THINK THIS IS WORTH?  WHERE CASCADE SAID PROBABLY

19  AT LEAST 50 MILLION.  SO THERE ARE SOME -- SOME BENCHMARKS

20  HERE.  BUT THE INJURY TO COMPETITION -- AND THIS IS AN

21  IMPORTANT POINT, I THINK THAT YOU HAVE TO REALIZE -- THE COURT

22  SHOULD REALIZE IS TO INVENTION --

23          **THE COURT:**  ISN'T THAT INCREDIBLY BROAD?  THAT'S LIKE

24  SAYING, YOU KNOW, IT COULD BE THE -- ALL CONSUMER PRODUCTS.  I

25  MEAN, THAT IS -- THERE IS NO WAY TO GET YOUR ARMS AROUND THAT

1   KIND OF ARGUMENT.

2          **MR. NIRO:**  I -- I DISAGREE, YOUR HONOR.  YOU CAN GET

3   YOUR ARMS AROUND IT BECAUSE --

4          **THE COURT:**  THEN DO I NEED TO HAVE YOU GO BACK AND

5   AGAIN SPECIFY WHAT THE MARKET IS?  IS THE MARKET ALL

6   INVENTORS' PATENTS?  IS THE MARKET THE '750 AND ITS

7   ACCOMPANYING COLLECTION?  IS IT -- THEN -- THEN WHAT IS IT?  I

8   THOUGHT WE WERE MAKING PROGRESS; PERHAPS WE'RE NOT.

9          **MR. NIRO:**  NO, I THINK WE'RE MAKING PROGRESS.  THE

10  MARKET IS AS WE DEFINE IT.  THERE'S A MARKET FOR THE '750

11  PATENT -- AND BECAUSE THE MANUFACTURING DEFENDANTS THROUGH RPX

12  SAID, WELL, WE WANT EVERYTHING.  THAT'S THE BROADER MARKET.

13  BUT THE -- THE SUBMARKET AND THE CORRECT SUBMARKET IS FOR

14  LICENSES UNDER THE '750 PATENT, AND THAT'S THE ANDROID-BASED

15  SYSTEMS, AND THAT'S THE MARKET IN WHICH THEY DOMINATE.

16      THE INJURY TO COMPETITION IS THE POINT I WAS TRYING TO

17  MAKE.  THAT'S NOT -- THAT'S NOT THE SPECIFIC INJURY TO -- TO

18  CASCADES.  IT'S INJURY TO COMPETITION.  BECAUSE IF INVENTORS

19  CAN'T LICENSE THEIR PATENTS, THEY DON'T HAVE AN INCENTIVE TO

20  INVENT.  AND IF THEY DON'T HAVE AN INCENTIVE TO INVENT, THEN

21  THAT INJURES COMPETITION, THAT INJURES THE PUBLIC.  THAT'S THE

22  POINT I THINK THAT -- THAT WE WANTED TO MAKE AS ONE OF THE

23  ITEMS -- ONE OF THE ELEMENTS OF INJURY THAT OCCURS THROUGH

24  THIS TYPE OF BUYER BOYCOTT.

25      IT ISN'T JUST SPECIFIC TO -- TO CASCADES.

1          **THE COURT:**  YOU KNOW, I HAVE TO SAY, THERE'S A LOT OF

2     LITERATURE ABOUT OUT THERE ABOUT HOW PATENT LITIGATION INJURES

3     THE MARKETS.

4               **MR. NIRO:**  WELL, CAN I ADDRESS THAT?

5          **THE COURT:**  I'M GOING TO LET MR. JACOBSON RESPOND,

6     AND THEN YOU CAN ADDRESS IT.

7               **MR. NIRO:**  OKAY.

8               **MR. JACOBSON:**  YOUR HONOR, I'LL BE VERY BRIEF, WHICH

9     IS THAT INJURY TO COMPETITION -- ALTHOUGH I DISAGREE WITH

10    PRETTY MUCH EVERY SYLLABLE THAT WAS SAID, WE DON'T EVEN NEED

11    TO ADDRESS THAT BECAUSE COUNSEL CONCEDED THAT INJURY TO

12    CASCADES CAME AFTERWARDS.  AND A PRIVATE CAUSE OF ACTION UNDER

13    SECTION 4 OF THE CLAYTON ACT DOES NOT ACCRUE UNTIL INJURY TO

14    THAT PLAINTIFF HAS OCCURRED.  THERE'S NO CAUSE OF ACTION.

15         **THE COURT:**  WELL, HE DIDN'T CONCEDE.

