United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **CASCADES COMPUTER INNOVATION LLC,** | **Case No.: 12-CV-1143 YGR** |
| **Plaintiff,** | **ORDER DENYING MOTIONS TO DISMISS FIRST AMENDED COMPLAINT; ORDER TO SHOW CAUSE** |
| **vs.** | |
| **RPX CORPORATION, *et al.*,** | |
| **Defendants.** | |

This antitrust case stems from allegations of anticompetitive behavior in the negotiation of patent licenses. Plaintiff Cascades Computer Innovation LLC ("Cascades") controls a portfolio of patents, one of which allegedly optimizes the operation of Android, an operating system for smartphones and tablet computers. Defendants HTC Corporation ("HTC"), Motorola Mobility Holdings, Inc. ("Motorola"), and Samsung Electronics Co. Ltd. ("Samsung") (collectively, "Manufacturing Defendants") manufacture a high percentage of all Android-compatible devices sold in the United States. Cascades alleges that the Manufacturing Defendants resolved to negotiate licenses for Cascades-controlled patents only through Defendant RPX Corporation ("RPX"; collectively with Manufacturing Defendants, "Defendants"), a purported "defensive" patent aggregator which counts the Manufacturing Defendants amongst its members. The thrust of Cascades' First Amended Complaint ("FAC") is that Defendants' alleged conduct constitutes a conspiracy to monopsonize the market to buy Cascades' patent licenses, in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and California unfair competition laws.

The Manufacturing Defendants and RPX have filed separate motions to dismiss the FAC. (Dkt. Nos. 98 (Manufacturing Defendants' Motion ("Mfr. Mot.")), 99 (RPX's Motion ("RPX Mot.")).)  The motions overlap substantially in arguing that the FAC fails to allege either antitrust violations or a plausible conspiracy to commit them.  Manufacturing Defendants, for their part, seek dismissal on the further ground that their alleged conduct is protected by the *Noerr-Pennington* doctrine.  That doctrine exempts from antitrust liability concerted action taken in the exercise of the First Amendment right of petition, a category of actions which, in proper circumstances, may encompass the settlement of lawsuits.  In this vein, the Court notes that Cascades has brought lawsuits against the Manufacturing Defendants (among others) in the Northern District of Illinois, claiming infringement of at least one of the patents implicated in this case.

Both motions before the Court are fully briefed.  Cascades filed a consolidated opposition brief (Dkt. No. 103 ("Opp'n")), to which the Manufacturing Defendants and RPX both replied (Dkt. Nos. 104 ("Mfr. Reply"), 105 ("RPX Reply")).

Having carefully considered the papers and oral argument submitted, the Court concludes that Cascades' amended complaint, unlike its initial complaint, alleges specific facts raising a reasonable inference that the Manufacturing Defendants and RPX engaged in a so-called "hub-and-spoke" conspiracy to force sub-competitive pricing for Cascades' patent licenses by monopsonizing the market therefor.[1]  In light of the revised allegations, and the procedural posture of this case, the Court **DENIES** both motions to dismiss.

While denying the motions to dismiss due to the plausibility of the antitrust conduct alleged, the Court remains concerned about the circumstances preceding the instant litigation and the role of the validity of the patents.  Given that the alleged antitrust conduct specifically concerns the

---

[1] Antitrust conspiracies are typically labeled as either horizontal or vertical.  "Restraints imposed by agreement between competitors have traditionally been denominated as *horizontal* restraints, and those imposed by agreement between firms at different levels of distribution as *vertical* restraints." *Bus. Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 730 (1988) (emphases supplied). Hub-and-spoke conspiracies are a hybrid in which a hub, "generally the dominant purchaser or supplier in the relevant market," coordinates concerted action between "spokes," that is, direct competitors connected to the hub by a vertical agreement.  *See Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 435 n.3 (6th Cir. 2008).  "The rim of the wheel is the connecting agreements among the horizontal competitors . . . that form the spokes."  *Id.*

United States District Court
Northern District of California

1  licensing of otherwise valid patents, the Court, exercising its inherent power to control its docket,

2  also issues an **ORDER TO SHOW CAUSE** why this case should not be stayed until a determination of

3  the merits of the patent claims now proceeding in the Northern District of Illinois.

4  **I.   BACKGROUND**

5      **A.   THE PARTIES**

6      Cascades is what is sometimes called a "non-practicing entity," "NPE," or, more

7  colloquially, a "patent troll"—that is, an entity that "enforces patent rights against accused infringers

8  in an attempt to collect licensing fees, but does not manufacture products or supply services based

9  upon the patents in question."  *Internet Ad Systems, LLC v. Opodo, Ltd.*, 481 F. Supp. 2d 596, 601

10 (N.D. Tex. 2007).  Labels aside, Cascades' stated purpose is to level the playing field between the

11 "individual inventors" who own patents and the "large multinational corporations with vast

12 resources" who, according to Cascades, commonly infringe them.  (FAC ¶¶ 17-18.)  Cascades

13 purports to make patent licensing and litigation a more equal contest by providing inventors with

14 financial assistance and strategic guidance.

15     One inventor associated with Cascades is non-party Elbrus International.  Cascades allegedly

16 holds exclusive rights to license and enforce a portfolio of 38 technology patents originally issued to

17 Elbrus (the "Elbrus Patents" or, individually, an "Elbrus Patent").  The Elbrus Patent central to this

18 case is United States Patent No. 7,065,750, entitled "Method and Apparatus for Preserving Precise

19 Exceptions in Binary Translated Code," issued June 20, 2006 ("'750 Patent").  The '750 Patent

20 allegedly optimizes the use of Android, a computer operating system used in mobile electronics such

21 as smartphones and tablets.

22     The Manufacturing Defendants manufacture mobile devices that allegedly employ Android

23 and infringe the '750 Patent.  Of the devices using Android sold in the United States, the three

24 Manufacturing Defendants, taken together, sell more than 90 percent of mobile phones and 75

25 percent of tablets.  (FAC ¶¶ 6, 13, 72, 88.)  Cascades alleges that the respective Manufacturing

26 Defendant's U.S. market share for Android phones is: for HTC, 41 percent; for Motorola, 35

27 percent; and for Samsung, 17 percent.  (FAC ¶ 12.)

28

RPX claims to be a defensive patent aggregator, or "anti-troll," formed to protect its members from allegedly baseless infringement claims brought by NPEs like Cascades. RPX members allegedly pay "from $60,000 to $6,000,000" to enter into a subscription agreement with RPX. (FAC ¶ 2.) Subscription gives members a license to practice RPX-controlled patents. RPX allegedly has in excess of 120 members who enjoy rights to a patent portfolio of "more than 2,950 patents in various fields, not counting the 29,000 patents for which it [has] acquired exclusive licensing rights." (FAC ¶¶ 2, 20.) Cascades alleges that RPX members typically subscribe for an initial period of three years, after which time they face the loss of their RPX-provided licenses and, "in some cases, . . . potential exposure to lawsuits for patent infringement if RPX chooses to sell the relevant acquired patents." (FAC ¶ 24.)  Importantly, the RPX subscription agreement "purportedly give[s] members the ability to deal independently in their own self-interest." (FAC ¶ 20.)

In addition to so-called "defensive" patent aggregation, RPX allegedly will sometimes act "as a purchasing or negotiating agent for a subset of its members in what it calls, variously, structured or syndicated acquisitions." (FAC ¶ 2; *see also id.* ¶ 20.) "In this type of arrangement, the pertinent members provide financing for the acquisition of specific patent rights." (FAC ¶ 2; *see also id.* ¶ 21.) By exercising group purchasing power and causing potential licensees to negotiate solely through RPX, RPX can obtain for its members reduced royalty rates, which RPX commonly refers to as "wholesale" prices. (*See* FAC ¶¶ 19-22.) Each Manufacturing Defendant is concededly a member of RPX.

**B.    LICENSE NEGOTIATIONS AND LITIGATION OF THE ELBRUS PATENTS**

The present dispute originates in failed patent license negotiations between Cascades and RPX. Whereas the initial complaint omitted the details of these negotiations, the FAC pleads specific names, dates, and communications. Notably, Cascades now alleges that RPX, not Cascades, initiated the licensing negotiations by contacting Cascades' law firm, Niro Haller & Niro, with which RPX had a prior history of dealing. During the ensuing negotiations, Cascades brought a number of patent infringement lawsuits against individual Manufacturing Defendants, as well as other RPX members. When licensing negotiations between RPX and Cascades broke down, Cascades made each of the Manufacturing Defendants an identical licensing offer which included a

sizable rebate to the first company to accept.  None of the Manufacturing Defendants responded to the offer.  Cascades then filed this antitrust lawsuit, alleging that RPX and the Manufacturing Defendants had agreed for the Manufacturing Defendants to refrain from negotiating with Cascades individually and instead to negotiate any license only through RPX.  As alleged in the FAC, these events unfolded in the following order:

Beginning in March 2008 and continuing through 2011, Niro Haller & Niro "negotiated numerous patent acquisition-licensing arrangements with RPX . . . ."  (FAC ¶ 101.)  Under these arrangements, RPX acquired licenses under patents held by several clients of Niro Haller & Niro, though not, apparently, Cascades.  (FAC ¶¶ 101-02.)

