*Counsel listed on signature pages*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| CASCADES COMPUTER INNOVATION LLC,<br><br>        Plaintiff,<br><br>    v.<br><br>RPX CORPORATION; HTC CORPORATION; and SAMSUNG ELECTRONICS, CO., LTD.<br><br>        Defendants. | Case No. 4:12-cv-01143 YGR<br><br>**JOINT STATUS STATEMENT**<br><br>Date:     December 5, 2014<br>Time:     9:01 a.m.<br>Judge:    Hon. Yvonne Gonzalez Rogers<br>Location: Courtroom 1 |

Pursuant to the Court's September 30, 2014 Order Extending Stay and Setting Status Hearing (Dkt. No. 150) (the "Stay Renewal Order"), the parties respectfully submit this joint statement to (1) update the Court on the results of an October 24 Settlement Conference in the '750 patent litigation pending in the Northern District of Illinois, along with other recent developments in that action, and (2) state the parties' respective positions on whether it is appropriate for Cascades to take limited discovery with respect to RPX's former employee, Kevin Barhydt.

**Joint Summary of Progress in the N.D. Illinois Patent Actions**

Cascades' '750 patent cases against Samsung and HTC remain consolidated for pre-trial purposes. A separate case on a different patent exists against Samsung (N.D. Ill., Case No. 1:14-cv-5691, Dkt. 1). In the '750 patent case, the Court conducted a mandatory Settlement Conference involving just Cascades and Samsung on October 24, 2014. (N.D. Ill. Case No. 1:11-cv-04574 ("N.D. Ill."), Dkt. No. 189). The Conference did not result in a settlement and the Court has determined that there is an *impasse* (N.D. Ill. Dkt. No. 215, attached).

Samsung and HTC filed a joint motion for summary judgment of non-infringement on September 24, 2014 in the '750 patent case. (N.D. Ill. Dkt. No. 198). Cascades filed its opposition to the motion on November 7, 2014. (N.D. Ill. Dkt. No. 208). Samsung's and HTC's reply brief is due on December 5, 2014. (N.D. Ill. Dkt. No. 202). This is the final motion for summary judgment to be decided in the '750 patent case.

Cascades has filed a separate suit against Samsung involving Cascades' U.S. Patent No. 6,366,130 and DRAM memory chips, which is on an independent track. (N.D. Ill., Case No. 1:14 cv 5691, Dkt. 1). This is another of the 38 Elbrus patents that are licensed to Cascades.

**Plaintiff's Statement Opposing Further Stay And Requesting The Deposition Of Kevin Barhydt And Limited Production Of Documents**

Defendants have successfully managed to prevent any discovery in this case for nearly three years. The lawsuit was filed on March 7, 2012 and, after various motions to dismiss, the Court found on December 3, 2013 that Cascades had stated a proper claim for relief ("[T]he Court concludes that Cascades' amended complaint, unlike its initial complaint, alleges specific facts

1 raising a reasonable inference that the Manufacturing Defendants and RPX engaged in a so-called

2 "hub-and-spoke" conspiracy to force sub-competitive pricing for Cascades' patent licenses by

3 monopsonizing the market therefor.") (Dkt. 119, p. 2).  In the year since that decision, repeated

4 orders staying all discovery have been entered at defendants' requests on March 4, 2014, July 8,

5 2014 and September 30, 2014 (Dkts. 133,137, 150).  As a consequence, RPX and its members,

6 Samsung and HTC, have effectively avoided the production of any documents or testimony that

7 could establish their liability.  No communications between RPX and its members during the

8 relevant time period have been produced, nor have files been provided of third-party witnesses,

9 like Kevin Barhydt, Motorola's Brett Rosselein and other key former RPX employees who were

10 involved in the antitrust conspiracy.

11 Kevin Barhydt was RPX's Vice President, Head of Acquisitions, and is a key player in the

12 antitrust conspiracy.  He has intimate knowledge of RPX's business practices; he negotiated

13 license terms with Cascades; then he communicated RPX's and its co-conspirators' decision not to

14 proceed at the initially agreed-upon price.  As specifically alleged in the Amended Complaint:

