1  SHEPPARD MULLIN RICHTER & HAMPTON LLP
    A Limited Liability Partnership
2    Including Professional Corporations
   GARY L. HALLING, Cal. Bar No. 66087
3  MICHAEL W. SCARBOROUGH, Cal. Bar No. 203524
   DYLAN I. BALLARD, Cal. Bar No. 253929
4  Four Embarcadero Center, 17th Floor
   San Francisco, California  94111-4106
5  Telephone:    415-434-9100
   Facsimile:    415-434-3947
6
   Attorneys for Defendant
7  SAMSUNG ELECTRONICS CO., LTD.

8  *Additional moving counsel on signature page*

9

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12                   OAKLAND DIVISION

13

| 14 | CASCADES COMPUTER INNOVATION LLC, | Case No. 4:12-cv-01143 YGR |
|---|---|---|
| 15 | Plaintiff, | **DEFENDANTS' JOINT MOTION FOR JUDGMENT ON THE PLEADINGS** |
| 16 | v. | |
| 17 | | |
| 18 | RPX CORPORATION; and SAMSUNG ELECTRONICS, CO., LTD. | Date:        December 15, 2015<br>Time:        2:00 p.m.<br>Judge:       Hon. Yvonne Gonzalez Rogers<br>Location:    Courtroom 1 |
| 19 | Defendants. | |

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS ........ 1

RELIEF SOUGHT ........................................................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ....................................................... 2

    I.       INTRODUCTION ..................................................................................... 2

    II.      ARGUMENT ............................................................................................ 4

          A.     The Non-Infringement Verdict Has Immediate Preclusive
               Effect In This Action. ........................................................................ 4

          B.     The Non-Infringement Verdict Establishes That Cascades
               Lacks Standing To Seek Any Relief Based On Its Inability to
               License the '750 Patent. ..................................................................... 5

          C.     The Non-Infringement Verdict Applies Equally To All Alleged
               Conspirators, Not Just To Samsung. ................................................. 9

          D.     The Conspiracy and Monopsonization Claims of Cascades'
               Amended Complaint Are Based Entirely On The '750 Patent,
               and Must Be Dismissed. .................................................................. 12

               1.     Cascades' Explanation For Why The Alleged
                     Conspiracy Makes "Economic Sense" Depends Entirely
                     on The Infringement of the '750 Patent. ................................ 12

               2.     Cascades' "Market Power" Allegations In Support of Its
                     Monopsonization and Rule of Reason Claims Refer
                     Exclusively To The '750 Patent. ............................................ 15

           E.     Cascades Has Failed To Plead A Plausible Conspiracy or
                Monopsonization Claim With Respect To The '130 Patent, Or
                Any Other Elbrus Patents. ............................................................... 16

    III.     CONCLUSION ...................................................................................... 21

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

<u>Federal Cases</u>

*Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*
   141 F.3d 947 (9th Cir. 1998)..................................................................................... 13, 18

*Addamax Corp. v. Open Software Foundation*
   152 F.3d 48 (1st Cir. 1998) ........................................................................................ 5

*Cascades Computer Innovation LLC v. RPX Corp.*
   2013 U.S. Dist. LEXIS 10526 (N.D. Cal. Jan. 24, 2013) ....................................... 5, 13

*Collins v. D.R. Horton, Inc.*
   505 F.3d 874 (9th Cir. 2007) ..................................................................................... 4

*Copperweld Corp. v. Independence Tube Corp.*
   467 U.S. 752 (1984) .................................................................................................. 19

*Dworkin v. Hustler Magazine, Inc.*
   867 F.2d 1188 (9th Cir. 1989)................................................................................... 5

*Hydranautics v. FilmTec Corp.*
   204 F.3d 880 (9th Cir. 2000)..................................................................................... 4

*Jones Knitting Corp. v. Morgan*
   244 F.Supp. 235 (E.D. Pa. 1965) ...................................................................... 5, 6, 7, 8

*Kendall v. Visa U.S.A., Inc.*
   518 F.3d 1042 (9th Cir. 2008).................................................................................. 18

*In re Lithium Ion Batteries Antitrust Litig.*
   2014 U.S. Dist. LEXIS 7516 (N.D. Cal. Jan. 21, 2014) ........................................... 18

*New Hampshire v. Maine*
   532 U.S. 742 (2001) .................................................................................................. 18

*Nova Designs, Inc. v. Scuba Retailers Ass'n*
   202 F.3d 1088 (9th Cir. 2000).................................................................................. 20

*NYNEX Corp. v. Discon, Inc.*
   525 U.S. 128 (1998) .................................................................................................. 20

*In re Online DVD-Rental Antitrust Litig.*
   779 F.3d 914 (9th Cir. 2015)..................................................................................... 7

*Scott v. Kuhlmann*
    746 F.2d 1377 (9th Cir. 1984)...................................................................... 4, 5

*Sony Electronics, Inc. v. Soundview Technologies, Inc.*
    281 F. Supp. 2d. 399 (D. Conn. 2003) ............................................................ passim

*Sony Electronics, Inc. v. Soundview Technologies, Inc.*
    2005 WL 1661696 (D. Conn. July 13, 2005) ("*Soundview II*") ..................... 6, 7, 8, 16

*United States v. 14.02 Acres*
    547 F.3d 943 (9th Cir. 2008)............................................................................ 9

*United States v. E.I. duPont de Nemours & Co.*
    351 U.S. 377 (1956) ........................................................................................ 20

Docketed Cases

*Cascades Computer Innovation, LLC v. Samsung Electronics Co., Ltd.*
    Case No. 11-4574 (N.D. Ill.)............................................................................ 4

Federal Statutes

Federal Rule of Civil Procedure 12(c)...................................................... 1, 4, 5

Other Authorities

U.S. Patent No. 7,065,750 ....................................................................... passim

P. Areeda & H. Hovenkamp, *Antitrust Law* (2d ed. 2000) .................................. 5

**NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS**

PLEASE TAKE NOTICE that on December 15, 2015, at 2:00 p.m., or as soon thereafter as the matter may be heard, in the United States District Court, Northern District of California, at 1301 Clay Street, Oakland City Center, Oakland, CA 94612, before the Honorable Yvonne Gonzales Rogers, Defendants Samsung Electronics Co., Ltd. ("Samsung") and RPX Corporation ("RPX") (collectively "Defendants") will, and hereby do, move the Court pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for a judgment on the pleadings dismissing all claims in Plaintiff's Amended Complaint for lack of standing in light of a recent judgment finding that the patent underlying Plaintiff's claims, U.S. Patent No. 7,065,750 (the "'750 Patent"), has not been infringed. Alternatively, Defendants move the Court for an order, based on lack of standing, barring Plaintiff from seeking any relief based on the non-infringed '750 Patent.   This motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the accompanying Request for Judicial Notice and exhibits thereto, the accompanying Proposed Order, the pleadings on file in this action, and such other matters as the Court may consider.

