1  SHEPPARD MULLIN RICHTER & HAMPTON LLP
      A Limited Liability Partnership
2     Including Professional Corporations
   GARY L. HALLING, Cal. Bar No. 66087
3  MICHAEL W. SCARBOROUGH, Cal. Bar No. 203524
   DYLAN I. BALLARD, Cal. Bar No. 253929
4  Four Embarcadero Center, 17th Floor
   San Francisco, California  94111-4106
5  Telephone:     415-434-9100
   Facsimile:     415-434-3947
6
   Attorneys for Defendant
7  SAMSUNG ELECTRONICS CO., LTD.

8  *Additional moving counsel on signature page*

9

10               UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12                    OAKLAND DIVISION

13

| 14 | CASCADES COMPUTER INNOVATION LLC, | Case No. 4:12-cv-01143 YGR |
|----|---|---|
| 15 | Plaintiff, | **DEFENDANTS' REPLY IN SUPPORT OF JOINT MOTION FOR JUDGMENT ON THE PLEADINGS** |
| 16 | | |
| 17 | v. | Date:         December 15, 2015 |
| 18 | RPX CORPORATION and SAMSUNG ELECTRONICS, CO., LTD. | Time:         2:00 p.m.<br>Judge:       Hon. Yvonne Gonzalez Rogers |
| 19 | Defendants. | Location:   Courtroom 1 |

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ............................................................................................... 1

II.  ARGUMENT ..................................................................................................... 3

    A.   Cascades Lacks Standing With Respect to the '750 Patent. ..................... 4

        1.   Cascades Ignores Its Own Admissions That The Non-Infringement Verdict Applies Equally to All Three Manufacturing Defendants ............... 4

        2.   Cascades Fails To Distinguish The Authorities Confirming That The Inability To License A Non-Infringed Patent Is Not An Antitrust Injury. ..................................................................................................... 6

    B.   Cascades Fails To State a Viable Antitrust Claim Based On The '130 Patent, Or The Elbrus Portfolio As A Whole. ........................................... 9

        1.   Cascades Does Not And Cannot Plead A Plausible Conspiracy That Makes Economic Sense With Respect to The '130 Patent Or The Elbrus Portfolio As a Whole. ............................................................. 9

        2.   Cascades Does Not And Cannot Allege That Defendants Have Market Power in A Market For The '130 Patent, or A Market For The Elbrus Portfolio As A Whole. ............................................. 12

    C.   Cascades Does Not Even Address Defendants' Alternative Argument That, At A Minimum, Cascades Should Be Barred From Seeking Relief Based On the '750 Patent. ......................................................................... 14

III. CONCLUSION ................................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

<u>Federal Cases</u>

*Bell Atl. Corp. v. Twombly*
    550 U.S. 544 (2007) .......................................................................................... 11

*Cafasso, U.S. ex rel. v. General Dynamics C4 Systems, Inc.*
    637 F.3d 1047 (9th Cir. 2011).............................................................................. 3

*Jones Knitting Corp. v. Morgan*
    244 F. Supp. 235 (E.D. Pa. 1965) ....................................................................... 7

*Kendall v. Visa U.S.A., Inc.*
    518 F.3d 1042 (9th Cir. 2008).............................................................................11

*In re Lithium Ion Batteries Antitrust Litig.*
    2014 U.S. Dist. LEXIS 7516 (N.D. Cal. Jan. 21, 2014) ...................................... 14

*Nat'l Collegiate Athletic Assn. v. Bd. of Regents of Univ. of Okla.*
    468 U.S. 85 (1984) ............................................................................................ 13

*Newcal Indus. v. Ikon Office Solution*
    513 F.3d 1038 (9th Cir. 2008)............................................................................ 13

*Scott v. Kuhlmann*
    746 F.2d 1377 (9th Cir. 1984)............................................................................. 4

*Scott v. Pasadena Unified Sch. Dist.*
    306 F.3d 646 (9th Cir. 2002) ............................................................................... 8

*Sony Electronics v. Soundview Technologies Inc.*
    281 F. Supp. 2d. 399 (D. Conn. 2003) ("*Soundview I*") ........................................ 7

*Sony Electronics, Inc. v. Soundview Technologies, Inc.*
    2005 WL 1661696 (D. Conn. July 13, 2005) ("*Soundview II*")............................... 8

*Sprewell v. Golden State Warriors*
    266 F.3d 979 (9th Cir. 2001).......................................................................... 3, 6, 9

<u>Federal Rules of Civil Procedure</u>

    Rule 12(b)(6) ................................................................................................ 3, 13
    Rule 12(c) .......................................................................................................... 3

<u>Other Authorities</u>

Tashima & Wagstaffe, RUTTER GROUP PRACTICE GUIDE: FEDERAL CIVIL PROCEDURE
    BEFORE TRIAL, Chapter 9, ¶ 9:319 (2015) ............................................................ 3

## I.      **INTRODUCTION**

Cascades devotes much of its opposition to cataloguing various "references" in its Amended Complaint to patents other than the '750 Patent.  Indeed, as Cascades points out, the Amended Complaint repeatedly asserts that the alleged conspiracy was directed at and affected the entire Elbrus portfolio, not just the '750 Patent.  But that is all these are—bare assertions.  And as this Court held in dismissing Cascades' original Complaint, to state a viable antitrust claim Cascades must do much more than provide "threadbare recitals of conspiracy."  *See* Dkt. No. 93 (Order Dismissing Original Complaint) at 9.  Among other things, Cascades must explain why the alleged conspiracy is facially plausible and economically rational, and how Defendants would have had sufficient market power to control a properly-alleged relevant market.