16         **MR. JACOBSON:**  HE DID JUST NOW.

17         **THE COURT:**  HOW DID HE CONCEDE THAT?

18         **MR. JACOBSON:**  BUT WHOLLY APART FROM THAT, WHETHER HE

19    CONCEDED OR NOT, YOUR HONOR, THE COMPLAINT IS AS CLEAR AS CAN

20    BE THAT THERE IS NO INJURY TO CASCADES UNTIL AT THE VERY

21    EARLIEST, A FAILURE OF THE RPX NEGOTIATIONS IN OCTOBER 2011

22    WHICH IS POST-LITIGATION ACTIVITY.  THERE IS NO INJURY TO

23    CASCADES PRIOR TO LITIGATION HAVING BEEN COMMENCED, AND THAT'S

24    WHAT'S DISPOSITIVE, YOUR HONOR, UNDER *NOERR-PENNINGTON* ON THE

25    FACE OF THE COMPLAINT.

1    **THE COURT:** OKAY. MR. NIRO, YOU WANTED TO SAY

2    SOMETHING?

3         **MR. NIRO:** YES, YOUR HONOR, TO ADDRESS THIS NPE

4    PATENT -- BUSINESS. THE FACT OF THE MATTER IS THAT A

5    COLLECTION OF COMPANIES LIKE CISCO AND OTHERS HAVE MADE A BIG

6    DEAL OUT OF $29 BILLION COMING OUT OF THE ECONOMY AS A

7    CONSEQUENCE OF NPE LITIGATION. THAT DATA GOES TO THE

8    UNIVERSITY OF BOSTON PROFESSOR -- WRITES AN ARTICLE THAT SAYS

9    THERE'S 29 BILLION. THAT DATA, WHEN YOU TRACE IT, IS FROM

10   RPX, AND THEY INCLUDE IN THE DATA UNIVERSITIES. IS THAT -- IS

11   THAT BAD, THAT UNIVERSITIES BRING LAWSUITS TO ENFORCE THEIR

12   PATENTS?

13        INDIVIDUAL INVENTORS WHICH CONSTITUTES, ACCORDING TO

14   STUDIES THAT WE'VE SEEN, 57 PERCENT OF ALL THE COMPANIES THAT

15   THEY CHARGE WITH BEING NPE TROLLS ARE OWNED AND CONTROLLED BY

16   INVENTORS. THE WRIGHT BROTHERS DIDN'T HAVE THE ABILITY AND

17   RESOURCES TO COMMERCIALIZE AN AIRPLANE. THEY HAD PATENTS.

18   AND WHEN CURTISS COPIED THEIR INVENTIONS, THEY HAD TO LITIGATE

19   FOR SEVEN YEARS IN ORDER TO GET A LICENSE FROM CURTISS.

20        **THE COURT:** RIGHT, BUT WHEN YOU STARTED PRACTICING --

21   HOW LONG -- I MEAN, BOTH OF YOU HAVE BEEN PRACTICING HOW LONG?

22                  (SIMULTANEOUS COLLOQUY.)