Through this preexisting relationship with Cascades' counsel, in May or June of 2011, RPX's Head of Acquisitions, Kevin Barhydt, initiated negotiations by contacting Niro Haller & Niro to discuss the possibility of acquiring license rights to Cascades' entire portfolio of Elbrus Patents.  (FAC ¶¶ 19, 103.)  Though the key Elbrus Patent needed by RPX and the Manufacturing Defendants was the '750 Patent, Cascades, in order to license that patent, was willing to consider a license for its entire Elbrus portfolio.  (FAC ¶ 19.)

On June 26, 2011, Cascades sued a non-party RPX member, Hynix, in Chicago, Illinois, for infringement of an Elbrus Patent relating to the design of a particular type of computer memory.  (FAC ¶ 103.)

On July 6, 2011, Cascades sued two of the Manufacturing Defendants, Samsung and Motorola, in Chicago, Illinois, for infringement of the '750 Patent.  (FAC ¶ 103.)  On September 7, 2011, Cascades sued the third Manufacturing Defendant, HTC, as well as former defendant LG Electronics, for infringement of the '750 Patent. (FAC ¶ 103.) [2]

On September 8, 2011, Cascades reported the value of the Elbrus Patents to RPX.  (FAC ¶ 51.)  The FAC does not disclose the total alleged value, nor the basis for its calculation, stating only

---

[2] Cascades has also sued the following RPX members for infringing various Elbrus Patents:  ACER America Corp.; Dell, Inc.; Hynix Semiconductor, Inc.; LG Electronics; Sharp Electronics Corp.; Sony-Ericsson; and Pantech Wireless, Inc.  (FAC ¶ 19.)  Of these, LG Electronics and Dell were named as defendants in the original complaint in this case.  Cascades voluntarily dismissed its claims against LG (Dkt. No. 88) and did not name Dell as a defendant in the FAC after the Court dismissed the original complaint's claims against Dell with leave to amend (Dkt. No. 93 at 10-12).

that the value of a license for the entire Cascades portfolio to "Samsung alone was then valued at $50 million."  (FAC ¶ 51.)

On September 20, 2011, Motorola's top licensing executive, Brett Roesslein, advised Cascades that Motorola would not deal independently with Cascades and that its intention was to deal only through RPX, stating, "We would like to resolve this through RPX."  (FAC ¶ 32.)

By September 23, 2011, Barhydt told Cascades that RPX had raised sufficient money from its members to acquire a license under all the Elbrus Patents, including the '750 Patent.  (FAC ¶ 32.) Prior to September 23, 2011, Cascades alleges, there were "[m]eetings and/or direct contact and communication between RPX and defendants Motorola, Samsung, HTC and other RPX members." (FAC ¶ 32.)  Cascades does not allege specifics about these meetings, only their bare occurrence. Cascades alleges bilateral meetings between RPX and single RPX members (*see* FAC ¶¶ 55, 62), though not multilateral meetings attended by multiple RPX members simultaneously.  Cascades alleges that Defendants have concealed most meetings and communications.  (FAC ¶ 62.)

By October 11, 2011, RPX, again through Barhydt, had negotiated with Cascades to acquire license rights under all of the Elbrus Patents for most of its 100-plus members (including each of the Manufacturing Defendants).  (FAC ¶¶ 19, 31.)  The relevant RPX members, including the Manufacturing Defendants, were required to contribute to the license acquisition, which would have resulted in a "high, seven-figure payment to Cascades for a fully paid-up license under all the [Elbrus Patents]."  (FAC ¶ 31.)

In mid-October 2011, "Barhydt told Cascades that RPX had to withdraw its offer because one or more of its members would not fund the license deal at the offered amount."  (FAC ¶ 33.) Cascades alleges that this statement amounted to an admission, "in effect, that all relevant members either had to agree to a license or none would agree."  (FAC ¶ 33.)

"On November 2, 2011, Barhydt . . . represented that the key RPX client-members wanted 'a global solution' to the Cascades matter."  (FAC ¶ 34.)  He wrote: "Solving problems for our clients is the role of RPX—but we aren't in a position where we can pay more for something than what our clients value it at."  (FAC ¶ 34.)  Cascades regards this statement as an admission "that client-

United States District Court
Northern District of California

1   members in combination, not RPX, [had] the ultimate say in determining what RPX would pay and

2   that RPX was negotiating collectively for its members."  (FAC ¶ 34.)

3       Also on November 2, 2011, Barhydt responded via email "to Cascades' question whether the

4   parties should 'discuss an exclusive license under just [the '750 Patent], forgetting about the entire

5   portfolio.'"  (FAC ¶ 36.)  Barhydt stated:  "[O]ur clients don't want to hear about Cascades again—

6   so unfortunately solving the problem on one asset [the '750 patent] isn't a workable solution for us."

7   (FAC ¶ 36 (alteration in FAC).)

8       Sometime later, Barhydt explained to Cascades why RPX wanted a license for all the Elbrus

9   Patents rather than the '750 Patent alone:

10          [M]y point was that our clients don't want to solve this one
            Cascades case (on the '750 Patent)—only to basically fund additional
11          litigations from Cascades.  They want a global solution to Cascades—
            not just a solution on this one particular case—knowing that there will
12          be others to follow.

13          It wasn't that I (or our clients) didn't want to hear about Cascades
            again.  We/they just don't want to have to solve this problem multiple
14          times."

15   (FAC ¶ 35 (emphasis omitted).)

16      "Meetings, email and telephone contact between RPX and its key members took place in

17   October and November 2011."  (FAC ¶ 34.)  One such meeting, between RPX and Pantech, a non-

18   party RPX member, was scheduled for November 7, 2011.  The topic allegedly was "RPX's

19   acquisition of a license under the Cascades patents."  (FAC ¶ 34.)

20      In January 2012, Cascades tried to negotiate licensing agreements with each of the

21   Manufacturing Defendants individually.  (FAC ¶ 41.)  Specifically, Cascades offered each of the

22   Manufacturing Defendants:

23          an identical low-priced license that would have required a lump-sum
            royalty payment of only $5 million for a fully paid-up license under all
24          the Cascades patents with the right (of the first party to accept) to
            recover up to all of the payment made based on 25% of the licensing
25          revenues that Cascades received from any other accused infringer.

26   (FAC ¶ 41.)  One effect of this license would be that the cost of the license for the first party to

27   accept would be subsidized by later licensees, up to the full cost of the first party's license.  (*See*

28   FAC ¶ 41.)  No Manufacturing Defendant responded to this offer.  (FAC ¶ 41.)

1    On March 7, 2012, Cascades filed this antitrust lawsuit.

2    After the filing of the lawsuit, at least two RPX members, LG Electronics and Philips, "broke

3    from the RPX-driven conspiracy and independently negotiated settlements with Cascades . . . ."

4    (FAC ¶ 42.)  LG Electronics allegedly has a 4 percent market share and Philips has a market share of

5    less than 1 percent.  (FAC ¶ 42.)[3]

6    On January 24, 2013, the Court dismissed Cascades' initial complaint, granting leave to

7    amend.  (Dkt. No. 93 ("Jan. 24 Order").)

8    **II.    LEGAL STANDARD**

9    A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in

10    the complaint.  *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1199-1200 (9th Cir. 2003).  "Dismissal can be

11    based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a

12    cognizable legal theory."  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  All

13    of a plaintiff's well-pleaded allegations of material fact are taken as true and construed in the light

14    most favorable to the plaintiff.  *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

15    The court need not, however, "accept as true allegations that contradict exhibits attached to the

16    Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory,

17    unwarranted deductions of fact, or unreasonable inferences."  *Id.*

18    To withstand a motion to dismiss, a plaintiff must not merely allege conduct that is

19    conceivable but must instead allege "enough facts to state a claim to relief that is plausible on its

20    face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when

21    the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

22    defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (citing

23    *Twombly*, 550 U.S. at 556).  In the antitrust context, "a court must determine whether an antitrust

24    claim is 'plausible' in light of basic economic principles."  *William O. Gilley Enters., Inc. v. Atl.*

25    *Richfield Co.*, 588 F.3d 659, 662 (9th Cir. 2009) (citing *Twombly*, 550 U.S. at 556).  "The

26    plausibility standard is not akin to a probability requirement, but it asks for more than a sheer

27

28    [3] The FAC describes Philips as having "0%" market share, but at oral argument Cascades' counsel clarified that Philips "was just launching its product line," thereby confirming the inference that Philips held a de minimus but actual share of the market.  (Dkt. No. 113 ("Transcript") at 22:22-25.)