> 32.    By September 23, 2011, Barhydt told Cascades that RPX had raised sufficient money from its members to acquire a license under all the Cascades patents, including the '750 patent. Meetings and/or direct contact and communication between RPX and defendants Motorola, Samsung, HTC and other RPX members preceded the September 23, 2011 offer to Cascades and continued thereafter. On September 20, 2011, Motorola's top licensing executive, Brett Roesslein, admitted that Motorola would not deal independently with Cascades and that its intention was to deal only through RPX, stating, "We would like to resolve this through RPX."
>
> 33.    Later, in mid-October 2011, Barhydt told Cascades that RPX had to withdraw its offer because one or more of its members would not fund the license deal at the offered amount, admitting, in effect, that all relevant members either had to agree to a license or none would agree.
>
> 34.    On November 2, 2011, Barhydt referred to the relevant RPX members as "our clients" and represented that the key RPX client-members wanted "a global solution" to the Cascades matter. He also admitted that client-members in combination, not RPX, have the ultimate say in determining what RPX would pay and that RPX was negotiating collectively for its members:
>
>> Solving problems for our clients is the role of RPX- but we aren't in a position where we can pay more for something than what our clients value it at.

1    Meetings, email and telephone contact between RPX and its key members
     took place in October and November 2011. Cascades is aware, for example,
2    that a meeting between RPX and C.D. Hwang of Pantech (an RPX member
     that was sued for infringement of the' 750 patent) was scheduled for
3    November 7, 2011 to discuss RPX's acquisition of a license under the
     Cascades patents. Motorola, Philips and other RPX members also admittedly
4    had contact with RPX on the Cascades patents as well.

5        35.    RPX admitted through Barhydt that it was negotiating
     collectively on behalf of its key members for a license under all the
6    Cascades/Elbrus patents: "*our clients* don't want to hear about Cascades
     again." Later, he told Cascades why RPX wanted a license under all the
7    Cascades patents, not just the '750 patent:

8        my point was that *our clients* don't want to solve this one
         Cascades case (on the '750 patent) – only to basically fund
9        additional litigations from Cascades. *They* want a global
         solution to Cascades – not just a solution on this one particular
10       case – knowing that there will be others to follow.

11       It wasn't that I (or *our clients*) didn't want to hear about
         Cascades again. We/they just don't want to have to solve this
12       problem multiple times.

(Dkt. 94, pp. 14-15).

13       The parties' agreement to preserve documents (Dkt. 74) does not bind third-party

14   witnesses like Kevin Barhydt, a former RPX employee, or Brett Roesslein of Motorola (later,

15   Google, and now, Lenovo), each of whom may well have documents in their personal possession.

16   Nor does the agreement counteract the inevitable risk that memories diminish over time.

17   Although decided in the context of a request to stay based upon an untimely reexamination

18   request, this Court, in *Fresenius Medical Care Holdings, Inc. v. Baxter International, Inc., et al.*,

19   2007 WL 1655625 at *5 (N.D. Cal. June 7, 2007) made the point that fading memories and lost

20   evidence inherently will occur three years after a complaint is filed.  ("In the lengthy delay that

21   would inevitably ensure if a stay were granted, evidence could be lost and witnesses' memories

22   could fade.  Accordingly, this factor weighs heavily in favor of denying a stay." (citation

23   omitted)).   See also, *Abassi v. BAE Systems Information Solutions*, 2010 U.S. Dist. LEXIS

24   115928 at *3-4 (S.D. Cal. November 1, 2010) ("Plaintiffs have demonstrated that they may suffer

25   damage if the stay is granted. Several witnesses with information relevant to this case are third

26   parties outside the control of Plaintiffs and Defendants. Significant delay in initiating discovery

27   may result in faded memories and lost documents.")

28

1    The *Lithium Ion Batteries*, *Masimo* and A*potex* cases relied upon by defendants did not
2 involve a portfolio of 38 patents, only two of which are in litigation.  Here, the '130 patent case is
3 on a separate track before a different judge.   A decision in the '750 patent case will not be
4 dispositive of the antitrust case, nor substantially narrow it, as defendants have repeatedly
5 promised.

6    In *In re Lithium Batteries Antitrust Litigation*, this Court **allowed the plaintiffs to take**
7 **limited discovery** despite the Defendants' argument that all discovery should be stayed prior to
8 rulings on motions to dismiss. 2013 WL 2237887, at *1 (N.D. Cal. May 21, 2013). Although this
9 Court recognized that antitrust discovery can be expensive and burdensome, it also recognized that
10 "the costs and burdens of antitrust discovery do not erect an automatic barrier to discovery in
11 every case in which an antitrust defendant challenges the sufficiency of a complaint." *Id.* at *2.
12 Here, Cascades has already survived Defendants' motions to dismiss. Cascades should not be
13 denied even the very limited discovery relating to Mr. Barhydt based on the mere possibility that
14 Defendants' could raise a future argument for dismissal depending on the outcomes of the '750
15 patent litigation, particularly where there is no reason to believe such an argument would be
16 successful.