## RELIEF SOUGHT

Defendants seek dismissal of each claim asserted against them in Plaintiff's Amended Complaint, pursuant to Federal Rule of Civil Procedure 12(c).  In the alternative, Defendants seek an order that Plaintiff lacks standing to seek any relief based on the '750 Patent.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.      INTRODUCTION

The Court stayed this antitrust case pending the resolution of related patent infringement litigation, which Cascades elected to file separately in the Northern District of Illinois, concerning U.S. Patent No. 7,065,750 (the "'750 Patent"). Consistent with a long line of authority approving stays of antitrust cases in favor of parallel patent litigation, the Court justified the stay on efficiency grounds. Because the '750 Patent is "the primary patent at issue in this case," (Dkt. No. 93 at 21:18-21), the Court observed that findings in the patent cases had "the potential to narrow substantially, or moot entirely, the antitrust issues now before this Court." (Dkt. No. 133 at 3:23-24). In particular, the Court observed that "the question of whether Defendants are causing Plaintiff antitrust injury by refusing to negotiate individual licenses under Plaintiff's '750 Patent *appears to depend, both logically and legally, on whether the '750 Patent is valid and infringed*." (*Id.* at 5:13-16) (emphasis added). Thus, if the '750 Patent were to be found invalid or not infringed, "any damage stemming from a refusal to negotiate a license under that patent may well prove to be illusory." (*Id.* at 3:21-22).

The Court's reasoning has proved well-founded, as that is *exactly* what has happened: a jury has found that Samsung did not infringe the '750 Patent. That verdict is judicially noticeable by this Court, and has immediate preclusive effect in this action. And that preclusive effect is not limited to Samsung. Because Cascades asserts an identical theory of infringement against *all* manufacturing members of the alleged conspiracy, based on the same underlying "functionality" of the Android operating system with respect to the '750 Patent, the Samsung non-infringement verdict applies equally to *all* of the alleged conspirators. Thus, because none of the alleged conspirators needed to license the '750 Patent, Cascades' claims for damages based on its inability to obtain such a license are indeed "illusory." As a result, Cascades lacks standing to maintain claims based on the '750 Patent.

1    This lack of standing is fatal to Cascades' entire case, because *all* of Cascades'

2  claims depend entirely on the '750 Patent and the premise that it was infringed and

3  therefore held value to the Defendants.  The Complaint is explicit that the '750 Patent was

4  the only patent that all of the alleged conspirators were using and needed to license, the

5  only patent that Cascades wanted to license to the Defendants, and the sole patent on

6  which Cascades' valuation of the Elbrus portfolio was based.  Moreover, Cascades' only

7  explanation for why the alleged antitrust violation "made economic sense" is that all of the

8  manufacturing Defendants needed to license the '750 Patent, and therefore would have

9  collectively benefitted by refusing to deal with Cascades independently.  And while

10  Cascades acknowledges that it is required to allege that Defendants had "market power" in

11  a "relevant market," it is only able to do so with respect to the '750 Patent as used in the

12  Android operating system.  Without the '750 Patent, then, Cascades cannot meet even the

13  most basic threshold pleading requirements for an antitrust claim.

14    Accordingly, Cascades' last-minute attempt to shift the focus of this litigation away

15  from the '750 Patent and the Android operating system, and toward an entirely different

16  Elbrus patent—the '130 Patent involving DRAM memory chips—is flatly refuted by

17  Cascades' own Complaint.  The Complaint does not refer to a single instance of conduct

18  regarding the '130 Patent, much less allege the details of a plausible antitrust violation

19  directed at that patent.  Indeed, the Complaint concedes that Samsung is the only alleged

20  conspirator who could have infringed the '130 Patent, because Samsung is the only alleged

21  conspirator who even manufactured DRAM memory chips.  It is simply impossible to

22  make out a plausible antitrust claim when only one of the alleged conspirators even

23  participated in the relevant market.   Stated differently, that scenario makes no economic

24  sense.

25    The bottom line is that, according to Cascades' own allegations, this case is and

26  always has been about the '750 Patent.  That is why Cascades alleges a conspiracy only

27  between RPX and manufacturers of Android-based mobile devices—the category of

28  products that Cascades says infringe the '750 Patent.  That is why Cascades concedes that

1  the '750 Patent is the only patent in the Elbrus portfolio that it actually cared about

2  licensing.  That is why Cascades identifies only the '750 Patent as the economic

3  motivation for Defendants' participation the alleged conspiracy.  And that is why Cascades

4  only alleges Defendants' "market power" as to the '750 Patent.  Cascades must now stand

5  by these allegations.  The fact that Cascades' underlying theory of liability has now fallen

6  apart does not give Cascades license to fundamentally change its story, particularly when

7  the new story appears nowhere in the Complaint, and is directly contradicted by existing

8  allegations.

9  ## II.  ARGUMENT

10  ### A.  The Non-Infringement Verdict Has Immediate Preclusive Effect In This Action.

11  On September 21, 2015, the jury in the trial of *Cascades Computer Innovation, LLC*

12  *v. Samsung Electronics Co., Ltd.*, Case No. 11-4574 (N.D. Ill.) returned a verdict finding

13  that (1) the '750 Patent is not invalid but (2) Samsung did not infringe the '750 Patent.

14  (N.D. Ill. Case No. 11-4574, Dkt. No. 420).  The patent jury's finding of non-infringement

15  has been reduced to final judgment.  *See* Request for Judicial Notice ("RJN"), Ex. A.  As a

16  result, it has collateral estoppel effect against Cascades in this action.  *See Hydranautics v.*

17  *FilmTec Corp.*, 204 F.3d 880, 885 (9th Cir. 2000) (collateral estoppel applies where an

18  issue was decided in a prior litigation, final judgment has been entered, and the party

19  against whom collateral estoppel is asserted was a party to the prior litigation).  While

20  Defendants are not aware of any appellate proceedings, the jury's verdict has preclusive

21  effect here regardless of whether Cascades files an appeal.  *Collins v. D.R. Horton, Inc.*,

22  505 F.3d 874, 882-83 (9th Cir. 2007) ("We have held that a final judgment retains its

23  collateral estoppel effect, if any, while pending appeal.").  And the preclusive effect of the

24  verdict is properly raised by this motion for judgment on the pleadings under Federal Rule

25  of Civil Procedure 12(c).[1]  *See, e.g., Scott v. Kuhlmann*, 746 F.2d 1377, 1378 (9th Cir.