The Court has found that Cascades' Amended Complaint (unlike the original Complaint) satisfies these pleading requirements with respect to the '750 Patent.  Cascades alleges that all of the Defendants needed the '750 Patent, and thus had an incentive to collude to ensure that none of their competitors procured a necessary license while they did not.  And Cascades alleges that Defendants are some of the largest manufacturers of Android-based devices—the technology covered by the '750 Patent—and thus had significant power in the market for such devices.  *These* are the substantive details the Court found necessary to allege an antitrust claim.

But in the wake of the non-infringement verdict, which is properly considered on this pleadings motion, Cascades can no longer rely on the '750 Patent.  As a result, the Court must now take a fresh look at the Amended Complaint—*without* the critical '750 Patent—and determine whether Cascades has satisfied these same plausibility, economic rationality, and market power pleading requirements with respect to some *other* Elbrus patent, or with respect to the Elbrus portfolio as a whole.  Such an analysis reveals that, when Cascades can no longer rely on the '750 Patent, the Amended Complaint suffers from the same lack of substance identified by the Court in dismissing Cascades' original Complaint.  *See* Dkt. No. 93 at 9-10, 15, 19-20 (ruling that Complaint failed to satisfy substantive plausibility, economic rationality, and market power pleading requirements).

Cascades' opposition only confirms this conclusion.  *First*, Cascades contends that it can allege a plausible, economically rational conspiracy without the '750 Patent because the Court has previously ruled that the allegations in the Amended Complaint make "economic sense."  But Cascades omits the fact that the Court based this ruling on allegations (which the Court found lacking in the original Complaint) that all of the Defendants shared a common need *specifically* for the '750 Patent.  Indeed, Cascades alleges that the '750 Patent is the *only patent* in the Elbrus portfolio that all of the Defendants were using.  When the '750 Patent is excised from the Complaint, then, Cascades' ability to allege an economically rational conspiracy goes with it.

*Second*, Cascades says it can allege Defendants' "market power" in a relevant market other than the market for the '750 Patent.  But all Cascades can point to are boilerplate references in the Complaint to a supposed relevant market for the entire Elbrus portfolio.  Cascades does not and cannot allege how Defendants could have sufficient market power in such a market, especially in light of Cascades' express concession that none of the alleged conspirators were using *any* of the Elbrus patents other than the '750 Patent.  Cascades' only other argument is to claim that Samsung and *Hynix*—a non-party DRAM manufacturer—"have controlled over 65% of the DRAM market covered by the '130 Patent."  But this assertion (which appears nowhere in the Complaint) is irrelevant for the simple reason that Hynix is not an alleged conspirator.  The possibility that *non-conspirators* may have had power in markets for certain Elbrus patents obviously does not satisfy Cascades' obligation to allege that *Defendants* collectively had such power.

Further, Cascades has no meaningful response to Defendants' alternative argument that, at a minimum, the non-infringement verdict strips Cascades of standing to seek relief based on its inability to license the '750 Patent.  Cascades cannot seriously dispute that the non-infringement verdict applies to all Defendants—not just to Samsung—as its own pleadings and filings in the patent cases confirm that its theory of infringement for the '750 Patent is *identical* for all manufacturers of Android-based devices.  Cascades entirely ignores these filings, and instead relies on a single snippet of testimony from the Samsung patent trial indicating that Samsung "adapted" the Android operating system for use in its phones.  Crucially, however, Cascades does

1  not and cannot argue that this unspecified "adaptation" had *anything at all* to do with Cascades'

2  theory of infringement for the '750 Patent.

3        Cascades' only remaining argument is that it has standing because the '750 Patent was

4  "only" found to be non-infringed, not invalid.  But the *Soundview* cases are directly on point and

5  explicitly refute that argument by confirming the common sense principle that the inability to

6  license a *non-infringed* patent—regardless of whether the patent is valid—is not a cognizable

7  antitrust injury.  Cascades offers no serious response to this case law.

8  **II.**    **<u>ARGUMENT</u>**

9        As a threshold matter, Cascades incorrectly states that this motion for judgment on the

10 pleadings requires a showing that "there is no issue of material fact in dispute."  (Opp. at 3:5-10).