23        **THE COURT:** WHEN YOU STARTED PRACTICING, RIGHT, DID

24   ANYONE EVER SAY, HEY, I SHOULD GO INTO PATENT LITIGATION

25   BECAUSE THAT'S THE HOT TICKET? NO, THIS HAS BEEN A NEW

1  CREATION IN AMERICA FOR -- AND I HAVEN'T STUDIED THE HISTORY

2  OF IT.  ONE DAY WHEN I -- MY DOCKET'S A LITTLE LIGHTER, I PLAN

3  ON DOING THAT.  IT'S ON MY LIST OF THINGS TO DO.  BUT THIS IS

4  A RELATIVELY NEW CREATION.

5       **MR. NIRO:**  I'VE LIVED IT.  I WAS AN ENGINEER THAT

6  WENT TO LAW SCHOOL, GEORGE WASHINGTON UNIVERSITY, WHERE A LOT

7  OF PATENT PEOPLE CAME FROM.  AND WHEN WE CAME OUT, THEY

8  CONSIDERED PATENT ATTORNEYS -- "THEY" BEING THE BIG FIRMS --

9  CONSIDERED PATENT ATTORNEYS TO BE ODD DUCKS.  THEY HAD SLIDE

10  RULES ON THEIR BELT.  THEY USED COMPUTERS.  THEY WERE CRAZY

11  GUYS.

12       ONLY WHEN IN 1982 THE FEDERAL CIRCUIT CAME INTO BEING AND

13  JUDGE MARKEY WHO HAPPENED TO BE FROM CHICAGO, IS A CHIEF JUDGE

14  OF THE FEDERAL CIRCUIT, STARTED TO SAY TO DISTRICT COURTS,

15  HEY, YOU KNOW, PATENTS ARE IMPORTANT, AND DAMAGES CAN BE

16  SIGNIFICANT.  AND NOW DAMAGE AWARDS INCREASE.  AND THEN ALL OF

17  A SUDDEN, THE FLOOD GATES OPEN.

18       WHEN I WENT INTO THE BUSINESS, THERE WERE ONLY SMALL

19  BOUTIQUE FIRMS LIKE OUR FIRM THAT DID PATENT WORK.  AND ALL OF

20  THE PEOPLE WERE ENGINEERS OR SCIENTISTS OF SOME KIND THAT

21  HAPPENED TO GO TO LAW SCHOOL.  THAT CHANGED.

22       NOW, BECAUSE OF THE SIGNIFICANT AWARDS, YOU HAVE THE MAJOR

23  LAW FIRMS NOW IN -- AND THAT'S CHANGED THE WHOLE DYNAMIC.  NO

24  QUESTION ABOUT IT.

25       I'VE LIVED IT.  I'VE SEEN IT.  IT'S AN INTERESTING

```
1    SUBJECT.
2            THE COURT:  IT IS.
3        ALL RIGHT, GENTLEMEN.  HAVEN'T DECIDED.  SUBMITTED?
4            MR. NIRO:  THANK YOU, YOUR HONOR.
5            THE COURT:  SUBMITTED.
6            MR. JACOBSON:  NOTHING FURTHER, YOUR HONOR.  THANK
7    YOU FOR YOUR TIME.
8            THE COURT:  COUNSEL?
9            MR. NIRO:  THANK YOU, YOUR HONOR.
10           MR. DEVLIN:  THANK YOU VERY MUCH, YOUR HONOR.
11       I WAS -- ONLY JUST MAKE ONE FINAL NOTE, WHICH IS I KNOW
12   THAT YOU AND YOUR CLERKS HAVE SOME THINKING TO DO AND -- IN
13   REVIEWING THIS.  BUT I REALLY ENCOURAGE YOU TO THINK THAT, IS
14   THERE ANYTHING MORE THAN JUST PARALLEL CONDUCT?  AND A NAKED
15   ASSERTION OF CONTRARY TO SELF-INTEREST IS INSUFFICIENT TO
16   CARRY THE DAY.  AND WITH THAT BASIS, I'D ENCOURAGE YOU TO
17   DISMISS WITH PREJUDICE.
18       THANK YOU, YOUR HONOR.
19           THE COURT:  THANK YOU.  COUNSEL, THANK YOU.
20           (PROCEEDINGS WERE CONCLUDED AT 2:59 P.M.)
21                          --oOo--
22
23
24
25
```

```
 1
 2                    CERTIFICATE OF REPORTER
 3
 4          I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT
 5     FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.
 6     I FURTHER CERTIFY THAT I AM NEITHER COUNSEL FOR, RELATED TO,
 7     NOR EMPLOYED BY ANY OF THE PARTIES TO THE ACTION IN WHICH THIS
 8     HEARING WAS TAKEN, AND FURTHER THAT I AM NOT FINANCIALLY NOR
 9     OTHERWISE INTERESTED IN THE OUTCOME OF THE ACTION.
10
11
12         RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR
13
14                    MONDAY, JUNE 3, 2013
15
16
17
18
19
20
21
22
23
24
25
```