United States District Court
Northern District of California

possibility that a defendant has acted unlawfully . . . .  When a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  *Iqbal*, 556 U.S. at 679 (quoting *Twombly*, 550 U.S. at 556-57) (internal quotation marks omitted).  In sum, a claim may proceed only if the facts alleged foster a reasonable inference of liability, stronger than a mere possibility.  *See id.*

## III.  DISCUSSION

The Court focuses principally on Cascades' federal antitrust claims, since Cascades' state-law claims rise and fall with them.  (*See infra* Section III.E.)  Cascades asserts four federal claims: (1) against all Defendants, a *horizontal* conspiracy to restrain trade in violation of Section 1 of the Sherman Act (FAC ¶¶ 52-67); (2) against all Defendants, a *vertical* conspiracy to restrain trade in violation of Section 1 (FAC ¶¶ 68-78); (3) against all Defendants, a conspiracy to monopsonize in violation of Section 2 (FAC ¶¶ 79-83); and (4) against RPX only, a separate Section 2 monopsonization claim (FAC ¶¶ 84-107).  Normally, a conspiracy is either horizontal *or* vertical; Cascades' assertion of both types is explained by its allegation of a hub-and-spoke conspiracy, which consists of both horizontal and vertical elements.  As set forth below, all four federal claims stemming from Cascades' hub-and-spoke theory survive the pleading stage.

### A.  FIRST ELEMENT OF SECTION 1 CLAIMS: CONSPIRACY

Section 1 makes illegal "[e]very contract, combination . . . , or conspiracy, in restraint of trade or commerce."  15 U.S.C. § 1.  The Supreme Court has construed the statute to prohibit, however, only *unreasonable* restraints of trade.  *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012).  To state a claim under Section 1, a plaintiff "must plead not just ultimate facts (such as a conspiracy), but evidentiary facts which, if true, will prove: (1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition."  *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008).

These elements must be pled "with enough factual matter (taken as true) to suggest that an agreement was made."  *Twombly*, 550 U.S. at 556.  "[A]n allegation of parallel conduct and a bare

United States District Court
Northern District of California

assertion of conspiracy will not suffice."  *Id.*  "Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality."  *Id.* at 556-57.  "Hence, when allegations of parallel conduct are set out in order to make a Section 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 557.  To allege an agreement, plaintiffs need not plead "specific back-room meetings between specific actors at which specific decisions were made."  *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007).  Nor is it necessary for each co-conspirator to "know of the existence or identity of the other members of the conspiracy or the full extent of the conspiracy."  *In re High-Tech Employee Antitrust Litig.*, 856 F. Supp. 2d 1103, 1118 (N.D. Cal. 2012) (citing *Beltz Travel Serv. Inc. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1366-67 (9th Cir. 1980)).  Antitrust plaintiffs must, however, allege "facts *such as* a 'specific time, place, or person involved in the alleged conspiracies' to give a defendant seeking to respond to allegations of a conspiracy an idea of where to begin."  *Kendall*, 518 F.3d at 1047 (quoting *Twombly*, 550 U.S. at 565 n.10) (emphasis supplied).  Courts weighing an antitrust defendant's motion to dismiss should consider the plaintiff's allegations in their entirety and refrain from "tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each."  *In re High-Tech Employee*, 856 F. Supp. 2d at 1118 (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)).  "The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole."  *Id.* (brackets omitted).

Cascades' Section 1 claims require Cascades to allege a plausible conspiracy—in this case, a hub-and-spoke conspiracy in which RPX is the hub and the Manufacturing Defendants are the spokes.  (Opp'n at 32.)  Accordingly, Cascades must allege both a horizontal agreement between the Manufacturing Defendants (that is, a connecting "rim") and vertical agreements (or "spokes") between RPX and each individual Manufacturing Defendant.

Defendants pose three challenges to the FAC's allegations of a conspiracy: (1) Defendants' alleged conduct is more plausibly explained by Cascades' overvaluation of the Elbrus Patents than

United States District Court
Northern District of California

by any collusive activity; (2) Cascades alleges mere parallel conduct and organizational membership in RPX and thus falls short of pleading a rim, i.e., horizontal agreement between Manufacturing Defendants; and (3) Cascades fails to plead the spokes, i.e., a vertical conspiracy, because the subscription agreements between RPX and its members are not themselves actionable.  The Court addresses each argument in turn.

### 1.     Explanation for the Alleged Conspiracy

The linchpin of RPX's attack on the conspiracy element of Cascades' Section 1 claims is its contention that Cascades overpriced its patent licenses, and that this overpricing, rather than any collusion, explains RPX's refusal to take a license on behalf of its members.  (RPX Mot. at 4-6.) The Manufacturing Defendants make substantially the same argument, framing it as a contention that the alleged conspiracy "makes no economic sense."  (Mfr. Mot. at 14-16.)  According to Defendants, Cascades' overvaluation supplies a more plausible reason than conspiracy for RPX's withdrawal from the licensing deal with Cascades after arriving at a price, and for the Manufacturing Defendants' non-responsiveness to Cascades' attempt to negotiate with them individually.  (Mfr. Mot. at 15 ("[T]he conduct alleged here is just as (if not more) consistent with each alleged conspirator . . . refusing to license an over-valued patent"); RPX Mot. at 4 ("Replacing that simple explanation [of overpricing] with conspiracy and monopsonization theories is profoundly implausible."))

Defendants' competing interpretation of the FAC may ultimately prove true, but "[t]he standard at this stage of the litigation is not that plaintiff's explanation must be true or even probable. The factual allegations of the complaint need only 'plausibly suggest an entitlement to relief.'" *Starr v. Baca*, 652 F.3d 1202, 1216-17 (9th Cir. 2011) cert. denied, 132 S. Ct. 2101 (U.S. 2012) (quoting *Twombly*, 550 U.S. at 556).  Indeed, "[i]f there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6).  Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *im*plausible." *Id.* at 1216.  Even in antitrust cases, where some courts have surmised that a higher pleading standard might apply, *e.g.*, *id.* at 1215-1216, the Court's task under Rule 12(b)(6) is only to

ascertain whether the allegations "raise a reasonable expectation that discovery will reveal evidence of illegal agreement," *Kendall*, 518 F.3d at 1047 (quoting *Twombly*, 550 U.S. at 556).

In its Jan. 24 Order dismissing Cascades' complaint with leave to amend, the Court rested its holding on a determination that Cascades had engaged in "generic pleading," and did not pass on the merits of Defendants' competing interpretation of the complaint. (*See* Jan. 24 Order at 9-10.) Turning now for the first time to Defendants' overpricing theory, the Court acknowledges its plausibility, but does not find it so fully and convincingly explanatory as to render Cascades' revised allegations implausible by comparison. The Court first addresses RPX's argument, which proceeds as follows: The FAC alleges that, by October 2011, RPX and Cascades had agreed on an undisclosed "high seven-figure" price for RPX to acquire license rights under Cascades' patents for RPX's members, including the Manufacturing Defendants. (FAC ¶¶ 19, 31.) Though RPX allegedly withdrew from that agreement after one or more of its members refused to fund the deal at the agreed-upon price (FAC ¶ 33), RPX uses said price to assert a "baseline" value for the entire Elbrus Patent portfolio of "less than $10 million" (RPX Mot. at 4). RPX then calculates that Cascades' later offers to the individual Manufacturing Defendants would have resulted in a total payment to Cascades of $12.5 million: $5 million each from the last two to respond, and $2.5 million from the first to respond. (*Id.* at 4-5.) This sum would purchase, for the three Manufacturing Defendants alone, a license for the '750 Patent only—rather than a license for all of RPX's members for all of the Elbrus Patents. In light of the purported sub-$10 million baseline established in the RPX-Cascades negotiations, RPX asks the Court to conclude that Cascades' later offers directly to the Manufacturing Defendants were "vastly more expensive" and therefore "predictably attract[ed] little interest." (*Id.* at 5, 4.)