17    In *Masimo Corp. v. Philips Elecs. N. Am. Corp.,* the court bifurcated the plaintiff's patent
18 claims and the defendant's antitrust claims. 2010 WL 925864, at *2-3 (D. Del. Mar. 11, 2010). In
19 so doing, the court recognized that there would be little prejudice to the defendants because they
20 could have brought the "antitrust counterclaims years ago, yet instead waited until this litigation."
21 *Id.* Here, Cascades brought its antitrust claim promptly, and thus should not be forced to submit to
22 the risks associated with the loss of evidence and fading memories. Moreover, unlike *Masimo*, the
23 outcome of the Northern District of Illinois patent litigation will not affect Cascades' antitrust
24 claims.

25    In *Apotex, Inc. v. Senju Pharmaceutical Co., Ltd.*, the court granted only a limited stay of
26 antitrust proceedings pending resolution of an appeal to the Federal Circuit.  921 F.Supp.2d 308,
27 315-316 (D. Del. 2013). In the event that the Federal Circuit allowed the patent case to proceed,
28 the court declined to stay the antitrust proceedings pending resolution of the patent case's merits.

1  *Id.* at 316, n. 16. Here, Cascades' antitrust case has already been stayed for almost a year, and
2  Defendants effectively propose to extend this stay indefinitely.
3      Contrary to defendants' arguments, the antitrust case is not limited to just a refusal to
4  license the' 750 patent.  Mr. Barhydt admitted that RPX needed a license for its members under all
5  38 of the Elbrus patents (not just the '750 patent) (Dkt. 94, ¶ 35) and the boycott impacted
6  Cascades' ability to license all the patents.  Hence, the filing of a separate suit against Samsung on
7  the '130 patent is far from irrelevant.  A boycott on that patent adversely impacted Cascades'
8  ability to license RPX, Samsung and others at fair prices.
9      Defendants also now claim enormous expense in providing a limited production of Mr.
10 Barhydt's communications with RPX members and within RPX itself regarding Cascades, its
11 patents and the terms of the proposed license.  That is not a voluminous, burdensome request.
12 Samsung and HTC need only produce their communications with Mr. Barhydt and others at RPX
13 regarding Cascades and its patents.  The relevant documents have likely already been examined in
14 the preparation of defendants' voluminous briefs seeking to dismiss this case.  There simply is no
15 undue burden to RPX, Samsung and HTC, each of whom have more than adequate resources to
16 produce documents and make a single witness available for a one-day deposition.
17     Finally, it has been a year since this Court concluded Cascades had adequately pled an
18 antitrust claim.  It should now be permitted to move forward with discovery and trial preparation
19 without further delay.

20 **Defendants' Statement Regarding Maintenance of the Stay and Opposing Early Discovery**
21 **Regarding Kevin Barhydt**

22     Allowing Cascades to conduct discovery regarding Mr. Barhydt while the stay of this
23 action remains in place would be both unnecessary and contrary to the Court's justification for
24 imposing the stay in the first place.
25     As recognized by the Court in its prior stay orders, the primary efficiency of the stay is in
26 allowing the parties to avoid costly—and potentially unnecessary—antitrust discovery until the
27 patent cases have brought the scope of Cascades' antitrust claims into sharper relief.  *See, e.g., In*
28 *re Lithium Ion Batteries Antitrust Litigation*, No. 13-MD-02420 YGR, 2013 WL 2237887, at *2

1  (N.D. Cal. May 21, 2013) (J. Gonzalez Rogers) ("[A]ntitrust discovery can be enormously
2  expensive and burdensome"); *Masimo Corp. v. Philips Elecs. N. Am. Corp.*, Civ. A. No. 09-80-
3  JJF-MPT, 2010 WL 925864, at *3 (D. Del. Mar. 11, 2010) (staying antitrust action pending result
4  of patent litigation because result of latter could moot or streamline requested antitrust discovery);
5  *accord Apotex v. Senju Pharma. Co., Ltd.*, 921 F. Supp. 2d 308, 315 (D. Del. 2013).  Allowing
6  Cascades to engage in early, piecemeal discovery, at a time when the parties are actively briefing
7  dispositive motions in the patent cases, would defeat this purpose.