26

27  _____

28  [1]      A motion for judgment on the pleadings is the proper vehicle for raising issues that
        arise after the pleadings have closed, but which can be resolved without the need for

-4-

1984) (a res judicata defense may be raised by pleadings motion where defense raises no disputed issues of fact; court properly took judicial notice of records from prior litigation).

### B. The Non-Infringement Verdict Establishes That Cascades Lacks Standing To Seek Any Relief Based On Its Inability to License the '750 Patent.

"Only those who possess antitrust standing by virtue of having suffered antitrust injury may bring a private action for damages for violation of the antitrust laws." *Cascades Computer Innovation LLC v. RPX Corp.*, 2013 U.S. Dist. LEXIS 10526 at *33-34 (N.D. Cal. Jan. 24, 2013) (citing *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 371 (9th Cir. 2003)). There are "four requirements for antitrust injury: (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Id.* at *34 (quoting *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*, 190 F.3d 1051, 1055 (9th Cir. 1999)). Thus, a plaintiff fails to allege antitrust injury, and therefore lacks standing, where "a force other than the antitrust violation fully accounts for the plaintiff's injury." 2 P. Areeda & H. Hovenkamp, *Antitrust Law* § 338, at 320 (2d ed. 2000); *see also Addamax Corp. v. Open Software Foundation*, 152 F.3d 48, 53-55 (1st Cir. 1998) (no antitrust injury where alleged business injury was caused by risky nature of plaintiff's business and characteristics of its product, rather than by anticompetitive conduct).

In accordance with these principles, courts have held that the inability to license an invalid or non-infringed patent is not a cognizable antitrust injury. The reason is simple: any loss or injury in such a situation is properly attributed, not to anticompetitive conduct, but to the simple fact that, by definition, *no one needs a license of an invalid or non-infringed patent*.

In *Jones Knitting Corp. v. Morgan*, the plaintiff patent holder alleged that a group of cloth manufacturers agreed that none of them would independently negotiate a license

---

discovery. *See* Fed.R.Civ.Proc. 12(c) ("After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."). Aside from its timing, such a motion is "functionally identical" to a motion to dismiss under Rule 12(b)(6). *Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989).

of the plaintiff's patent without first notifying the other members of the group.  244 F.Supp. 235 (E.D. Pa. 1965) *overruled on other grounds*, 361 F.2d 451 (3d Cir. 1966).  The court held that, regardless of whether this agreement constituted a "group boycott," the plaintiff was entitled to no relief because the patent was invalid:

> [S]ince this Court has found the Morgan patent invalid, Morgan suffered no damage because of the group boycott.  If by some conceptual machination damage could be shown, it would be de minimus. If, absent the group boycott, it is reasonable to assume some one of the twelve would have taken a license and thus paid royalties to Morgan, Morgan would have been unjustly enriched since he did not have a valid patent from which a valid license could stem.

*Id.* at 239.

In *Sony Electronics v. Soundview Technologies Inc.*, the Court confirmed that this principle is not limited to situations where a patent is found invalid, but also applies where, as here, the patent is not infringed.  281 F. Supp. 2d. 399 (D. Conn. 2003) ("*Soundview I*").

In *Soundview*, a trade association and several TV manufacturers allegedly agreed to fix the price of royalties paid to the plaintiff patent holder, or, alternatively, refuse to negotiate a license altogether.  The court held that, regardless of whether such an agreement existed, the plaintiff could not have suffered antitrust injury, and thus lacked standing, because the patent in question was not infringed:

> [E]ven if an illegal agreement is proved to be one reason the [defendants] refused to license Soundview's patent, the proximate or legal cause of Soundview's licensing revenue loss is that no television manufacturer…needed a license of the patent….  The conclusion that the [defendants'] content blocking technology did not infringe Soundview's patent and Soundview's failure to present any evidence that any other television manufacturer uses different (and infringing) technology leads inexorably to the conclusion that a force other than the antitrust violation fully accounts for the plaintiff's injury, thus foreclosing a showing of antitrust injury.

*Id.* at 402 (internal punctuation and citations omitted).

Indeed, in a subsequent opinion the *Soundview* court held that "Soundview's pursuit of its antitrust claim after the finding of no-infringement must be deemed frivolous," observing that "it should have been clear to Soundview that its antitrust claim was extinguished by the summary judgment of non-infringement," and that "its continued

1  pursuit of the claim can only be viewed as a vexatious effort to multiply the proceedings."

2  *Sony Electronics, Inc. v. Soundview Technologies, Inc.*,  2005 WL 1661696 at *9 (D.

3  Conn. July 13, 2005) ("*Soundview II*").  As a result, the court ordered Soundview to pay

4  the defendants' attorney fees for the antitrust portion of the case.

5      The factual scenarios at issue in *Jones Knitting* and *Soundview* are, in their relevant

6  details, identical to the scenario here.  Cascades claims that an agreement among potential

7  licensees prevented it from obtaining a license of the '750 Patent.  But even if that were

8  true, Cascades did not suffer an antitrust injury, and thus lacks standing to maintain claims

9  based on the '750 Patent, because any inability to procure a license is properly attributed

10 not to an antitrust violation, but to the fact that the '750 Patent was not infringed.