11 That is the standard for a motion for summary judgment.  In deciding this motion under Rule 12(c)

12 of the Federal Rules of Civil Procedure, by contrast, "the court applies the same standards

13 applicable to a Rule 12(b)(6) motion."  Tashima & Wagstaffe, RUTTER GROUP PRACTICE GUIDE:

14 FEDERAL CIVIL PROCEDURE BEFORE TRIAL, Ch. 9, ¶ 9:319 (2015); *see also Cafasso, U.S. ex rel. v.*

15 *General Dynamics C4 Systems, Inc.*, 637 F.3d 1047, 1054, n. 4 (9th Cir. 2011) ("Rule 12(c) is

16 functionally identical to Rule 12(b)(6).").

17       Thus, this pleadings motion should be granted if, after considering Cascades' allegations,

18 the non-infringement verdict, and all other judicially noticeable facts, the Court concludes that

19 Cascades fails to state a claim as a matter of law.  *See Cafasso*, 637 F.3d at 1054, n. 4 (*Twombly*

20 and *Iqbal* pleading standards apply equally on a 12(c) motion).  In making this determination, the

21 Court need not "accept as true allegations that contradict matters properly subject to judicial

22 notice," nor "allegations that are merely conclusory, unwarranted deductions of fact, or

23 unreasonable inferences."  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

24       This is one of those unusual—though certainly not unprecedented—situations where it is

25 necessary for the Court to reevaluate the legal sufficiency of a Complaint that was upheld on a

26 previous pleadings motion due to changed circumstances.  And an intervening jury verdict with

27 collateral estoppel effect—like the non-infringement verdict at issue here—is exactly the kind of

28 change in circumstances that is properly raised on a renewed pleadings motion.  *See Scott v.*

1    *Kuhlmann*, 746 F.2d 1377, 1378 (9th Cir. 1984) (a res judicata defense may be raised by pleadings

2    motion where defense raises no disputed issues of fact; court properly took judicial notice of

3    records from prior litigation).

4         In its opposition, Cascades appears to make two general arguments:  (1) that it has standing

5    to obtain relief based on the '750 Patent, notwithstanding the non-infringement verdict; and (2)

6    even if it lacks standing with respect to the '750 Patent, the Amended Complaint alleges a viable

7    antitrust violation with respect to the '130 Patent, or with respect to the Elbrus portfolio as a

8    whole.

9         **A.**     **Cascades Lacks Standing With Respect to the '750 Patent.**

10            1.    Cascades Ignores Its Own Admissions That The Non-Infringement Verdict
                    Applies Equally to All Three Manufacturing Defendants.

11

12        It is beyond dispute that the non-infringement verdict establishes that Samsung did not

13   infringe the '750 Patent, and thus had no need to negotiate a license of that patent with Cascades.

     Nevertheless, Cascades argues that the verdict establishes these facts *only* as to Samsung, and thus
14
     it remains possible that the other allegedly conspiring manufacturing Defendants in this case—
15
     which is to say, HTC and Motorola—*did* infringe the '750 Patent.  But in fact, the non-
16
     infringement verdict eliminates that possibility, because the theory of infringement that the jury
17
     rejected in the Samsung trial is *the very same theory* that Cascades asserted against HTC and
18
     Motorola.  Cascades knows this, as it is the one who asserted its identical theory of infringement
19
     against the manufacturing Defendants (and did so against two of those defendants—Samsung and
20
     Motorola—in the *same case*).
21
          Indeed, Cascades has already admitted as much.  In support of this motion, Defendants
22
     submitted several judicially noticeable filings and orders in Cascades' patent cases establishing
23
     that Cascades accused Samsung, HTC, and Motorola of infringing the '750 Patent in the same
24
     way.  Cascades completely ignores these documents.
25
          This includes Cascades' recent statement to the Court in its patent case against HTC
26
     confirming that it accused Samsung and HTC of using the same underlying "Android
27
     functionality," and therefore a jury finding that Samsung did not infringe the '750 Patent would
28

1   likely be dispositive of Cascades' case against HTC as well.  *See* Dkt. 187 (Defendants' Request

2   for Judicial Notice) ("RJN"), Ex. C (Cascades' and HTC's Motion for Stay of Proceedings).

3         Similarly, it is beyond dispute that Cascades asserted exactly the same theory of

4   infringement against Motorola—and indeed, Cascades sued Samsung and Motorola in a single

5   infringement action.  *See id.*, Ex. D (Cascades' Third Amended Complaint against Samsung and

6   Motorola) at ¶ 14 (alleging that Motorola's mobile devices violate the '750 Patent by using the

7   Dalvik JIT Compiler, and that "the claimed method is performed when a user of the cellular

8   phones operates the device for their intended purpose using the Android operating system"); *id.*,

9   Ex. E (Cascades' Opposition to Motion to Dismiss) at p. 9 ("Use of the method and, thus, direct

10  infringement, occurs when a user activates the DROID3 [a Motorola product] or Nexus S phone [a