This theory, while plausible, is insufficient to compel dismissal for three reasons. First, RPX's overpricing theory depends on inferences drawn against, rather than in favor of, Cascades—namely, that the "high seven-figure" price initially agreed upon represents a "reasonable valuation" of the Elbrus Patents (RPX Mot. at 4), and not "monopsonization achieving its illegal purpose" of price suppression (Opp'n at 24). The FAC is amenable to either interpretation, and therefore this argument presents no basis for dismissal. *Starr*, 652 F.3d at 1216.

United States District Court
Northern District of California

Second, RPX's overvaluation theory amounts to a bare denial of Cascades' allegation that it had valued its patents much higher than the seven-digit figure upon which Cascades and RPX initially agreed.  (*Compare* RPX Mot. at 4 (suggesting Cascades must have valued Elbrus Patents at less than $10 million) *with* FAC ¶ 51 (alleging Cascades reported the value of its portfolio to RPX as over $50 million).)[4]  Whether Cascades in fact valued its patents this way, and whether such valuation was realistic, are questions for another day, and not amenable to resolution at the pleading stage.  *Cf. PAE Gov't Servs., Inc. v. MPRI, Inc.*, 514 F.3d 856, 858 (9th Cir. 2007) (Rule 12(b)(6) authorizes courts to "review claims for legal sufficiency," not to adjudicate merits on the pleadings).

Finally, while RPX's theory explains why *RPX* would decline to take a $12.5 million license for only the '750 Patent on behalf of the three Manufacturing Defendants, that is not the license allegedly offered, and RPX is not the party to whom Cascades offered it.  The license Cascades allegedly offered was a license to each individual Manufacturing Defendant directly, containing an incentive to accept first which, in RPX's telling, could have required the first taker to pay $2.5 million—a figure roughly in line with the amount each Manufacturing Defendant would have had to pay under the original sub-$10 million offer, assuming an equal split.  RPX's overpricing theory explains why RPX itself would decline that offer when acting as buyer for a defensive buying fund, but it does not fully explain why any individual Manufacturing Defendant acting in its individual interest would decline the offer.  In essence, RPX invites the Court to analyze the Manufacturing Defendants' individual decisions as if the three comprised a single purchasing unit.  For obvious reasons, this invitation does not support RPX's argument for dismissal of Cascades' complaint of a conspiracy to monopsonize.[5]

---

[4] RPX discounts as "irrelevant," "vague," or "cryptic" allegations tending to show that the value of Cascades' patent portfolio was significantly greater than $10 million.  For example, RPX claims that it is irrelevant that Intel took a license "for a substantial, seven-figure lump-sum payment" (FAC ¶ 11), because "Intel's situation was unique, coming in the context of Intel hiring the patents' lead inventor, Mr. Boris Baba[i]an."  (RPX Mot. at 5)  The FAC says nothing about Intel "hiring" Babaian, but does specify that he is "an Intel Fellow (a prestigious honor)."  (FAC ¶ 10.)  Accepting RPX's argument requires one to infer that, because Babaian was an Intel Fellow, Intel gratuitously paid millions for his patents.  At the pleading stage, the Court cannot draw that inference.

[5] To be clear, the Court does not pass on the question of whether Cascades' alleged offers to individual Manufacturing Defendants should have been more attractive to them.  There are a number

The Court turns now to the Manufacturing Defendants' call to dismiss the FAC on the ground that the alleged conspiracy fails to "make economic sense."  (Mfr. Mot. at 14-16.)  When distilled, this contention is not so much one that the alleged conspiracy fails to make sense as it is a contention that innocent explanations of the Manufacturing Defendants' decisions to refrain from taking a license make *more* sense.  (*E.g.*, *id.* at 15-16 (Cascades' overvaluation of its patents is a "perfectly plausible," "alternative" explanation for Manufacturing Defendants' veto of the license agreement initially struck on their behalf by RPX and subsequent refusal to negotiate individually with Cascades).)  Plainly, the conspiracy alleged by Cascades makes economic sense because it would permit potential licensees of the '750 Patent to realize RPX's publically stated promise of "wholesale" pricing, provided they refrained from competitively bidding against each other and sent RPX to the market in their stead, where it would be the sole viable purchaser.  Close reading of Manufacturing Defendants' argument reveals that they do not contend that this alleged arrangement makes no sense; rather, they argue that the arrangement is implausible because economic self-interest explains the Manufacturing Defendants' alleged behavior as well or better than illegal collusion.  That argument fails because it ignores the FAC's allegations that at least one Manufacturing Defendant in the market for the '750 Patent expressly declined, through Roesslein, to engage in individual negotiations with Cascades on the ground that it preferred to negotiate through RPX; that RPX, through Barhydt, represented itself as speaking for all the Manufacturing Defendants collectively; and that none of the Manufacturing Defendants responded to Cascades' offer of a license that included a rebate for the first to accept.  These specific allegations tend to exclude innocent explanations for the Manufacturing Defendants' refusal to deal individually with Cascades and lend plausibility to the FAC's allegations of conspiracy.  They also demonstrate how the alleged conspiracy could result in an economic benefit to the Manufacturing Defendants: by refusing Cascades' direct appeals to their individual self-interest and instead acting only through

---

of reasons why the alleged individual licenses might have been unattractive to an individual Manufacturing Defendant acting independently, including perceived weakness of Cascades' claims to patent validity, perceived weakness of Cascades' infringement claims, or a desire to repel perceived nuisance suits.  The Court decides only that the FAC alleges facts which "tend[] to exclude the possibility of independent action," *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984), and provide "plausible grounds to infer an agreement," *Twombly*, 550 U.S. at 556.

United States District Court
Northern District of California

RPX, the Manufacturing Defendants could maintain a single-buyer market with the requisite market power to drive the price of Cascades' licenses to sub-competitive levels.  Enforcement of this arrangement could plausibly be achieved by the limited term of each RPX members' subscription agreement, which could expose individual (ex-)members to competition with RPX if not renewed. Discovery may reveal a paucity of evidence that the Manufacturing Defendants had any agreement or understanding to manipulate market conditions in the manner alleged, or it may reveal that, as Defendants contend, a license for the Elbrus Patents collectively or '750 Patent alone was worth far less than Cascades asked.[6]  But the FAC alleges facts which, if true, would tend to discount entirely innocent explanations and plausibly suggest an economic benefit to be derived from conspiring.[7]  In

---

[6] Manufacturing Defendants purport to demonstrate the counterintuitive proposition that LG's settlement of Cascades' claims—that is, its *acceptance* of Cascades' asking price—"confirm[s] that Cascades' asking price was too high."  (Mfr. Reply at 8.)  They infer from the FAC that LG settled for $800,000 and then ask the Court to determine that this "minimal payment," which Manufacturing Defendants say is "less than a typical run up to a *Markman* hearing," is "most plausibly viewed as a nuisance fee."  (*Id.*)  To support their representation of the cost of a *Markman* hearing, Manufacturing Defendants cite a case where a defendant paid nearly $4.7 million in fees to win summary judgment.  (*Id.* (citing *MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 910 (Fed. Cir. 2012).)  Setting aside how this argument asks the Court to draw inferences adverse to Cascades, as well as to assume a fact neither alleged in the FAC nor subject to judicial notice—the cost of a typical *Markman* hearing—the argument does not support dismissal, even if the Court were to accept arguendo its premise that the Elbrus Patents were valueless and that LG settled only for "nuisance value."  To wit: if the Court takes at face value Manufacturing Defendants' claim that a *Markman* hearing typically costs $4.7 million, then Cascades' offer of a license for $5 million with a rebate for the first to accept would yield, for the first taker, a discount even on nuisance value.  Yet, the FAC alleges, no Manufacturing Defendant responded, even with an aggressively lower counteroffer.  Thus, even granting Manufacturing Defendants their premises for the sake of argument, LG's settlement with Cascades does not require the Court to infer that Cascades overvalued the Elbrus Patents when it offered to license them individually to the Manufacturing Defendants.

[7] The Manufacturing Defendants contend that the severe penalties imposed for willful infringement of valid patents makes any conspiracy to do so "extraordinarily risky and therefore implausible."  (Mfr. Mot. at 16.)  If that view were correct, no plaintiff could ever state a claim for conspiracy to infringe a patent, because the penalties for infringement would always render such a claim implausible.  That view, however, is not correct.  While a court may dismiss as implausible a conspiracy claim where the alleged conspiracy is "highly unlikely to succeed," *Universal Grading Serv. v. eBay, Inc.*, C-09-2755 RMW, 2012 WL 70644, at *5 (N.D. Cal. Jan. 9, 2012), the Manufacturing Defendants' argument does not address the likelihood of success of the FAC's alleged conspiracy.  Rather, it denies that anyone would ever be so bold as to risk conspiring.  That denial is no reason to dismiss Cascades' FAC.

so doing, the FAC nudges Cascades' allegations of conspiracy "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

For the foregoing reasons, the Court **DENIES** both motions to dismiss insofar as they use Cascades' purported overvaluation of the Elbrus Patents to attack the plausibility of Cascades' claim of conspiracy.