8        Cascades once again argues that the resolution of dispositive issues in the patent cases
9  cannot affect the scope of discovery in this case because the patent cases involve "only" the '750
10 patent, and not the other Elbrus patents referred to in Cascades' antitrust complaint.  The Court has
11 already rejected this argument.  Cascades alleges in its Complaint that the only patent "the
12 manufacturer defendants specifically needed access to and were using was the '750 patent," and
13 Cascades has only pleaded injury from its alleged inability to license the '750 patent as to devices
14 using Google's Android operating system.  *See* Amended Complaint, ¶¶ 19, 92-100.  Thus, as this
15 Court has observed, the '750 patent is at a minimum the "primary patent at issue" in this case.
16 *See, e.g.,* Dkt. No. 93 at 21:18-21; Dkt. No. 133 at 3:20-22 ("In this case, as Defendants aptly
17 remark, if the Illinois litigation determines that Plaintiff's '750 Patent is invalid, any damage
18 stemming from a refusal to negotiate a license under that patent may well prove to be illusory.").
19 It is therefore irrelevant that Cascades has recently filed another patent case against one of the
20 Defendants here, Samsung, involving a second Elbrus patent.  The patent at the heart of *this case*
21 is the '750 patent.

22       While Cascades purports to request a "limited production of documents," it makes no
23 attempt to explain or define that phrase—and indeed, Cascades' "limited" discovery request
24 appears already to be expanding.  Where Cascades originally purported to seek documents only
25 for Mr. Barhydt, it now refers for the first time to a second individual, Brett Rosselein, and
26 potentially "other key former RPX employees" as well.  This suggests that allowing Cascades to
27 conduct "limited" early discovery regarding Mr. Barhydt could result in ancillary disputes about
28

the proper scope of that discovery—disputes that may be avoided by denying Cascades' request for interim discovery and allowing the stay to run its course.

Nor does Cascades articulate any basis for its conjecture about the "expense" Defendants would incur in responding to its completely undefined discovery requests.  In fact, the time and costs associated with preparing even a "limited" production of documents at this early stage would be significant, and contrary to Cascades' suggestion has not already been incurred by the Defendants.  This is particularly true for the manufacturing defendants, Samsung and HTC, who have never employed Mr. Barhydt and have no custodial files for him.  To search for documents related to Mr. Barhydt, these Defendants would be required to investigate and identify the relevant document custodians; locate, load, and process these custodians' electronically-stored information; formulate and run searches likely to obtain communications involving Mr. Barhydt; review the results for responsiveness and other issues; and then prepare a production.  Then, if and when a more comprehensive discovery process becomes appropriate in this litigation, Samsung and HTC would be required to go through all of these same steps again in preparing their broader document productions.  The same is largely true for RPX.  Defendants presume Cascade would want all files relating to Mr. Barhydt and not just his custodial files; if so, RPX would be put to the same likelihood of expensive and duplicative searches.  Such extensive duplication of efforts would undermine the original purpose of the stay—to ensure that any necessary discovery in this litigation proceeds in the most efficient manner possible.

Moreover, there is simply no reason for conducting early discovery regarding Mr. Barhydt. While Mr. Barhydt is no longer employed by RPX, Cascades does not contend that he has left the country or will otherwise be unavailable to participate in discovery at the appropriate time. Moreover, the alleged conduct at issue in this litigation occurred recently—in 2011 and 2012— and the parties have taken necessary steps to preserve potentially relevant evidence.  *See* Dkt No. 74 (Joint Case Management Statement), ¶ VI.  In short, there is no reason to believe that early discovery regarding Mr. Barhydt is necessary to preserve evidence.  And indeed, this Court has already rejected the notion that the type of stay in place here poses an unusual risk that evidence will be lost.  *See, e.g.*, March 4, 2014 Order Staying Case (Dkt. No. 133) at 5:1-4 ("Plaintiff's

1   fourth and final prejudice argument is that the stay will result in lost evidence due to fading
2   memories and witness unavailability. The Court disagrees….A concern for loss of evidence exists
3   anytime a court issues a stay and does not supply sufficient grounds to refrain from issuing an
4   otherwise appropriate stay."); *Apotex*, 921 F. Supp. 2d at 316 (rejecting plaintiff's arguments that
5   it would be prejudiced by "fading recollections or vanishing witnesses"; plaintiff "has not
6   proffered any reason why such concerns would be especially relevant in the instant case.").