11     Defendants anticipate that Cascades may nevertheless argue that, even though the

12 '750 Patent has been found not infringed, the Patent still had some value to Defendants at

13 the time of the alleged negotiations—for example, because there may have been doubt at

14 that time about whether the Defendants were actually infringing, or because agreeing to a

15 license would have allowed Defendants to avoid costly litigation.  But this argument

16 misses the point of the antitrust injury requirement.  Certainly Cascades suffered *some*

17 *injury* due to its inability to obtain a license from Defendants, in the sense that it made less

18 money.  *See Soundview*, 281 F. Supp. 2d. at 402 ("Soundview's inability to procure

19 licensing agreements is plainly an injury in fact to its business or property").  But antitrust

20 plaintiffs must do more than allege an injury; they must allege an injury that is proximately

21 caused by an antitrust violation.  *See In re Online DVD-Rental Antitrust Litig.*, 779 F.3d

22 914, 921-922 (9th Cir. 2015).  And Cascades' inability to license the '750 Patent is not

23 such an antitrust injury, because "the proximate or legal cause" of the injury is not an

24 antitrust violation, but the fact that the Defendants simply did not need a license to a patent

25 they were not infringing.  *Id.*

26     Just as importantly, as explained by the *Jones Knitting* court, allowing Cascades to

27 recover any damages based on the '750 Patent, on a theory of nuisance value or otherwise,

28 would amount to improper "unjust enrichment," because it would allow Cascades to

extract the equivalent of royalties from a patent on which no royalties were properly earned.  *See* 244 F. Supp. at 238 ("If, absent the group boycott, it is reasonable to assume some one of the twelve would have taken a license and thus paid royalties to Morgan, Morgan would have been unjustly enriched since he did not have a valid patent from which a valid license could stem.").

Alternatively, Cascades may argue that the settlement agreements it has reached with certain entities with respect to the '750 Patent are proof that the Patent has value, notwithstanding the subsequent non-infringement finding.  But that *exact argument* was thoroughly refuted by the *Soundview* court:

> Soundview's assertion that settlement agreements with other television manufacturers show that there is (or was) a market for the licenses it is selling misapprehends the import of agreements to settle legal claims. Parties are encouraged to resolve lawsuits prior to final judicial determination of the merits of the case and do so for many reasons, including avoidance of the cost, delay and uncertainty inherent in the litigation and trial process, extrinsic business interests, and changed circumstances.  The decision of certain television manufacturers to settle in the face of Soundview's aggressive pre-litigation assertions of the '584 patent's broad scope does not alter the stark fact that…the patented technology has been determined not to be in use by any of the [defendants]….  Soundview's loss is not proximately caused by any antitrust violation but instead by the operation of the patent laws and this Court's summary judgment ruling of non-infringement.

281 F. Supp. at 402-403; *see also Soundview II*, 2005 WL 1661696 at *9 ("the licensing settlements reached with other manufacturers prior to litigation could not establish a 'market for licenses' supporting Soundview's antitrust claim.").

Exactly the same is true here.  The fact that Cascades may have negotiated settlements or license agreements with other entities does nothing to change the fact that Cascades' inability to obtain a license from Defendants was proximately caused, not by an antitrust violation, but by the fact that Defendants had no need to license the '750 Patent.

In addition to having no claim for damages or other relief based on *past* or *existing* infringement, Cascades is also barred from seeking injunctive relief with respect to *future* infringement of the '750 Patent.  As previously reported to the Court, on January 29, 2014, Cascades entered into a license agreement with Google Inc. and Motorola Mobility

regarding Google's Android Operating System software.  The Court in the '750 Patent cases held that, under the doctrine of "patent exhaustion," this license agreement precludes Cascades from asserting infringement against any entity based on use of Google's Android Operating System *after* the date of the license.  *See* RJN, Ex. B.  Accordingly, the Court entered a judgment of non-infringement as to the '750 Patent in favor of Samsung and HTC for all use after January 29, 2014.  Thus, because there can be no future infringement of the '750 Patent, there is nothing to enjoin.

      C.   <u>The Non-Infringement Verdict Applies Equally To All Alleged Conspirators, Not Just To Samsung.</u>

While the non-infringement verdict occurred in a trial involving Samsung, it applies equally to the other alleged conspirators, because Cascades' theory of infringement for the '750 Patent is identical for all manufacturers of Android-based mobile devices.  Put another way, the non-infringement verdict means that Android-based devices, regardless of who manufactures them, do not infringe the '750 Patent.  And this fact can be properly established for purposes of this pleadings motion by judicially noticeable public filings in the '750 Patent cases.  *See United States v. 14.02 Acres*, 547 F.3d 943, 955 (2008) (court "may take judicial notice of matters of public record and consider them" on motion for judgment on the pleadings) (internal quotations omitted).

As an initial matter, the only conspirators alleged in Cascades' operative Complaint are RPX and the three so-called "manufacturing defendants" of Android-based mobile devices—Samsung, HTC, and Motorola.  *See* Dkt. No. 94 (Amended Complaint), ¶ 38.  Cascades does not allege any unnamed co-conspirators, or any "Doe" Defendants.  And at the recent Case Management Conference in this action, the Court made clear that Cascades will not be permitted to further amend its Complaint.  *See also* Dkt. No. 179 (Case Management and Pretrial Order:  no amendment of parties or pleadings without leave of Court).

Cascades has accused all of the "manufacturer defendants"—Samsung, HTC, and Motorola—of infringing the '750 Patent in the same way—by manufacturing smartphones

1    and tablet computers that use specific features of the Android operating system.  *See*

2    Amended Complaint at ¶ 47 ("The '750 patent relates to software embedded in mobile

3    phones and tablet computers that permits optimization of applications when Android

4    operating systems are used.  Cascades has actively sought to license the '750 patent … so

5    that the patented technology could be legally shared with the entire mobile phone and

6    tablet industry that uses Android operating systems.").

7        Cascades explains that the '750 Patent applies to the Android operating system, and

8    thus applies equally to all devices that use that operating system:

> More than 300,000 applications are available for use on Android devices and
> only devices that meet Google's compatibility requirements can install such
> applications on Android-based phones and tablets.  The technology of the
> Elbrus '750 patent facilitates the installation and use of such applications on
> Android devices (such as smartphones), through dependency trees, which
> permit the optimization of the bytes code used in an application, thus
> increasing the speed and value of the application.  The '750 patent covers
> such optimization techniques, is valid and has been infringed by the
> manufacturing defendants.

14   Id., ¶ 13.

15       Accordingly, in the HTC patent case (before it was resolved by settlement),

16   Cascades acknowledged that a jury determination of Samsung's non-infringement would

17   likely be dispositive for HTC as well, because Cascades' infringement theory against both

18   entities involved exactly the same claim of the '750 Patent and the same underlying

19   Android "functionality":

> Because Cascades has accused the same Android functionality and the same
> claim 15 of the '750 patent at issue in the Samsung trial against HTC
> devices, HTC and Cascades recognize that a final judgment of non-
> infringement in Samsung's could be dispositive of the same issues against
> HTC.

23   *See* RJN, Ex. C (Cascades' and HTC's Motion for Stay of Proceedings).