11  Samsung product] which, in turn, activates the Dalvik Virtual Machine embedded in the phone.").

12        Cascades also ignores the patent Court's order ruling that Cascades' January 2014 license

13  agreement with Google and Motorola applies not just to Google and Motorola, but also precluded

14  Cascades from asserting infringement of the '750 Patent by *Samsung and HTC* after the date of

15  the license.  *See id.*, Ex. B (the "Exhaustion Order").  The Court reasoned that, because the Google

16  license resolves any potential future infringement of the '750 Patent by Google's Android

17  operating system, and the manufacturing Defendants were alleged to have infringed only because

18  their devices used the Android operating system, the license resolves any potential future

19  infringement by the manufacturing Defendants as well.  Such reasoning is only tenable because

20  the manufacturing Defendants were all alleged to have infringed the '750 Patent in the same way.

21  Accordingly, in making this ruling the Court explicitly found that Cascades' claim of infringement

22  against all of the manufacturing Defendants depends entirely "on the use of a feature of the

23  Android operating system called the Dalvik JIT Compiler," which, according to Cascades, is used

24  by all Android-based mobile devices running the relevant versions of Google's Android operating

25  system.  *See id.* at 2-4.

26        Finally, Cascades ignores the fact that, because of the identical infringement theory

27  asserted against all three manufacturers, Cascades' patent cases against Samsung, Motorola, and

28

1    HTC were consolidated for pretrial proceedings, and subject to a single claim construction order.

2    *See id.*, Ex. F (Claim Construction Order).

3         In the face of these judicially noticeable filings and orders, Cascades can only point to a

4    single snippet of testimony from the first Samsung trial in which an undisclosed witness

5    apparently indicated that Google's Android operating system had to be "appropriately modified to

6    be suitable for Samsung's hardware."  (Opp. at 11).  No context is provided for this statement,

7    much less any context that would suggest this statement is of consequence here.  Cascades offers

8    nothing to suggest that this type of "modification" was unique to Samsung, rather than a

9    modification that all manufacturers were required to perform to make Android compatible with

10   their mobile devices.  And even more importantly, Cascades offers nothing to suggest that the

11   "modification" performed by Samsung—whatever it was—has *anything at all to do* with the

12   "Dalvik JIT Compiler" that is covered by the '750 Patent.  The possibility that certain features of

13   the Android operating system may have been adapted for each manufacturer's hardware is

14   obviously irrelevant if those modifications had no effect on the specific feature of the Android

15   operating system that is allegedly covered by the '750 Patent.

16        If Cascades had information that refutes the extensive filings in the patent cases stating that

17   Cascades' theory of infringement is identical for all three of the manufacturing Defendants in this

18   case, it would have provided it.  The fact that Cascades instead attempts to sweep the issue under

19   the rug confirms that the pleadings and filings submitted by Defendants—which include

20   Cascades' own admissions—are correct.  Thus, in light of the jury's finding that *Samsung's* use of

21   the Android operating system does not infringe the '750 Patent, the only reasonable inference is

22   that *HTC's and Motorola's* identical use of the Android operating system likewise does not

23   infringe.  *See Sprewell*, 266 F.3d at 988 (on a pleadings motion the Court is only required to

24   indulge "reasonable inferences.").

25        2.   <u>Cascades Fails To Distinguish The Authorities Confirming That The
          Inability To License A Non-Infringed Patent Is Not An Antitrust Injury.</u>

26        In their opening brief, Defendants presented directly applicable case law holding that an

27   antitrust plaintiff's alleged inability to license a patent that is invalid *or* non-infringed is not a

28

-6-                                    Case No. 4:12-cv-01143 YGR

1   cognizable antitrust injury.  Cascades fails to distinguish these cases, and cannot identify a single

2   contrary authority.

3        First, Cascades says the *Jones Knitting* case is inapplicable because it involved a patent

4   that was found invalid, not non-infringed.  *See Jones Knitting Corp. v. Morgan*, 244 F. Supp. 235,

5   239 (E.D. Pa. 1965).  But the principle announced in *Jones Knitting* is that a plaintiff should not

6   be permitted to recover under an antitrust theory for a patent that holds no value to the defendant,

7   on the theory that any such recovery would amount to unjust enrichment.  *See id.* at 239 ("If by

8   some conceptual machination damage could be shown, it would be de minimus.  If, absent the

9   group boycott, it is reasonable to assume some one of the twelve would have taken a license and

10  thus paid royalties to Morgan, Morgan would have been unjustly enriched").  And that principle

11  applies to any valueless patent, regardless of whether it is valueless because it is invalid, or

12  because it is simply not infringed.