### 2.    Horizontal Agreement Between Manufacturing Defendants

Manufacturing Defendants argue that the FAC is "fatally defect[ive]" because it alleges "no more than organizational membership and parallel conduct." (Mfr. Mot. at 11.)  RPX makes the closely related argument that the FAC's alleged hub-and-spoke conspiracy fails for lack of a rim connecting the Manufacturing Defendants, because the FAC purportedly fails to allege that RPX served as the Manufacturing Defendants' go-between.  (RPX Mot. at 7-9.)  According to RPX, Cascades alleges "no more than parallel behavior."  (*Id.* at 7.)

Had the FAC not augmented the generic allegations of the original complaint with additional, specific facts, Defendants' arguments would have more merit.  The FAC, like the previous complaint, alleges organizational membership (of the Manufacturing Defendants in RPX) and parallel conduct (the Manufacturing Defendants' refusal to deal independently with Cascades), but it also alleges more.  Those additional allegations are sufficient to "raise[] a suggestion of a preceding agreement." *Twombly,* 550 U.S. at 557; *see also id.* at 556 ("*Without more*, parallel conduct does not suggest conspiracy . . . .") (emphasis supplied); *Monsanto*, 465 U.S. at 764 (calling for evidence of "something more," meaning, "evidence that tends to exclude the possibility that the [defendants] were acting independently. . . . [T]he antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the [defendants] had a conscious commitment to a common scheme designed to achieve an unlawful objective.") (internal quotation marks omitted); Holmes & Mangiaracina, ANTITRUST LAW HANDBOOK § 2:6  (describing necessity of pleading, in addition to parallel conduct, "plus" factors such as action against apparent self-interest or an express invitation to common action).  Cascades need not plead "specific back-room meetings between specific actors at which specific decisions were made."  *In re Graphics Processing Units*, 527 F. Supp. 2d at 1024.  Rather, alleging "facts such as a specific time, place, or

16

1  person involved in the alleged conspiracies" are sufficient "to give a defendant seeking to respond to

2  allegations of a conspiracy an idea of where to begin."  *Kendall*, 518 F.3d at 1047 (internal quotation

3  marks omitted).

4      Here, the FAC goes beyond bare assertions of parallel conduct to allege specific facts which,

5  taken together, are suggestive of concerted action.  Specifically, the FAC alleges that a named

6  representative, Roesslein, of an alleged conspirator, Motorola, affirmatively expressed a desire to

7  conduct business only through RPX.  (FAC ¶ 32.)  That alone might suggest nothing more than an

8  independent, non-actionable business decision.  *See Monsanto*, 465 U.S. at 761 (citing *United States*

9  *v. Colgate & Co.*, 250 U.S. 300, 307 (1919)).  However, the FAC goes farther.  It alleges that, after

10  Cascades and RPX reached an agreement as to price, RPX's representative, Barhydt, told Cascades

11  that RPX members, in the plural, had raised the amounts necessary to fund the deal.  (FAC ¶¶ 31-

12  32).  This allegation suggests RPX members' awareness that RPX was negotiating with Cascades.

13  The FAC alleges that, later, Barhydt informed Cascades it had to withdraw its offer at the previously

14  agreed-on price because at least one RPX member refused to pay that amount.  (FAC ¶ 33.)  This

15  allegation, if proved, could constitute direct evidence of RPX's knowledge, and circumstantial

16  evidence of RPX members' knowledge, that the RPX members funding the deal—a group that

17  plausibly includes Manufacturing Defendants—had to agree on a price for Cascades' licenses.

18  Supporting this inference is the allegation that Barhydt informed Cascades that RPX would decline

19  to pursue a license for the '750 Patent alone because RPX's "clients"—collectively—wanted to

20  license Cascades' entire portfolio.  (FAC ¶¶ 34-35.)  This allegation supports a reasonable inference

21  that the Manufacturing Defendants and RPX had agreed on a concerted course of action regarding

22  how to deal with Cascades.  Under these circumstances, the Manufacturing Defendants' lack of

23  response to Cascades' individual, $5 million licensing offers, notwithstanding the offers' rebate for

24  the first to accept, plausibly suggests the existence of an agreement among Manufacturing

25  Defendants to refrain from dealing individually with Cascades.  The allegations also support a

26  reasonable inference that RPX coordinated responses amongst the Manufacturing Defendants in the

27  course of acting as their negotiating agent.

28

*United States District Court*
*Northern District of California*

17

Also supporting this conclusion are the alleged public statements in which RPX describes its ability to achieve "wholesale" pricing for its members, that is, pricing that is substantially lower than what companies would pay if they acted individually.  (FAC ¶¶ 21-22.)  Implicit in those statements is a proviso that wholesale pricing can be achieved through RPX but not independently.  The allegations plausibly describe an invitation to common action, and to have RPX coordinate that action.  If the purpose of negotiating through RPX is to achieve "wholesale" pricing, then the advantage of collective bargaining through RPX is realized only if the other Manufacturing Defendants also decide to negotiate a license through RPX.  The evidentiary facts alleged in the FAC lend plausibility to the allegation that "RPX, by publicly stating its intention to accumulate purchaser-side market power . . . has, in essence, invited each of the [M]anufacturing [D]efendants to participate in a scheme to artificially drive the price or license fee of acquiring the '750 [P]atent below the competitive rate."  (FAC ¶ 38(e).)  Alternative explanations may exist, but that issue is not yet ripe for resolution.

For the reasons set forth above, the Court **DENIES** both motions to dismiss to the extent they assert a failure to plead a rim for Cascades' alleged hub-and-spoke conspiracy.

### 3.     Vertical Agreements Between RPX and Manufacturing Defendants

The Manufacturing Defendants contend that mere membership in RPX and agreement to fund a potential deal does not amount to a vertical conspiracy, that Cascades has alleged no more than that, and that the FAC must therefore be dismissed.  (Mfr. Mot. at 13-14; Mfr. Reply. at 4-5.)  RPX frames this same issue in terms of Cascades' purported failure to plead the "spokes" of its alleged hub-and-spoke conspiracy.  (RPX Reply at 7-8.)  Both arguments hinge on the fact, alleged in the FAC, that the "subscription contract"—that is, written membership agreement—between RPX and each individual Manufacturing Defendant "purportedly" allows individual RPX members such as Manufacturing Defendants "to deal independently in their own self-interest . . . ."  (FAC ¶ 20.)  According to Defendants, this provision in the subscription agreement, whose existence they not only admit but rely upon, defeats Cascades' claim of a vertical conspiracy to restrain trade.  The Court discusses the "restraint of trade" aspect of these arguments in Section III.B.1, *infra*; here, it confines its analysis to the "agreement" aspect.

The FAC acknowledges the RPX membership agreement's "purported" reservation of RPX members' rights to negotiate separately from RPX, and thereby to compete with each other and, theoretically, RPX itself in bidding for patent licenses.  It also alleges, however, that "the whole purpose of RPX and the reason for joining RPX is to form an industry group of potential purchasers who can jointly exercise group purchasing power . . . ."  (*Id.*)  In other words, while the FAC alleges a written agreement between RPX and each individual Manufacturing Defendant which permits individual negotiation, it also suggests that in this instance each Manufacturing Defendant understood that it should refrain from exercising its right to negotiate individually with Cascades and instead deal with Cascades either through RPX or not at all.  (*Id.* ¶¶ 26-27.)

The FAC alleges specific facts which bear a plausible inference that such an understanding existed here.  The understanding of each Manufacturing Defendant that it should refrain from independent negotiation with Cascades is suggested by Motorola representative Roesslein's alleged refusal to negotiate with Cascades except through RPX (FAC ¶ 32), which came in the context of RPX's alleged public statements inviting collective action through RPX to achieve wholesale pricing (FAC ¶¶ 21-22).  The FAC further alleges that, when presented with individual licensing offers including inducements for the first to accept, no Manufacturing Defendant responded.  These allegations support the inference of a second, "off-the-books" agreement or understanding between each Manufacturing Defendant and RPX.  The Manufacturing Defendants ignore allegations pertaining to this second agreement, in effect arguing that the existence of one agreement precludes the existence of a second.  Nothing in the FAC compels the Court to so find.