7         Cascades' heavy reliance on the *Lithium Ion Batteries* case is misplaced.  The partial stay
8   imposed in that litigation, which was tied to the Defendants' pending motions to dismiss, has
9   nothing to do with the type of stay in place in this litigation—*i.e.*, a stay of antitrust discovery
10  pending closely related patent litigation that Cascades elected to file in another District.  In the
11  case of a stay pending the resolution of motions to dismiss, it is conceivable that some limited
12  discovery could be appropriate as to issues unaffected by the pending motions.  But that is not so
13  here, where *all* discovery in this antitrust case potentially could be narrowed or obviated by the
14  resolution of dispositive issues in the patent cases.

15        Similarly, the facts and reasoning of *Fresenius Medical Care* bear no resemblance to the
16  facts here.  In *Fresenius*, the Court refused to impose a stay requested more than *three years* after
17  the case had been filed, at a time when discovery had been completed, summary judgment motions
18  had been resolved, two trials had been held (one on liability and another on damages) and a third
19  trial was about to commence.  2007 WL 1655625 at *1-3.  The Court rejected the stay request
20  because it found the requesting party's "dilatory motives could not be more apparent" as the
21  request was made "at the 11th hour after suffering a substantial setback." *Id.* at *4-5.  Moreover,
22  the Court found the stay would be too lengthy because it was tied to a reexamination of the patent
23  at issue by the U.S. Patent and Trademark Office, a process that can take years and allows multiple
24  levels of appellate review.  *Id.* at *5.

25        Here, of course, Defendants request simply that the discovery stay imposed at the outset of
26  this litigation be allowed to remain in place long enough to serve its originally intended purpose.
27  And unlike the stay at issue in *Fresenius*, there is no concern that the stay will be allowed to linger
28  indefinitely due to events outside the Court's control.  The Court has always retained full authority

over the duration of the stay and has closely monitored the progress of the patent cases throughout. It should continue to do so until the potentially dispositive issues in the patent cases are fully resolved.

Dated:   November 25, 2014          Respectfully submitted,

                              NIRO, HALLER & NIRO
                              Raymond P. Niro (Member of the N.D. Cal. Bar)
                              Daniel R. Ferri (*Pro Hac Vice*)
                              Ashley LaValley (*Pro Hac Vice*)
                              181 West Madison, Suite 4600
                              Chicago, IL 60602-4515
                              Phone: (312) 236-0733
                              Fax: (312) 236-3137
                              E-mails: rniro@nshn.com; dferri@nshn.com; alavalley@nshn.com

                              DAVIS WRIGHT TREMAINE LLP
                              Martin L. Fineman, Bar No. 1104413
                              505 Montgomery Street, Suite 808
                              San Francisco, CA 94111
                              Phone: (415) 276-6575
                              Fax: (415) 276-6599
                              Email: martinfineman@dwt.com

By          */s/ Ashley LaValley*
                ASHLEY LAVALLEY

Attorneys for Plaintiff
CASCADES COMPUTER INNOVATION LLC


SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
Michael W. Scarborough
4 Embarcadero Center, 17th Floor
San Francisco, CA  94111
Telephone:  (415) 434-9100
Facsimile:   (415) 434-3947
mscarborough@sheppardmullin.com


By          */s/ Michael W. Scarborough*
              MICHAEL W. SCARBOROUGH

Attorneys for Defendant
SAMSUNG ELECTRONICS CO., LTD.

---

Case No. 4:12-cv-1143 YGR                                                                     JOINT STATUS STATEMENT

| | |
|---|---|
| 1 | |
| 2 | WILSON SONSINI GOODRICH & ROSATI P.C. |
| 3 | Jonathan M. Jacobson |
|   | 1301 Avenue of the Americas |
| 4 | New York, NY 10019 |
| 5 | Telephone:  (212) 999-5800 |
|   | Facsimile:   (212) 999-5899 |
| 6 | jjacobson@wsgr.com |

By           */s/ Jonathan M. Jacobson*
                    JONATHAN M. JACOBSON

Attorneys for Defendant
HTC CORPORATION

LATHAM & WATKINS LLP
Alfred C. Pfeiffer, Jr.
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Telephone:  (415) 391-0600
Facsimile:  (415) 395-8095
alfred.pfeiffer@lw.com

By           */s/ Alfred C. Pfeiffer, Jr.*
                    ALFRED C. PFEIFFER, JR.

Attorneys for Defendant
RPX CORPORATION

## E-FILING ATTESTATION

I, Michael W. Scarborough, am the ECF User whose ID and password are being used to file this document.  In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that each of the signatories identified above has concurred in this filing.

                    */s/ Michael W. Scarborough*
                    Michael W. Scarborough