24       Further, in issuing the Exhaustion Order described above, the patent Court

25   explicitly found that Cascades' theory of infringement is identical for all mobile device

26   manufacturers because it is based on a feature of Google's Android operating system

27   (which the mobile devices use), not on any features of the mobile devices themselves:

28

1

2
> Cascades contends that Samsung and HTC infringe the '750 patent by manufacturing and selling smartphones and tablets that use the Dalvik JIT Compiler, which is part of the Android operating system distributed by Google.  According to Cascades, "[t]he claimed method is performed when a user of the cellular phones operates the device for their intended purpose using the Android operating system, e.g., allowing the Dalvik Virtual Machine to optimize the byte code for each application."

3

4

5
> …

6

7
> Cascades's claims of infringement focus on the use of a feature of the Android operating system called the Dalvik JIT Compiler. Cascades has identified no other feature of the defendants' devices or the operating system they use that infringes the '750 patent…. It is undisputed that the Android operating system is a Google product; no reasonable fact finder could find otherwise. The same is true of the Dalvik JIT Compiler.

8

9
*See* RJN, Ex. B (Patent Exhaustion Order) at 2-4.

10

11
While the Exhaustion Order was entered only as to Samsung and HTC, that is

12
because the remaining manufacturing defendant and alleged conspirator, Motorola, had

13
previously reached a settlement with Cascades.  Cascades' infringement claim against

14
Samsung and HTC was also identical to its infringement claim against Motorola.  *See* RJN,

15
Ex. D (Cascades' Third Amended Complaint), ¶ 14 (alleging that Motorola's mobile

16
devices violate the '750 Patent by using the Dalvik JIT Compiler, and that "the claimed

17
method is performed when a user of the cellular phones operates the device for their

18
intended purpose using the Android operating system").

19
Accordingly, Cascades sued Samsung and Motorola for infringement of the '750

20
Patent in the same action, and repeatedly represented to the Court that its infringement

21
theory was identical as to both Samsung and Motorola (and therefore as to HTC as well).

22
*See* RJN, Ex. E (N.D. Ill. 1:11-cv-06235, Dkt. No. 40) (Cascades' Opposition to Motion to

23
Dismiss) at p. 9 ("Use of the method and, thus, direct infringement, occurs when a user

24
activates the DROID3 [a Motorola product] or Nexus S phone [a Samsung product] which,

25
in turn, activates the Dalvik Virtual Machine embedded in the phone.").  Because of the

26
identical theory at issue, the Samsung, Motorola, and HTC cases, along with several other

27
of Cascades' '750 Patent cases, were consolidated for pretrial proceedings , and the court

28

-11-

SMRH:473478971.5

1  issued a single claim construction order that applied equally to each defendant.  *See id.*,

2  Ex. F (N.D. Ill. 1:11-cv-06235, Dkt. No. 141) (Claim Construction Order).

3      Thus, the non-infringement verdict establishes that *none* of the RPX members who

4  supposedly conspired not to license the '750 Patent were actually infringing that patent.

5  As a result, as explained above, the alleged conspiracy could not have resulted in a

6  cognizable antitrust injury to Cascades.

7      D.    The Conspiracy and Monopsonization Claims of Cascades' Amended
            Complaint Are Based Entirely On The '750 Patent, and Must Be Dismissed.

8

9      Cascades asserts two general types of claim in this action:  antitrust conspiracy

10  claims against all Defendants, which Cascades casts under both a "*per se*" and "rule of

11  reason" theory, (*see* Amended Complaint, ¶¶ 52-83), and a monopsonization claim only

12  against RPX (*see id.*, ¶¶ 84-107).  As alleged, both types of claim rely entirely on the

13  premise that the '750 Patent held value for all of the alleged conspirators.  But as explained

14  above, the non-infringement verdict establishes that Cascades' premise is *exactly wrong*:

15  the '750 Patent held *no value* to *any* alleged conspirator, because it was not being

16  infringed.  As a result, all of Cascades' claims must be dismissed.

17      1.    Cascades' Explanation For Why The Alleged Conspiracy Makes
            "Economic Sense" Depends Entirely on The Infringement of the '750
            Patent.

18

19      The '750 Patent has always been the centerpiece of Cascades' claims.  Cascades'

20  Complaint is explicit:  "With the exception of Samsung…***the patent that RPX and the***

21  ***manufacturer defendants specifically needed access to and were already utilizing was***

22  ***the '750 patent***."  Dkt. No. 94 (Amended Complaint), ¶ 19.  Accordingly, aside from the

23  '130 DRAM patent discussed in Section E below, Cascades does not allege that *any*

24  alleged conspirator was infringing *any* patent in the Elbrus portfolio other than the '750

25  Patent.  Aside from the '130 Patent case against Samsung, Cascades has sued the alleged

26  conspirators only for infringing the '750 Patent.  *Id.*, ¶ 36 ("the manufacturing defendants

27  were only sued for infringement of the '750 patent").

28

1       Not surprisingly, then, the '750 Patent was the only patent that Cascades sought to

2   license to the Defendants, and it was only at RPX's request that the other Elbrus patents be

3   included in the negotiation.  *Id.*, ¶ 36 ("When Cascades suggested RPX negotiate a license

4   under just the '750 patent, RPX refused"); ¶ 19 ("Cascades, *in order to license the '750*

5   *patent*, was willing to include the other 37 patents in the Elbrus portfolio in a license with

6   RPX.") (emphasis added).  The other patents in the portfolio were included in the

7   negotiations only to avoid the nuisance of future infringement claims.  *Id.*, ¶ 19 ("Because

8   patent licensees often want to ensure that they will not be sued on other patents held by a

9   licensor, the licensee often demands that it be licensed on the licensor's entire portfolio of

10  patents.").  By its own allegations, Cascades' license offer for the Elbrus portfolio was

11  based *entirely* on its valuation of the '750 Patent.  *Id.*, ¶ 36 ("it would make no economic

12  sense for the manufacturing defendants to decline a license under all the Cascades/Elbrus

13  patents effectively for the price of a license under the '750 Patent.").  In other words, the

14  other Elbrus patents, which were merely tacked-on to the negotiations by RPX as a matter

15  of policy, had no independent value.  These are Cascades' own allegations.

16      According to Cascades, then, the '750 Patent was (1) the only patent all of the

17  manufacturing defendants were infringing and needed to license; (2) the only patent

18  Cascades sought to license to the Defendants; and (3) the sole basis for Cascades'

19  valuation of the Elbrus portfolio in its licensing offers.  Thus, the fact that none of the

20  Defendants were infringing the '750 Patent negates the foundation of Cascades' claims,

21  because it establishes that the Elbrus patents held *no value* to the alleged conspirators, and

22  that Cascades was never entitled to a license from Defendants in the first place.