13       Indeed, the *Soundview* cases explicitly confirm this point by extending the principle

14  announced in *Jones Knitting* to non-infringed patents.  There was no suggestion in *Soundview* that

15  the patent at issue was invalid; nevertheless, the Court had no difficulty concluding that there was

16  no antitrust injury.  *See Sony Electronics v. Soundview Technologies Inc.*, 281 F. Supp. 2d. 399,

17  402 (D. Conn. 2003) ("*Soundview I*") ("The conclusion that the [defendants'] content blocking

18  technology did not infringe Soundview's patent…leads inexorably to the conclusion that a force

19  other than the antitrust violation fully accounts for the plaintiff's injury, thus foreclosing a

20  showing of antitrust injury.").

21       Cascades' attempt to distinguish the *Soundview* cases makes no sense.  Cascades focuses

22  on a sentence in the *Soundview* opinion explaining that, regardless of whether the alleged antitrust

23  conspiracy existed, the "proximate or legal cause" of Soundview's alleged injury was not the

24  conspiracy, but the fact that the defendants were not infringing and did not need a license.  *Id.* at

25  402.  Cascades contends that this principle does not apply here, because "the illegal agreement

26  amongst Samsung, RPX, and the other RPX members is the reason that Cascades could not license

27  this patent."  (Opp. at 10:8-17).  But that is exactly the point the *Soundview* court is making.  As a

28  legal matter, it does not matter whether the alleged "illegal agreement" was "one reason"

1   Defendants refused to take a license, because the "proximate or legal" reason for the inability to

2   obtain a license is simply that the Defendants did not need a license to a patent they were not

3   infringing.  *Id.* at 402.  That principle applies directly to this case, and confirms that Cascades is

4   foreclosed from establishing antitrust injury.  *Id.* at 402.

5           Cascades next appears to argue that, even if Defendants were not infringing the '750

6   Patent, the fact that RPX allegedly made a license offer on their behalf establishes that the Patent

7   still held value to them.  But as set forth in Defendants' opening brief, the *Soundview* decisions

8   directly refute that argument too, explaining that the existence of settlement agreements is

9   irrelevant to the antitrust injury inquiry.  *See id.* at 402-403 ("The decision of certain television

10  manufacturers to settle in the face of Soundview's aggressive pre-litigation assertions of the '584

11  patent's broad scope does not alter the stark fact that…the patented technology has been

12  determined not to be in use by any of the [defendants]"); *see also Sony Electronics, Inc. v.*

13  *Soundview Technologies, Inc.*,  2005 WL 1661696 at *9 (D. Conn. July 13, 2005) ("*Soundview*

14  *II*") ("the licensing settlements reached with other manufacturers prior to litigation could not

15  establish a 'market for licenses' supporting Soundview's antitrust claim.").   And if settlement

16  *agreements* are irrelevant to the antitrust injury inquiry, then settlement *offers* surely are irrelevant

17  as well.

18          Finally, Cascades appears to argue that, even if Defendants were not using the '750 Patent

19  at the time of the alleged negotiations, they still should have paid for a license in case they wanted

20  to use the '750 Patent "in the future."  (Opp. at 10:19-22).  But such conjecture about hypothetical

21  future infringement cannot establish antitrust standing, or even basic Article III standing.  *See*

22  *Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 656 (9th Cir. 2002) (for standing purposes, a

23  future injury must be "real and immediate, not conjectural or hypothetical").   And in any event,

24  the patent Court's Exhaustion Order completely precludes Cascades from accusing Defendants of

25  infringing the '750 Patent in the future.  *See* RJN, Ex. B.  Even if this were not true, it would defy

26  common sense to suppose that Defendants—who do not currently infringe the '750 Patent, and

27  have recently survived protracted litigation regarding the Patent's contours—will nonetheless

28  voluntarily begin infringing the '750 Patent at some point in the future.  *See Sprewell*, 266 F.3d at

988 (on a pleadings motion the Court need not accept as true "unwarranted deductions of fact, or unreasonable inferences.").

**B.** **Cascades Fails To State a Viable Antitrust Claim Based On The '130 Patent, Or The Elbrus Portfolio As A Whole.**

Cascades next argues that even if it lacks standing with respect to the '750 Patent, it has plead a viable antitrust violation with respect to the '130 Patent, or the Elbrus Portfolio as a whole. Cascades' primary support for this argument is a catalogue of "references" and paragraph cites from the Amended Complaint, which, it says, establish that "Cascades consistently references *all* of its patents and the adverse impact the antitrust violations had on its ability to license *all* its patents." (Opp. at 2:21-23) (emphasis in original).

In a sense, Cascades is correct: the Amended Complaint does repeatedly *reference* the entire Elbrus portfolio as the target of the alleged conspiracy. But merely *referring* to all of its patents is not nearly enough for Cascades to properly allege an antitrust violation with respect to those patents. Instead, Cascades must support its assertions of a portfolio-wide conspiracy with the same substantive plausibility, economic sense, and market power allegations that Cascades currently makes with respect to the '750 Patent. Cascades' opposition brief confirms that it is incapable of substantiating an antitrust violation by Defendants based on the '130 Patent, or the Elbrus portfolio as a whole.