Further, Manufacturing Defendants mischaracterize the nature of the agreement alleged in the FAC.  Manufacturing Defendants describe their alleged agreement with RPX as one "to fund a potential deal."  (Mfr. Mot. at 13.)  That description ignores allegations that the Manufacturing Agreements agreed not only to fund a potential deal, a deal which RPX allegedly reached with Cascades (FAC ¶ 32), but to fund it *either collectively or not at all*, as suggested by RPX's withdrawal from the deal after "one or more of its members" refused funding (FAC ¶ 33).  This agreement, to use RPX exclusively notwithstanding the purported ability to refrain from doing so, is the secondary vertical agreement plausibly suggested by the facts alleged in the FAC.

1  For the reasons set forth above, the Court finds that Cascades has alleged facts sufficient to

2  infer the plausible existence of a hub-and-spoke conspiracy.  Accordingly, Defendants' motions to

3  dismiss are **DENIED** to the extent they challenge Cascades' pleading of the conspiracy element of its

4  Section 1 claims.

5        **B.**     **SECOND ELEMENT OF SECTION 1 CLAIMS: UNREASONABLE RESTRAINT OF TRADE**

6  Defendants attack Cascades' pleading of this element on two grounds.  Defendants argue that

7  Cascades fails to plead any restraint of trade in light of its acknowledgement that the subscription

8  agreement between RPX and its members expressly permits members to negotiate and enter

9  licensing agreements independent of RPX.  Defendants further contend that, even if the Court finds

10  a restraint of trade, Cascades has pled no *unreasonable* restraint of trade.  In this vein, they argue

11  that Cascades fails to plead either a per se antitrust violation or a violation of the rule of reason.  The

12  Court addresses these arguments in order.

13         **1.**     **No Restraint of Trade**

14  Both RPX and Manufacturing Defendants argue that Cascades fails to allege any restraint of

15  trade—let alone an unreasonable restraint of trade—because, while Cascades alleges that

16  Manufacturing Defendants agreed to have RPX negotiate on their collective behalf, Cascades also

17  admits that RPX members' subscription agreement with RPX permits members to negotiate

18  independently of RPX.  (RPX Mot. at 6; RPX Reply at 2; Mfr. Mot. at 17-18.)  RPX further argues

19  that Cascades' allegations of a restraint on trade are contradicted by the fact that RPX members LG

20  and Philips negotiated individual deals to license the '750 Patent with Cascades.  (RPX Mot. at 6.)

21  These arguments fail because they would require the Court impermissibly to disregard well-pleaded

22  evidentiary facts alleged in the complaint and draw inferences adverse to Cascades.

23  Cascades acknowledges that the subscription agreements between RPX and its members

24  "purportedly give members the ability to deal independently in their own self-interest."  (FAC ¶ 20.)

25  However, it does not follow from the fact that the Manufacturing Defendants are *permitted* to deal

26  independently that they *did* deal independently.  As set forth in detail in Section III.A.3, *supra*,

27  sufficient facts have been pled to allege coordinated conduct including the statements of more than

28  one executive and the timing of discussions relative to the known conduct.  (FAC ¶¶ 31-32, 42, 48.)

United States District Court<br>Northern District of California

On these allegations, it is reasonable to infer the existence of a restraint on trade in the form of a secondary, "off-the-books" agreement or understanding to deal only through RPX, despite being contractually permitted to do otherwise.

That alleged co-conspirators LG and Philips "broke" from the alleged conspiracy by settling their claims with Cascades does not render implausible the inference of a secondary agreement to deal with Cascades only through RPX. On the contrary, the settlements by LG and Philips could support an inference that the '750 Patent was valid and infringed, lends a competitive advantage, and had been driven to sub-competitive prices by the three Manufacturing Defendants' domination of the buyer's market, leading smaller players to capitalize on the market conditions created by the alleged conspiracy. A conspiracy need not be effective to be illegal. *See Plymouth Dealers' Ass'n of No. Cal. v. United States*, 279 F.2d 128, 133 (9th Cir. 1960). Nor does the failure, dissolution, or scope of an alleged conspiracy necessarily render it implausible. The ultimate question is whether the claimed conspiracy is plausible in light of all the evidentiary facts alleged in the complaint. Here, it is.

For the foregoing reasons, the Court **DENIES** Defendants' motions to dismiss to the extent they argue Cascades fails plausibly to allege a restraint on trade.

### 2.      Alternatively, No Unreasonable Restraint

Defendants argue that, even if the FAC alleges some restraint on trade, it fails to allege an *unreasonable* restraint under either the per se or the rule of reason tests. The Court need not rule at this juncture whether the FAC alleges a restraint of trade that is per se unreasonable because it concludes that the FAC's allegations suffice to plead a violation of the rule of reason.[8]

_____

[8]      Courts presumptively apply the rule of reason standard except in those cases where the alleged agreement or activity is "manifestly anticompetitive" and lacks "any redeeming virtue." *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (internal quotation marks omitted). Further, "the per se rule is appropriate only after courts have had considerable experience with the type of restraint at issue . . . and only if courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason[.]" *Id.* at 886-87 (citations omitted). Here, Cascades characterizes the alleged conspiracy as a simple price-fixing scheme among direct competitors (*e.g.*, FAC ¶ 67; Opp'n at 27-28), though the FAC could be said to allege a group boycott by direct competitors as well (*see, e.g.*, FAC ¶¶ 39, 100). Normally, either form of restraint is considered per se unreasonable. *Leegin*, 551 U.S. at 886 (horizontal price-fixing); *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998) (competitors' boycott). However,

United States District Court
Northern District of California

Under the rule of reason, a plaintiff must plead that the challenged agreement, by virtue of the defendants' market power, was unreasonably restrictive of competition in a relevant market and that the plaintiff suffered antitrust injury. *Nat'l Soc. of Prof'l Engineers v. United States*, 435 U.S. 679, 690 (1978). The relevant market has two dimensions: the "relevant geographic market" and the "relevant product market." *Brown Shoe v. United States*, 370 U.S. 294, 325 (1962). In the motions at bar, Defendants dispute whether Cascades has adequately defined the relevant product market in which Defendants allegedly restrained competition. Under traditional principles, whether "products are part of the same or different [product] markets under antitrust law depends on whether consumers view those products as reasonable substitutes for each other and would switch among them in response to changes in relative prices[.]" *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1196 (N.D. Cal. 2008) (citing *Newcal Indus.*, 513 F.3d at 1045). However, because the validity of the relevant market typically is a factual rather than a legal issue, an antitrust complaint survives dismissal under Rule 12(b)(6) "unless the alleged market suffers a fatal legal defect."

---

the Court believes that this case is not the same type of case in which those categories of per se unreasonable restraints were developed. That is because the market here is one for an intellectual property right rather than for a good or a service, and a market for intellectual property is, at least arguably, different in kind from the traditional objects of antitrust analysis. For example, it is not obvious how the high incidence of patent invalidity should impact economic analysis of a "market" for patent licenses, considering how often the patents underlying those licenses are revealed as worthless. That factor alone would appear to make pricing patent licenses an altogether more volatile and risky proposition than pricing known widgets, with uncertain impacts on the market for such licenses. A market would only seem to exist for *valid* patents, but patent validity may be difficult to predict. The Court is cognizant that the validity of the '750 Patent is currently at issue in litigation outside this District.

The economic questions raised by this case are more complex than Cascades has acknowledged. The Court notes the Supreme Court's "reluctan[ce] to adopt per se rules with regard to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious." *Leegin*, 551 U.S. at 877 (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)). Moreover, per se rules derive from a considered assessment of a business practice's demonstrable economic effects, not from empty formal categories. *See Bus. Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 726 (1988); *Leegin*, 551 U.S. at 887. The Court believes this case presents non-obvious questions about the economic effect of RPX's business model. Accordingly, the Court is unwilling to say—at least without further development of the record—that the type of arrangement alleged in the FAC is so manifestly anticompetitive, so lacking in redeeming virtues, and so certain to be invalidated under the rule of reason that it may confidently be labeled a per se unreasonable restraint.

*Newcal Indus.*, 513 F.3d at 1045 ("a complaint may be dismissed under Rule 12(b)(6) if the complaint's 'relevant market' definition is facially unsustainable") (citing *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436-37 (3d Cir. 1997)); *see Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1435 (9th Cir. 1995) (definition of relevant market "is a factual inquiry").