23      Put another way, without the '750 Patent, Cascades' claims cease to make economic

24  sense.  *Cascades Computer Innovation LLC v. RPX Corp.*, 2013 U.S. Dist. LEXIS 10526

25  at *38 (N.D. Cal. Jan. 24, 2013) (where "an alleged conspiracy makes no economic sense,

26  the claim must be dismissed."); *see also Adaptive Power Solutions, LLC v. Hughes Missile*

27  *Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998) ("Antitrust claims must make economic

28  sense").   In defending its current Complaint against a motion to dismiss, Cascades

provided its official explanation for why it was economically rational for Defendants to participate in the alleged conspiracy.  *See* Dkt. No. 103 (Cascades' Combined Response to Motions to Dismiss) at 6-7.  That explanation, which is also specifically set forth in Cascades' Complaint, is based *entirely* on the '750 Patent and its relevance to mobile devices using the Android operating system:

- "Each of the manufacturing defendants is a competitor of the other two in the sale of Android operated cell phones and/or tablets and knew that use of the '750 patent technology improves the performance of their Android operated devices."  *Id.*; *see also* Amended Complaint, ¶¶ 6, 38(e).

- "Each also knew that it would, therefore, be at a competitive disadvantage vis-à-vis the other two manufacturing defendants if they licensed the '750 patent but it did not."  *Id.* at 7; *see* Amended Complaint, ¶ 38(e).

- "Each manufacturing defendant also knew that RPX had invited all of them to participate in a scheme to jointly negotiate licenses with technology providers, such as Cascades….  In the absence of that common invitation…each of the manufacturing defendants, in the furtherance of its own individual self-interest, would have individually and competitively bid to license the '750 patent…so as to better compete against each of the other two manufacturing defendants in the sale of Android-based mobile electronic devices."  *Id.*; *see* Amended Complaint, ¶ 38(e).

- "However, because of the common invitation, each manufacturing defendant understood and tacitly agreed that they would act together, in which case it would not be contrary to their self-interest to refrain from individually negotiating a license for the '750 patent at the competitive rate because not one of them would gain a competitive advantage over the others and all of them would benefit from being able to jointly suppress the rate at which all of them could obtain the '750 patented technology."  *Id.*; *see* Amended Complaint, ¶ 38(e).

Again, this is Cascades' *own explanation* for why the alleged conspiracy was formed.  Simply put, Cascades theorizes that, because all of the manufacturing defendants needed the '750 Patent for their Android-based mobile devices, they all stood to benefit by "acting together" to "suppress the rate" at which the '750 Patent—and, in turn, the other Elbrus patents that were tacked-on to the negotiations—was licensed.  But the non-infringement verdict negates the entire premise of this theory.  *None* of the manufacturing defendants needed the '750 Patent for their Android-based mobile devices.  Thus, none of the manufacturing defendants had any economically rational motive to "act together" to

SMRH:473478971.5

1  lower the price of a patent that none of them were infringing.  According to Cascades' own

2  argument, without the '750 Patent its conspiracy claims make no sense.

3          2. <u>Cascades' "Market Power" Allegations In Support of Its Monopsonization and Rule of Reason Claims Refer Exclusively To The '750 Patent.</u>

4

5        As this Court has explained, to maintain its monopsonization claim, as well as its

6  conspiracy claims under a "rule of reason" theory, Cascades must plead that Defendants

7  had "market power" in a properly defined "relevant market."  Dkt. No. 93 (Order

8  Dismissing Cascades' original Complaint) at 14 & n. 15 (citing *Nat'l Soc. of Prof'l*

9  *Engineers v. United States*, 435 U.S. 679, 690 (1978).  Cascades' original Complaint failed

10  to satisfy this requirement.  *Id.*  In its Amended Complaint, Cascades more specifically

11  defined the relevant market, and in so doing confirmed that the only market in which

12  Defendants had "market power" is the supposed market for the '750 Patent as used in

13  Android-based devices:

14  - "The relevant product market is the market for the purchase, acquisition or licensing of technology covered by the Cascades '750 patent…to manufacturers of mobile phones and tablets that use the Android operating system."  Amended Complaint, ¶ 92.  It is only because Defendants required the other Elbrus patents to be included in negotiations that they are relevant to this case.  *Id.*

15

16

17

18  - "More than 300,000 applications are available for use on Android devices and only devices that meet Google's compatibility requirements can install such applications on Android-based phones and tablets. The technology of the Elbrus '750 patent facilitates the installation and use of such applications on Android devices (such as smartphones), through dependency trees, which permit the optimization of the bytes code used in an application, thus increasing the speed and value of the application. The '750 patent covers such optimization techniques, is valid and has been infringed by the manufacturing defendants."  *Id.*, ¶ 13.

19

20

21

22

23  - "Together, HTC, Motorola and Samsung sell in the United States more than 90% of the mobile phones that use Google's Android operating system and more than 75% of all electronic devices (both mobile phones and tablets) that utilize the Android operating system."  *Id.*, ¶ 6.

24

25  - "The manufacturing defendants dominate the sale of Android-based products in the United States. As mobile phone suppliers that use the Android operating systems, HTC reportedly sells 41%, Motorola 35% and Samsung 17% of all Android-based mobile phones sold in the United States."  *Id.*, ¶ 12.

26

27

28

- As a result, "Defendants HTC, Motorola and Samsung…are…an important part of the Android mobile phone and tablet business requiring a license from Cascades under its patented technology. The manufacturing defendants constitute nearly the total demand for the licensing of Cascades' patented technology and collectively enjoy substantial market power; together, they have exercised their power to control the acceptance and terms and conditions of licenses from Cascades." *Id.*, ¶ 72.

- "RPX has obtained monopsony power over the relevant market by entering into membership agreements that make it the negotiating or purchasing agent for the manufacturing defendants who collectively control more than 90% of the mobile phone business using the Android operating system and 75% of the combined mobile phone and tablet business.  RPX has used that monopsony power to deprive Cascades of the licenses of the '750 patent that it otherwise would have entered into at competitive market rates." *Id.*, ¶ 88.