1.   Cascades Does Not And Cannot Plead A Plausible Conspiracy That Makes Economic Sense With Respect To The '130 Patent Or The Elbrus Portfolio As a Whole.

In dismissing Cascades' original Complaint, this Court ruled, among other things, that Cascades had failed to plead a plausible conspiracy:

> Cascades alleges that the Manufacturing Defendants conspired, but Cascades does not answer any of the basic questions: who, did what, to whom (or with whom), where and when? Instead, the allegations in the Complaint consist primarily of threadbare recitals of conspiracy….Other than Cascades' allegation that negotiations with RPX broke down when one or more RPX members would not agree to fund the deal, all Cascades has alleged is parallel behavior. This is the sort of generic pleading—alleging misconduct against various defendants without specifics as to the role each played—that was rejected by *Twombly*.

(Dkt. No. 93 at 9-10) (internal quotations and citations omitted).

1    The Court further explained that Cascades had failed to "clarify why, absent a conspiracy,

2    it is economically irrational" for Defendants to independently refuse to pay for a license to

3    Cascades' patents:

4        Without clarification and specificity, the Court will not presume economic
         rationality where the circumstances giving rise to the lawsuit plausibly suggest

5        nothing more than a tactical ploy to regain economic leverage that Plaintiff lost in
         the licensing negotiations.

6    (*Id.* at 19-20); (*see also id.* at 17) (Cascades has provided insufficient facts from which to

7    plausibly infer that the reason it suffered this [alleged] harm is due to a conspiracy in a particular

8    market, rather than due to individual business disputes between independent actors.").

9        The Court subsequently found that Cascades had addressed this problem by providing

10   more substance in its Amended Complaint.  Specifically, the Court explained that:

11       [T]he conspiracy alleged by Cascades makes economic sense because it would
         permit *potential licensees of the '750 Patent* to realize RPX's publically stated

12       promise of "wholesale" pricing, provided they refrained from competitively
         bidding against each other and sent RPX to the market in their stead, where it

13       would be the sole viable purchaser…. [The Amended Complaint alleges] that *at
         least one Manufacturing Defendant in the market for the '750 Patent* expressly

14       declined…to engage in individual negotiations with Cascades.

15   (Dkt. No. 119 at 14) (emphasis added).

16       In other words, the Court adopted Cascades' explanation—which is set forth in full in

17   Defendants' opening brief—that it was economically rational for Samsung, HTC, and Motorola to

18   conspire because (1) they were all competitors "in the sale of Android operated cell phones and/or

19   tablets"; (2) they all "knew that use of the '750 patent technology improves the performance of

20   their Android operate devices"; and (3) each of them "knew that it would, therefore, be at a

21   competitive disadvantage vis-à-vis the other two manufacturing defendants if they licensed the

22   '750 patent but it did not."  *See* Dkt. No. 103 (Cascades' Combined Response to Motions to

23   Dismiss) at 6-7; *see also* Amended Complaint, ¶¶ 6, 38(e).

24       Thus, Cascades' explanation for why the alleged conspiracy made economic sense, as

25   adopted by the Court in approving the Amended Complaint, relies entirely on the premise that all

26   of the Defendants manufactured Android-based devices and therefore shared a common need for

27   the "'750 Patent technology."  Because we now know that the Defendants did *not*, in fact, need the

28

1   '750 Patent to manufacture their Android-based devices, Cascades' explanation falls apart.  And

2   most importantly, Cascades has nothing to replace it with, because it does not and cannot allege

3   that the "manufacturing Defendants"—Samsung, HTC, and Motorola—were competitors in the

4   sale of devices using the '130 Patent (as neither HTC nor Motorola manufactures DRAM), or any

5   other Elbrus patent besides the '750 Patent.  There is no economically rational explanation—and

6   the Amended Complaint offers none—for why Defendants would have conspired to lower the

7   price of a patent they were not collectively infringing.

8         Cascades first tries to sidestep this problem by advancing the clearly incorrect argument

9   that the requirement of alleging a plausible conspiracy that makes economic sense only applies at

10  the summary judgment stage.  This Court already rejected that argument in this litigation—in

11  accordance with extensive Supreme Court and Ninth Circuit authority—holding that, "[w]here the

12  facts alleged in the complaint demonstrate that an alleged conspiracy makes no economic sense,

13  the claim must be dismissed."  (Dkt. No. 93 at 17); *see also Kendall v. Visa U.S.A., Inc.*, 518 F.3d

14  1042, 1049 (9th Cir. 2008) ("Allegations of facts that could just as easily suggest rational, legal

15  business behavior by the defendants as they could suggest an illegal conspiracy are insufficient to

16  plead a violation of the antitrust laws.") (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553-556

17  & n.5 (2007)).

18        Cascades next points out that the Court upheld the plausibility and economic rationality of

19  the alleged conspiracy in approving the Amended Complaint.  But as set forth above, that ruling

20  was naturally based entirely on Cascades' proffered explanation for why the conspiracy makes

21  economic sense, which is that all of the manufacturing Defendants shared a common need for the

22  "'750 Patent technology"—a premise since refuted by the non-infringement verdict.