In dismissing the initial complaint, the Court held that Cascades failed to identify a coherent relevant market, offering instead "subterfuge" in the form of numerous, wildly divergent definitions. (Jan. 24 Order at 15.)  The Court observed that Cascades was not required "to limit its antitrust allegations to a single market or sub-market," but did "need to specify the market or markets in which the allegedly anticompetitive acts occurred . . . ."  (*Id.*)  In amending its complaint, Cascades has more precisely defined the relevant markets.  Specifically, it has identified as the relevant product market the market for "purchase, acquisition or licensing of technology covered by" all the Elbrus Patents, with the market for licenses under the '750 Patent alone allegedly constituting a relevant submarket.  (FAC ¶¶ 92, 94.)  Cascades avers that the former, broader market, for licenses under all the Elbrus Patents exists only because of "the requirements of RPX and the [M]anufacturing [D]efendants" to purchase a license only under the entire portfolio of Elbrus Patents.  (*See* FAC ¶ 92.)  The Court finds in these definitions no "fatal legal defect" that compels dismissal at this stage, especially given the lack of clarity in the intellectual property arena.

The Court rejects Manufacturing Defendants' argument that Cascades' asserted market is legally untenable because the FAC "contains no facts concerning reasonable interchangeability, cross-elasticity of demand, or any other factors needed to establish the relevant product market." (Mfr. Mot. at 21; *see also* Mfr. Reply at 11-13 (same).)  That is, Manufacturing Defendants contend that the FAC must be dismissed because Cascades has pled no facts regarding competing technologies that the Manufacturing Defendants could use instead of the '750 Patent or other Elbrus Patents.  (Mfr. Mot. at 21-22.)  That argument is unavailing at this stage.  Cascades alleges a monopsony in the market to *buy* Cascades' patents, not a monopoly in the market to *sell* them.  The proper focus of the market analysis in monopsony cases is "the commonality and interchangeability of the buyers, not the commonality or interchangeability of the sellers."  *Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001) (internal quotation marks omitted); *see also Kamakahi v. Am. Soc. for*

United States District Court
Northern District of California

United States District Court
Northern District of California

1   *Reprod. Med.*, C 11-01781 SBA, 2013 WL 1768706, at *10 (N.D. Cal. Mar. 29, 2013) (where

2   defendants allegedly comprise a buyers' cartel, the relevant market is comprised of buyers "who are

3   seen by sellers as being reasonably good substitutes").  Here, the Manufacturing Defendants

4   allegedly comprise between 75 and 90 percent of at least the relevant submarket of buyers of

5   licenses under the '750 Patent.  That suffices to establish a plausible market, sufficient to survive a

6   Rule 12(b)(6) motion.  *Cf. In re Webkinz Antitrust Litig.*, C 08-1987 RS, 2010 WL 4168845, at *3

7   (N.D. Cal. Oct. 20, 2010) ("On a motion to dismiss, the court need not engage in extensive analyses

8   of reasonable interchangeability and cross elasticity of demand.") (internal quotation marks and

9   brackets omitted).

10          RPX offers a different challenge to Cascades' market definitions.  RPX does not dispute that

11   those market definitions are valid; instead, it argues that the facts alleged in the FAC "flatly

12   contradict" them.  (RPX Mot. at 9.)  Specifically, RPX contends that the FAC itself demonstrates

13   that Cascades' patented technology can be used on electronic devices *other than* those using the

14   Android operating system.  From this premise, RPX argues that Cascades, by limiting its submarket

15   definition to manufacturers of Android devices, has overstated the share of the market for the '750

16   Patent controlled by the Manufacturing Defendants and, thus, by RPX.

17          The Court rejects this argument because it distorts the facts actually alleged in the FAC.  As

18   an initial matter, the FAC expressly alleges: "The technology of the Elbrus '750 patent facilitates the

19   installation and use of . . . applications *on Android devices* . . . ."  (FAC ¶ 13 (emphasis supplied).)

20   RPX merely argues, in essence, that this allegation is not true.  Though RPX may prove correct,

21   whether the technology covered by the '750 Patent is truly limited to Android devices is a factual

22   dispute, not a pleading deficiency.

23          Further, while RPX's argument hinges on the existence of purported contradictions in the

24   FAC, the allegations referenced by RPX are not, in fact, contradictory.  Specifically, RPX takes

25   Cascades to task for its allegation that it sold a license to Philips in light of Philips's alleged "0%

26   market share," suggesting that because Philips has been described as having a 0 percent share of the

27   market for Android devices, it must sell non-Android devices that use the '750 Patent.  However, the

28   use of the figure "0%" merely represents a de minimus but actual share of the market for Android

devices, something less than 1 percent.  (*See supra* note 3.)  RPX also bases its contradiction argument on the FAC's allegations that Cascades offered licenses to non-parties Hynix and Pantech, whom, according to RPX, do not make Android devices.  First, the fact of which devices Hynix and Pantech actually manufacture is not alleged in, or fairly inferable from, the FAC, nor is it judicially noticeable under Federal Rule of Evidence 201.  Second, the allegations to which RPX cites concerning Hynix and Pantech describe Cascades offering those companies *some* license, not necessarily a license under the '750 Patent.  (FAC ¶ 48.)  Indeed, the FAC suggests that at least the license to Hynix involved a different Elbrus Patent.  (FAC ¶ 103 (Cascades sued Hynix in connection with alleged infringement of a license pertaining to DRAM technology, rather than Android).)  Nothing in the FAC supports RPX's position that the relevant market is necessarily broader than the market Cascades alleges.  The issues identified in RPX's motion are disputed issues of fact, not pleading issues.

For the reasons stated above, the FAC supplies a market definition sufficient to survive Defendants' Rule 12(b)(6) challenges.  Accordingly, the Court **DENIES** both motions to dismiss to the extent they are premised on a failure to allege an unreasonable restraint of trade.

### C.   SECTION 2 CLAIMS: MONOPSONIZATION

Section 2 of the Sherman Act makes it unlawful to "monopolize, attempt to monopolize, or combine or conspire . . . to monopolize" any part of the nation's interstate or foreign commerce.  15 U.S.C. § 2.  Cascades here alleges a monopsony, which "is sometimes colloquially called a 'buyer's monopoly.'"  *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc.*, 549 U.S. 312, 320 (2007); *see also United States v. Syufy Enterprises*, 903 F.2d 659, 663 n.4 (9th Cir. 1990) (describing monopoly and monopsony as "equivalent").  In addition to its claim against all Defendants for a conspiracy to monopsonize (Claim 3 (FAC ¶¶ 79-83)), Cascades also asserts, against RPX alone, a claim of actual or attempted monopsony (Claim 4 (FAC ¶¶ 84-107)).

To plead actual monopsonization, a plaintiff must allege: (1) monopsony power in the relevant market, (2) that was willfully acquired and (3) caused antitrust injury.  *See Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1151

United States District Court
Northern District of California

25

United States District Court
Northern District of California

(9th Cir. 1997). [9]  Pleading monopsony power requires allegations of a "dominant" market share, generally at least 65 percent.  *See Image Technical Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997) (citing *Rebel Oil*, 51 F.3d at 1434; *American Tobacco Co. v. United States*, 328 U.S. 781, 797 (1946)).  For attempted monopsonization, a plaintiff must allege a "dangerous probability" of achieving monopsony power.  *See Rebel Oil*, 51 F.3d at 1433.

Here, Cascades alleges that RPX wields monopsony power in the market for Cascades' patents—and specifically for the '750 Patent—by virtue of its role as purchasing agent for the Manufacturing Defendants, "who collectively control more than 90% of the mobile phone business using the Android operating system and 75% of the combined mobile phone and tablet business." (FAC ¶ 88.)  RPX, however, discounts these allegations as pertaining only to the Manufacturing Defendant's share of the "downstream" product market for Android mobile devices but saying "nothing about their buyer share in the *upstream* input market" for the '750 Patent.  (RPX Mot. at 11 (emphasis in original).)  The Court rejects that argument.  Nothing in the FAC suggests that anyone would or could participate in the "upstream" market for the '750 Patent except for the makers of the Android devices that the '750 Patent allegedly optimizes.  RPX hints that there may be other purchasers for the '750 Patent, but the Court has already addressed how that suggestion is unsupported by the facts alleged in the FAC.  (*See supra* Section III.B.2.)

The Court **DENIES** RPX's motion to dismiss to the extent it seeks dismissal of Cascades' Section 2 claims for failure to allege market power and market share.

### D.    *NOERR-PENNINGTON* DOCTRINE

In addition to challenging the pleading of Cascades' prima facie case, Manufacturing Defendants also raise the collateral matter of *Noerr-Pennington* immunity.  The *Noerr-Pennington* doctrine stems from the First Amendment right to petition the government, and immunizes from civil liability both (1) petitioning activity itself—for instance, "[a] complaint, an answer, a counterclaim"—and (2) "conduct incidental to a petition."  *Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1183-84 (9th Cir. 2005).  Only those litigation activities that communicate to the court

---

[9] RPX does not expressly challenge Cascades' pleading of either the "willful acquisition" or "antitrust injury" prongs.