Thus, despite boilerplate allusions to a broader market for all of Cascades' Elbrus patents, it is beyond dispute that Cascades only specifically alleges Defendants' market power in a single "relevant market"—the supposed market for the '750 Patent as allegedly used in the Android operating system.  These are the relevant market allegations on which the Court relied in sustaining Cascades' current Complaint.  *See* Dkt. No. 119 (Order on Motion to Dismiss Amended Complaint) at pp. 24, 26 (relying on allegations about relevant Android market).  But the non-infringement verdict establishes that *there is no market* for the '750 Patent.  *See, e.g., Soundview I*, 281 F. Supp. 2d. at 402 (rejecting the argument that there is a market for a non-infringed patent); *Soundview II*, 2005 WL 1661696 at *9 ("licensing settlements reached with other manufacturers prior to litigation could not establish a 'market for licenses'" for a non-infringed patent).  And without the '750 Patent, Cascades does not allege market power in *any* relevant market.  Because this is an essential element of Cascades' monopsonization and rule of reason claims, those claims must be dismissed.

E.    Cascades Has Failed To Plead A Plausible Conspiracy or Monopsonization Claim With Respect To The '130 Patent, Or Any Other Elbrus Patents.

As set forth above, when the '750 Patent is removed from the ambit of Cascades' claims—as it must be under the doctrine of antitrust standing—Cascades' claims fall apart.

1    Without the '750 Patent, Cascades fails to allege a plausible conspiracy that makes

2    economic sense, and fails to allege that Defendants had market power in a relevant market.

3          Not surprisingly, then, Cascades has already indicated that it will attempt to

4    abandon the '750 Patent and Android operating system as the crux of its antitrust claims,

5    and try to refocus this case on another Elbrus patent, or on the Elbrus portfolio as a whole.

6    In recent  statements to the Court, for example, Cascades has made much of a pending

7    patent infringement suit against Samsung regarding another Elbrus patent, the '130 Patent

8    concerning DRAM memory chips, even taking the position that this patent is "vastly more

9    important" than the '750 Patent.  *See e.g.,* Dkt. No. 175 (Oct. 9, 2015 CMC Statement);

10   Dkt. No. 169 (Aug. 21, 2015 CMC Statement).

11         However, any attempt by Cascades to shift the focus of this litigation to another

12   Elbrus patent, or to the Elbrus portfolio as a whole, would directly contradict its existing

13   allegations that the '750 Patent was the *exclusive motivation* for the alleged antitrust

14   violation, and was the *sole* relevant market in which the Defendants exercised the requisite

15   market power.  *See* Section II.D, *supra* (summarizing relevant allegations).  Indeed, the

16   Court relied on these '750-specific allegations in sustaining Cascades' current Complaint.

17   *See, e.g.,* Dkt. No 119 (Order Denying Motions to Dismiss First Amended Complaint) at

18   14:8-10 ("Plainly, the conspiracy alleged by Cascades makes economic sense because it

19   would permit potential licensees of the '750 Patent to realize RPX's publically stated

20   promise of "wholesale" pricing, provided they refrained from competitively bidding

21   against each other"); *id.* at 24:3-6 ("Here, the Manufacturing Defendants allegedly

22   comprise between 75 and 90 percent of at least the relevant submarket of buyers of

23   licenses under the '750 Patent. That suffices to establish a plausible market, sufficient to

24   survive a Rule 12(b)(6) motion.").

25         Thus, even if the Court had not already ruled that Cascades may not further amend

26   its Complaint, *see* Dkt. No. 179 (Case Management and Pretrial Order), Cascades could

27   not contradict its existing theory based on the '750 Patent—a theory it used to survive a

28   prior motion to dismiss—merely because subsequent developments have revealed that

1   theory to be baseless.  *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("absent

2   any good explanation, a party should not be allowed to gain an advantage by litigation on

3   one theory, and then seek an inconsistent advantage by pursuing an incompatible theory.")

4   (internal quotes omitted).

5        In any event, the Complaint lacks een the most basic allegations necessary to

6   support an antitrust violation based on the '130 Patent, or any other Elbrus patent, or the

7   Elbrus portfolio as a whole.  For example, to state a viable antitrust claim, Cascades "must

8   not merely allege conduct that is conceivable but must instead allege enough facts to state

9   a claim to relief that is plausible on its face."  *In re Lithium Ion Batteries Antitrust Litig.*,

10  2014 U.S. Dist. LEXIS 7516 at *64 (N.D. Cal. Jan. 21, 2014) (internal quotations omitted)

11  (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d

12  929 (2007)).  To meet this plausibility standard, Cascades' complaint must, among other

13  things, state "who, did what, to whom (or with whom), where and when?"—*i.e.*, the

14  "specific time, place or person involved in the alleged conspiracies."  *Kendall v. Visa*

15  *U.S.A., Inc.*, 518 F.3d 1042, 1047-1048 (9th Cir. 2008).  As explained above, Cascades is

16  further "required to allege that each individual defendant joined the conspiracy and played

17  some role in it because, at the heart of an antitrust conspiracy is an agreement and a

18  conscious decision by each defendant to join it."  *Lithium Ion Batteries*,  2014 U.S. Dist.

19  LEXIS 7516 at *38.  And Cascades must explain why any alleged antitrust violation would

20  have been economically rational.  *Adaptive Power Solutions*, 141 F.3d at 952 ("Antitrust

21  claims must make economic sense").

22        Without the '750 Patent, Cascades meets *none* of these pleading requirements.  The

23  Complaint is devoid of even a single reference to *any* anticompetitive conduct directed at

24  or relating to the '130 Patent or DRAM memory chips, or any other Elbrus patent, or the

25  Elbrus portfolio as a whole.  And this is not surprising, because as the Complaint explicitly

26  alleges, the '750 Patent was the *only* patent in the Elbrus portfolio that all of the

27  Defendants "specifically needed access to and were already utilizing."  Amended

28  Complaint, ¶ 19.  Indeed, Cascades' recent focus on the '130 DRAM Patent as the

1   centerpiece of the alleged antitrust violation is particularly unfounded given the

2   Complaint's acknowledgement that only one of the alleged conspirators—Samsung—*even*

3   *manufactures DRAM.  See id.,* ¶ 46 ("the '750 patent is the primary Cascades/Elbrus patent

4   presently of interest to the defendants," though "Samsung infringes at least one other

5   patent relating to its DRAM business").[2]

6          Further, as explained above, the Complaint's existing explanation for why the

7   alleged antitrust violation "makes economic sense" is that *all* of the manufacturing

8   Defendants needed the '750 Patent—and *only* the '750 Patent—to compete with each other

9   in the sale of Android-based mobile devices.   The Complaint alleges no collective

10  competitive need for any of the *other* Elbrus patents, or for the Elbrus portfolio as a whole.