23        Finally, Cascades attempts to articulate a brand new explanation—which of course appears

24  nowhere in the Complaint—for why the alleged conspiracy, even without the '750 Patent,

25  somehow makes economic sense.  Cascades notes its allegation (which also appeared in the

26  dismissed original Complaint) that Cascades made an offer to each of the manufacturing

27  Defendants to license the entire Elbrus portfolio, and declares that it would have made no

28  economic sense for these Defendants "to refuse a license under all 38 patents for such a modest

1  price, especially for Samsung, which faced enormous liability under the '130 Patent."  (Opp. at

2  7:11-20).  But as Cascades alleges, the only "patent that RPX and the manufacturer defendants

3  specifically needed access to and were already utilizing was the '750 patent."  Amended

4  Complaint, ¶ 19.  Thus, even putting aside Cascades' "modest price" assumption, Cascades does

5  not (and cannot) answer the basic question of why it would have made sense for these Defendants

6  to conspire to lower the price of patents they undisputedly were not using. [1]  The fact that *one*

7  Defendant, Samsung, is alleged to have infringed *one* other Elbrus patent, the '130 Patent, does

8  not answer the question, because there is no explanation for why it would have made sense for

9  Samsung to conspire with respect to that patent with other manufacturers who, as even Cascades

10  concedes, were *not* using the '130 Patent.  Because Cascades has no answer to these foundational

11  questions, all of its claims must be dismissed.

12              2.    <u>Cascades Does Not And Cannot Allege That Defendants Have Market Power in A Market For The '130 Patent, or A Market For The Elbrus Portfolio As A Whole.</u>

14       In dismissing Cascades' original Complaint, the Court also found that Cascades had failed

15  to allege an appropriate relevant market in which Defendants collectively hold sufficient market

16  power:

> While Cascades does not need to limit its antitrust allegations to a single market or sub-market, it does need to specify the market or markets in which the allegedly anticompetitive acts occurred (and the effects of those anticompetitive acts on those specific markets).  Otherwise, it is impossible to determine the actual effect the alleged challenged conduct has had on competition.  Without a coherent market definition, the Complaint necessarily fails to allege a contract, combination, or conspiracy in restraint of trade or monopolization of the relevant market.  To survive a motion to dismiss, Cascades must provide sufficient specificity of each alleged violation in each alleged market or sub-market.

22  (Dkt. No. 93 at 15).

---

[1] Cascades points to its allegation that Intel took a license to the entire Elbrus portfolio in exchange for a "seven-figure lump-sum payment," as proof that the Elbrus portfolio is "extremely valuable."  (Opp. at 2) (quoting Amended Complaint, ¶ 11).  But of course the quoted allegation, if proven, could establish only that *Intel*—which is not a manufacturer of Android-based mobile devices—found it worthwhile to purchase a license from Cascades.  The allegation says nothing at all about the value of the portfolio to Defendants—much less the value of the portfolio to Defendants after the '750 Patent is excluded.

1    The Court later found that Cascades had resolved this problem by providing more

2    substance in its Amended Complaint, observing that:

3        [T]he Manufacturing Defendants allegedly comprise between 75 and 90 percent of
         at least the relevant submarket of buyers of licenses under the '750 Patent.  That
4        suffices to establish a plausible market, sufficient to survive a Rule 12(b)(6)
         motion.

5
     (Dkt. No. 119 at 24).  Thus, while the Amended Complaint purports to allege two "relevant
6
     markets"—a market for all of the Elbrus patents, and a "submarket" for the '750 Patent alone—the
7
     Court found, consistent with Cascades' allegations, only that Defendants had sufficient market
8
     power in the "submarket" for the '750 Patent.  Because the non-infringement verdict establishes
9
     that there was no market for the '750 Patent—at least, not among the manufacturers of Android-
10
     based devices named as Defendants—Cascades fails to allege Defendants' market power in *any*
11
     relevant market.
12
          In its opposition brief, Cascades contends that this market power question is "a factual
13
     inquiry ordinarily reserved for the jury."  (Opp. at 4).  But most facts are ultimately "reserved for
14
     the jury"; that does not relieve Cascades of its obligation to properly *plead* Defendants' market
15
     power in a cognizable relevant market in the first instance.  *See Newcal Indus. v. Ikon Office*
16
     *Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008).  And as this Court has already ruled in this
17
     litigation, it is beyond dispute that Cascades must allege Defendants' market power in a well-
18
     defined relevant market to maintain an antitrust claim under a "rule of reason" theory.[2]  (*See* Dkt.
19
     No. 93 at 14) ("Under the rule of reason, a plaintiff must plead that the challenged agreement, by
20
     virtue of the defendants' market power, was unreasonably restrictive of competition in a relevant
21
     market") (collecting authorities).
22
          Cascades next appears to argue that it can allege sufficient market power in a relevant
23
     market for DRAM memory chips, the technology covered by the '130 Patent, because Samsung
24
     and another RPX member, Hynix Semiconductor, have a "combined market share" in that market
25
     that "has exceeded 65%."  (Opp. at 1).  But this assertion appears nowhere in the Amended
26    _____

27   [2] Cascades cites *Nat'l Collegiate Athletic Assn. v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85,
     109-110 (1984), for the proposition that "market power" need not be proved to establish a *per se*
28   theory.  (Opp. at 4).  Defendants have not contended otherwise.