United States District Court
Northern District of California

constitute petitioning activity itself.  *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 933 (9th Cir. 2006) (citing *Freeman*, 410 F.3d at 1184).  Still, conduct incidental to a petition, including "communications between private parties," may enjoy *Noerr-Pennington* protection, "so long as they are sufficiently related to petitioning activity." *Id.* at 935.  Certain private, litigation-related communications must be analyzed to determine whether a sufficient relationship to legitimate petitioning activity exists.  *E.g.*, *Freeman*, 410 F.3d at 1185 (discovery constituted conduct incidental to a petition); *Sosa*, 437 F.3d at 935-37 (demand letters sent prior to formal commencement of lawsuit constituted conduct incidental to a petition).  The Ninth Circuit has expressly held, however, that "[a] decision to accept or reject an offer of settlement is conduct incidental to the prosecution of the suit and not a separate and distinct activity which might form the basis for antitrust liability." *Columbia Pictures Indus., Inc. v. Prof'l Real Estate Investors, Inc.*, 944 F.2d 1525, 1528 (9th Cir. 1991) aff'd, 508 U.S. 49 (1993); *see also Freeman*, 410 F.3d at 1184-85 (acknowledging this rule); *Sosa*, 437 F.3d at 934-35 (same).

Here, Manufacturing Defendants assert *Noerr-Pennington* immunity on three grounds.  First, they contend that "the decision to accept or reject a licensing offer from Cascades under the circumstances described in the [FAC] was a decision whether or not to settle Cascades' patent claims."  (Mfr. Mot. at 23.)  The Court cannot agree on the record before it.  The FAC does not allege sufficient matter to establish that the Manufacturing Defendants' decision to reject a license was *ipso facto* a decision not to settle.  Determining whether the Manufacturing Defendants' alleged cooperative conduct falls within the ambit of *Noerr-Pennington* necessarily requires a close look at the timing of any decision to refuse Cascades' individual licensing overtures, the timing of any perceived threats or demands pre-lawsuit, the scope of any perceived threat, and potentially other, unforeseen matters.  The FAC does not identify these elements with sufficient particularity for the Court to determine that the *Noerr-Pennington* doctrine shields the Manufacturing Defendants' alleged collective action.[10]  To the contrary, as set forth herein, the revised allegations suggest ulterior motivations.

---

[10] Manufacturing Defendants argue that the FAC must be dismissed on *Noerr-Pennington* grounds because the events purportedly giving rise to Cascades' antitrust injuries, and therefore its standing to sue, occurred prior to the commencement of the Illinois patent litigation—those events being the

United States District Court
Northern District of California

1    Second, the Manufacturing Defendants argue that Cascades bears the burden of pleading

2    facts "rebutting [*Noerr-Pennington* doctrine's] applicability." (Mfr. Mot. at 22.)  The Court

3    disagrees.  Both cases that Manufacturing Defendants cite for this principle are cases involving the

4    sham litigation exception to *Noerr-Pennington* doctrine.  *See Oregon Natural Resources Council v.*

5    *Mohla*, 944 F.2d 531 (9th Cir. 1991); *Kottle v. Nw. Kidney Centers*, 146 F.3d 1056 (9th Cir. 1998).

6    The sham-litigation exception:

7                    encompasses situations in which persons use the governmental
                     process—as opposed to the outcome of that process—as an
8                    anticompetitive weapon.  A classic example is the filing of frivolous
                     objections to the license application of a competitor, with no
9                    expectation of achieving denial of the license but simply in order to
                     impose expense and delay.  A "sham" situation involves a defendant
10                   whose activities are not genuinely aimed a procuring favorable
                     government action at all, not one who genuinely seeks to achieve his
11                   governmental result, but does so through improper means.

12   *Kottle*, 146 F.3d at 1060 (quoting *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S.

13   365, 380 (1991)).  In the cases relied upon by Manufacturing Defendants, actual petitioning

14   occurred—in *Oregon Natural Resources Council*, the filing of a counterclaim; in *Kottle*, lobbying

15   before an administrative agency—which required the antitrust plaintiff to show how the petitioning

16   activity fit into *Noerr-Pennington*'s sham exception.  Neither opinion stands for the broad

17   proposition that antitrust plaintiffs bear the burden of pleading around *Noerr-Pennington* when, as

18   here, the doctrine is implicated by "conduct incidental to a petition" instead of direct petitioning

19   activity itself.  The Court finds the Manufacturing Defendants' authorities inapposite.

20   Finally, the Manufacturing Defendants contend that *Sosa* supports a finding of *Noerr-*

21   *Pennington* immunity here, regardless of the timing of any licensing negotiations vis-à-vis the

22   Illinois lawsuits, because any refusal to settle was simply conduct in anticipation of a lawsuit.  The

23   argument rests on an overly broad reading of *Sosa*.  In that case, the Ninth Circuit upheld a district

24   court's dismissal of a RICO complaint under Rule 12(b)(6), holding that sending formal demand

25

26   alleged October 2011 failure of licensing negotiations with RPX and Manufacturing Defendants'
     alleged January 2012 refusal to respond to Cascades' individual settlement offers.  (Mfr. Reply at
27   13-14.)  The Court cannot so find as a matter of law, because the argument rests on the not-yet-
     established premise that a refusal to take a license under Cascades' patents was tantamount to a
28   refusal to settle.

letters was protected activity incidental to a petition, notwithstanding the fact that the demand letters, as threats to sue, were sent before any lawsuit, and hence any petition, existed. *See Sosa*, 437 F.3d at 936-37. The *Sosa* court observed that demand letters are "a common, if not universal, feature of modern litigation" and analyzed a variety of ways in which protection of presuit settlement demands furthers the same concerns animating *Noerr-Pennington* doctrine's direct protection of lawsuits themselves. *Id.* Here, the allegations of the FAC are insufficient to conclude that the threat of litigation, if any, inherent in Cascades' licensing negotiations with Manufacturing Defendants was concrete and definite enough to make an offer to license tantamount to a presuit settlement demand. If anything, the FAC supports the opposite inference, alleging that, after Motorola refused Cascades' direct overtures because it preferred to negotiate through RPX, Cascades, rather than immediately suing, began working with RPX. Manufacturing Defendants essentially ask the Court impermissibly to draw inferences in their favor rather than Cascades', notwithstanding this case's procedural posture and the confinement of the Court's inquiry to the well-pleaded allegations of the FAC.

The Court **DENIES** Manufacturing Defendants' motion to dismiss to the extent it is predicated on *Noerr-Pennington* immunity. This denial is without prejudice to any defendant raising the defense after further development of the record.

### E.    STATE-LAW CLAIMS

Cascades asserts two claims based on California state law, both asserted against all Defendants: (1) violation of California's Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*; and (2) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* This Court earlier ruled that Cascades' state-law claims rise and fall with its federal claims. (Jan. 24 Order at 23-24.) Accordingly, Cascades' federal claims having survived dismissal, the Court **DENIES** both motions to dismiss insofar as they attack Cascades' state-law claims.

///

///

///

///

1   **IV.    CONCLUSION**

2       For the reasons set forth above, the respective Motions to Dismiss of defendants RPX

3   Corporation and, jointly, HTC Corporation, Motorola Mobility Holdings, Inc., and Samsung

4   Electronics Co. Ltd., are **DENIED**.[11]

5       Plaintiff Cascades Computer Innovation LLC is hereby **ORDERED TO SHOW CAUSE** why this

6   action should not be stayed pending resolution of the merits of the patent litigation underway in the

7   Northern District of Illinois.  Plaintiff shall file a written response of no more than 10 pages, no

8   more than 5 business days from the signature date of this Order.  RPX and the Manufacturing

9   Defendants may reply to Plaintiff's response in separate responses of no more than 5 pages each,

10  filed no more than 3 business days after Plaintiff's response.  The Court will determine after briefing

11  whether oral argument is required.

12      This Order terminates Docket Nos. 98, 99, and 118.

13      **IT IS SO ORDERED**.

14

15  Date: December 3, 2013

                                **YVONNE GONZALEZ ROGERS**

16                                  **UNITED STATES DISTRICT COURT JUDGE**

17

18

19

20

21

22

23

24

25

26

---

27  [11] The Court also **DENIES AS MOOT** Cascades' Motion for Leave to File Notice of Recent Decision
    (Dkt. No. 118).  The decision Cascades has lodged, a ruling in the ongoing patent litigation in the
28  Northern District of Illinois declining to dismiss Cascades' infringement suit for lack of standing,
    played no part in the Court's ruling here, which is confined to the sufficiency of the pleadings.