11  Indeed, with respect to the '130 Patent, the Complaint states that exactly the opposite is

12  true:  Samsung is the only alleged conspirator who manufactured DRAM, and therefore the

13  only alleged conspirator who could have possibly infringed the '130 Patent.  Yet there is

14  not a single specific allegation in the Complaint about *anything* done or said by Samsung,

15  much less any alleged acts in furtherance of a '130 Patent conspiracy.  And indeed, such a

16  conspiracy would not make economic sense, because Samsung would have nothing to gain

17  from conspiring with companies that did not need to license the '130 Patent.  Likewise, the

18  other alleged conspirators would have nothing to gain from boycotting a patent that they

19  clearly were not infringing, because they did not even manufacture the relevant product.

20         Similarly, Cascades fails to plead that Defendants had market power with respect to

21  the '130 Patent, or any other non-'750 Elbrus patent, or the Elbrus portfolio as a whole.

22  Far from having "market power" in the markets for the '130 Patent or DRAM memory

23  chips, the Complaint makes clear that only one of the Defendants, Samsung, even arguably

24

---

25  [2]      Indeed, it is difficult to see how Cascades could allege a plausible conspiracy with
         respect to a patent for which there is only a single potential "conspirator."  *See*

26       *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769 (1984) (an

27       antitrust conspiracy claim requires "*two or more entities* that previously pursued
         their own interests separately…combining to act as one for their common benefit.")

28       (emphasis added).

1   *participated* in those markets.  This is in direct contrast to Cascades' existing allegations

2   regarding Defendants' market participation and market power with respect to the '750

3   Patent and the Android operating system—allegations on which the Court relied in

4   sustaining Cascades' operative complaint.  *See, e.g.,* Dkt. No. 119 at 24:3-6 ("Here, the

5   Manufacturing Defendants allegedly comprise between 75 and 90 percent of at least the

6   relevant submarket of buyers of licenses under the '750 Patent. That suffices to establish a

7   plausible market, sufficient to survive a Rule 12(b)(6) motion."); Dkt. No. 103 (Cascades'

8   Combined Response to Motions to Dismiss) at 7 (explaining that each of Samsung, HTC

9   and Motorola "is a competitor of the other two in the sale of Android operated cell phones

10  and/or tablets"); *accord* Amended Complaint, ¶ 38(e).

11       Cascades' inability to allege market power for patents other than the '750 is fatal

12  both to its conspiracy claims under a "rule of reason" theory and its monopsonization

13  claim.  *See, e.g.,* Dkt. No. 93 (Order Dismissing Cascades' original Complaint) at 14

14  ("Under the rule of reason, a plaintiff must plead that the challenged agreement, by virtue

15  of the defendants' market power, was unreasonably restrictive of competition in a relevant

16  market.") (citing *Nat'l Soc. of Prof'l Engineers v. United States*, 435 U.S. 679, 690

17  (1978));  *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 391 (1956)

18  (defining monopoly power as "the power to control prices or exclude competition" in the

19  relevant market).

20       Finally, and relatedly, because Cascades does not allege that the manufacturing

21  defendants—Samsung, HTC, and Motorola—were direct competitors in any market other

22  than the market for the '750 Patent as used in the Android operating system, Cascades

23  cannot maintain a per se antitrust conspiracy claim based on any other Elbrus patent.  *See,*

24  *e.g., NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128 (1998) (the per se rule for group boycotts

25  should be limited to cases "involving horizontal agreements among direct competitors.");

26  *Nova Designs, Inc. v. Scuba Retailers Ass'n,* 202 F.3d 1088, 1092 (9th Cir. 2000) ("Since

27  PADI and Rodale are not competitors, the district court correctly concluded that the *per se*

28  rule for group boycotts should not apply to the Rodale-PADI agreement.").

### III. <u>CONCLUSION</u>

By Cascades' own allegations and admissions in this case (and others), the '750 Patent was the only patent the alleged conspirators needed, the only patent Cascades wanted to license, and the only patent to which Cascades ascribed value. Cascades alleges that it was Defendants' supposed common need for the '750 Patent that provided the economic motivation for the alleged conspiracy, and that Defendants used their "market power" in the market for the '750 Patent to effect the conspiracy. In short, all of Cascades' claims in this case depend on the premise that the alleged conspirators were infringing the '750 Patent, and therefore, absent an antitrust violation, the alleged conspirators needed a license from Cascades.

As confirmed by the patent jury's non-infringement verdict, however, that premise is false. Cascades' inability to obtain a license of the '750 Patent (and therefore the other, independently valueless Elbrus patents) was proximately caused, not by any antitrust violation, but by the fact that the Defendants were not infringing the '750 Patent, and therefore did not need a license. As a result, Cascades lacks standing to maintain this antitrust case, and the Court should dismiss all of its claims with prejudice. Alternatively, if the Court finds that the Complaint plausibly alleges a conspiracy directed at patents other than the '750 Patent, the Court should enter an order barring Plaintiff from seeking any relief based on the non-infringed '750 Patent.

1  Dated:  November 3, 2015

2                                      Respectfully submitted.

3

4                                      SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
                                       4 Embarcadero Center, 17th Floor
5                                      San Francisco, CA  94111
                                       Telephone:  (415) 434-9100
6                                      Facsimile:   (415) 434-3947
                                       mscarborough@sheppardmullin.com
7

8
                                       By      _____/s/ Michael W. Scarborough_____
9                                                   MICHAEL W. SCARBOROUGH
10                                                    Attorneys for Defendant
                                            SAMSUNG ELECTRONICS CO., LTD.
11

12

13                                     LATHAM & WATKINS LLP
                                       505 Montgomery Street, Suite 2000
14                                     San Francisco, California 94111-6538
                                       Telephone:  (415) 391-0600
15                                     Facsimile:  (415) 395-8095
                                       aaron.chiu@lw.com
16

17

18                                     By      _____/s/ Aaron T. Chiu_____
                                                      AARON T. CHIU
19                                                 Attorneys for Defendant
                                                   RPX CORPORATION
20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **E-FILING ATTESTATION**

I, Michael W. Scarborough, am the ECF User whose ID and password are being used to file this document.  In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that each of the signatories identified above has concurred in this filing.


_____*/s/ Michael W. Scarborough*_____
Michael W. Scarborough