1   Complaint, nor is there even a reference to a relevant market for DRAM memory chips or the '130

2   Patent.  Instead, the Amended Complaint's substantive allegations exclusively concern the '750

3   Patent and its supposed use in Android-based mobile devices.

4          More importantly, nowhere does the Complaint even remotely allege that *Hynix*

5   *Semiconductor* participated in the alleged conspiracy.  *See In re Lithium Ion Batteries Antitrust*

6   *Litig.*, 2014 U.S. Dist. LEXIS 7516 (N.D. Cal. Jan. 21, 2014) ("Plaintiffs are required to allege

7   that each individual defendant joined the conspiracy and played some role in it because, at the

8   heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join

9   it.") (internal quotations omitted).  Thus, it is irrelevant whether one alleged conspirator, Samsung,

10  and a non-conspirator, Hynix, jointly controlled some percentage of the DRAM market.  The only

11  inquiry here is whether the *manufacturing Defendants*—Samsung, HTC, and Motorola—had

12  market power in that market.  *See* Dkt. No. 93 at 14 (Cascades must allege that "the challenged

13  agreement, *by virtue of the defendants' market power*, was unreasonably restrictive of competition

14  in a relevant market") (emphasis added).  It is undisputed that they did not.

15         Finally, Cascades observes that its Amended Complaint refers to a "relevant market" for

16  the entire Elbrus portfolio.  *See* Amended Complaint, ¶ 92.  But merely *referring* to a relevant

17  market is not the same thing as adequately pleading one.  And Cascades cannot point to a single

18  allegation indicating that Defendants had *market power* in a market for the entire Elbrus portfolio.

19  The reason is simple:  as Cascades admits, the '750 Patent was the *only* patent in the Elbrus

20  portfolio that all Defendants were allegedly using and "needed access to."  *See* Amended

21  Complaint, ¶ 19.  Because the Defendants were not even *using* any of the other Elbrus patents,

22  they could not have possessed *any* market power with respect to those patents, much less

23  sufficient market power to establish an antitrust violation.

24         **C.    Cascades Does Not Even Address Defendants' Alternative Argument That, At
               A Minimum, Cascades Should Be Barred From Seeking Relief Based On the**
25             **'750 Patent.**

26         Even if the Court concludes after reevaluating the Amended Complaint that Cascades has

27  substantively alleged an antitrust violation with respect to some other Elbrus patent, or the Elbrus

28  portfolio as a whole, it should at a minimum issue an order that Cascades lacks antitrust standing

1    to maintain a claim for relief with respect to the non-infringed '750 Patent.  Crucially, Cascades

2    does not even respond to this alternative request.

3    **III.    <u>CONCLUSION</u>**

4          While Cascades' Amended Complaint is full of boilerplate concerning other patents, its

5    only *substantive* allegations—which are the only allegations that matter on this pleadings

6    motion—*exclusively* concern the '750 Patent.  When one reviews the Amended Complaint without

7    those allegations—which have now been refuted by the non-infringement verdict—one can only

8    reach the same conclusion the Court reached in dismissing the original Complaint:  namely, that

9    Cascades fails to plead a plausible, economically rational conspiracy, or allege Defendants' market

10   power in an appropriate relevant market.  This complete lack of substance concerning other

11   patents is fatal to Cascades' case.

12

13   Dated:  December 1, 2015

14                                  Respectfully submitted,

15

16                                  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
                                    4 Embarcadero Center, 17th Floor
17                                  San Francisco, CA  94111
                                    Telephone:  (415) 434-9100
18                                  Facsimile:  (415) 434-3947
                                    mscarborough@sheppardmullin.com
19

20

21                                  By    _____/s/ Michael W. Scarborough_____
                                                 MICHAEL W. SCARBOROUGH
22                                              Attorneys for Defendant
                                         SAMSUNG ELECTRONICS CO., LTD.
23

24

25

26

27

28

LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Telephone:  (415) 391-0600
Facsimile:  (415) 395-8095
aaron.chiu@lw.com


By _____ */s/ Aaron T. Chiu*
                            AARON T. CHIU
                        Attorneys for Defendant
                        RPX CORPORATION


## E-FILING ATTESTATION

I, Michael W. Scarborough, am the ECF User whose ID and password are being used to file this document.  In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that each of the signatories identified above has concurred in this filing.


_____ */s/ Michael W. Scarborough*
                       Michael W. Scarborough